**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

<div style="border: dotted;">

360 DEGREE EDUCATION, LLC,
d/b/a Cortiva Institute School of Beauty, Health,
and Wellness,

and

THE COALITION FOR CAREER SCHOOLS,

               Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF
EDUCATION;

and

MIGUEL CARDONA, in his official capacity as
Secretary of Education,

           Defendants.

</div>

Case No. _____

## **COMPLAINT**

Effective July 1, 2024, the U.S. Department of Education will enforce a new regulation to close off federal student aid for career-education programs that required even one hour more than the State's minimum-hour requirement for licensure in the relevant field. For 30 years, students have been able to obtain federal student aid (grants and subsidized loans) for career-education programs up to 150% of the State's minimum—commonly called the "150% Rule." So, for instance, if a State requires 500 hours of training to be a licensed massage therapist, a student may obtain federal student aid for a massage program of 500 hours, 750 hours, or anywhere in between.

Not anymore. The Department's new rule, if it takes effect, will allow a student to access federal student aid only to attend a career-education program that offers the bare-minimum number of hours required for licensure.

This "Bare-Minimum Rule" should not take effect because it is substantively and procedurally invalid. It exceeds the agency's statutory authority by exercising control over programs of instruction that the Higher Education Act of 1965, as amended, ("HEA") reserves to the States, *see* 20 U.S.C. §§ 3403(a)–(b); it presents a textbook case of "arbitrary and capricious" rulemaking, *e.g.*, *Louisiana v. United States Dep't of Energy*, 90 F.4th 461, 469–77 (5th Cir. 2024); and it fails to reflect a logical outgrowth of the proposed rule that went through the statutorily mandated negotiated rulemaking process, *see Mock v. Garland*, 75 F.4th 563, 584 (5th Cir. 2023).[1]

Therefore, Plaintiffs 360 DEGREE EDUCATION, LLC d/b/a CORTIVA INSTITUTE SCHOOL OF BEAUTY, HEALTH AND WELLNESS ("Cortiva") and THE COALITION FOR CAREER SCHOOLS (the "Coalition") bring this action for declaratory and equitable relief against Defendants the U.S. DEPARTMENT OF EDUCATION (the "Department") and the Honorable MIGUEL CARDONA, in his official capacity as the Secretary of the Department (the "Secretary") and allege as follows:

## NATURE OF THE CASE

1.     Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. §§ 551–706 (the "APA") to challenge certain provisions of the Department's Final Rule which unlawfully assert control over programs of instruction for gainful employment[2] under Title IV of

---

[1] *Id.* ("[T]he logical-outgrowth test requires that the proposed rule fairly apprises interested persons of the subjects and issues the agency is considering. But merely informing the public, in a generic sense, of the broad subjects and issues the Final Rule would address is insufficient. Instead, the Proposed and Final Rule must be alike in kind so that commentators could have reasonably anticipated the Final Rule.") (quotation omitted).

[2] Gainful Employment ("GE") programs are referenced at 20 U.S.C. §§ 1002(b)(1)(A)(i) and (c)(1)(A), but are not defined. The Department recently conducted a rulemaking on defining "gainful employment," (*see Financial Value Transparency & Gainful Employment,* 88 Fed. Reg. 70,004 (Oct. 10, 2023), which is subject to two litigation

the HEA, cut off access to federal student loans and Pell Grants for students seeking to jump-start their careers, and give rise to a wide array of perverse and unintended consequences. *See Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB)*, 88 Fed. Reg. 74,568 (Oct. 31, 2023) (the "Final Rule"). Plaintiffs challenge only certain portions of the Final Rule, which allow federal student aid only for career programs at the State's bare-minimum hours requirement. Those portions are described specifically at Paragraphs 65–66, and Plaintiffs use the shorthand "Bare-Minimum Rule" herein to refer to those portions for ease of reference.

2.      The Bare-Minimum Rule will take effect on July 1, 2024, unless this Court provides preliminary relief to set it aside or to delay its effective date. *See* 5 U.S.C. § 706.

3.      If the Bare-Minimum Rule does take effect, it will dramatically alter the ability of career schools to prepare their students for their careers after program completion. For schools like Cortiva and programs like its Professional Massage Therapy Program ("PMT Program"), which it offers at its Arlington, Texas, location, the Bare-Minimum Rule cuts off students' access to Pell Grants—which need not be repaid, but have a minimum-hours requirement of 600 hours—and forces them either to forgo their chosen career or to take out federal student loans—specifically Direct Loans, with interest, which must be repaid. That counter-productive result is not good for students, for schools, for the Department's stated goals, or for a massage industry in which the Federal Government's own Bureau of Labor Statistics projects 18% growth in employment for massage therapists between 2022 and 2032.[3]

---

challenges in this Court. *See Ogle Sch. Mgmt., LLC v. U.S. Dep't of Educ.*, 4:24-cv-00259-O (N.D. Tex. filed Mar. 20, 2024) and *Am. Assoc. of Cosmetology Schs. v. U.S. Dep't of Educ.*, 4:23-cv-01267-O (N.D. Tex. filed Dec. 22, 2023).
[3] *See* Bureau of Labor Statistics, Occupational Outlook Handbook: Massage Therapists (Apr. 17, 2024), https://www.bls.gov/ooh/healthcare/massage-therapists.htm.

4.      The Bare-Minimum Rule also upends thirty years of regulatory certainty. In 1994, the Department first promulgated the 150% Rule, *see Student Assistance General Provisions; Federal Family Education Loan Programs; Federal Pell Grant Program*, 59 Fed. Reg. 22,387 (Apr. 29, 1994), allowing federal student loans or grants to be used for career education programs up to 150% of a State's minimum *clock-hour* requirement for licensure to practice certain occupations such as vocational nursing, cosmetology, or massage therapy. A clock-hour program is distinct from a credit-hour program; clock-hour programs are based on the total number of actual hours a student spends attending class or other instruction to complete a program of study, while credit-hour programs are based on the credit a student receives for completing various courses based on their workload, regardless of the actual time spent in instruction.

5.      Under the 150% Rule—which has always applied to clock-hour programs, but never to credit-hour programs—institutions of higher education that provide career education subject to state minimum-hours requirement have been able to conceive, design, and offer career programs within that 100–150% range to ensure that their students satisfy the minimum requirements for licensure, that they are well-prepared to perform in their chosen fields, and that they have the best opportunity to obtain gainful employment.

6.      Congress made clear in the HEA that States and schools are primarily responsible for these judgments:

**(a) Rights of local governments and educational institutions**

It is the intention of the Congress in the establishment of the Department to protect the rights of State and local governments and public and private educational institutions in the areas of educational policies and administration of programs and to strengthen and improve the control of such governments and institutions over their own educational programs and policies. The establishment of the Department of Education shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the States.

**(b) Curriculum, administration, and personnel; library resources**

***No provision of a program administered by the Secretary or by any other officer of the Department shall be construed to authorize the Secretary or any such officer to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system***, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system, ***except to the extent authorized by law***.

20 U.S.C. §§ 3403(a)–(b) (emphasis added).

7.      The Department recognized this limitation on its authority when it first promulgated the 150% Rule in 1994:

The Secretary proposes to consider the relationship between the quantity of training provided in the program and entry-level requirements to be reasonable if the number of ***clock hours*** in the program does not exceed by more than 50 percent any State requirement for the minimum number of ***clock hours*** necessary to train the student in the occupation for which the program prepares the student.

59 Fed. Reg. 9,548 (emphasis added).

8.      The 150% Rule served as a buffer for the disparities among State minimum requirements to allow students to be able to move to different states and still qualify to practice their occupation in a different state.

9.      Against the backdrop of the HEA and the 150% Rule, States have generally established *minimum* requirements for licensure in professions like massage, cosmetology, and nursing, but left it to schools to design programs within the 100–150% range. For instance, the Texas Department of Licensing and Regulation ("TDLR") has established a minimum academic hours requirement of 500 hours for a Massage Therapist License in the State of Texas, 16 Tex. Admin. Code § 117.20(a)(8), which was last revised in 2017. Under the 150% Rule, Cortiva and other institutions in Texas may offer massage therapy programs up to 750 clock hours.

10.     Cortiva, for instance, offers a PMT Program in Arlington, Texas, which includes 24 semester credit hours or 600 instructional clock hours. That is comfortably within the 500–750-hour range created by Texas's 500-hour minimum for licensure as a massage therapist and the Department's long-standing 150% Rule. By setting the program length at 600 hours, Cortiva is able to provide students with training on the business-side of a career in massage therapy and ensure that its students who are eligible for Pell Grants (approximately 85% of enrollees)[4] can use them for the PMT Program instead of paying out of pocket or taking out less-favorable federal student loans.

11.     The Bare-Minimum Rule upends this workable regime and replaces it with an ill-conceived regime that threatens chaos for students, schools, and the industries that rely on them. The Court can and should set aside the Final Rule and preserve the *status quo*.

12.     ***First***, the Bare-Minimum Rule exceeds the Department's statutory authority and violates §§ 3403(a)–(b), where Congress made clear that States and schools have primary responsibility for programs and that the Department cannot "exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school" without express statutory authorization. *Id.* § 3403(b). The Department, for the first time, is purporting to regulate the length and content of both clock-hour and credit-hour programs without any statutory authority.

13.     ***Second***, the Department acted arbitrarily and capriciously in justifying the Bare-Minimum Rule on the grounds that it was simply deferring to the States, which had established

---

[4] From the Department's website: The Pell Grant is the largest federal grant program offered to undergraduates and is designed to assist students from low-income households. A Federal Pell Grant, unlike a loan, does not have to be repaid, except under certain circumstances. To qualify for a Pell Grant, a student must demonstrate financial need through the *Free Application for Federal Student Financial Aid* (FAFSA) form." *See* U.S. Dep't of Educ., Fed. Student Aid, Federal Pell Grant program definition, https://studentaid.gov/help-center/answers/article/federal-pell-grant-program.

their own hours requirements. *See* 88 Fed. Reg. 74,640. This explanation is irrational. The States have determined what they believe, in their judgment, should be the *minimum* hours for licensure in a particular career. The Bare-Minimum Rule treats that minimum as a *maximum* without adequate justifications. In other words, the States have set floors, and the Department is treating them like ceilings. That approach is particularly irrational since most if not all of the State minimums were established against the backdrop of the 150% Rule, meaning that States knew their laws would create a range and never expected that they would be construed as a one-size-fits-all solution.

14.     ***Third***, the Department has not identified—nor could it—any relevant data, academic study, or peer-reviewed analysis to support the central premise of the Bare-Minimum Rule: that there is no value at all in additional academic hours of instruction. The Department claiming that such evidence exists but does not cite any. *See* 88 Fed. Reg. 74,639. Relying on phantom "evidence" is quintessentially arbitrary and capricious.

15.     ***Fourth***, the Bare-Minimum Rule includes arbitrary carve-outs for Department-favored programs that undercut the Department's stated concerns about "overpaying for programs beyond what the State requires for licensure or certification." *See* 88 Fed. Reg. 74,640.

16.     ***Fifth***, the Bare-Minimum Rule suffers from significant procedural defects, particularly that the Final Rule is not a "logical outgrowth" of the proposed rule that went through the statutorily mandated negotiated rulemaking process. *Mock*, 75 F.4th at 584.

17.     The Bare-Minimum Rule is not only invalid; it also has dramatic consequences for Plaintiff Cortiva and other career schools.

18.     Under the Bare-Minimum Rule, Cortiva will be required to either dramatically alter its educational program or close the impacted program altogether. Currently, under the 150% Rule,

Cortiva's PMT Program is 24 semester credit hours. Under Department regulations, this translates to 600 in total hours.[5]

19.     The Bare-Minimum Rule will require Cortiva to cut its program from 600 hours to 500 hours, if it wants (as it does) to ensure that students who enroll remain eligible to obtain any form of federal student aid. This is a practical necessity both for the students, the vast majority of whom could not afford to enroll without federal student aid, and the school, which could not maintain a viable program if students on federal student aid are shut out.[6]

20.     If Cortiva cuts down the PMT Program, there are certain academic and training necessities that must remain in place to prepare students for their certification exam. But other significant elements of the PMT Program that benefit students and, ultimately, consumers and employers will have to be cut. As the following chart illustrates, the Bare-Minimum Rule will significantly alter the PMT Program, including by requiring reductions to core academic courses and as well as to courses that contribute to important business skills for graduates: managing the business side of their massage career, marketing their services to potential customers, and developing customer-service skills to improve their services and to build their clientele roster over time.

| **Required Reduction** | **Course Subject to Reduction** | **Negative Impact** |
|---|---|---|
| **15 Hour Reduction** | Anatomy and Physiology | Reducing hours in body systems which will adversely affect students' understanding of the body's systems and how they are affected by massage therapy. |

---

[5] The Department provides a "credit-to-clock-hour" conversion equation and examples in Volume 2, Chapter 2 of the "2023-2024 Federal Student Aid Handbook," https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2023-2024/vol2/ch2-program-eligibility-written-arrangements-and-distance-education.

[6] Plaintiffs are aware that many institutions with programs at or below 600 hours forego participation in the Title IV program altogether, as the administrative burden of participation in Title IV, HEA programs is not cost effective for those programs.

| | | |
|---|---|---|
| **25 Hour Reduction** | Professional Ethics and Business Course | Reducing hours in this area will affect students' understanding of complex reasoning and decision-making skills when it comes to the industry of massage therapy. |
| **60 Hour Reduction** | Massage Techniques Education from Clinical Assessment and Therapies and Allied Modalities | The reduction would mean either cutting back training in areas of stretching to just basic stretching and range of motion training or eliminating modalities such as lymphatic drainage, myofascial techniques, and structural bodywork hours altogether. |

21.     For Cortiva's PMT Program, the effects of the Bare-Minimum Rule will also be immediate if it goes into effect on July 1, 2024. Cortiva has PMT Program start dates on July 1, 2024, July 8, 2024, July 15, 2024 and July 22, 2024. *See* Exhibit 1. Cortiva and its students will therefore feel the effects of the Bare-Minimum Rule right away.

22.     After July 1, 2024, if the Court does not provide preliminary relief to set aside the Bare-Minimum Rule or delay its effective date, students will enroll in stripped-down programs that leave them less well prepared to enter their career fields and without the skills necessary to compete in the marketplace. Those setbacks mean that students will potentially earn far less in the earlier years of their careers than they would if they completed the full PMT Program.

23.     The effects are particularly egregious—and perverse—for the neediest students in the PMT Program. Currently, under the 150% Rule, students are able to obtain Pell Grants, which unlike federal student loans do not require repayment,[7] to enroll in Cortiva's PMT Program in

---

[7] "Federal Pell Grants usually are awarded only to undergraduate students who display exceptional financial need . . . . [and] unlike a loan, does not have to be repaid."  U.S. Dep't of Educ., Fed. Student Aid, Federal Pell Grants, https://studentaid.gov/understand-aid/types/grants/pell.

Arlington, Texas. By law, a student may not use a Pell Grant to enroll in a program that provides less than 600 hours of instruction. *See* 20 U.S.C. § 1088(b). Under the Bare-Minimum Rule, all massage therapy programs in Texas, including Cortiva's PMT Program, would have to be limited to 500 hours to remain eligible for federal student aid. *See* 16 Tex. Admin. Code § 117.20(a)(8). As a result, program students would be ineligible for Pell Grants, significantly reducing their eligibility for financial aid.

24.    Under statute, students in programs comprising between 300 and 600 clock hours can only access the Direct Loan Program. *See* 20 U.S.C. § 1088(b). Therefore, contrary to the Final Rule's concern about "the potential harm to students created by excessive borrowing," s*ee* 88 Fed. Reg. 74,637, the Final Rule would condemn PMT Program students solely to loans with interest that must be paid back.

25.    Briefly summarized, in promulgating the Final Rule, the Department failed to articulate satisfactory explanations and rational grounds for disregarding the myriad of failures in the data underlying the new regulations; cherry-picking biased research to support their preferred policy that does not engage with the relevant facts; failing to justify the change in position from existing regulations; ignoring the academic and career benefits of continuing the 150% Rule; treating certain academic programs differently on irrational and unlawful bases; basing the Final Rule on unexplained, flawed assumptions and positions; and ignoring the detrimental effects on students and schools the new regulations would create. As a result, the Court should set aside the Final Rule because it is in excess of statutory authority and arbitrary and capricious.

## PARTIES

26.    Plaintiff Cortiva Institute School of Beauty, Health, and Wellness operates a cosmetology, massage therapy, and esthetician school that is currently Title IV eligible. Cortiva

operates two schools in Florida and Texas. The Texas school is located at 808 W. Interstate 20, Suite 100, Arlington Texas 76017.

27.     The Coalition for Career Schools is a Texas unincorporated nonprofit association of career schools that offer various gainful employment programs and companies that conduct business with these career schools.

28.     The U.S. Department of Education is an executive agency of the United States responsible for, *inter alia*, overseeing the provision of grants and loans to students enrolled at institutions of higher learning and improving the management and efficiency of federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of federal funds in connection with educational issues. *See, e.g.*, 20 U.S.C. §§ 1070, 1087a, 3402(6). The Department, in its current form, was created by the Department of Education Organization Act of 1979, 20 U.S.C. §§ 3401 *et seq.*, Pub. L. No. 96-88, 93 Stat. 668 (1979). As such, the Department is subject to the Administrative Procedure Act. *See* 5 U.S.C. § 551(1).

29.     Defendant Miguel Cardona is the U.S. Secretary of Education. The Secretary is named as a party to this matter in his official capacity as the head of the U.S. Department of Education. The Secretary, in his official capacity, is responsible for the Department's promulgation of the challenged regulations and for related acts and omissions alleged herein.

## JURISDICTION & VENUE

30.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331, as this matter arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

31.     Venue is proper in this district under 28 U.S.C. § 1391(e) because a plaintiff, Cortiva, resides in the Fort Worth Division of the Northern District of Texas and no real property

is involved in this action, and also because a substantial part of the events giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

### I.      Cortiva's Programs, Students, and Participation in Title IV, FSA Programs

32.      Cortiva was founded in 1978 to provide professional training and education to individuals in a career in health, beauty, and wellness related career fields.

33.      Cortiva is owned by 360 Degree Education, LLC.

34.      Cortiva currently offers programs that prepare students to work in cosmetology or as a massage therapist, esthetician, or manicurist.

35.      Cortiva operates two campuses, one in Arlington, Texas, and one in St. Petersburg, Florida. The Texas campus serves primarily Texas residents and businesses.

36.      Cortiva is licensed to operate in the State of Texas by TDLR. TDLR sets the minimum requirements for massage therapists for licensure in Texas, including the minimum number of academic hours that students must attend at Cortiva and other similarly situated schools in the State. As a condition of licensure to operate as an institution in Texas, Cortiva must offer certain curriculum that meets or exceeds TDLR's standards, as set forth in Texas state regulation.

37.      Cortiva meets the requirements prescribed by the Department to participate in Title IV, HEA programs, including, *inter alia*, accreditation and state licensure.

38.      Cortiva supports its campus and students will a full-time staffed support office that handles matters related to financial aid and admissions, and that assists students with obtaining licensure and with their job searches.

39.       Cortiva currently has 65 students enrolled in the PMT Program. Generally speaking, the PMT Program enrollment has been roughly consistent with these numbers.

40.     Cortiva's student body is demographically and economically diverse. According to the College Navigator website, 72% of Cortiva's student body is female. In addition, 64% of the student body is Black or African American and 19% is Hispanic/Latino.

41.     For the most recent reporting period (April, 2021 – March, 2022), Cortiva had a completion rate of 80% and an employment rate for graduates employed in a training-related field of 71%. The median debt load for a person who completes one of Cortiva's four academic programs is $7,577.00, which translates into a roughly $90 monthly payment when amortized over a 10-year period.

42.     As of March 13, 2024, the total cost of the PMT Program is $13,939.

43.     According to the Department's College Navigator website, for students who began their studies in 2019-2020, Cortiva has an overall graduation rate of 78%.

44.     Cortiva is nationally accredited by the Accrediting Commission of Career Schools and Colleges ("ACCSC"). According to ACCSC, Cortiva was last accredited on February 1, 2021 and its current accreditation lasts until February 1, 2026.

45.     In order to assist students with paying for the costs of attendance, Cortiva participates in Title IV, HEA programs. As with other institutions of higher education, Cortiva students may use Pell Grants, which they do not need to repay, and Direct Loans, which are federal student loans currently with a 5.5% interest rate, as well as other sources of funding (e.g., cash on hand, private loans, scholarships) to finance their educations.

46.     As with every other institution that receives Title IV, HEA funds from its students, Cortiva participates in the Title IV, HEA programs through a program participation agreement ("PPA").

47.    In a typical year, the majority of students at Cortiva rely in whole or in part on Title IV, HEA funds to pay for their educations. For example, of the 65 active students in the PMT Program, 84.6% received Pell Grants.

48.    Without student access to Title IV, HEA funds, Cortiva would not have sufficient revenue to fund its operations and would cease to operate.

49.    Cortiva employs 20 people, including 12 faculty.

**II.    Background on the Coalition**

50.    Plaintiff The Coalition for Career Schools is an association of over 100 career schools and businesses who work with career schools affected by the Bare Minimum Rule.

51.    The Coalition and its members wish to ensure that the Department and Secretary of Education follow the law and that the substantively and procedurally invalid Bare Minimum Rule is set aside.

52.    Many members of the Coalition, like Cortiva, are directly regulated by the Bare Minimum Rule and will be adversely affected and irreparably harmed if the Bare Minimum Rule goes into effect.

**III.    Regulatory History of the 1994 150% Rule**

53.    The Department originally proposed the 150% Rule on February 28, 1994. *See Student Assistance General Provisions and Federal Pell Grant Program*, 59 Fed. Reg. 9,526 (Feb. 28, 1994). The initial proposal read as follows:

> (k) If the stated objectives of an educational program of the institution are to prepare a student for gainful employment in a recognized occupation—
>> (1) Demonstrate a reasonable relationship between the length of the program and entry level requirements for the recognized occupation for which the program prepares the student. The Secretary considers the relationship to be reasonable if the number of clock hours provided in the program does not exceed by more than 50 percent the minimum number of clock hours required for training in the

recognized occupation for which the program prepares the student, as established by the State in which the program is offered, if the State has established such a requirement.[8]

54.     The Department promulgated the 150% Rule on April 29, 1994 unchanged from the proposed version. *See* 59 Fed. Reg. 22,387. In response to public commenters opposed to the regulation, the Department explained that the purpose behind the provision was to "curb existing abuses" by institutions and to "specifically target areas of past abuse." The behavior that the Department was referencing has come to be known as "course stretching." *Id.*

55.     In addition, the Department questioned the "motives" of any institution that claims it is necessary to "greatly exceed" the minimum number of clock hours required by a State. *Id.* By publishing the 1994 regulations, the Department made a tacit acknowledgment that 150% of the minimum state hours requirements does not "greatly exceed" the State's minimum hours standards.

## IV.   The Defendant's 2022-2023 Regulatory Rulemaking Regarding 34 C.F.R. § 668.14(b)(26)(ii)(A)

### *The Defendant's Notice of Proposed Rulemaking*

56.     On May 26, 2021, in accordance with the statute's requirement, at 20 U.S.C. § 1098a, the Department announced its intention to conduct rulemaking regarding the provisions of 34 C.F.R. § 668.14(b)(26). *See Negotiated Rulemaking Committee; Public Hearings*, 86 Fed. Reg. 28,299 (May 26, 2021).[9] The Department convened a negotiated rulemaking committee—the

---

[8] *Note:* The proposed provision was initially located at 34 C.F.R. § 668.16(k); a regulatory chapter that contains the Department's requirements for institutions to demonstrative administrative capability to administer Title IV, HEA programs on their campus. The provision was moved to 34 C.F.R. § 668.14 in the 1994 final regulations.

[9] *Note:* The Department's original announcement does not propose rulemaking related to certification procedures at 34 C.F.R. § 668.14, but rather only to 34 C.F.R. § 668.13. However, in the Department's production of materials in anticipation of the Affordability and Student Loan Committee Meetings, which would produce the Notice of Proposed Rulemaking ("NPRM") in question, the Department proposes changes to certification requirements found at §§ 668.13, 668.14, and 668.43. *See* U.S. Dep't of Educ., "Issue Paper 6: Certification Procedures; Session 1: January 18-21, 2022," https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/6certprocedures.pdf. The changes discussed in this Complaint were originally proposed in Issue Paper 6, Session 1 on pg. 8.

Institutional and Programmatic Eligibility Committee—that met between January 18, 2022, and March 18, 2022. *See Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB)*, 88 Fed. Reg. 32,300, 32,301 (May 19, 2023). Among the number of topics addressed were the Department's proposed changes to 34 C.F.R. § 668.14(b)(26). The committee did not reach a consensus agreement with negotiators on those proposed changes.

57.    On May 19, 2023, the Department published a NPRM that included the proposed changes to the regulatory language at 34 C.F.R. § 668.14(b)(26)(ii)(A). At 88 Fed. Reg. 32,320, the Department stated that it planned to:

> Amend § 668.14(b)(26)(ii)(A) to limit the number of hours in a gainful employment program to the greater of the required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement, or as established by any Federal agency or the institution's accrediting agency.

58.    For the first time, the Department proposed to regulate credit hours, even though the Department had not previously done so for purposes of the 150% Rule.

59.    In the NPRM, the Department explained that the proposed changes would "address concerns . . . about institutions offering programs tied to licensure that are longer than required by their State," which, in the Department's opinion, "results in those students using up more of their lifetime eligibility for Pell Grants or other Federal financial aid, potentially making it harder for them to pursue later training." *id.* at 88 Fed. Reg. 32,381.

60.    The Department added that "[l]onger programs associated with State minimum licensure requirements are more likely to result in higher debt and a longer period of enrollment without requisite career benefits." *Id.*

16

61.     Finally, the Department concluded that "[t]he current regulations . . . have led to situations where institutions have offered more hours than were necessary for a student to become licensed in the State where the institution was located." *Id.* at 32,381-82.

62.     Regarding statutory authority for the change, the Department identified only two sections of the HEA as providing the authority for the proposed revision. First, the Department cited § 498 of the HEA, which requires the Secretary to determine the process through which a postsecondary institution applies to the Department certifying that it meets all applicable statutory and regulatory requirements to participate in the Title IV, HEA programs. *Id.* at 32,379.[10] Second, and more specifically, the Department identified § 498(c) of the HEA which outlines the criteria used to determine whether an institution demonstrates financial responsibility.[11] Significantly, neither statute contains – or could be interpreted to contain – sufficient authority for the Department to promulgate regulations in line with the proposed and subsequent Final Rule, as discussed below.

<center>*The Final Rule*</center>

63.     In accordance with the HEA, *see* 20 U.S.C. § 1098a, the Department provided the NPRM for public comment. What is most notable is that the Department combined the NPRM for this rule change to include a number of other significant regulatory provisions as well: (1) financial value transparency and gainful employment regulations; (2) financial responsibility requirements; (3) administrative capability requirements; (4) certification procedures; and (5) rules for ability-to-benefit programs. Despite several commenters asking the Department to extend the comment

---

[10] In the relevant section of the NPRM, the Department listed changes to the requirements included in a PPA, at 34 C.F.R. § 668.14, including: (b)(5) [financial responsibility requirements]; (b)(17) [provision allowing certain regulatory agencies to share information about the institution]; (b)(18) [prohibitions on retaining certain employees]; and (b)(26). With that in mind, the Department also listed § 498(c) of the HEA as statutory authority, which outlines the criteria used to determine whether an institution demonstrates financial responsibility.

[11] Notably, in the document cited in note 2 above, the Department's lone statutory cite is as follows: "§498 of the Higher Education Act of 1965, as amended."

period past the thirty days provided, consistent with Executive Orders 12866 and 13563,[12] to analyze the two-hundred-and-twelve-page NPRM covering six major topics, the Department refused, rejecting the commenters' requests, and keeping the abbreviated time to submit comments.

64.     Despite the Department's attempts to limit the public's opportunity to comment on the NPRM, the Department still received 7,583 public submissions within the 30-day response period.

65.     On October 31, 2023, the Department published a Final Rule that included the proposed changes to § 668.14(b)(26)(ii)(A), but which were different from what was in the NPRM. *See* 88 Fed. Reg. 74,568.

66.     The version of § 668.14(b)(26)(ii)(A) in the Final Rule, which is set to become effective on July 1, reads as follows:

> (26) If an educational program offered by the institution on or after July 1, 2024, is required to prepare a student for gainful employment in a recognized occupation, the institution must –
> (i)      . . .
> (ii)    Demonstrate a reasonable relationship between the length of the program and the entry level requirements for the recognized occupation for which the program prepares the student by limiting the number of hours in the program to the greater of—
>> (A) The required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as establish by the State in which the institution is located, if the State has established such a requirement or as established by any Federal agency…

---

[12] *See* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) and Exec. Order No. 13,563, 76 Fed. Reg. 3,821 (Jan. 18, 2011). Note: Both Executive Order 12866 and Executive Order 13563 cite sixty days as the recommended length for public comment.

67.     In its first response to a substantive comment—one that bemoaned the proposed rule's impact on nursing graduates—the Department created an exception to the regulation in cases where a State's requirements for licensure involve degree programs to allow certain nursing programs to remain largely unaffected. *See* 88 Fed. Reg. 74,636-37.

68.     Notably, this exception does not appear nor was it proposed in the NPRM. Indeed, this exception does not address nursing programs that do not require degree programs such as vocational nursing or practical nursing programs.

69.     The Department also carved out a novel exception to the regulatory modification in the Final Rule for distance education programs and correspondence programs. *See* 88 Fed. Reg. 74,637. The Defendants briefly explained that this exception was necessary to avoid situations where the length of a program required in the institution's State differs from State requirements for the length of a program in the student's State. *Id.* Curiously, the Department did not extend the exception to hybrid program modalities, which could also potentially result in disparities between the institution's home State and the student's home state.

70.     Next, commenters argued that the acceptable length of a program is "best determined by the institutions and their accrediting agencies" and subjected to refinement over time. *Id*. The commenters added that accreditors are trusted with ensuring the quality of an educational program and that the regulatory proposal amounts to "prohibited direction, supervision, and control over the curriculum" provided by an institution. *Id.*

71.     The Department responded that the requirements "are not dictating the length of a particular program, or its curriculum." *Id.* Rather, the Department concluded that the programs that exceed the length that the State has set for licensure or certification should not be supported

by Federal financial student aid. *Id.* The Department added that schools may still offer longer programs, but those students cannot receive Title IV, HEA funds to pay for them. *Id.*

72.    The Department then turned to the accreditor-related provision in the NPRM. Citing "conflicting signals" in the NPRM about how program length requirements are set by accrediting agencies, the Department, without expressed provocation or request from a commenter, removed the accreditor-related provision. *Id.*

73.    The Department cited two reasons for this 180-degree policy shift regarding accreditors. First, the Department expressed concern—for the first time in writing—that continuing to include accrediting agency requirements would "undercut" the purpose of focusing on State requirements, "as an accreditor could decide to simply set hour requirements higher than what a State deems necessary." *Id.*

74.    Second, the Department concluded that the inclusion of institutional accrediting agency requirements is "problematic" because some programmatic accreditors are sometimes also able to operate as institutional accreditors and the Department is concerned that this situation would create situations where institutions otherwise in the same State would have different requirements. *Id.*

75.    The Department justified this change in the Final Rule by stating that the Final Rule "recognizes the different roles of these entities in the regulatory triad."[13] *Id.* The Department

---

[13] In short, the regulatory triad with respect to higher education, works as follows: States are responsible for consumer protection; accreditors are responsible for academic quality; and the Department is responsible for running the Title IV, HEA programs. For more information on the regulatory triad in higher education, *see* Alexandra Hegji, "Institutional Eligibility for Participation in Title IV Student Financial Aid Programs," Cong. Research Serv., #R43159 (Feb. 8, 2023), https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://crsreports.congress.gov/product/pdf/R/R43159&ved=2ahUKEwilhZP2zZ-GAxUwF1kFHSHOCcMQFnoECB4QAQ&usg=AOvVaw3II_blDevNC7Tb1ACHRvEc; *see also* Alexandra Hegji, "An Overview of Accreditation of Higher Education in the United States," Cong. Research Serv., #R43826 (Apr. 12, 2024),

explained that accrediting agencies are responsible for overseeing academic quality, while States oversee consumer protections, and the Department administers the Title IV, HEA programs. The Department added the following:

> While we understand that accrediting agencies may have policies related to program length, they are involved in setting States' requirements and not required to consider the value of title IV, HEA funds when they make determinations about academic quality, and could therefore approve programs that they may view to be academically valuable without considering the relative costs and benefits to students, including the potential harm to students created by excessive borrowing or loss of Pell Grant lifetime eligibility due to program length that exceeds States' requirements for licensure or certification for the occupation in which a student seeks employment. *Id.*

76.     In response to a commenter who posited that the proposed rule was contrary to the HEA's purpose and not supported by any rational basis, the Department provided a list of statutory provisions that provide the Defendants the support necessary to justify the rulemaking. *Id.* at 74,638. Those provisions, and the Department's understanding of the authority provided to the Defendants by the statute, are provided as follows:

> a. Section 498 of the HEA "describes the Secretary's authority relating to institutional eligibility and certification procedures." *Id.*;
>
> b. Section 487(c)(1)(B) of the HEA "gives the Department the authority to issue regulations as may be necessary to provide reasonable standards of financial responsibility and appropriate institutional capability for the administration of title IV." *Id.*;
>
> c. Section 498A(e) of the HEA "authorizes the Secretary to determine an appropriate length for programs that are measured in clock hours." *Id.*;
>
> d. Sections 101, 102, and 481(b) of the HEA "[permit the Department] to implement and enforce statutory eligibility requirements, including those relating to GE programs." *Id.*;
>
> e. Section 410 of the General Education Provisions Act ("GEPA") "provides the Secretary with authority to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operations of, and governing the applicable programs administered by, the Department." *Id.*; and

---

https://www.google.com/url?sa=t&source=web&rct=j&opi=89978449&url=https://sgp.fas.org/crs/misc/R43826.pdf&ved=2ahUKEwilhZP2zZ-GAxUwF1kFHSHOCcMQFnoECB8QAQ&usg=AOvVaw1Nuqejnzyblov1fIgBE36d.

       f.   Section 414 of the Department of Education Organization Act ("DEOA") "authorizes the Secretary to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department." *Id.*

77.    Notably, of the Final Rule's list of statutory provisions, only § 498 of the HEA was cited in the NPRM as statutory authority for the proposed provision.

78.    In citing to the 1994 Final Rule, the Department stated that it had previously relied upon the notion that the 150% Rule limitation gave "latitude for institutions to provide quality programs and furnishes a sufficient safeguard against the abuses of course stretching." *Id.*, quoting 59 Fed. Reg. 22,431. However, in the Department's view, a program that exceeds length requirements by 50% costs students and taxpayers a substantial amount "for training that is not necessary to obtain employment." *Id.*

79.    In response to commenters that raised concerns about limiting educational opportunities and truncated educational programs that do not properly prepare graduates, the Department cited to three studies to show that programs that are unnecessarily long may interfere with a student's ability to persist and complete, may cost more in tuition but not lead to higher wages, and delay the student's entry into the workforce. First, the Department cited to a January 2022 study for the proposition that there is no correlation between setting higher hours requirements in massage therapy or cosmetology and increased wages.[14] *Id.* at 74,639. Second, for a similar purpose, the Department cited a 2016 study focused on cosmetology schools that similarly found no correlation between curriculum hours and wages.[15] *Id.* Indeed, the Department

---

[14] Nicolas Acevedo, Kathryn J. Blanchard, and Stephanie Riegg Cellini, "Occupational Licensing and Student Outcomes," *Postsecondary Equity & Econ. Project* (Feb. 2022), https://www.peerresearchproject.org/peer/research/body/2022.2.17-PEER-Occupationa-Licensing-Final.pdf ("Acevedo Study"); 88 Fed. Reg. 74,639, n.31.

[15] Kaila M. Simpson, et al., "Examination of Cosmetology Licensing Issues," *Am. Insts. for Research* (Aug. 30, 2016), https://web.archive.org/web/20210620203106/https://www.ncsl.org/Portals/1/Documents/Labor/Licensing/ Reddy_PBAExaminationofCosmetologyLicensingIssues_31961.pdf ("Simpson Study"); 88 Fed. Reg. 74,639, n.32.

pointed out that the 2016 study also found no correlation between training hours and safety incidents or complaints. *Id.* Finally, the Department relied upon a 2021 study for the statement that programs with lower training requirements in particular tend to result in lower earnings for graduates, "which means spending an additional few hundred or thousand dollars to attend an unnecessarily long program may be the difference between a positive and negative return on investment."[16] *Id.*

80.    In response to commenters that stated the additional hours included in the 150% of State minimums is "critical for success," the Department curtly suggested that the commenters approach their States about revising the program length requirements or offer the coursework outside of the Title IV, HEA programs. *Id.* at 74,641.

81.    Finally, in response to commenters' concerns that States would not have enough time to act to change hours requirements in response to the Final Rule, the Department stated that it could not speculate "on how quickly or slowly licensing bodies may update licensure requirements." *Id.* While questioning the commenters' claims, the Department added that under the Master Calendar requirements, *see* 20 U.S.C. § 1089, there are seven months between the regulation's finalization and the effective date.

82.    In short, the Department justified the Final Rule by stating that revising the limit to 100% of the State's requirement for licensure is "logical and appropriate" and that a State's requirements for program length are "adequate for a student seeking employment in a licensed or certified occupation in that State. *Id.* at 74,638; 74,640. Further, the Department concluded,

---

[16] Kathryn J. Blanchard and Stephanie R. Cellini, ''Quick college credentials: Student outcomes and accountability policy for short-term programs,'' Brookings Institution (2021), https://www.brookings.edu/articles/quick-college-credentials-student-outcomes-and-accountability-policy-for-short-term-programs/ ("Cellini Study"); 88 Fed. Reg. 74,639, n.34.

"[w]hen a student seeks training for a specific occupation, their goal is to meet the requirements for that occupation." *Id.* at 74,638.

## THE FINAL RULE EXCEEDS THE DEPARTMENT'S AUTHORITY AND VIOLATES THE APA

### I.     The Department's Final Rule is in Excess of Statutory Authority.

83.     The Department exceeded its statutory authority in effectively setting program lengths taught by institutions by capping federal student aid at a State or any Federal agency's minimum licensure requirements. In other words, these programs will not qualify to receive any federal student aid for any students unless these programs are the absolute minimum length required by a State for licensure.

84.     Congress has expressly provided that the Department does not have authority "to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system, except to the extent authorized by law." *See* 20 U.S.C. § 3403(b).

85.     The Final Rule contradicts this prohibition by setting a maximum program length based upon the content of the curriculum or program of instruction of an educational institution, which represents a form of exercising "direction, supervision, or control."[17]

86.     The citations listed in the NPRM are unhelpful to the Department. Section 498(c) relates to financial responsibility requirements, which are entirely unrelated to the Final Rule. Similarly, the Department's broader citation to § 498 in the NPRM does not provide the

---

[17] *See* Exhibit 2, CECU Public Comment submission to Docket ID ED-2023-OPE-0089 at pg. 79; *see also* Exhibit 3, Bellus Academy Public Comment submission to Docket ID ED-2023-OPE-0089 at pg. 6.

Department with any sufficient authority to conduct a rulemaking in line with the regulation at § 668.14(b)(26)(ii).

87.     The ex-post facto citations provided in the Final Rule—which can, in no way, cure the failures of the statutory citations provided in the NPRM—are similarly unavailing.

88.     Section 487(c)(1)(B)[18] provides the Department authority to issue regulations "as may be necessary to provide reasonable standards of financial responsibility" and administrative capability. The Department cannot rely upon this authority because 34 C.F.R. § 668.14(b)(26)(ii) is not a financial responsibility or an administrative capability regulation. The Department is not providing a new requirement for financial responsibility; it is determining how long an academic credit program can be funded at certain types of institutions. Similarly, the Final Rule does not implicate administrative capability regulations, which are intended to determine whether a Title IV, HEA program participating school has the internal capacity to run their financial aid program efficiently, effectively, and without significant error. The length of an academic program, as determined by an institution's subject matter experts in consultation with State requirements and governed by institutional and programmatic accreditors, is not part of that capacity.

89.     Other cited sections are similarly unhelpful to the Department. Section 101 [the definition of an institution of higher education], Section 102 [definition of an institution of higher education for purposes of Title IV programs], and Section 481(b) [definitions and minimum standards for Title IV eligibility] do not support the Department's regulatory rulemaking. While certain of these definitions relate to and create bare minimum clock hour requirements for

---

[18] The statute reads as follows: Notwithstanding any other provisions of this title, the Secretary shall prescribe such regulations as may be necessary "in matters not governed by specific program provisions, the establishment of reasonable standards of financial responsibility and appropriate institutional capability for the administration by an eligible institution of a program of student financial aid under this title, including any matter the Secretary deems necessary to the sound administration of the financial aid programs, such as the pertinent actions of any owner, shareholder, or person exercising control over an eligible institution."

participation in the Title IV program, nowhere in these statutory sections does Congress offer the Defendants an opportunity to pass judgment on the appropriate amount of education needed, as the Department attempts in the Final Rule, to prepare a student for a career-oriented field of study.

90. Finally, the Department points to Section 410 of GEPA[19] and Section 414 of the DEOA.[20] Both of these provisions provide only general rulemaking authority to the Department. Such a provision is precisely the kind of elephant in a mousehole that Justice Scalia warned about in *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001), and which was more recently cited in Justice Gorsuch's concurrence in *West Virginia v. E.P.A.*, 597 U.S. 697, 746 (2022). Federal agencies cannot interpret generalized provisions like § 410 and § 414 to contain heretofore unknown authority that allows the Department to upend students' programs and institutions' program offerings.

91. There is a statutory exception to this limitation for clock-hour programs, which the Department cites in the Final Rule, but not in the NPRM. Even so, this language does not save the Final Rule. The statutory exception states:

> The provisions of section 3403(b) of this title shall not apply to Secretarial determinations made regarding the appropriate length of instruction for programs measured in clock hours. *See* 20 U.S.C. § 1099c-1(e).

92. Many of the programs to which the Final Rule applies will be clock hour programs, but there are several reasons why this statutory exception does not justify the Final Rule.

93. First, the Final Rule is not limited to clock hour programs. It applies on its face to educational programs required to prepare a student for gainful employment in a recognized

---

[19] In full: "The Secretary, in order to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law, and subject to limitations as may be otherwise imposed by law, is authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department."

[20] In full: "The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."

occupation, whether a clock hour program or credit hour program.[21] The exception therefore does not support the Final Rule. As a general rule, the court cannot affirm a narrower version of the Final Rule applicable only to clock hour programs because "the grounds upon which [a regulation] must be judged are those upon which the record discloses that its action was based." *Texas v. Equal Employment Opp. Comm.*, 633 F.Supp. 824, 837 (N.D. Tex. Oct. 1, 2022) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

94.     Second, as referenced above, the Department never notified stakeholders in the NPRM of the perceived authority nor did it request for comment that it might impose a restriction on clock hour programs based on § 1099c-1(e). It is a bedrock principle of administrative law, adopted in the Fifth Circuit, that an agency must provide adequate notice to allow for meaningful comment and cannot adopt a final rule that does not represent a "logical outgrowth" from the proposed rule. *See Mock v. Garland*, 75 F.4th 563, 584 (5th Cir. 2023); *see also Ariz. Pub. Serv. Co. v. E.P.A.*, 211 F.3d 1280, 1299 (D.C. Cir. 2000).

95.     Third, even in the Final Rule, the Department mentioned this exception but did not expressly rely upon it. *See* 88 Fed. Reg. 74,638. Again, under black-letter administrative law, a court cannot uphold a regulation based on a legal justification that the agency itself did not invoke. *See Equal Employment Opp. Comm.*, at 837.

96.     Thus, statute, at § 3403(b) precludes the Final Rule and § 1099c-1(e) does not save it.

---

[21] The rule would also result in significant confusion as some states do not use "credit hours" or "clock hours" in their requirements. For example, the Final Rule would apply to New York state's registered professional nurse or licensed practical nurse requirements for "30 semester hours." *See* N.Y. Comp. Codes R. & Regs. tit. 8 § 52.12(b)(1)(i). Similarly, under the Final Rule, practical nursing programs in the District of Columbia would be subject to a minimum of "six hundred (600) clinical hours." *See* D.C. Mun. Regs. tit. 17 § 5608.20(l)(2). New Hampshire would be subject to the state's minimum of "600 hours of nursing classroom instruction." *See* N.H. Code Admin. R. Nur 602.12(c).

**II.     The Department's Final Rule is Arbitrary and Capricious under the APA.**

97.     An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). With regard to the Final Rule, there are numerous ways in which the Department has failed to consider important questions or provided inadequate, nonsensical explanations.

98.     Most fundamentally, the Department fails to justify the reasonableness of pegging the *maximum* hours for a program to the State-law *minimum*. The Final Rule dictates that, for educational programs measured in clock hours, credit hours, or the equivalent, the State's minimum hours requirement—very likely enacted when the 150% Rule existed—is the maximum length for purposes of federal student aid.

99.     States, including Texas, have enacted their minimum licensure requirements while the 150% Rule was in effect, and certainly had no occasion to think their minimum requirements would be treated by federal regulation as maximum requirements. A State appropriately exercises authority to set program length requirements for gainful employment programs by setting *minimum* requirements.

100.    States have the authority to set a maximum length of a program, but they have not set these maximums. Nor have they indicated any authorization toward the federal government allowing it to use their minimums as maximums.[22] The Department's decision to limit Title IV,

---

[22] *See* Exhibit 2, CECU Public Comment submission to Docket ID ED-2023-OPE-0089 at pg. 79.

HEA funds for gainful employment programs to the absolute minimum length, however, remains unjustified.

101.    When commenters raised concerns about the effects of the rule change on their schools, the Department advised them to contact their State legislatures or "offer the coursework outside of the title IV, HEA programs." *See* 88 Fed. Reg. 74,641.

102.    Perhaps anticipating this response, another commenter raised concerns that State regulators move too slowly to respond to the rule change, but the Department said it "cannot speculate on how quickly or slowly" licensure requirements are updated, plus the rule would not take effect for seven months after publication. *Id.* Indeed, it is public knowledge that the legislatures in Montana, Nevada, North Dakota, and Texas hold voting sessions only every other year, meaning that some states will not be able to change their minimum hours requirements for gainful employment programs until at least 2025.

103.    These responses—essentially, the Department willfully choosing not to address the gaps caused by the Final Rule and telling commenters to go away—together with the bare minimum public comment period are the definition of arbitrary and capricious rulemaking by a federal agency.

104.    Indeed, the Department's willingness to create carve-outs—for distance education programs, correspondence courses, and certain nursing programs that require a degree—shows that the Department is not genuinely concerned about student debt or the "excessive length" of programs. Indeed, distance education programs can, by the Department's own logic, continue to provide programs that are too long, too expensive, and lead to too much student debt. And the Department appears to be perfectly fine with that. Yet, it has not treated gainful employment programs equally or explained why it will not do so.

29

105.    The Department also has failed to explain why it is using a program intended to be a safe-harbor as a strict-liability trap. The Department has traditionally interpreted the 150% Rule as a safe harbor for an educational institution to "[d]emonstrate a reasonable relationship between the length of the program and the entry level requirements for the recognized occupation for which the program prepares the student by limiting the number of hours in the program to" a certain prescribed length. *See* 34 C.F.R. § 668.14(b)(26)(ii).

106.    However, the Final Rule imposes an absolute maximum limit for program length, as demonstrated by its most recent guidance document.[23] The Department expressly recognizes in that guidance that applicable GE programs exceeding these length restrictions by any amount are ineligible in their entirety to participate in the Title IV programs.[24]

107.    In sum, the Final Rule's elimination of the 150% Rule did not provide any safe harbor, but instead created a strict liability standard—the program length must be the minimum amount of clock hours or credit hours that a State or federal agency requires or the Department will say the program is ineligible for Title IV federal student aid.

108.    On top of all of this, as indicated above, the Department has already published two pieces of guidance on a Final Rule that does not become effective until July 1, 2024. The necessity of two guidance documents is a tacit acknowledgement that the Department's actions are unclear and, thus, arbitrary and capricious under the APA.

---

[23] *See* Exhibit 4, Fed. Student Aid, "Implementation of Program Length Restrictions for Gainful Employment (GE) Programs," GEN-24-06 (Apr. 15, 2024), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2024-04-15/implementation-program-length-restrictions-gainful-employment-ge-programs.
[24] *Id.*

*The Department Failed to Examine Relevant Data*

109.    Declaring a rulemaking to be "logical and appropriate" is insufficient under the APA. A federal agency cannot fail to examine relevant data or mischaracterize the findings of the studies it reviewed, but the Department did both in the Final Rule.

110.    For example, the Department claims that "unnecessarily long" programs "may interfere" with students' ability "to persist and complete" their programs, *see* 88 Fed. Reg. 74,639, but no support or citation is provided. At one point, the Department states that programs that are longer than the State minimum licensing requirements "may have engaged in course stretching," *see* 88 Fed. Reg. 74,640, again, without supporting evidence.

111.    Throughout the Final Rule,[25] the Department expresses concerns about higher student debt, especially in relation to longer programs, but provides no demonstration that this is a widespread problem or that the 150% Rule actually contributed to it.

112.    For example, in opposition to commenters who stated that programs that are 150% of the State minimum confer certain benefits, including meeting the needs of employers and the public, the Department cited three studies and failed to accurately describe or overcome the limitations of each one.

113.    First, the Department offered the Acevedo Study for the proposition that there is a "lack of any correlation" between setting higher hours requirements in massage therapy or cosmetology and increased wages.

114.    In reality, the study took an "average wage" for all individuals in the given occupation and did not control for location of employment (which can have an effect on median earnings), did not examine whether the examined individuals work part-time or full-time, and did

---

[25] *See, e.g.*, 88 Fed. Reg. 74,612; 74,639; and 74,641.

not distinguish between different ages and experience levels.[26] As a result, the study is unreliable as the data that unpins the conclusions suffers from serious limitations.

115.    Second, the Department cited the Simpson Study to demonstrate that there is no correlation between curriculum hours and wages or training hours and safety/complaints. In reality, the study admitted that the wage data was not reliable:

> [T]here are two primary limitations to these data: (1) the data reported incorporate reported hourly wage information, which excludes data on tips—a significant source of income for those in the service industry; and (2) wage estimates are for wage and salary workers only, which excludes self-employed persons.[27]

116.    On issues of safety, the Simpson Study concluded that the lack of correlation between hours length and safety was due, at least in part, "to the extensive limitations in the available safety data for the cosmetology profession."[28]

117.    Regarding complaints, the Simpson Study admitted that the data is of limited usefulness and it would be inappropriate to draw broader conclusions from it:

> Due to the small sample sizes for each variable, these data are presented in summary only to describe the overall range of occurrence, and no inferences are appropriate at this time. It should be noted that [the American Institutes of Research] collected anecdotal evidence from cosmetology [subject matter experts] that complaints are sometimes a result of personal disputes between practitioners or competing establishments rather than a threat to consumer safety, further limiting its usefulness.[29]

118.    Third, the Department relied upon the Cellini Study for the proposition that programs with "lower training requirements . . . tend to result in lower earnings . . . which means spending an additional few hundred of thousand dollars to attend an unnecessarily long program

---

[26] *See* Acevedo Study at pg. 3, "We note that average wages are calculated for all individuals in the given occupation and we cannot distinguish between different ages and experience levels, so our earnings measures represent an upper bound on the earnings of early career cosmetologists."
[27] *See* Simpson Study at pg. 41.
[28] *See* Simpson Study at pg. 46.
[29] *See* Simpson Study at pg. 43.

may be the difference between a positive and negative return on investment."[30] *See* 88 Fed. Reg. 74,639. While the Cellini Study does conclude that lower training requirements means lower earnings, the Department's extrapolation that additional hours could result in a negative return on investment ("ROI") does not appear in the study. Further, this third study also does not control for full-time versus part-time work. Indeed, it is important to note that the purpose of the Cellini Study was to show that, in the authors' opinions, lower hour programs should not have access to federal funds, not that longer programs would flip positive ROI to a negative ROI.

119.    The Supreme Court has explained that, while regulatory changes are generally subject to the same standards as new regulations, when a long-standing rule is subject to a challenge, the agency must provide a "more reasoned explanation" for "why it deemed it necessary to overrule its previous position." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

120.    The Department did not satisfy that standard in the Final Rule. Institutions have been relying upon the 150% Rule for thirty years; it is reasonable to conclude that hundreds of programs with thousands of students[31] were developed under the 150% Rule's guidelines. Indeed, entire schools could be wiped out because of this regulatory change.

121.    The Department had an obligation to examine relevant data and to construe it fairly. The Department made no wage or earnings-related showing and offered no evidence that schools are engaging in "course stretching," the original purpose behind the 150% Rule. Beyond a passing mention of potential course stretching, the Department entirely replaces the original justification for the regulation and does so without adequate support.

---

[30] *See* Cellini Study.
[31] For example, a recent report suggested that the total number of cosmetology students in 2018-2019 was 198,861. *See* Carolyn Fast, et. al., *Cosmetology Training Needs a Make-Over*, The Century Foundation (July 14, 2022), https://tcf.org/content/report/cosmetology-training-needs-a-make-over/#easy-footnote-bottom-9-49933.

*The Department Failed to Provide an Adequate Justification for the New Rule*

122.    At no point in the Final Rule does the Department satisfactorily justify the regulatory change. As a general matter, the Supreme Court has rejected the notion that "agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).

123.    At the same time, the Supreme Court has explained that "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position," and "of course the agency must show that there are good reasons for the new policy." *Id.* at 515.

124.    And as noted above, "an agency must be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account,'" *Encino Motorcars*, 579 U.S. at 212 (quoting *Fox*, 556 U.S. at 515), and an "'[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice,'" *id.* (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (alteration in original)).

125.    The 150% Rule has given rise to substantial reliance interests—for institutions, for States, for students, and for employers who hire students from these programs. And in light of that reliance upon a decades-old rule, the Department's short justification for the change is simply inadequate.

126.    The Department's stated reason for the change proceeds essentially as follows: the Department is protecting students from being charged for unnecessary training; training over the statutory minimum is necessarily deemed "unnecessary" by the Defendants; therefore, no

participation should be permitted for programs over a State's statutory minimum. By the Department's logic, States, through the promulgation of clock hour minimum requirements, intend to establish that the bare minimum is all the training that students could or should receive, not only to be eligible for licensure, but to be successful in their career.

127.    There are two major issues with this conclusion. First, the 150% Rule was created in 1994. It is reasonable to conclude that many state licensure requirements have been either created or modified since 1994, thirty years ago. And, as stated above, the legislatures would have been aware of the 150% Rule and created their minimums with the 150% Rule in mind.

128.    Second, certain public comment submissions[32] argued that, by setting minimum requirements, States indicated their primary concern is that career programs were not long enough and that, if a State thought a program was too long, it could set a maximum length in its reasonable discretion.[33] The Department did not directly or meaningfully respond to this argument.

129.    Pointing to the States' minimums is unavailing and, at the very least, unconvincing. It is more reasonable to conclude that it is the Department—not individual States and in violation of clear statutory authority—that has determined that the additional training beyond the State minimum is "unnecessary."

130.    The Department cannot make such a determination by law, as noted above. The determination of the appropriate length and academic content of a program is therefore rightfully left to another member of the Regulatory Triad: accreditation agencies in collaboration with individual schools.

---

[32] See Exhibit 2, CECU Public Comment submission to Docket ID ED-2023-OPE-0089 at pg. 79. Thompson Coburn Public Comment submission to Docket ID ED-2023-OPE-0089.

[33] "Indeed, certain States have exercised their authority to set program length requirements for career programs by setting **minimum** requirements. This shows both that States have this authority, and their primary concerns is that career programs are not long enough. Should a State have concerns that a particular program or too long, it could set a maximum length in its reasonable discretion." Exhibit 2, CECU Public Comment submission to Docket ID ED-2023-OPE-0089 at pg. 79 (emphasis in original).

35

131.    The 150% Rule took into account disparities among States' minimum requirements. For example, 300 hours of training are required to become licensed as a massage therapist in Utah, whereas 1,000 hours are required in Nebraska and New York.[34] Similarly, 1,800 hours of training are required to become licensed as a cosmetologist in West Virginia,[35] whereas 1,000 hours are required in Vermont, Texas, Rhode Island, New York, Massachusetts, and California.[36] If institutions in States offered programs up to 150% more than the State minimum, then a student may more easily satisfy the requirements of a different State. The 150% Rule allowed students in various states to more easily transfer their skills and continue their occupations in other States.[37]

132.    The 150% Rule also allowed students to qualify for programs that were slightly longer than the State minimum requirements and long enough to receive international certificates. These international certificates greatly benefited military members and military spouses who could continue their work as a cosmetologist overseas. The Department never even responded to a public comment raising this concern regarding international certification.[38]

133.    But 20 U.S.C. § 3403(b) precludes the Department from making judgment calls about "curriculum." Its declaration that certain amounts of training are "unnecessary" is an academic judgment call that should be left to the schools and accreditors.

---

[34] *See* as follows: Utah - Utah Code Ann. § 58-11a-302(4)(a)(iv); Nebraska - Neb. Rev. Stat. § 38-1710 & § 38-1703; New York - N.Y. Comp. Codes R. & Regs. tit. 8 § 52.15(b).

[35] *See* W. Va. Code, § 30-27-3(l).

[36] *See* as follows: Vermont - Vt. Admin. Code 20-4-300:5-2(b); Texas - 16 Tex. Admin. Code § 83.202(a); New York - N.Y. Comp. Codes R. & Regs. tit. 19 § 162.4(a); Massachusetts - 240 Mass. Code Regs. § 2.01(1); California – Cal. Bus. & Prof. Code § 7362.5(a).

[37] *Note*: In Cortiva's Public Comment submission to Docket ID ED-2023-OPE-0089 at pg.2 (Exhibit 5), Plaintiff focused on the impact of the Final Rule on the Florida-based school. The comment submission argued that, based upon his at the time reading of the NPRM, the Texas-based school would not be impacted by the Bare Minimum Rule. However, after subsequent research and additional consideration, Plaintiff is now aware that, in fact, the impact of the Bare Minimum Rule on the Texas-based school would be much more significant than previously realized.

[38] *See* Exhibit 3, Bellus Academy Public Comment submission to Docket ID ED-2023-OPE-0089 at pg. 6.

*The Department Failed to Demonstrate a Connection between the Facts Found and the Choices Made in the Final Rule*

134.    There is no rational connection that the Department shows because there is no factual analysis to rely upon in the Final Rule.

135.    As indicated above, the three studies that the Department cites to do not support the conclusions that the Department indicates that they do. The studies are each subject to serious and debilitating limitations on the reliability of the underlying data, the control for variations between individual experiences and skill levels, as well as a failure to control for geographic differences that could reasonably explain the different outcomes identified by the study's conclusions.

136.    Additionally, the Department offers no evidence that the original purpose behind the 150% Rule in 1994—"course stretching"—remains an issue in 2023 or 2024 or that it was enabled by the 150% Rule. Rather, the Department made a policy decision to change course after thirty years of regulatory stability that undergirded many students' programs and told institutions that if they do not like the changes, to take up their concerns with their State regulatory agencies and legislatures.

*The Department's April 9, 2024 and April 15, 2024 Guidance Documents about the Bare Minimum Rule Demonstrate its Arbitrary and Capricious Nature*

137.    As July 1, 2024, quickly approaches, Plaintiffs and other career schools desperately sought assistance in complying with the impossible mandates of receiving approval from both States and accreditors for changes to program length and sought to resolve these issues amicably with the Department. In response, the Department issued two guidance documents: 1) the April 9, 2024 Updates on New Regulatory Provisions Related to Certification Procedures and Ability-to-Benefit[39]   ("April 9 Guidance") and 2) the April 15, 2024, Implementation of Program Length

---

[39] *See* Exhibit 6, GEN-24-03, https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2024-04-09/updates-new-regulatory-provisions-related-certification-procedures-and-ability-benefit.

Restrictions for Gainful Employment (GE) Programs[40] ("April 15 Guidance"). These guidance documents demonstrate that the Bare Minimum Rule runs counter to the Department's alleged goal of guarding against unnecessary debt. The Department also concedes in these guidance documents that the enforcement of the Bare Minimum Rule will be arbitrary and capricious.

138.    The April 9 Guidance explains that the "Department issued final regulations related to certification procedures for institutions participating in the Title IV, HEA programs to provide important protections for students to ensure that their programs do not result in unnecessary debt and can meet their educational goals." *See* GEN-24-03. Ironically, the April 15 Guidance acknowledges that "in some cases a GE program will no longer qualify for Federal Pell Grant eligibility and will need to satisfy placement and completion rate requirements in order to qualify for participation in the William D. Ford Direct Loan program." *See* GEN-24-06. Contrary to the Department's goals to prevent unnecessary debt, the Department concedes that the Bare Minimum Rule will require students who are otherwise qualified for Pell Grants to take out loans and go into debt because programs, like Cortiva's PMT Program, will be required to be 100 hours less than the threshold eligibility for Pell Grants.

139.    The Department also concedes in the April 9 Guidance that it will not be able to evenhandedly enforce the Bare Minimum Rule but does not fully explain when and whether it will give a "pass" to institutions that cannot comply by July 1, 2024. The Department states:

> [I]nstitutions have expressed concern about their ability to seek and obtain approval from accrediting agencies and States to change the lengths of their GE programs in time to come into compliance with the regulations. Institutions have also expressed concern about their ability to determine the specific requirements for licensure in the States in which they operate and, in some cases, limit the States in which they operate in order to comply with requirements for programs to meet licensure and certification requirements in all States where an institution enrolls students. The Department has also

---

[40] *See* Exhibit 4, GEN-24-06, https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2024-04-15/implementation-program-length-restrictions-gainful-employment-ge-programs.

heard concerns from State agencies about their ability to approve a substantial number of program changes in time for their institutions to be in compliance. Additionally, we are aware of challenges that institutions have experienced regarding access to and use of certain Department systems.

The Department understands that there may be circumstances outside of an institution's control that prevent compliance with these new requirements by July 1, 2024. However, the Department believes that most of those concerns and challenges will have been resolved or sufficiently mitigated by January 1, 2025. The Department has enforcement discretion with respect to an institution's compliance with certain Title IV, HEA requirements. Given the concerns received from institutions and States, particularly for the period between July 1, 2024 and January 1, 2025, we will consider exercising this discretion before taking action regarding the provisions in 34 CFR 668.14(b)(26) and 34 CFR 668.14(b)(32).

140.    According to the Department, institutions will not be able to comply with the Bare Minimum Rule due to circumstances outside of their control. Without giving any reason, the Department picks an arbitrary date of January 1, 2025, as the deadline for the Department to exercise its discretion as to when and whether to enforce the Bare Minimum Rule. In the meantime, institutions like Cortiva are at the whim and mercy of bureaucrats who have the leisure of exercising their discretion as they please until at least January 1, 2025.

### III.    The Defendant's Final Rule is Not a "Logical Outgrowth" of the NPRM.

141.    As identified and explained above, the APA requires that a federal agency conducting regulatory rulemaking must include in the NPRM "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *See* 5 U.S.C. § 553(b)(3).

142.    In addition, it is generally accepted that a final regulatory action need not be an exact replica of the rule proposed in the notice, only a "logical outgrowth" of the proposed rule. *See Mock*, 75 F.4th at 584.

143.    In the NPRM, the Department proposed that one of the standards for the required minimum hours would be the hours established by the institution's accreditor. *See* 88 Fed. Reg.

32,380. Nowhere in the Preamble to the NPRM did the Department suggest that one of the policy positions being contemplated by the Department was the deletion of the accreditor-related provision.

144.    In fact, the Department did not even receive a public comment submission proposing to remove accreditors from the provision. Rather, commenters expressed support for the inclusion of accreditors in the Final Rule.

145.    Regardless, the Department removed the provision stating that it "would undercut the purpose of focusing on State requirements, as an accreditor could decide to simply set hour requirements higher than what a State deems necessary." *See* 88 Fed. Reg. 74,637.

146.    Had the public been made aware that the Department would potentially remove the accreditor-related provision, it is reasonable to conclude that the public comment submissions would have been markedly different.

147.    As a result, the public was not given fair notice of the regulatory change in the Final Rule in violation of the APA. Therefore, the deletion of the accreditor-related provision fails to satisfy the logical outgrowth doctrine.

## **CAUSES OF ACTION**

### **Count I: Agency Action Not in Accordance with Law and in Excess of Statutory Authority (5 U.S.C. § 706(2)(A)(C))**

148.    The Court must enjoin agency action that is not in accordance with law, in excess of statutory authority, or without observance of procedure required by law. See 5 U.S.C. § 706(2). The Final Rule is final agency action subject to judicial review in accordance with 5 U.S.C. § 704.

149.    The Final Rule's provisions regarding the revisions to the 150% Rule are not authorized under the HEA, 20 U.S.C. §§ 1001 *et seq.*

150.    Those provisions exceed the Department's statutory jurisdiction and authority and do not comport with the terms of the HEA, GEPA, DEOA, or any other identifiable statutory source of authority that Congress has conferred upon the Department. The regulations impermissibly allow the Defendants to reach decisions about academic matters, otherwise afforded to accreditors and institutions of higher education. Simply stated, the Department seeks to regulate the curriculum of certain institutions that they have deemed – without a rational, data-driven basis – to offer programs that are of little academic value; no statute allows the Department to do so. To the contrary, Congress expressly prohibited the Department from exercising direction, supervision, or control over institutional curriculum.

151.    Consequently, the Final Rule's provisions concerning the revisions to the 150% Rule are in excess of statutory authority, jurisdiction, and limitations, in violation of 5 U.S.C. § 706(2)(C), and are not in accordance with law, in violation of 5 U.S.C. § 706(2)(A).

**Count II: Arbitrary and Capricious Agency Action (5 U.S.C. § 706(2)(A))**

152.    The Court must enjoin agency action that is arbitrary and capricious, an abuse of discretion, or otherwise contrary to law. *See* 5 U.S.C. § 706(2). The Final Rule is final agency action subject to judicial review in accordance with 5 U.S.C. § 704.

153.    An agency acts arbitrarily and/or capriciously if it fails to examine relevant data, does not articulate a satisfactory explanation for an action, and/or lacks a rational connection between the facts found and the choices made. An agency acts arbitrarily and capriciously if it entirely fails to consider an important aspect of the problem, offers an explanation for its decision that runs counter to evidence before it, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. If an agency changes its position with respect

to a matter it previously considered, the agency must adequately explain the reason for the change in policy.

154.    As detailed above, in promulgating the Final Rule, Defendants acted arbitrarily and capriciously by disregarding public commenters' concerns; failing to articulate satisfactory explanations and rational grounds for ignoring the myriad of failures in the data underlying the new regulations; cherry-picking biased research to support their preferred policy; failing to justify the change in position from existing regulations; ignoring the academic and career benefits of continuing the 150% Rule; failing to notify the public of potential regulatory outcomes; treating certain academic programs differently on irrational and unlawful bases; basing the Final Rule on unexplained, flawed assumptions and positions; failing to provide the public notice of the potential issues under consideration; and ignoring the detrimental effects on students and schools that would result from the Final Rule.

## Count III: Agency Action Not a Logical Outgrowth of the Proposed Rule in Violation of the APA (5 U.S.C. § 553(b)(3))

155.    The APA requires that a federal agency conducting regulatory rulemaking must include in the NPRM "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *See* 5 U.S.C. § 553(b)(3).

156.    In addition, while federal regulatory action need not be an exact replica of the proposed rule, a final rule must be a "logical outgrowth" of the proposed rule.

157.    In the NPRM, the Department proposed that one of the standards for the required minimum hours would be the hours established by the institution's accreditor. Without explanation or notice, the Department removed the provision stating that it "would undercut the purpose of focusing on State requirements, as an accreditor could decide to simply set hour requirements higher than what a State deems necessary." *See* 88 Fed. Reg. 74,637.

158.    Had the public been made aware that the Department would potentially remove the accreditor-related provision, it is reasonable to conclude that the public comment submissions would have been markedly different and would have provided the opportunity for the public to provide information, data, and/or argument as to why the provision should not be removed from the Final Rule.

159.    Therefore, the deletion of the accreditor-related provision fails to satisfy the logical outgrowth doctrine. As a result, the public was not given fair notice of the regulatory change in the Final Rule in violation of the APA.

## PRAYER FOR RELIEF

As a remedy to the arbitrary, capricious, unlawful, and unconstitutional Final Rule, Plaintiffs request the following relief.

   a.    A declaration, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, that the regulatory changes in 34 C.F.R. § 668.14(b)(26)(ii)(A) in the Final Rule are arbitrary, capricious, not in accordance with law, contrary to constitutional right, in excess of statutory authority, and/or without observance of procedure required by law;

   b.    A judgment holding unlawful, setting aside, and enjoining the enforcement of the regulatory changes in 34 C.F.R. § 668.14(b)(26)(ii)(A) in the Final Rule in its entirety, or, in the alternative, holding unlawful, setting aside, and enjoining the enforcement of the Final Rule as applied to Cortiva and members of the Coalition;

   c. An order awarding Plaintiffs attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

   d. Any other relief that this Court deems just and proper.

Dated May 31, 2024          Respectfully submitted,

*/s/ Melissa Hensley*
Melissa Hensley (Texas Bar No. 00792578)
Cory R. Ford (Texas Bar No. 24121098)
McGuireWoods LLP
2601 Olive Street, Suite 2100
Dallas, TX 75201
Telephone: (469) 372-3926
Facsimile: (214) 273-7475
cford@mcguirewoods.com
mhensley@mcguirewoods.com

Farnaz Farkish Thompson (D.C. Bar No. 1659285) (*pro hac vice forthcoming*)
John S. Moran (D.C. Bar No. 1014598) (*pro hac vice forthcoming*)
Jonathan Helwink (D.C. Bar No. 1754411) (*pro hac vice forthcoming*)
Stephen Tagert (Virginia Bar No. 99641) (*pro hac vice forthcoming*)
McGuireWoods LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Telephone: (202) 828-2817
Facsimile: (202) 828-3327
fthompson@mcguirewoods.com
jmoran@mcguirewoods.com
jhelwink@mcguirewoods.com
stagert@mcguirewoods.com