# Exhibit 2

**CECU** | **Career Education Colleges and Universities**

June 20, 2023

The Honorable Miguel A. Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Re:     Comments of Career Education Colleges and Universities, and 15 Local and Regional Associations, in Response to the Proposed Regulations: Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB) (Docket ID ED–2023–OPE–0089)

Dear Secretary Cardona:

On behalf of Career Education Colleges and Universities ("CECU") and the undersigned associations, we submit the following comments in response to the above-referenced Notice of Proposed Rulemaking (the "NPRM" or the "Proposed Rule") published in the May 19, 2023, Federal Register (88 Fed. Reg. 32300) by the United States Department of Education (the "Department").

CECU is a national trade organization with a membership of more than 750 accredited, postsecondary educational institutions throughout the United States, most of which participate in the Federal student financial assistance programs. Our primary interest is the well-being of our nation's students and their preparation for productive careers. As noted in our comments, CECU generally supports an accountability framework that protects students and taxpayers and respects institutional missions through the disclosure of meaningful, well-reasoned, and accurate student outcome metrics for all Title IV programs at all Title IV-participating institutions. Our comments express our appreciation for certain proposals, highlight various concerns, and offer recommendations for improvement. With significant revision, we believe the Department could promulgate a much improved, final rule that would put into place a meaningful and successful accountability framework. Absent such revision, we foresee a system that would be administratively unmanageable for the Department, impossible for institutions to navigate, and in the end, fail to serve the best interests of the students and taxpayers it is meant to serve and protect.

We appreciate the opportunity to comment on these proposed regulations and for your careful consideration of the issues raised in the attached comments. If you require any additional information or

The Honorable Miguel A. Cardona
Secretary of Education
Page 2 of 87

further clarification, please contact Nicholas Kent, Chief Policy Officer, at Nicholas.Kent@career.org or 571-800-6524.

Sincerely,

Jason Altmire, DBA
President and CEO


On behalf of:

Arizona Private School Association
Association of Private Colleges
California Association of Private Postsecondary Schools
Career Colleges & Schools of Texas
Colorado Association of Career Colleges and Schools
Florida Association of Postsecondary Schools and Colleges
Georgia Alliance for Career Education
Louisiana Association of Private Colleges and Schools
Mid-Atlantic Association of Career Schools
Nevada Association of Career Colleges
Northwest Career Colleges Federation
Northwest Career Colleges Idaho
Ohio-Michigan Association of Career Colleges and Schools
Private College and School Association of New Jersey
The Coalition of New York State Career Schools

The Honorable Miguel A. Cardona
Secretary of Education
Page 3 of 87

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 8

II.  FINANCIAL VALUE TRANSPARENCY AND GAINFUL EMPLOYMENT ....................... 8

   A.   Global Position Statement ...................................................................................... 8

   B.   Financial Value Transparency Framework (Subpart Q: 668.401 - 668.402) .................. 13

      1.   The Proposed Rule's D/E rates do not provide meaningful, well-reasoned, and accurate student outcome metrics. **........14**

      2.   The Department's decision to change the D/E rate thresholds once again is arbitrary and capricious. **........15**

      3.   If the Department moves forward with the Proposed Rule's D/E rates, the Department should not eliminate the "zone" and thereby effectively tighten the D/E rate thresholds once again. **........17**

      4.   D/E rates calculated for graduate degree programs in particular should be strictly for informational purposes. **........18**

      5.   The Department is correct in considering only the earnings of program graduates and excluding the earnings of non-completers from the metrics. **........19**

      6.   The Department correctly requires passage of either D/E ratio, rather than both. **........19**

   C.   Calculating D/E Rates (Subpart Q: 668.403) ...................................................... 20

      1.   The Department correctly caps loan debt for the D/E rate calculations at the net direct costs charged to a student. **........20**

      2.   We support the amortization periods varied by program type, with some recommendations for improvement. **........20**

      3.   The Department should include an extended cohort period for any graduate healthcare or other program with a State-mandated internship or residency component. **........21**

      4.   The Department correctly excludes Parent PLUS loans from the debt measure. **........21**

      5.   We support the Department's decision to keep the interval between the award year of graduation and the calendar year for which earnings are calculated the same for every student. **........22**

      6.   The Department should not implement any accountability framework based on D/E rates until the Department has resolved the many issues presented by the use of actual earnings data in the calculation of D/E rates. **........22**

      7.   The Department should develop a mechanism to account for the impact of wage discrimination on reported earnings. **........22**

      8.   The Department should develop a means to account for the impact of a program's geographic location on reported earnings. **........26**

      9.   The Department should develop a means to accommodate market events that negatively impact earnings for graduates. **........27**

      10.  The Department should develop a solution to the problem of unreported income. **........28**

      11.  The Department should develop a means to account for unearned income and self-employment income. **........30**

The Honorable Miguel A. Cardona
Secretary of Education
Page 4 of 87

12. The Department should develop a mechanism for accommodating individuals who report no income. ................................................................................................30

13. The Department should use the higher of the mean or median earnings for purposes of the D/E rate calculation. ...........................................................31

14. To calculate a program's annual loan payment under § 668.403(b), the Department should limit the amount to the amount that would be due under the Department's REPAYE plan or other IDR plans. ....................................31

D. Calculating the Earnings Premium Measure (Subpart Q: 668.404) ............................33

1. The Earnings Threshold is not a meaningful or appropriate basis of comparison. ............33

2. The Department should not implement an earnings premium measure before the Department resolves the many issues arising from the use of actual earnings in the calculation. ................................................................................35

E. Process for Determining D/E Rates and Earnings Premium (Subpart Q: 668.405 - 668.406) ........................................................................................................36

1. The Department must include a transitional rate opportunity for GE programs. ..............36

2. The rule against retroactive rulemaking precludes the Department from making program eligibility determinations based on metrics calculated using data from years that precede the effective date of the Proposed Rule. ............................37

3. The Department should provide institutions with a meaningful opportunity to review and correct its D/E rate data and calculations before the Department imposes any sanctions. ................................................................................39

4. As part of a reinstated process for appealing draft D/E rates, the Department should perform alternate D/E rate calculations at the level of the 8-digit OPEID (i.e., individual locations). ................................................................................43

5. The Department should not impose sanctions for metrics calculated using data from years that exceed required record retention periods. ..............................43

F. Student Disclosure Acknowledgements (Subpart Q: 668.407) .....................................43

1. On its website, and in its various acknowledgements and warnings required by the Proposed Rule, the Department should recognize that there are many ways to measure postsecondary education value. ..................................................44

2. On its website and in its various acknowledgements and warnings, the Department should ensure precision in describing the nature and import of the metrics that it calculates. ................................................................................45

3. The Department should develop and disclose alternative value measures to provide a more holistic picture of program value. .........................................46

G. Reporting Requirements (Subpart Q: 668.408) ............................................................46

1. The reporting requirements are unreasonable and unduly burdensome and will needlessly increase the cost of higher education. ...........................................46

H. GE Program Eligibility (Subpart S: 668.601 – 668.603) ...............................................50

1. The Department lacks the statutory authority to determine a program's Title IV eligibility on the basis of the program's D/E rates. .........................................50

The Honorable Miguel A. Cardona
Secretary of Education
Page 5 of 87

    **2. An institution should not be penalized if a program is being responsibly retired and produces failing D/E rates in its final years. ...............................................56**

    **3. Students who have enrolled in or remain enrolled in a program with full knowledge of the program's D/E rates and earnings premium should be permitted to receive Title IV aid until they complete the program. .....................................56**

    **4. If a program is subject to a loss of eligibility due to failing D/E rates or earnings premiums, the program should only lose access to the Direct Loan program. ..................56**

  I. Certification Requirements for GE programs (Subpart S: 668.604) .............................57

  J. Student Warnings and Acknowledgments (Subpart S: 668.605) ..................................57

    **1. The Department should not compel institutions to issue misleading or inaccurate warnings to current and prospective students. .........................................57**

    **2. At the very least, the Department should modify the text of its proposed warnings to accurately reflect the rule. .............................................58**

    **3. The proposed warnings violate the First Amendment's prohibition on compelled speech. .................................................58**

    **4. The proposed warnings will cause irreparable harm to programs, making it impossible to recruit future students and leading to program teach-out. ...........................59**

    **5. Any acknowledgement requirements should apply equally to GE and non-GE programs. ..................................................60**

III. FINANCIAL RESPONSIBILITY ...........................................................................61

  A. General Comments ..........................................................................61

    **1. The proposed financial responsibility rules exceed the Department's authority under § 487 of the HEA. ...............................................61**

    **2. Many elements of the proposed financial responsibility rules are unreasonable and unsupported by any factual record, as detailed in the section-by-section comments and suggestions. ...............................................63**

  B. Factors of Financial Responsibility (Proposed § 668.15) ......................................63

    **1. The Department must ensure that all statutorily required provisions found in § 668.15 are preserved. ...............................................63**

  C. Compliance Audits and Audited Financial Statements (Proposed § 668.23(d)(5)) .....................64

    **1. The proposed requirement that institutions disclose expenditures relating to recruiting, advertising, and other pre-enrollment activities is unwarranted and unreasonable. ...............................................64**

  D. General Standards of Financial Responsibility (Proposed § 668.171(b)) .....................................65

    **1. The proposed financial responsibility standards create an unreasonable and unnecessarily complex framework. ...............................................65**

    **2. The proposed financial responsibility standards that do not include a materiality threshold are unreasonable. ...............................................66**

    **3. Any determination of financial responsibility that does not involve input from an institution is unreasonable. ...............................................67**

The Honorable Miguel A. Cardona
Secretary of Education
Page 6 of 87

4.  **Financial responsibility events or actions that are speculative or unquantifiable are unreasonable.**.................................................................................................**67**

E.  Financial Responsibility Triggers (Proposed § 668.171(c-d)) ...........................................68

1.  **The proposed "automatic" failures of financial responsibility are inconsistent with HEA § 498(c)(3) and the current regulatory language found at § 668.171(f).**...................**68**
2.  **The proposed method of assessing financial protection is inconsistent with HEA § 498(e).**.......................................................................................................**68**
3.  **The proposed standard for removing financial protection is unreasonable.** ....................**69**
4.  **The proposed financial responsibility trigger related to lawsuits and other actions is unreasonable.**.......................................................................................**69**
5.  **The proposed financial responsibility trigger related to institutions initiating a change in ownership is unreasonable.** .................................................................**70**
6.  **The proposed financial responsibility trigger related to teach-out plans is unreasonable.**.............................................................................................**70**
7.  **The proposed trigger related to State actions is unreasonable.** ...................................**71**
8.  **The proposed trigger related to the U.S. Securities and Exchange Commission ("SEC") reports is unreasonable.**.........................................................................**72**
9.  **The proposed trigger related to creditor events is unreasonable.** ................................**72**
10. **For its discretionary triggers, the applicable standard should be "material" adverse effect rather than "significant" adverse effect.**.................................................**72**
11. **The Department should include criteria for how it will interpret an adverse effect on the financial condition of the institution in regulation.**...............................**72**
12. **Any list of discretionary triggers should be finite.**..............................................**73**
13. **The Department should remove or clarify vague or arbitrary discretionary triggers.** ........**73**

F.  Recalculating the Composite Score (Proposed § 668.171(e)). .......................................... 73

G.  Reporting Requirements (Proposed § 668.171(f))...........................................................74

1.  **The Department should create a simpler reporting framework for institutions.**...............**74**
2.  **The Department should remove proposed § 668.171(f)(1)(iii).** .........................................**74**

H.  Audit Opinion and Disclosures (Proposed § 668.171(h)).................................................74

I.  Alternative Standards and Requirements (Proposed § 668.175) ......................................75

J.  Change in Ownership (Proposed § 668.176) ..................................................................75

1.  **The Department should abandon changes that would have an unnecessary chilling effect on change in ownership transactions.** ...................................................**75**
2.  **The Department should foster certainty and predictability for institutions engaging in change in ownership transactions.** ...................................................**76**

IV.  CERTIFICATION PROCEDURES........................................................................................76

A.  Certification Procedures (Proposed § 668.13)................................................................76

1.  **Removing the timeframe at proposed § 668.13(b)(3) is counterproductive and harmful to institutions.** .............................................................................**76**
2.  **Proposed § 668.13(c)(1)(i)(D),(F), and (G) and § 668.13(c)(1)(ii)(A) and (B) exceed the Department's authority under §§ 487(d)(2) and 498(h) of the HEA.** .........................**77**

    **3.  Factors proposed under § 668.13(e) exceed the Department's authority under § 498(b) of the HEA.** ........................................................................................... **77**

  B.  Program Participation Agreement (Proposed § 668.14). ........................................ 78

    **1.  The co-signature requirement at proposed § 668.14(a)(3)(ii) is inconsistent with the Department's statutory authority under § 498(e) of the HEA.** ..................... **78**

    **2.  Proposed § 668.14(b)(26) is inconsistent with the Department's statutory authority.** ......................................................................................................... **79**

    **3.  Proposed § 668.14(b)(32) and § 668.43(a)(5) should be removed and addressed during the Department's upcoming State Authorization rulemaking.** ................ **80**

    **4.  Proposed § 668.14(e) exceeds the Department's authority under § 498 of the HEA.** ...... **82**

    **5.  Proposed § 668.14(b)(34) should be revised to avoid unintended consequences.** ............ **82**

V.  ADMINISTRATIVE CAPABILITY ........................................................................................ 83

  A.  Adequate Financial Aid Counseling (Proposed § 668.16(h)) .................................. 83

  B.  Significant Negative Action or Finding (Proposed § 668.16(n)) ............................... 83

  C.  Adequate Career Services (Proposed § 668.16(q)) ................................................. 84

    **1.  Accreditors – and especially accreditors of career schools – already require that institutions provide career services, calculate and disclose placement and employment rates, and satisfy related thresholds.** ............................................ **84**

    **2.  The Department's statutory obligation is to determine whether institutions have the capability to administer the Title IV programs, and we do not believe there is a sufficient nexus between the administration of the Title IV programs and the adequacy of their career services to assert that the latter is an element of the former.** ........................................................................................................ **84**

    **3.  The proposed standards articulated by the Department for determining the adequacy of such services are vague and do not represent a clear metric against which institutions could measure their likely compliance.** ................................. **84**

  D.  Provide Clinical or Externship Opportunities (Proposed § 668.16(r)) ......................... 85

  E.  Delayed Disbursements (Proposed § 668.16(s)) ................................................... 85

    **1.  The Department should eliminate the condition related to student complaints or specify with more detail how student complaints could trigger noncompliance.** .............. **85**

    **2.  The Department should eliminate the condition related to high rates of withdrawals attributable to delays in disbursements.** ...................................... **86**

  F.  Title IV Funds from Failing Gainful Employment Programs (Proposed § 668.16(t)) ..................... 86

VI.  ABILITY TO BENEFIT ...................................................................................................... 87

  A.  The Department should increase the enrollment cap for the approved State process. .............. 87

  B.  The Department should not define a time period for determining an appropriate success rate. ...................................................................................................................... 87

  C.  The Department should define the proposed eligible career pathway program compliance requirements in greater detail. ............................................................ 87

The Honorable Miguel A. Cardona
Secretary of Education
Page 8 of 87

## I.      INTRODUCTION

CECU submits these comments to the Proposed Rule in order to vocalize support for select concepts, to highlight various concerns, and to make recommendations for improvement. At a minimum, we observe that the Proposed Rule must be revised in certain respects to be consistent with the United States Constitution, the Administrative Procedure Act ("APA"), and the Higher Education Act ("HEA"). With the exception of the initial, global position statement below (Part II.A), the comments address the Proposed Rule in a section-by-section format.

## II.     FINANCIAL VALUE TRANSPARENCY AND GAINFUL EMPLOYMENT

### A.      Global Position Statement

CECU generally supports an accountability framework that protects students and taxpayers and respects institutional missions through the disclosure of meaningful, well-reasoned, and accurate student outcome metrics for all Title IV programs at all Title IV-participating institutions. As compared to prior versions of the GE rule, the Department's proposed Financial Value Transparency and Gainful Employment framework is a step in the right direction, insofar as it would extend the calculation and disclosure of debt-to-earnings ("D/E") rates and an earnings premium to both non-GE programs (degree programs offered by public and private nonprofit institutions) and GE programs (non-degree programs offered by public and private nonprofit institutions and all programs offered by proprietary institutions). Unfortunately, and for reasons discussed in more detail below, the proposed GE rule continues to fall short in most other respects.

As an initial matter, we observe that the D/E rates and earnings premium measure advanced in the NPRM do not constitute meaningful, well-reasoned, or accurate student outcome metrics. Both measures are impacted by a wide range of unresolved issues that have been discussed at length during prior negotiated rulemakings, comment periods, and court proceedings. In particular, the Department has failed to offer any solution to the myriad issues with its earnings data – issues openly acknowledged during the 2019 rulemaking – including the impact of wage discrimination, geography, or market events (e.g., a pandemic), and the inability to account for unreported income, unearned income, and self-employment income.[1]

We also are deeply disappointed that the Department has advanced a rule that omits critical review and appeal mechanisms that were present in the 2014 GE rule and were designed to ensure fair process and the use of the best possible data. Mechanisms, we note, that were created and endorsed by the Obama administration "in the interest of fairness and due process."[2] These omissions, presumably made in an effort to speed the calculation and determination process, can only increase the likelihood of erroneous

---

[1] *See, for example*, 84 Fed. Reg. 31414 (July 1, 2019) ("[P]rograms with larger proportions of women and minorities may achieve poorer outcomes under the D/E rates measure. It is unlikely that students who complete GE programs are not subjected to the same gender and race pay disparities that exist across the general population.").

[2] *See, for example*, 79 Fed. Reg. 16485 (March 25, 2014) ("The proposed regulations are intended to provide institutions, in the interest of fairness and due process, with an adequate opportunity to challenge the completion, withdrawal, and repayment rates and median loan debt determined by the Department. The proposed regulations would also establish a clear administrative process to determine when a program's completion, withdrawal, and repayment rates, median loan debt, and median earnings information are final and, therefore, required to be disclosed.").

The Honorable Miguel A. Cardona
Secretary of Education
Page 9 of 87

outcomes. We remind the Department that erroneous outcomes lead to the erroneous loss of program access for students, jobs for instructors, and for single-program institutions, overall operational viability.

Most concerning is the Department's continued insistence on promoting an accountability framework that is unequal in its application, in this case advancing a disclosure-only, accountability model for non-GE programs and an eligibility-based, accountability model for GE programs.

To be clear, there is no sound policy basis for drawing a distinction between GE programs and non-GE programs when creating an accountability framework, whether that be with regard to the metrics calculated or the sanctions imposed. The Department does not (and cannot) explain in the NPRM why a master's in business administration ("MBA") program at a public or private, nonprofit institution that has failing D/E rates for two consecutive years should maintain its Title IV eligibility, while an MBA program at a proprietary institution that has the same exact failing D/E rates for two consecutive years should not. Certainly, the institution's tax exempt status should not be the deciding factor in an accountability framework that is supposed to be based on student outcomes metrics. The deciding factor should be the program's performance as measured by the metrics. An accountability framework that would treat identical Title IV programs with identical performance metrics differently for reasons unrelated to their performance is irrational, arbitrary, and capricious. Put differently, "[p]rogram level data and accountability enable accountability systems to use a scalpel rather than a sledgehammer. Therefore, policymakers should no longer be talking about targeting higher education sectors or even institutions. Since every failing program can be identified and sanctioned, punishing entire sectors or institutions entails unfair and unnecessary collateral damage to programs that benefit students."[3]

Moreover, available data demonstrate that there is no performance-based reason to draw such a distinction. Research suggests that "a significant share of programs at for-profit institutions fail the GE rule because they are not subsidized by state and local legislatures, not because they offer low-quality programs vis-à-vis their public peers. An apples-to-apples comparison of public and for-profit institutions would eliminate most, but not all, of the disparity in GE pass rates between the two sectors."[4] Much has been made of the Department's first and only release of gainful employment results under the 2014 Rule, which showed that, of the 703 programs failing the debt-to-earnings measures, 98 percent of the programs were at for-profit institutions.[5] However, data demonstrate that, by excluding most programs at public and private nonprofit universities, the gainful employment framework failed to evaluate the vast majority of programs that result in excessive student loan debt. In fact, when all programs at all colleges are subjected to the same debt-to-earnings measures, proprietary schools account for 11 percent of failing programs—not 98 percent.[6]

---

[3] Andrew Gillen, *Lessons from Gainful Employment: Improvements to Replicate and a Mistake to Avoid*, Tex. Pub. Policy Found. pg. 2-3 (Feb. 14, 2022), *available at* https://www.texaspolicy.com/lessons-from-gainful-employment-improvements-to-replicate-and-a-mistake-to-avoid/.

[4] Preston Cooper & Jason D. Delisle, *Measuring Quality or Subsidy? How State Appropriations Rig the Federal Gainful Employment Test*, Am. Ent. Inst., pg. 11 (March 2017), *available at* https://www.aei.org/wp-content/uploads/2017/03/Measuring-Quality-or-Subsidy.pdf?x91208.

[5] U.S. Dept. of Educ., *Gainful Employment Information (Data Set)*, Fed. Student Aid, *available at* https://studentaid.gov/data-center/school/ge.

[6] Andrew Gillen, *Lessons from Gainful Employment: Improvements to Replicate and a Mistake to Avoid*, Tex. Pub. Policy Found. pg. 6 (Feb. 14, 2022), *available at* https://www.texaspolicy.com/lessons-from-gainful-employment-improvements-to-replicate-and-a-mistake-to-avoid/.

The Honorable Miguel A. Cardona
Secretary of Education
Page 10 of 87

More to the point, the Department's own data demonstrate that more students are enrolled in non-GE programs that fail at least one of the proposed metrics than in GE programs. In its Regulatory Impact Analysis, the Department projects over 875,000 students in 1,633 failing non-GE programs, as compared to approximately 700,000 students in 1,775 failing GE programs.[7] Specifically, the NPRM indicates 873 public programs (representing 561,100 students) and 760 private, nonprofit degree programs (representing 313,900 students) would fail at least one of the D/E rate or earnings premium tests.[8] The Department also observes that rates of not passing at least one of the tests are particularly high "for professional programs in law (19.6 percent of law programs, representing 29.2 percent of enrollment in law programs), theology (6.6 percent, 25.4 percent) and health (9.7 percent, 18.6 percent)."[9] An accountability framework that applies lesser sanctions to the class of Title IV programs that fail the most students is irrational in the extreme.

Not only does the Department's continued insistence on drawing a distinction between GE and non-GE programs lack any reasonable policy basis, the Department lacks the statutory authority to attach an accountability framework to the phrase "gainful employment." From the date of its enactment in 1965, the HEA has required all programs offered by proprietary institutions, and all non-degree programs offered by public and private nonprofit institutions, to "prepare students for gainful employment in a recognized occupation."[10] However, at no time has the Department been directed or authorized by Congress to develop a system for measuring whether programs were satisfying this "gainful employment" standard. As the Department observed in 2019:

> Despite numerous reauthorizations of the HEA between 1964 and 2008, Congress never attempted to define 'gainful employment' based on a mathematical formula nor did it attempt to define the term using threshold debt-to-earnings ratios. Congress never attempted to prohibit students who attended GE programs from participating in income-driven repayment (IDR) programs. In addition, the GE regulations were also identified in 2015 by the bipartisan Senate Task Force on Higher Education Regulation as a glaring example of the Department's "increasing appetite" for regulation.[11]

Ultimately, the Department concluded that "it is dangerous and inappropriate for [the Department] to use two words in the HEA to create an approach to institutional accountability, that could potentially be used to manipulate the higher education marketplace."[12] In the NPRM, the Department cites a range of broad statutory authorities as the basis for its proposal, but nowhere does it point to specific authorization from Congress to define the phrase "gainful employment" or to embed an accountability framework into the definition of this undefined, two-word phrase. Nor does the Department sufficiently explain why, only three years after it concluded that this approach was "dangerous and inappropriate," it now believes it is worthy of becoming the law of the land, a law that, as articulated in this very NPRM, would eliminate access to Title IV for over 700,000 Federally-aided students enrolled in nearly 1,800 career training programs.[13] Absent sufficient rationale, this reversal is, by definition, arbitrary and capricious, as well as

---

[7] *See* 88 Fed. Reg. 32418-32421 (May 19, 2023).
[8] *See* 88 Fed. Reg. 32418-32421 (May 19, 2023).
[9] *See* 88 Fed. Reg. 32418-32421 (May 19, 2023).
[10] *See* Pub. L. No. 89-329 (Nov. 8, 1965).
[11] 84 Fed. Reg. 31402 (July 1, 2019).
[12] 84 Fed. Reg. 31411 (July 1, 2019).
[13] 88 Fed. Reg. 32421 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 11 of 87

lacking statutory authority.[14] If the Department wishes to pursue a GE type framework, it must seek explicit congressional authorization to do so.

Instead of manufacturing a distinction between non-GE and GE programs, the Department should simply apply the Financial Value Transparency component of its proposed framework to all programs and institutions. The resulting framework would exclusively rely on consumer disclosures, and be applied equally to all Title IV programs at all Title IV-participating institutions. Although there are still significant issues to resolve regarding the proposed metrics, this would represent a reasonable and fair approach, authorized under the Department's existing statutory authority to collect and distribute consumer information. As a practical matter, we also believe this is an approach that would be endorsed by most future administrations, and, provided the metrics were refined, embraced by higher education. The Department previously recognized the merit of this approach, observing that "the most effective method to increase accountability and transparency, under current law, for all programs is through a disclosure-only protocol[.]"[15]

This having been said, if the Department insists on making Title IV eligibility determinations based on each program's student outcome performance, it must make such determinations for all Title IV eligible programs, without regard to whether they "prepare students for gainful employment in a recognized occupation."[16] As noted above, there is no rational basis for drawing a distinction between non-GE and GE programs. All Title IV-participating programs should be measured and sanctioned similarly. We are aware the Department has argued in the past that it lacks the statutory authority to require degree programs at institutions of higher education (as defined at 20 U.S.C. § 1002) to comply with the "gainful employment" rule. As we repeatedly have observed, however, the Department has the ability to require all programs at all institutions to demonstrate compliance with D/E rate thresholds and other metrics under its statutory authority at 20 U.S.C. § 1087d. Here, Congress specifically authorized the Department to include in the program participation agreement between institutions and the Department "such other provisions as the Secretary determines are necessary to protect the interests of the United States and to promote the purposes of this part." More specifically, Congress authorized the Department to require institutions to participate in a "quality assurance system, as established by the Secretary and developed in consultation with institutions of higher education, to ensure that the institution is complying with program requirements and meeting program objectives." Pursuant to this authority, the agency could require institutions, as a condition of continued participation, to demonstrate that their programs meet certain eligibility requirements, such as compliance with prescribed metrics, without reference to their status as non-GE or GE.

As we conclude these threshold comments, we observe our considerable dissatisfaction with the extremely limited amount of time the Department has afforded institution's to negotiate and comment on the NPRM, and specifically, the proposed Financial Value Transparency and GE rule. The suggested framework is lengthy, the calculations are complex, and the research and data cited by the Department is voluminous. Moreover, the stakes for institutions of higher education, their students, and the communities they serve are very high. Even if a program maintains eligibility, the implications for financial, business, and admissions offices are extraordinary, and the administrative burden placed on institutions

---

[14] Additional discussion regarding the Department's lack of statutory authority is included Section II.H below.
[15] 84 Fed. Reg. 31404 (July 1, 2019).
[16] *See* Public Law 89-329 (Nov. 8, 1965).

The Honorable Miguel A. Cardona
Secretary of Education
Page 12 of 87

is extreme. For proprietary institutions with only one or two programs, the Proposed Rule could result in the closure of the school.

In the past, entire rulemakings were dedicated to the GE framework. The Obama administration devoted 51 hours to negotiating the 2014 version over the course of seven days, and the Trump administration devoted 72 hours to negotiations over the course of nine days prior to rescinding the rule. During this most recent negotiated rulemaking, negotiators had approximately 12 hours over two days to discuss the Department's proposed language, prompting the Department's own negotiator to acknowledge on the record that "I understand that given the number of topics that we have on this table that there is less time devoted to GE than has been in the past and that time constraints are tight."[17] Perhaps for this reason, during the final vote on the new GE rule, all six institutional representatives voted against the Department's proposal, including the negotiators representing minority-serving institutions, two-year public institutions, four-year public institutions, private nonprofit institutions, financial aid administrators, and proprietary institutions.

We also emphasize that this administration has afforded the shortest period for comments – the minimum 30 days required under law – to evaluate its dense, complex, and consequential 1,077-page proposal (unofficial version), which was also supplemented with Program Performance Data that included over 155,000 lines of data, despite providing itself 425 days to write and publish its proposal after negotiated rulemaking concluded. The Obama administration, in contrast, afforded the public a full 60 days to comment on its similarly complex, proposed GE rule in 2014.[18]

Finally, we express our deep concern that a mere four years after it rescinded the 2014 Rule, the Department now revives the GE framework in its strictest form to date. In doing so, the Department is requiring institutions to expend substantial human and monetary resources to create new compliance infrastructures to comply with the Proposed Rule. These costs cannot simply be absorbed by institutions, but ultimately must be passed along to the institutions' consumers (i.e., current and future students).

An agency must provide a greater justification for a policy change when the agency's "prior policy has engendered serious reliance interests that must be taken into account."[19] In such a case, the agency must not only justify the reasons underlying the new policy, but also must provide an explanation for why the agency is "disregarding facts and circumstances that underlay or were engendered by the prior policy."[20] "It would be arbitrary or capricious" to do otherwise.[21]

Here, by the Department's own admission, "institutions would incur costs as they make changes needed to comply, including costs associated with the reporting, disclosure, and acknowledgment requirements.

---

[17] Greg Martin, Federal Negotiator, Session 2, Day 2, Morning, Feb. 15, 2022, Institutional and Programmatic Eligibility Negotiated Rulemaking.

[18] *See* 57 Fed. Reg. 16426 (March 25, 2014). The Trump administration only afforded a 30-day comment period for review of its proposed rescission of the 2014 GE rule. However, at 17 pages, that proposal is not a meaningful comparison.

[19] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Encino*, 136 S. Ct., at 2126 (warning agencies to be "cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account") (internal quotations omitted).

[20] *Fox Televisions Stations, Inc.*, 556 U.S., at 515-16.

[21] *Fox Televisions Stations, Inc.*, 556 U.S., at 515.

The Honorable Miguel A. Cardona
Secretary of Education
Page 13 of 87

These costs could include: (1) training staff for additional duties, (2) hiring new employees, (3) purchasing new, or modifying existing, software or equipment, and (4) procuring external services."[22] The Department's prior policy (the 2019 Recission) has "engendered serious reliance interests" for institutions, which presently have no cost or compliance obligations related to GE.[23] The Department fails to provide "greater justification" for this policy reversal, rendering the proposed framework arbitrary and capricious.[24]

### B.    Financial Value Transparency Framework (Subpart Q: 668.401 - 668.402)

As a threshold matter, we agree that the Department has the statutory authority to create the financial value transparency framework and apply it to all Title IV programs. As the Department aptly points out, it has "generally applicable rulemaking authority, which includes provisions regarding data collection and dissemination[,]"[25] in addition to other HEA directives regarding the Department's authority to request and distribute information gathered from Title IV institutions. The Department also has the authority to require all programs at all institutions to demonstrate compliance with D/E rate thresholds (and other metrics) under its statutory quality assurance authority in 20 U.S.C. § 1087(d)(a)(4).

We agree with the Department's proposal to wield its statutory authority for purposes of promulgating the financial value transparency framework and applying it to all programs at all institutions. CECU strongly believes that all students, regardless of program type, would benefit from meaningful student outcomes information.[26] As the Department has implicitly acknowledged, there is no sound policy justification for denying important outcomes information to students in degree programs at any institution of higher education. If D/E rates are deemed important and useful information, they are important and useful for all students. In fact, there is greater need among students of public institutions and private, nonprofit institutions. According to the Department's own data, as of the first quarter of fiscal year 2023, 5.2 million graduates of public institutions, 3.1 million graduates of private, nonprofit institutions, and 2.7 million graduates of proprietary institutions were participating in income-driven repayment plans.[27] These are graduates who have represented to the Department that they are not presently able to afford their student loan debt based on their income and family size, and most of them attended programs outside the proprietary sector.[28]

However, despite our general support for the financial value transparency framework, we have a number of significant concerns with the Department's specific proposal. We comment on discrete concepts within the financial value transparency proposal section-by-section below.

---

[22] 88 Fed. Reg. 32440 (May 19, 2023).

[23] *Fox Televisions Stations, Inc.*, 556 U.S., at 515-16.

[24] *Fox Televisions Stations, Inc.*, 556 U.S., at 515.

[25] 88 Fed. Reg. 32321 (May 19, 2023).

[26] *See Comments of Career Education Colleges and Universities in Response to the Request for Information (Docket ID ED–2022–OUS–0140): Low-Financial-Value Postsecondary Programs,* CAREER EDUC. COLLEGES AND UNIVERSITIES, *available at* https://downloads.regulations.gov/ED-2022-OUS-0140-0055/attachment_1.pdf.

[27] *See IDR Portfolio by School Type*, U.S. Dep't of Educ., *available at* https://studentaid.gov/data-center/student/portfolio.

[28] *See IDR Portfolio by School Type*, U.S. Dep't of Educ., *available at* https://studentaid.gov/data-center/student/portfolio.

The Honorable Miguel A. Cardona
Secretary of Education
Page 14 of 87

1.  **The Proposed Rule's D/E rates do not provide meaningful, well-reasoned, and accurate student outcome metrics.**

The Proposed Rule's D/E rates do not remotely represent a measure of overall program quality. In 2019, the Department conceded this point, observing that the "D/E rates measure is an inaccurate and unreliable proxy for program quality."[29] And as the Department noted in the preamble to the Proposed Rule, "[c]hoosing whether and where to pursue a postsecondary education is one of the most important and consequential investments individuals make during their lifetimes. The considerations are not purely, or in many cases even primarily, financial in nature." More recently, the American Council on Education observed in its February 10, 2023 letter to the Department that "it is not possible to establish a metric or metrics that will fully capture all of the relevant information - both qualitative and quantitative - that would theoretically be used to determine value."[30]

It also is the case that the D/E rates do not accurately assess, nor do they even claim to assess, the financial value of a program over a graduate's lifetime. The Department previously acknowledged this indisputable point, stating that it "agrees that D/E rates, based on earnings in the third and fourth year following completion of a program, do not accurately predict how much a graduate will earn over a lifetime."[31]

At best, the D/E rates suggest the ability of a graduate to service his or her loan debt in the years immediately following graduation. However, the Proposed Rule's D/E rates are not a meaningful measure of graduates' ability to service loan debt either because they have universal access to, and are encouraged to take advantage of, the Department's income-driven repayment programs such as REPAYE. As the Department acknowledged in 2019, the availability of such IDR programs renders the D/E rate thresholds "obsolete," as no borrower is actually required to repay loans under a standard payment plan.[32] Moreover, Congressional support for IDR plans makes it clear that Congress does not wish for a student to feel compelled to select the highest paying major or job, to select the lowest cost educational opportunity, or to abandon his or her interests in lower-paying careers, such as public service careers, in order to meet student loan repayment obligations under the standard, 10-year repayment plan. Thus, the GE regulations do not align with Congressional intent.[33]

We also observe that the Department erred in relying on mortgage industry practices as the template for the D/E measures. In the preamble to the Proposed Rule, the Department reveals that "[t]he proposed thresholds for the discretionary D/E rate and the annual D/E rate are based upon expert recommendations and mortgage industry practices. The acceptable threshold of 8 percent for the annual D/E rate used in the proposed regulations has been a reasonably common mortgage underwriting standard, as many lenders typically recommend that all nonmortgage loan installments not exceed 8 percent of the borrower's pretaxed income."[34] As the Department stated in the NPRM, it is true that "[c]omparing debt to earnings is a commonly accepted practice when making determinations about a

---

[29] 84 Fed. Reg. 31392 (July 1, 2019).
[30] Ted Mitchell, *Low Financial Value Programs RFI Comment Letter*, AM. COUNCIL ON EDUC., (Feb. 10, 2023), *available at* https://www.acenet.edu/Documents/Comments-ED-RFI-LFVP-021023.pdf.
[31] 84 Fed. Reg. 31410 (July 1, 2019).
[32] 84 Fed. Reg. 31407 (July 1, 2019).
[33] 84 Fed. Reg. 31402 (July 1, 2019).
[34] 88 Fed. Reg. 32326 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 15 of 87

person's relative financial strength, such as when a lender assesses suitability for a mortgage or other financial product."[35]

However, mortgage standards are a misplaced comparison. Unlike mortgage debt, Congress has specifically authorized Title IV loans to be available to students of all income levels regardless of their creditworthiness and other qualities that might be considered by mortgage lenders. The two types of debt – Federal student loans and residential mortgages—are not comparable. The Department's attempt to equate them flies in the face of the public policy underlying the HEA, which does not subject borrowers to such considerations. The Department is seeking to regulate in a way that conflicts with duly-passed statutes established by Congress and, thus, is acting arbitrarily and capriciously and contrary to law.[36]

In addition, the Department, unlike mortgage underwriters, does not have access to the program completers' actual annual earnings, but only the completers' earnings as reported to a yet-to-be-named Federal agency ("Earnings Agency"), such as the Internal Revenue Service ("IRS"). Earnings data from Federal agencies offer an incomplete picture of a completer's actual annual earnings, due to deductions for health insurance, 401(k) plan contributions, nonmonetary or cash benefits, equity compensation, etc.

> **2.** **The Department's decision to change the D/E rate thresholds once again is arbitrary and capricious.**

The Department acknowledges that "[t]his proposed rule departs from the 2019 rescission, as well as the 2014 Prior Rule" in terms of the D/E rate thresholds.[37] However, the Department's "departure" from the prior versions of the rule stops woefully short of accurately describing the Department's wholesale revival of the GE framework, which the Department rescinded entirely a mere four years ago.

Such a departure is not permissible because the Department has failed to satisfy its basic procedural requirement of providing "adequate reasons for its decisions."[38] To meet this requirement, "the agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"[39] This analysis must be made expressly by the agency; courts will not "speculate on reasons that might have supported an agency's decision."[40] If the agency does not provide "that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."[41]

Such is the case here. There is no evidence that the Department "examine[d] the relevant data" or considered "all the relevant factors" before promulgating the Proposed Rule. Indeed, there appears to be very little effort to document that the Proposed Rule will, in fact, achieve the Department's stated goals

---

[35] 88 Fed. Reg. 32325 (May 19, 2023).

[36] *See, e.g., Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) ("The authority to issue regulations is not the power to make law, and a regulation contrary to a statute is void.").

[37] 88 Fed. Reg. 32307 (May 19, 2023).

[38] *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

[39] *Encino*, 136 S.Ct. at 2125 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); see *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 766 (9th Cir. 2007) ("An agency action is not supportable if it did not consider all the relevant factors and if there is no rational connection between the facts found and the determination made.").

[40] *Encino*, 136 S.Ct., at 2127.

[41] *Encino*, 136 S.Ct., at 2125.

(e.g., "promote transparency, competence, stability, and effective outcomes for students"[42]), opting instead to rely on "we believe" statements as the basis for the agency's decision-making.[43] In one poignant example of this, the Department stated in 2019 that "the formula for deriving D/ E rates is complicated and that it may be difficult for students and parents to understand how it was calculated and how to apply it to their own situation to determine what their likely debt and earnings outcomes will be."[44] However, in the Proposed Rule, the Department intends the information to be "timely, personalized, and easy to understand,"[45] "believing" that such information will assist students in "making better informed choices about whether and where to enroll."[46] Without evidence that the Department reasoned through this 180-degree change, and many other proposals like it, the Department's Proposed Rule is arbitrary and capricious.

Additionally, the Department has not provided any convincing analysis demonstrating that the new D/E standards would be more efficient or effective than those previously promulgated. For example, the Department has previously concluded that the agency "has no empirical basis for the 8 percent threshold and will, therefore, no longer use it to determine title IV program eligibility."[47] But under the Proposed Rule, the 8 percent threshold returns, unaccompanied by any reasoned explanation for why it now represents an "empirical basis" for distinguishing between passing and failing programs.

Perhaps most remarkably, the Department fails to offer any rational basis for its departure from the 2019 Recission.  Although "[a]gencies are free to change their existing policies," they may do so only if "they provide a reasoned explanation for the change."[48] This means that, in order to justify a policy change, the agency must "display awareness that it is changing position" and "show that there are good reasons for the new policy."[49] "[A]n '[u]nexplained inconsistency' in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'"[50]

As recently as 2019, the Department concluded that it:

> has determined that the GE regulations rely on a debt-to- earnings (D/E) rates formula that is fundamentally flawed and inconsistent with the requirements of currently available student loan repayment programs, fails to properly account for factors other than institutional or program quality that directly influence student earnings and other outcomes, fails to provide transparency regarding program-level debt and earnings outcomes for all academic programs, and wrongfully targets some academic programs and institutions while ignoring other programs that may result in lesser outcomes and higher student debt. Although the GE regulation applies to less-than-degree programs at

---

[42] 88 Fed. Reg. 32300 (May 19, 2023).

[43] *See generally* 88 Fed. Reg. 32313 (containing 84 instances of the phrase "we believe" preceding an unfounded assertion as the explanation for the Department's proposal).

[44] 84 Fed. Reg. 31396 (July 1, 2019).

[45] 88 Fed. Reg. 32325 (May 19, 2023).

[46] 88 Fed. Reg. 32325 (May 19, 2023).

[47] 84 Fed. Reg. 31407 (July 1, 2019).

[48] *Encino*, 136 S.Ct. at 2125.

[49] *Encino*, 136 S.Ct. at 2126. (*quoting FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

[50] *Encino*, 136 S.Ct. at 2126. (*quoting Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)); see *Huntington Hosp. v. Thompson*, 319 F.3d 74, 79 (2d Cir. 2003) (holding that an agency cannot "adopt inconsistent positions without presenting 'some reasoned analysis.'" (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 57)).

non-profit institutions, this represents a very small percentage of academic programs offered by non-profit institutions.[51]

Because the Department has failed to address why it believes these conclusions from the 2019 Recission are no longer valid, it has acted arbitrarily and capriciously in reinstating the GE framework.

This is not to say that the Department has not provided any explanation at all. Indeed, the Department published a very lengthy preamble describing the basis for the Proposed Rule. However, in all 189 preamble pages, the Department failed to effectively communicate a "reasoned explanation" for the proposal to "change their *existing policies*."[52] To be clear, the Department's "existing policy" is the 2019 Recission of the GE rule—not the 2014 Rule. Curiously, though, the Department devoted the vast majority of its analysis to comparing and contrasting the Proposed Rule with the 2014 Rule (referenced 44 times in the preamble),[53] rather than justifying the Proposed Rule against the backdrop of the existing policy (the 2019 Rescission, which is referenced just 12 times in the preamble), as the Department is legally required to do.

But even if comparisons to the 2014 Rule were sufficient to meet the Department's legal burden to provide a rational basis for the policy change (and they are not), contrary to the Department's assertions, the Proposed Rule is not merely a return to the 2014 Rule. The Proposed Rule augments the 2014 Rules substantially, creating, in the Department's own words, the "strongest" GE rule to date[54]—all without a legally satisfactory explanation for the change.

> ### 3. If the Department moves forward with the Proposed Rule's D/E rates, the Department should not eliminate the "zone" and thereby effectively tighten the D/E rate thresholds once again.

With each iteration of the D/E rates, the Department has arbitrarily changed the D/E rate thresholds for GE programs, in each case making it more difficult for programs to remain eligible. Under the 2011 rule, a program was only deemed failing if its D/E rate exceeded 12 percent and its debt-to-discretionary income rate exceeded 30 percent. Under the 2014 Rule, a program was deemed failing if its D/E rate exceeded 8 percent and its debt-to-discretionary income rate exceeded 20 percent. The 2014 Rule, however, included a "zone" concept, allowing a program additional time to come into compliance if its D/E rate was between 8 percent and 12 percent or its debt-to-discretionary income rate was between 20 percent and 30 percent. In this most recent proposal, the thresholds remain at 8 percent and 20 percent and the zone concept has been removed. This is a material and disconcerting deviation from the 2014 framework that highlights the arbitrary nature of these thresholds. Indeed, the arbitrary nature of these thresholds was conceded by the Department in 2019, when it observed "the Department has no empirical

---

[51] 84 Fed. Reg. 31392 (July 1, 2019).

[52] *Encino*, 136 S.Ct. at 2125 (emphasis added).

[53] *See* 88 Fed. Reg. 32330 (May 19, 2023) for one of many examples: "The methodology we would use to calculate the D/E rates under the proposed regulations is largely similar to that of the 2014 Prior Rule. We discuss our reasoning by subject area."

[54] *Department of Education Releases Proposed Rules on Accountability for Certificate and For-Profit Programs and Transparency into Unaffordable Student Debt*, U.S. Dep't of Educ. (May 17, 2023), *available at* https://www.ed.gov/news/press-releases/department-education-releases-proposed-rules-accountability-certificate-and-profit-programs-and-transparency-unaffordable-student-debt.

The Honorable Miguel A. Cardona
Secretary of Education
Page 18 of 87

basis for the 8 percent threshold and will, therefore, no longer use it to determine title IV program eligibility. Moreover, under the 2011 GE regulation, the Department used a different set of thresholds that included 12 percent as the passing rate rather than 8 percent for the D/E rate. This further demonstrates the absence of a reasoned methodology for distinguishing between passing and failing programs."[55]

> **4.** **D/E rates calculated for graduate degree programs in particular should be strictly for informational purposes.**

As explained elsewhere, the Department lacks the statutory authority to attach an accountability framework to the phrase "gainful employment."  Although this is true for all higher education programs, the inclusion of graduate programs in a GE framework is particularly problematic for a number of reasons.

First, there is no evidence to suggest that Congress ever contemplated the possibility that proprietary institutions would offer graduate degree programs when drafting the definition of "proprietary institution" in the HEA.[56] If Congress did not consider this possibility, it follows that Congress could not have intended the requirement for an institution to provide "an eligible program of training to prepare students for gainful employment in a recognized occupation" to apply to graduate programs. Without such intent, the Department lacks the statutory authority to apply a GE framework to graduate programs.

Second, the problems with measuring D/E rates are even more acute when considering graduate programs. Graduate students already have completed undergraduate degrees and in many cases have significant employment experience prior to beginning their graduate program. Their future earnings will be significantly impacted by these factors and cannot be fairly and consistently attributed to their graduate degree program.

Students also attend graduate programs for a number of reasons, not all having to do with financial value. For example, students may attend a program to learn a new skill, pursue a passion, receive additional training in a field that furthers the public good without an expectation of additional compensation (for instance, ministry programs), or further lifelong learning.[57] Because a significant number of students attend programs for reasons other than to increase their earnings, ascribing a D/E metric would not measure the programs' academic quality or financial value. It is therefore not surprising, as noted by the Department's own analysis, that graduate programs failed GE "almost exclusively due to the failure of the D/E metric..."[58]

Graduate students are typically sophisticated and able to evaluate the costs and benefits of graduate degree programs. Having the Federal government remove financial aid from a particular graduate

---

[55] 84 Fed. Reg. 31407 (July 1, 2019).

[56] To reach this conclusion, we reviewed the full Congressional record and legislative history preceding the passage of the HEA in 1965.

[57] Many retirees, for instance, are going back to school to continue learning or foster important social connections. *See, e.g.* Sheila Callaham, *How This Man's "Post-Retirement" Degrees Keep Him Young, Vibrant And Connected*, FORBES, (Sept. 29, 2019), *available at* https://www.forbes.com/sites/sheilacallaham/2019/09/29/how-this-mans-post-retirement-degrees-keep-him-young-vibrant-and-connected/?sh=ea8d095337c6.

[58] 88 Fed. Reg. 32417 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 19 of 87

program or signal its opinion on the program's financial value unfairly limits a student's right to choose the program that is best for that student.

Lastly, as noted above, it is illogical that similar graduate programs are treated differently based on the tax status of the institution. An MBA is a prototypical vocational degree, yet an MBA at a nonprofit school is not subject to the full GE framework, while an MBA at a proprietary school would be subject to GE. All programs, but particularly vocational programs, should be evaluated consistently across institutions of higher education.

> **5.    The Department is correct in considering only the earnings of program graduates and excluding the earnings of non-completers from the metrics.**

Some consumer advocates have raised concerns that "[l]eaving out non-completers will make some low-quality programs look more effective than they are[.]"[59] Excluding non-completers from the calculation does not artificially inflate the D/E metrics, making programs "look more effective than they are." Rather, the metrics show exactly how effective a program is when a student actually completes it. Of course excluding non-completers will lead to better D/E rates. Quite predictably, people with academic credentials are more likely to be qualified for higher paying jobs that allow them to better service their debt.[60] And, non-completers acquire less debt because they do not attend programs for as long a time period as completers. The Obama administration acknowledged this, explaining that the D/E rate is not "an appropriate metric" for holding institutions accountable for the GE outcomes of non-completers, further stating "we agree that including students who do not complete a program in the D/E rates measure could have the perverse effect of improving the D/E rates of some of those programs because students who drop out early may accrue relatively lower amounts of debt than students who complete the program."[61] For this reason, the Department should maintain its position with regard to excluding non-completers from the metrics in the final rule.

> **6.    The Department correctly requires passage of either D/E ratio, rather than both.**

We strongly support the Department's proposal to require passage of either D/E ratio, rather than both. As explained by the Obama administration:

> The annual earnings rate and the discretionary income rate, which comprise the D/E rates measure, serve distinct and important purposes in the regulations. The annual earnings rate more accurately assesses programs with graduates that have low earnings but relatively low debt. The discretionary income rate will help capture programs with students that have higher debt but also relatively higher earnings.[62]

---

[59] Tia Caldwell, *Six Ways to Strengthen Gainful Employment Regulations*, New Am. (May 30, 2023), *available at* https://www.newamerica.org/education-policy/edcentral/gainful-employment-recommendations/.

[60] Tia Caldwell, *Six Ways to Strengthen Gainful Employment Regulations*, New Am., pg. 3, (May 30, 2023), *available at* https://www.newamerica.org/education-policy/edcentral/gainful-employment-recommendations/. ("This is both because students learn skills throughout their programs and because of selection bias. The students who are able to finish their college program even with limited support may also be more employable regardless of their education.").

[61] 79 Fed. Reg. 64929 (October 31, 2014).

[62] 79 Fed. Reg. 64925 (October 31, 2014).

The Honorable Miguel A. Cardona
Secretary of Education
Page 20 of 87

Requiring passage of both D/E rates would make programs ineligible "that, based on expert analysis, leave students with manageable levels of debt."[63] We believe the Department's approach is both reasonable and supportive of the public policy goals underlying the Proposed Rule.

### C.  Calculating D/E Rates (Subpart Q: 668.403)

As explained above, we believe that the Department has the statutory authority to require all Title IV programs to calculate and publish their D/E rates. However, it is critical that D/E calculations are based on accurate data and produce metrics that are meaningful and precise. In the Department's own words, "studies show that such information, when designed well, delivered by a trusted source, and provided at the right time can help improve choices and outcomes."[64] Given the high stakes, we believe there are several meaningful improvements to D/E calculations that can be made. We provide our detailed analysis of § 668.403 below.

#### 1.  The Department correctly caps loan debt for the D/E rate calculations at the net direct costs charged to a student.

In § 668.403(b)(1)(i), the Proposed Rule determines the loan debt of each student "based on the lesser of the loan debt incurred by [the] student as determined under paragraph (d) of this section or the total amount for tuition and fees and books, equipment, and supplies for each student, less the amount of institutional grant or scholarship funds provided to that student." We support this aspect of the Proposed Rule because institutions should not be held accountable for funds borrowed in excess of what is required to pay for tuition and fees (i.e., for room and board, living expenses, etc.). We agree with the Department's conclusion that it is fair to institutions that provide substantial assistance to students "to account for institutional grants and scholarships to ensure that the amount of debt disclosed under the D/E rates accurately reflects the borrowing necessary for the student to finance the direct costs of the program."[65]

#### 2.  We support the amortization periods varied by program type, with some recommendations for improvement.

The proposal to vary amortization periods by program type aligns with the public policy underlying income-driven repayment plans. For many programs across many institutions, it is often the case that graduates will not be able to fully manage their loan debt in the years immediately following their graduation. As the Department acknowledges in the Proposed Rule preamble, "[t]he amortization periods account for the typical outcome that borrowers who enroll in higher-credentialed programs (e.g., bachelor's and graduate degree programs) are likely to have more loan debt than borrowers who enroll in lower-credentialed programs and, as a result, are more likely to take longer to repay their loans.[66] The Department's various Income-Drive Repayment Plans were designed specifically with this issue in mind, permitting students to set their "monthly student loan payment at an amount that is intended to be

---

[63] 79 Fed. Reg. 64925 (October 31, 2014).
[64] 88 Fed. Reg. 32310 (May 19, 2023).
[65] 88 Fed. Reg. 32331 (May 19, 2023).
[66] 88 Fed. Reg. 32412 (May 19, 2023).

affordable based on [the student's] income."[67] We recommend that the Department revise its approach to amortization periods by implementing tiered periods based on the amount of debt a student owes up to the most extended repayment period allowed under IDR (i.e., 25 years). There is support for tying the amortization period to debt, as seen in the Department's Direct Consolidation Loan program. Under that program, the repayment period is based on the total Federal student loan debt, not the underlying credential, and is 10 years if the total debt is up to $7,500, 12 years if between $7,500 and $10,000, 15 years if between $10,000 and $20,000, 20 years if between $20,000 and $40,000, 25 years if between $40,000 and $60,000, and 30 years if $60,000 or more. Tying the amortization periods to debt will more closely align the Proposed Rule with the Department's existing practices, promoting consistency across the regulatory landscape and guarding the reliance interests of institutions.

### 3.    The Department should include an extended cohort period for any graduate healthcare or other program with a State-mandated internship or residency component.

The Department acknowledges that "[p]rofessional programs in Medicine (MD) and Dentistry (DDS) would have earnings measured over a longer time horizon to accommodate lengthy post-graduate internship training, where earnings are likely much lower three years after graduation than they would be even a few years further removed from completion."[68] However, medical and dental programs are not the only programs with required substantial post-graduation internship or residency periods (e.g., social work[69]). The Department should include a similar extended cohort period for any graduate healthcare or other program with a similar post-graduation State-mandated internship or residency component that extends the time needed for a graduate to obtain professional licensure and enter the workforce and achieve representative earnings.

### 4.    The Department correctly excludes Parent PLUS loans from the debt measure.

We support the exclusion under § 668.403(d)(i) of Direct PLUS loans made to parents of dependent students when determining the debt load for the students. The D/E rate is intended to measure the ability of a *student* to service his or her debt. To do so, the rate compares the student's debt load to his or her earnings. A Direct PLUS loan made to parents is not part of the student's debt load; it is the obligation of the parent. Including it in the D/E rate calculation is illogical and inappropriate. If the Department were to include Direct PLUS loans made to parents, it would also need to include the earnings of the parents in calculating D/E rates in order to maintain consistency.

As the Department aptly noted, "we believe that the primary purpose of the D/E rates is to indicate whether graduates of the program can afford to repay their educational debt. Repayment of PLUS loans obtained by a parent on behalf of a dependent student is ultimately the responsibility of the parent borrower, not the student. Moreover, the ability to repay parent PLUS debt depends largely upon the

---

[67] *If your federal student loan payments are high compared to your income, you may want to repay your loans under an income-driven repayment plan,* Fed. Student Aid, *available at* https://studentaid.gov/manage-loans/repayment/plans/income-driven.

[68] 88 Fed. Reg. 32412 (May 19, 2023).

[69] For example, the State of Nevada mandates the completion of 3,000 hours of supervised, post-graduation social work approved by the Board of Examiners for Social Workers. *See* Nev. Rev. Stat. § 641B.240(1)(b). Many States, like Nevada, also cap the number of hours that can be completed in a year.

The Honorable Miguel A. Cardona
Secretary of Education
Page 22 of 87

income of the parent borrower, who did not attend the program. We believe that including in a program's D/E rates the parent PLUS debt obtained on behalf of dependent students would cloud the meaning of the D/E rates and would ultimately render them less useful to students and families."[70]

5.    **We support the Department's decision to keep the interval between the award year of graduation and the calendar year for which earnings are calculated the same for every student.**

The proposed interval gives students an improved amount of time to establish normal earning levels and will provide for a more meaningful comparison of programs.

6.    **The Department should not implement any accountability framework based on D/E rates until the Department has resolved the many issues presented by the use of actual earnings data in the calculation of D/E rates.**

The D/E rates calculated by the Department are only as good as the data upon which they are based. If the underlying data is flawed or incomplete, the rates not only fail to serve their purpose, they can be harmful. Students may be dissuaded from attending good programs and persuaded to attend low-performing ones. A single program institution could erroneously be forced into closure. The Department has not yet meaningfully addressed the many issues that previously have been raised with the earnings data that would serve as the basis for the Annual Earnings determination and be used in both the D/E rates and the earnings premium calculations. As the Department acknowledged in 2019, "[u]ntil the Department has more sophisticated analytical tools that take into account the many variables other than institutional quality that impact both cost and outcomes, it is inappropriate to develop a scheme that imposes high-stakes sanctions…"[71]

7.    **The Department should develop a mechanism to account for the impact of wage discrimination on reported earnings.**

In the NPRM, the Department readily admits that "[o]n several dimensions, programs that have higher enrollment of underserved students have worse outcomes—lower completion, higher default, and lower post-college earnings levels—due to a myriad of challenges these students face, including fewer financial resources and structural discrimination in the labor market."[72] Accordingly, the Department should develop a mechanism to account for the impact of wage discrimination on reported earnings.

After conceding that "structural discrimination in the labor market" causes "lower post-college earnings levels" at "programs that have higher enrollment of underserved students," the Department insists:

The Department has considered that discrimination based on gender identity or race and ethnicity may influence the aggregate outcomes of programs that disproportionately enroll members of those groups. However, our analyses, and an ever-increasing body of academic research, strongly rebut the claim that differences across programs are solely

---

[70] 88 Fed. Reg. 32331 (May 19, 2023).
[71] 84 Fed. Reg. 31399 (July 1, 2019).
[72] 88 Fed. Reg. 32433 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 23 of 87

or primarily a reflection of the demographic or other characteristics of the students enrolled. [73]

But the very studies cited by the Department (found in footnote 26 of the NPRM)[74] refute or do not otherwise support this assertion. The Brookings Institution study focused on community colleges, which offer many programs similar to those offered by proprietary institutions. The authors state:

- "The racial/ethnic composition of a program and a program's NEP ["Net Earnings Premium"] are correlated and programs that serve more underrepresented minority students tend to have lower net earnings."
- "Gender is also correlated with net earnings in certificate programs, with a 10-percentage point increase in the share of the students who are women being correlated with a $610 reduction in average net earnings."
- "These estimates suggest that a program's race/ethnicity and gender composition are significantly correlated with program-level net earnings and loan repayment."
- "[A]ccountability measures that are specific to programs – such as the GE rule – raise potential concerns. This is because many factors correlate with student outcomes. Some of these factors are under the control of the institutions, while other[s] are not."
- "[P]rograms located within institutions that serve large shares of underrepresented students could be unfairly punished by program-level accountability metrics, since the students that attend these institutions will likely face greater challenges in the labor market, all else equal."[75]

As is clear from their abstracts, the four other studies cited by the Department did not analyze discrimination based on gender identity or race and ethnicity and, thus, do not support the Department's assertion:

- "Existing studies of the effects of college quality on wages typically rely on a single proxy variable for college quality. This study questions the wisdom of using a single proxy given that it likely contains substantial measurement error. We consider four econometric approaches to the problem that involve the use of multiple proxies for college quality: factor analysis, instruments variables, a method recently proposed by Lubotsky and Wittenberg, and a GMM estimator. Our estimates suggest that the existing literature understates the wage effects of college quality and illustrate the value of using multiple proxies in this and other similar contexts."[76]

- "We analyze a Massachusetts merit aid program that gives high-scoring students tuition waivers at in-state public colleges with lower graduation rates than

---

[73] 88 Fed. Reg. 32309 (May 19, 2023).

[74] 88 Fed. Reg. 32309 (May 19, 2023).

[75] Cody Christensen, et. al, *Student Outcomes at Community Colleges: What Factors Explain Variation in Loan Repayment and Earnings?* THE BROOKINGS INSTIT., (2021), *available at* https://www.brookings.edu/wp-content/uploads/2021/09/Christensen_Turner_CC-outcomes.pdf, at 8, 11, 17, 25-26.

[76] Dan Black & Jeffrey A. Smith, *Estimating the returns to college quality with multiple proxies for quality*, J. OF LABOR ECON. 24.3 (2006): 701-728.

The Honorable Miguel A. Cardona
Secretary of Education
Page 24 of 87

available alternative colleges. A regression discontinuity design comparing students just above and below the eligibility threshold finds that students are remarkably willing to forgo college quality and that scholarship use actually lowered college completion rates. These results suggest that college quality affects college completion rates. The theoretical prediction that in-kind subsidies of public institutions can reduce consumption of the subsidized good is shown to be empirically important."[77]

- "We use administrative data from Texas to estimate how graduating from a state flagship or a community college relative to a nonflagship university affects the distribution of earnings. We control for the selection of students across sectors using a rich set of observable ability and background characteristics and find evidence of substantial heterogeneity in the returns to quality. Returns increase with earnings among UT—Austin graduates but decline among Texas A&M graduates. For community colleges, returns are negative for lower earners but go to zero for higher earners. Our estimates also point to differences in the distribution of returns by race/ ethnicity."[78]

- "We consider the effects of student ability, college quality, and the interaction between the two on academic outcomes and earnings, using data on two cohorts of college enrollees. Student ability and college quality strongly improve degree completion and earnings for all students. We find evidence of meaningful complementarity between student ability and college quality in degree completion at four years and in long-term earnings, but not in degree completion at six years or STEM degree completion. This complementarity implies some trade-off between equity and efficiency for policies that move lower-ability students to higher-quality colleges."[79]

The Department cannot seriously dispute that women, minorities, and groups bearing other socioeconomic characteristics are subjected to wage discrimination in the United States.[80] Although multiple Federal laws, including, but not limited to, the Equal Pay Act, Title VI and VII of the Human Rights Act of 1964, and Title IX of the Education Amendments of 1972, have addressed discrimination in the workplace and educational programs, a commitment to the prohibition of discrimination across all facets is necessary to ensure equitable access to education and high quality job opportunities. At many career schools, enrollments in certain types of programs skew significantly toward one gender or another. For example, allied health and cosmetology programs tend to favor women, while automotive and trade programs tend to favor men. However, "[w]omen are more likely than men to pursue higher education

---

[77] Sarah R. Cohodes, & Joshua S. Goodman, *Merit aid, college quality, and college completion: Massachusetts' Adams scholarship as an in-kind subsidy*, AM. ECON. J.: APPLIED ECON., 6.4 (2014): 251-285.

[78] Rodney J. Andrews, Jing Li, and Michael F. Lovenheim, *Quantile treatment effects of college quality on earnings*, J. OF HUM. RES. 51.1 (2016): 200-238.

[79] Eleanor Wiske Dillon & Jeffrey Andrew Smith, *The consequences of academic match between students and colleges*" J. OF HUM. RES. 55.3 (2020): 767-808.

[80] *See generally* Anthony P. Carnevale et al., *How Racial and Gender Bias Impede Progress toward Good Jobs,* GEO. U. CTR. ON EDUC. & THE WORKFORCE, (2022), *available at* https://files.eric.ed.gov/fulltext/ED624516.pdf.

The Honorable Miguel A. Cardona
Secretary of Education
Page 25 of 87

and earn less than men with comparable levels of education on average."[81] Although women make up approximately 40 percent of the overall workforce, "in 2021, women earned an estimated 82 cents for every dollar that men earned (an overall pay gap of 18 cents on the dollar). Specifically, annual median pay for women was an estimated $11,243 less than for men (an estimated $49,532 for women and $60,775 for men)."[82] Minority populations at career schools in certain markets also can be very high by virtue of their location and the communities they serve.[83] Any D/E rate or earnings premium formula that does not recognize and adjust for these differences will yield unequal effects because of gender, racial/ethnic, and similar earnings disparities.[84] "[T]he likelihood of having a good job as a young adult depends on many factors outside of young people's control—including their race/ethnicity and gender. The deep and pernicious inequality of opportunity that is embedded throughout our country's history continues to affect the experiences of young Americans."[85]

The NPRM also asserts that through its "compliance oversight activities including program reviews, the Department has concluded that many institutions aggressively recruit individuals with low income, women, and students of color into programs with substandard quality and poor outcomes and then claim their outcomes are poor because of the 'access' they provide to such individuals."[86] The Department, however, has provided no factual or analytical support to show that aggressive tactics in recruiting have any impact on whether a program fails under the GE rule. Again, this language provided by the Department appears to be a way for the Department to avoid the pertinent issue of discrimination imbedded in the GE rule. Although it may be true that for various reasons, women, minorities, and low-income students may be especially vulnerable to aggressive recruitment tactics into substandard programs, this does not negate the fact that discrimination continues to exist throughout the workforce among all job types.[87] To the extent the Department has concerns about aggressive recruitment tactics, another rule, the Borrowers' Defense to Repayment rule, would address any concerns that the Department has with students taking out loans for poor performing programs that they were fraudulently or illegally recruited to attend.

Further, as previously recognized by the Department, "any effort to place sanctions on institutions that does not also take into account the socioeconomic status and demographics of students served unfairly targets those institutions that are expanding access and opportunity to students who are not served by

---

[81] Kristin Blagg, *Disparities by Gender Complicate Proposed Accountability Metrics*. Urban Inst., (April 25, 2022), available at https://www.urban.org/urban-wire/disparities-gender-complicate-proposed-accountability-metrics.

[82] *Women in the Workforce*, GAO-23-106041, U.S. Gov't Accountability Off., pg. 4 (2022).

[83] "[T]he for-profit sector has clearly increased the availability of education. Demographic information suggests the sector has given additional opportunities to minorities, low-income students, and adults that they may not have found as readily in public and nonprofit institutions." Kinser, K., *How the For-Profit Sector Contributes to Access in U.S. Higher Education*, 3 Enrollment Mgmt J. 4, 23-44 (2009).

[84] *See* Anthony P. Carnevale et al., *How Racial and Gender Bias Impede Progress toward Good Jobs*, Geo. U. Ctr. on Educ. & the Workforce, 22 (2022), *available at* https://files.eric.ed.gov/fulltext/ED624516.pdf).

[85] *See* Anthony P. Carnevale et al., *How Racial and Gender Bias Impede Progress toward Good Jobs*, Geo. U. Ctr. on Educ. & the Workforce, 3 (2022), *available at* https://files.eric.ed.gov/fulltext/ED624516.pdf).

[86] 88 Fed. Reg. 32309 (May 19, 2023).

[87] *See* 88 Fed. Reg. 32433 (May 19, 2023); Anthony P. Carnevale et al., *How Racial and Gender Bias Impede Progress toward Good Jobs*, Geo. U. Ctr. on Educ. & the Workforce, 22 (2022), *available at* https://files.eric.ed.gov/fulltext/ED624516.pdf ("But educational outcomes are themselves affected by the systemic and sociocultural factors described below, which restrain individuals' ability to make optimal choices.").

The Honorable Miguel A. Cardona
Secretary of Education
Page 26 of 87

more selective institutions."[88] In order to avoid such sanctions, institutions presently serving those populations that are most in need may focus on recruiting more advantaged students. Again, this concern was previously acknowledged by the Department, which agreed that "the GE regulations could deter programs from enrolling students with high financial need, minority students, or women because they are more likely to borrow more and to have greater challenges in earning equal pay to men and non-minority students who complete similar programs. Thus, these students could make it more difficult for the institutions' programs to pass the D/ E rates measure, regardless of program quality."[89]

It is also important to note that these concerns are shared by members of Congress on both sides of the aisle. For example, a Dear Colleague Letter drafted by Congressman Jared Moskowitz (D-FL) expresses concerns that the Department's proposal could lead to unintended consequences of restricting program access disproportionately for low-income students based on gender or race. These concerns are shared by other members of the House Democratic Caucus who co-signed Rep. Moskowitz's Letter.[90]

The Letter cites an important question from House Education and Workforce Committee Ranking Member Bobby Scott to Under Secretary James Kvaal:

> [T]o some extent [the GE rule] measures the socioeconomic demographics of the student body, as much as it does the quality of the program. If you have a student body of sons and daughters of business owners, of course they are going to get jobs regardless of the quality of the program. If you have first generation people who may be minorities and subject to discrimination, they will have more challenges getting jobs. Have you done anything in the gainful employment to address that problem?[91]

The problems identified by Reps. Scott and Moskowitz, however, are not addressed in the NPRM.

> **8.    The Department should develop a means to account for the impact of a program's geographic location on reported earnings.**

In 2019, the Department opined that "the evidence is substantial that even within a given occupation, salaries can vary from one geographic region of the country to another, and yet the D/E rates measure fails to take those differences into account."[92] The Department's current proposal continues to suffer from this issue, failing to accommodate or otherwise account for wage differences across geographic locations. Institutions in rural markets may not be able to reduce the costs associated with delivering their programming enough to offset local earnings depression. The proposal especially suffers in the case of

---

[88] 84 Fed. Reg. 31398 (July 1, 2019).

[89] 84 Fed. Reg. 31398 (July 1, 2019).

[90] Letter from Jared Moskowitz, U.S. Rep., Fla. 23rd Dist., to Miguel Cardona, U.S. Dept. of Educ. Sec'y (forthcoming June 2023).

[91] *Breaking the System Part II: Examining the Implications of Biden's Student Loan Policies Before the H. Comm. on Educ. & the Workforce*, at minute 1:13:24, (May 24, 2023), *available at* https://www.youtube.com/watch?v=f7Up35z3v-I.

[92] 84 Fed. Reg. 31421 (July 1, 2019).

The Honorable Miguel A. Cardona
Secretary of Education
Page 27 of 87

persistent poverty counties.[93] Although definitions vary, counties are typically considered to be in persistent poverty if they maintained poverty rates of 20 percent or more for the past 30 years. Approximately 6.1 percent of the U.S. population lives in a persistent poverty county.[94] The Proposed Rule fails to account for the 9.1 million people living in one of those counties, to the detriment of the overall accuracy, decade after decade, of the debt-to-earnings measure.[95] Further, in many cases, program length and content are dictated by State agencies (e.g., cosmetology boards, nursing boards, etc.) or programmatic accreditors, and the costs associated with facilities and equipment are largely fixed without regard to the location of the school. Without any accommodation for the impact of geographic location on reported earnings, institutions housed in rural and socioeconomically-depressed markets will suffer. These, of course, are the very markets where students are most in need of programming that leads to upward socioeconomic mobility.

> **9.     The Department should develop a means to accommodate market events that negatively impact earnings for graduates**.

As a general matter, we believe the Department's accountability framework should include some means by which it can accommodate unforeseen market events that impact all institutions (e.g., a recession). In the NPRM, the Department acknowledges that economy-disrupting events have had economic impact on schools and students.[96] Namely, both the Great Recession and the COVID-19 pandemic resulted in widespread unemployment and depressed earnings. For instance, in January 2010, the unemployment rate caused by the Great Recession peaked at 10.6 percent, and in April 2020, the unemployment rate caused by COVID-19 was 14.4 percent.[97]

At the time an event of this nature occurs, institutions have no ability to alter the debt and cost data that would be used in a D/E rate or earnings premium measure, as it is fixed well in advance of the event occurring. As a consequence, many programs would be unable to prevent failing D/E rates or earnings premiums.[98] Under the Department's proposal, there is no way to account for this market impact. Further,

---

[93] Craig Benson, et al., *Persistent Poverty in Counties and Census Tracts*, Am. Community Survey Reports (May 2023), *available at* https://www.census.gov/content/dam/Census/library/publications/2023/acs/acs-51%20persistent%20poverty.pdf.

[94] Craig Benson, et al., *Persistent Poverty in Counties and Census Tracts*, Am. Community Survey Reports (May 2023), *available at* https://www.census.gov/content/dam/Census/library/publications/2023/acs/acs-51%20persistent%20poverty.pdf.

[95] Craig Benson, et al., *Persistent Poverty in Counties and Census Tracts*, Am. Community Survey Reports (May 2023), *available at* https://www.census.gov/content/dam/Census/library/publications/2023/acs/acs-51%20persistent%20poverty.pdf.

[96] *See* 88 Fed. Reg. 32407 (May 19, 2023).

[97] Rakesh Kochhar, *Unemployment rose higher in three months of COVID-19 than it did in two years of the Great Recession*, Pew Rsch. Ctr. (June 11, 2020), *available at* https://www.pewresearch.org/short-reads/2020/06/11/unemployment-rose-higher-in-three-months-of-covid-19-than-it-did-in-two-years-of-the-great-recession/.

[98] This would also create a discriminatory effect, as during some market events, such as COVID-19, women have returned to the workforce at rates much slower than men. *See* Stephanie Ferguson and Isabella Lucy, *Data Deep Dive: A Decline of Women in the Workforce,* U.S. Chamber of Commerce (April 27, 2022), *available at* https://www.uschamber.com/workforce/data-deep-dive-a-decline-of-women-in-the-workforce ("[M]en have returned to work at a higher rate than women. Today, women's labor force participation is still a full percentage

The Honorable Miguel A. Cardona
Secretary of Education
Page 28 of 87

the impact to programs would be swift and extreme. A single failing D/E rate would require warning disclosures, which would likely lead to the immediate decline of the program. Further, under the Proposed Rule, no replacement program could be introduced for years. Thus, at precisely the time critical workforce programs would be needed, they would no longer be available, having been eliminated for no reason other than the market event. In this regard, the Proposed Rule represents unfortunate and shortsighted public policy.

In any case, we think it would be wholly inappropriate for the Department to make, publish, and sanction institutions based on "financial value" determinations that rely on earnings data from the COVID-19 pandemic years of 2020 and 2021. And yet, this is precisely what the Department proposes to do. Under the NPRM, earnings data for calendar year 2021 would be used for individuals who graduated in the 2017-2018 award year, which would be part of the standard 2-year cohort for all programs evaluated in 2024-2025. Earnings data for calendar year 2020 would be used for individuals who graduated in the 2016-2017 award year, which would be part of the expanded 4-year cohort for all programs evaluated in 2024-2025. The final rule should be revised to avoid this unfair result.

> **10.    The Department should develop a solution to the problem of unreported income**.

The Department asserts that due to new legal requirements to report income that was typically left unreported, the concerns regarding unreported income related to its impact on GE are "less persuasive."[99] Although the Department agrees that "some fraction of income will be unreported despite legal duties to report," it asserts that it also must recognize circumstances regarding reporting have changed.[100] 26 U.S.C. § 6053, which requires the reporting of tips, went into effect on December 19, 2014.[101] Despite the requirement to report tips, researchers estimated that in 2022, there was approximately "$147.8 billion in unreported tip income" that goes underreported.[102] The Department further notes that "income adjustments to IRS earnings are not used in other parts of the Department's administration of the title IV, HEA programs[,]" and that it would be consistent with other programs to use IRS data.[103] However, unlike using IRS data for Title IV programs, which looks at data on an individual basis to calculate family income for Title IV eligibility, ignoring unreported income in D/E rates could yield lasting consequences for schools that offer programs with students who have a greater percentage of income that goes unreported.

As the Department is well aware, on June 28, 2017, the United States District Court for the District of Columbia issued an opinion and order in *American Association of Cosmetology Schools v. the U.S. Department of Education* (the "*AACS* Litigation"), largely agreeing with the American Association of

---

point lower than it was pre-pandemic, meaning an estimated one million women are missing from the labor force."). With a slow return of women to the workforce, programs that enroll mostly women will fail at a rate higher than programs serving more men, which will yield to the perpetuation of a lack of access to education for women and systemic sexism.

[99] 88 Fed. Reg. 32335 (May 19, 2023).

[100] 88 Fed. Reg. 32335 (May 19, 2023).

[101] 26 U.S.C. § 6053 (2014).

[102] *S*tephanie Riegg Cellini & Kathryn J. Blanchard, *Hair and Taxes: Cosmetology Programs, Accountability Policy, and the Problem of Underreported Income*, POSTSECONDARY EQUITY & ECON. RSCH. PROJECT (Jan. 2022), *available at* https://www.peerresearchproject.org/peer/research/body/PEER_HairTaxes-Final.pdf.

[103] 88 Fed. Reg. 32335 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 29 of 87

Cosmetology Schools (AACS) that the Department did not adequately address how underreported income would be treated when calculating the D/E ratios under the 2014 GE rule for programs like cosmetology. Thereafter, in its 2019 action to rescind the 2014 GE rule, the Department acknowledged on the record that "the exclusion of tip-based income— especially in heavily tip-influenced professions, such as cosmetology—some self-employment income, and household income from the D/E rates measure renders the earnings portion of the D/E calculation subject to significant errors…While the Department agrees that individuals who receive tip income should report that income fully and pay required taxes on that income, it is not the fault of institutions of higher education that many individuals do not."[104] Despite the ruling of the D.C. District Court and the Department's prior acknowledgement, the agency proposes once again to calculate D/E rates using actual earnings without offering any solution for the underreported income problem. Moreover, the issue is compounded by the introduction of the earnings premium measure, which suffers from the same shortcoming. Finally, and surprisingly, the Department also proposes to eliminate the alternate appeals process.

In the *AACS* Litigation, the Department actually relied upon the alternate earnings appeal process, arguing that the availability of an appeal process justified the use of actual earnings, as it affords schools some opportunity to address the problem of underreported income by using alternate earnings data collected from a State data system or through a survey. In the same litigation, the court held that the Department was arbitrary and capricious for its "narrowing of appellate recourse."[105] Remarkably, despite this ruling, the Department's proposal does not narrow, but rather eliminates altogether, the opportunity for appellate recourse. With the appeal process removed, the Department would appear to have no mechanism whatsoever for addressing the unreported income issue. Even researchers who advocate for the Department continuing to use IRS data advocate for an increase of 8-10 percent on wages to account for underreported tips for the purposes of GE.[106]

Finding a solution to the problem of unreported income is even more important in light of the IRS's delayed implementation of the "$600 Rule."[107] The $600 Rule states that if an individual uses a third-party platform, such as PayPal, Venmo, or CashApp, to collect payments for their business, the individual must report any income of at least $600 on a Form 1099-K.[108] Previously, the threshold was $20,000 or 200 or more transactions, whichever came first.[109] The prior rule was scheduled to terminate at the end of 2022,

---

[104] 84 Fed. Reg. 31409 (July 1, 2019).

[105] *Am. Ass'n of Cosmetology Sch. v. Devos*, 258 F. Supp. 3d 50, 56 (D.D.C. 2017).

[106] *See* Stephanie Riegg Cellini and Kathryn J. Blanchard, *Hair and Taxes Cosmetology Programs, Accountability Policy, and the Problem of Underreported Income*, POSTSECONDARY EQUITY AND ECONOMICS RESEARCH PROJECT (Jan. 2022) ("We believe that an 8-10% adjustment may reasonably be applied beyond cosmetology to other fields where underreporting is prevalent.").

[107] *IRS announces delay for implementation of $600 reporting threshold for third-party payment platforms' Forms 1099-K*, Internal Revenue Serv. (Dec. 23, 2022), *available at* https://www.irs.gov/newsroom/irs-announces-delay-for-implementation-of-600-reporting-threshold-for-third-party-payment-platforms-forms-1099-k.

[108] *IRS announces delay for implementation of $600 reporting threshold for third-party payment platforms' Forms 1099-K*, Internal Revenue Serv. (Dec. 23, 2022), *available at* https://www.irs.gov/newsroom/irs-announces-delay-for-implementation-of-600-reporting-threshold-for-third-party-payment-platforms-forms-1099-k.

[109] *IRS announces delay for implementation of $600 reporting threshold for third-party payment platforms' Forms 1099-K*, Internal Revenue Serv. (Dec. 23, 2022), *available at* https://www.irs.gov/newsroom/irs-announces-delay-for-implementation-of-600-reporting-threshold-for-third-party-payment-platforms-forms-1099-k.

The Honorable Miguel A. Cardona
Secretary of Education
Page 30 of 87

to be replaced by the $600 Rule.[110] However, the IRS has now extended the implementation date of the $600 Rule to December 31, 2023, during which time the prior rule will remain in effect.[111] The $600 Rule represents a meaningful step toward remedying the issue of unreported income. However, in the absence of its implementation, now delayed by a full calendar year, the issue of unreported income remains as rampant as ever—a concern that the Proposed Rule fails to adequately address.

### 11.   The Department should develop a means to account for unearned income and self-employment income.

With regard to unearned income, many career school graduates, in particular, start their own businesses following graduation (e.g., cosmetology, HVAC). In the initial years, these entrepreneurs may not have significant earned income, but would potentially have unearned income that should be captured in the calculation. With regard to self-employment income, self-employment earnings, captured on IRS form 1040 schedule SE, would not appear to be included in a graduate's income as reported to some Federal agencies. In either case, the failure to accurately account for all graduate income may result in depressed earnings information for institutions, resulting in erroneous D/E rates and earnings premium measures.

We note that the Department has expressed that the IRS is its preferred Earnings Agency. In the preamble to the Proposed Rule, the Department said that "[w]hile the 2014 Prior Rule relied upon earnings data from the Social Security Administration, at this time we would prefer to use earnings data provided by the [IRS]. IRS now seems to be the highest quality data source available[.]"[112] It is important to acknowledge that, in stating their preference, the Department concedes that data from other agencies, which the Department may still need to rely upon, is not as reliable as the data from the IRS. The Department says that it will "determine the specific source of earnings data in the future."[113] The Department should do so immediately. Institutions deserve to know which agency the Department intends to rely upon for earnings information so that they can understand the full range of limitations of that data and respond accordingly.

### 12.   The Department should develop a mechanism for accommodating individuals who report no income.

When determining the earnings for a cohort group, the Earnings Agency calculating these numbers should exclude any individual who has reported no income, and the Department should exclude from the calculation of the median loan debt the same number of students with the highest loan debts. A report of no income could easily represent a misreporting, an underreporting, a determination by the graduate not to seek employment, or the inability of the graduate to obtain employment due to a disability or some similar issue. It is inappropriate to assume that the sole basis for an individual's reporting of no income is that he or she is unable to find employment and to penalize institutions based on this assumption. The Department previously recognized this issue, noting that "[p]enalizing programs because the students

---

[110] *IRS announces delay for implementation of $600 reporting threshold for third-party payment platforms' Forms 1099-K*, Internal Revenue Serv. (Dec. 23, 2022), *available at* https://www.irs.gov/newsroom/irs-announces-delay-for-implementation-of-600-reporting-threshold-for-third-party-payment-platforms-forms-1099-k.

[111] *IRS announces delay for implementation of $600 reporting threshold for third-party payment platforms' Forms 1099-K*, Internal Revenue Serv. (Dec. 23, 2022), *available at* https://www.irs.gov/newsroom/irs-announces-delay-for-implementation-of-600-reporting-threshold-for-third-party-payment-platforms-forms-1099-k.

[112] 88 Fed. Reg. 32334 (May 19, 2023).

[113] 88 Fed. Reg. 32334 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 31 of 87

they serve may decide, for example, to work fewer hours in order to be with children is absurd, especially because daycare challenges and costs may make it economically advantageous to work part-time when family members can provide free or low-cost childcare."[114]

13.     **The Department should use the higher of the mean or median earnings for purposes of the D/E rate calculation**.

In both the 2011 and 2014 GE rules, the Department used the higher of the mean or median of the earnings of the cohort as the denominator when calculating D/E rates, on the belief that this approach best and most fairly represented the earnings for the cohort. In 2014, the Department reasoned that using the higher of the mean or median earnings was preferable because "[b]y using the higher of the mean or median earnings, the regulations strike a balance between providing stakeholders information that is easy to use and comprehend and ensuring an accurate assessment of program performance."[115] The Department further explained that in cases where mean earnings are greater than median earnings, the mean is appropriate because the median may be sensitive to zero earnings; therefore, "we use the mean earnings to diminish the sensitivity of the D/E rates to zero earnings and better reflect the central tendency in earnings for programs where many students have extremely low and extremely high earnings." Here, the Department proposes only to use the median. However, the Department provides an unconvincing explanation for why its former reasoning no longer stands, making this proposal arbitrary and capricious. The Department's 2014 reasoning was sound. Therefore, the Department should revert to its former position and use the higher of the mean or median in the final rule.

14.     **To calculate a program's annual loan payment under § 668.403(b), the Department should limit the amount to the amount that would be due under the Department's REPAYE plan or other IDR plans.**

As discussed above, the amortization methodology should be the same for "higher-credentialed programs" and "lower-credentialed programs", in each case based on the total amount of debt. Further, the REPAYE plan and other IDR plans should be taken into account in measuring the amount of annual loan payment for Federal loans eligible for REPAYE or another IDR plan.

Under the Department's current REPAYE plan, borrowers may pay 10 percent of their "discretionary" income, which is defined as income above 150 percent of the Federal poverty guidelines. The time limit for an IDR plan is 20 years for undergraduate students (and 25 years for graduate students). If an undergraduate borrower has made payments under an IDR plan for 20 years, any remaining balance is forgiven.

On January 10, 2023, the Department proposed new regulations to revise the REPAYE plan to make it more generous to borrowers. Under the revised plan, borrowers would pay 5 percent of their "discretionary income," which is redefined as income above 225 percent of the Federal poverty guidelines. For undergraduates, the loan forgiveness point is 10 years for $12,000 or less in debt and 11-20 years depending on the amount of debt above $12,000.

---

[114] 84 Fed. Reg. 31410 (July 1, 2019).
[115] 79 Fed. Reg. 64933 (October 31, 2014).

The Honorable Miguel A. Cardona
Secretary of Education
Page 32 of 87

In calculating a program's annual loan payment, the Proposed Rule should assume that borrowers will act rationally and take advantage of the Department's REPAYE plan (or other IDR plans) in order to minimize the amount that they are required to repay to the Department for their Federal student loans. It makes no sense for borrowers to pay more than the Department requires them to pay. As such, the Proposed Rule should limit the amount of annual loan payment to that provided by the Department's REPAYE plan, which is projected to be no more than 5 percent of "discretionary income," defined as income above 225 percent of the Federal poverty guidelines.

The Department knows that the Proposed Rule's annual loan payment methodology cannot be squared with its ambitious REPAYE plan. Indeed, in 2019, the Department noted that "[t]he amortization terms used to calculate D/E rates are in direct conflict with the amortization terms made available by Congress, and the Department in the case of the Revised Pay As You Earn (REPAYE) repayment plan, to all borrowers."[116]

In the NPRM for the Proposed Rule, the Department addresses the fact of its IDR plans as follows:

> Income driven repayment plans are aimed at alleviating the burden of high debt for students who experience unanticipated circumstances, beyond an institution's control, that adversely affect their ability to repay their debts. While the Department believes it is critical to reduce the risk of unexpected barriers that borrowers face, and to protect borrowers from delinquency, default and the associated adverse credit consequences, it would be negligent to lower our accountability standards across the entire population as a result to permit institutions to encumber students with even more debt while expecting taxpayers to pay more for poor outcomes related to the education programs offered by institutions. Instead, we view the D/E rates as an appropriate measure of what students can borrow and feasibly repay.[117]

The Department's reasoning is flawed because its IDR plans do not take any of these considerations into account. IDR plans are available to *all* borrowers, not just those "who experience unanticipated circumstances … that adversely affect their ability to repay their debts." And if the stated considerations were real, the Department would not permit institutions with non-GE programs "to encumber students with even more debt while expecting taxpayers to pay more for poor outcomes related to the education programs offered by institutions."

In seeking to revise the REPAYE plan, the Department has made no secret that its goal is to "reduce the cost of Federal student loan payments, especially for low and middle-income borrowers."[118] In unveiling the revised REPAYE plan on January 10, 2023, the Department stated in a press release:

> Today, the U.S. Department of Education (Department) proposed regulations to reduce the cost of federal student loan payments, especially for low and middle-income

---

[116] 84 Fed. Reg. 31398 (July 1, 2019).

[117] 88 Fed. Reg. 32309 (May 19, 2023).

[118] *New Proposed Regulations Would Transform Income-Driven Repayment by Cutting Undergraduate Loan Payments in Half and Preventing Unpaid Interest Accumulation*, U.S. DEP'T OF EDUC., (Jan. 10, 2023), *available at* https://www.ed.gov/news/press-releases/new-proposed-regulations-would-transform-income-driven-repayment-cutting-undergraduate-loan-payments-half-and-preventing-unpaid-interest-accumulation.

The Honorable Miguel A. Cardona
Secretary of Education
Page 33 of 87

borrowers. The regulations fulfill the commitment President Biden laid out in August when he announced his Administration's plan to provide student debt relief for approximately 40 million borrowers and make the student loan system more manageable for student borrowers. The proposed regulations would create the most affordable income-driven repayment (IDR) plan that has ever been made available to student loan borrowers, simplify the program, and eliminate common pitfalls that have historically delayed borrowers' progress toward forgiveness.

Today the Biden-Harris administration is proposing historic changes that would make student loan repayment more affordable and manageable than ever before," said U.S. Secretary of Education Miguel Cardona. "We cannot return to the same broken system we had before the pandemic, when a million borrowers defaulted on their loans a year and snowballing interest left millions owing more than they initially borrowed. These proposed regulations will cut monthly payments for undergraduate borrowers in half and create faster pathways to forgiveness, so borrowers can better manage repayment, avoid delinquency and default, and focus on building brighter futures for themselves and their families.[119]

For several years, the Department has vigorously advocated for reducing the burden of Federal student loans on borrowers through IDR programs and other loan forgiveness programs. It is well known that the Department has pressed its contracted Federal student loan services to proactively encourage borrowers to enroll in IDR plans.

The Department is seeking for IDR plans to become the de facto terms of repayment for Federal student loan programs. As a result, the Department's Proposed Rule should measure annual loan payments based on the Department's IDR plans, not the Department's arbitrary methodology.

### D. Calculating the Earnings Premium Measure (Subpart Q: 668.404)

#### 1. The Earnings Threshold is not a meaningful or appropriate basis of comparison.

Under proposed § 668.404, "for each award year, the Secretary calculates the earnings premium measure for a program by determining whether the median annual earnings of the title IV, HEA recipients who completed the program exceed the earnings threshold." Proposed § 668.2(b) defines the "earnings threshold" as "the median earnings for working adults aged 25–34, who either worked during the year or indicated they were unemployed when interviewed, with only a high school diploma (or recognized equivalent) (1) in the State in which the institution is located; or (2) nationally, if fewer than 50 percent of the students in the program are located in the State where the institution is located while enrolled." To further explain the earnings threshold, the Department indicates that the earnings threshold is "computed as the median annual earnings among respondents aged 25–34 in the American Community Survey who have a high school diploma or GED, but no postsecondary education, and who are in the labor force when

---

[119] *New Proposed Regulations Would Transform Income-Driven Repayment by Cutting Undergraduate Loan Payments in Half and Preventing Unpaid Interest Accumulation*, U.S. DEP'T OF EDUC., (Jan. 10, 2023), *available at* https://www.ed.gov/news/press-releases/new-proposed-regulations-would-transform-income-driven-repayment-cutting-undergraduate-loan-payments-half-and-preventing-unpaid-interest-accumulation.

The Honorable Miguel A. Cardona
Secretary of Education
Page 34 of 87

they are interviewed, indicated by working or looking for and being available to work."[120] The American Community Survey is an annual survey conducted by the United States Census Bureau.[121] According to the American Community Survey, the labor force includes individuals who are classified as either "employed" or "unemployed." The term "unemployed," as used in the Survey, includes:

> All civilians 16 years old and over are classified as unemployed if they (1) were neither "at work" nor "with a job but not at work" during the reference week, and (2) were actively looking for work during the last 4 weeks, and (3) were available to accept a job. Also included as unemployed are civilians who did not work at all during the reference week, were waiting to be called back to a job from which they had been laid off, and were available for work except for temporary illness.[122]

Under proposed § 668.404(b)(1), the median annual earnings is based on the actual earnings of all of the program's graduates, without regard to whether they are seeking employment. Thus, the annual earnings calculation includes program graduates who may not need to work because their household income is sufficient to support their lifestyle, or who have determined (or have no choice) to remain home to care for children or other loved ones, or who for any other reason are not actively seeking employment. In contrast, the proposed earnings threshold would exclude all of these individuals, as it only includes individuals who "were actively looking for work during the last 4 weeks" and "were available to accept a job."

Moreover, under the Proposed Rule, the annual earnings is based on the actual earnings of all of the program's graduates, as measured approximately three years following completion of their program. Because most career school graduates are not employed in their career **prior** to completing their program, it is likely the case that most graduates will have been employed in their career, at best, for three years when their earnings are measured. In contrast, the earnings threshold includes earnings data for individuals between the ages of 25 and 34. Understanding that most persons graduate from high school at around 18 years of age, individuals included in the earnings threshold may have been employed in their current career for as long as 16 years.

Further, studies have shown that "the high school earnings test would increase the number of failing undergraduate certificate programs by more than fivefold and would establish a standard high enough to render the debt-to-income test unnecessary."[123] The earnings threshold for each State in 2019 ranged considerably from $31,294 (North Dakota) to $20,859 (Mississippi). The median earnings of high school graduates is about $25,000 nationally.[124] Finally, because the annual earnings is based on the actual

---

[120] 88 Fed. Reg. 32413 (May 19, 2023).

[121] The Department confirms in the Proposed Rule that for purposes of calculating the Earnings Threshold, it will use the "median annual earnings of students with a high school diploma or GED using data from the Census Bureau." Proposed 34 C.F.R. § 668.404(b).

[122] Glossary, U.S. CENSUS BUREAU, *available at* https://www.census.gov/glossary/#term_Laborforce?term=Unemployed (defining "unemployed").

[123] Jason D. Delisle & Jason Cohn, *A Newly Proposed Earnings Standard for Higher Education Is Surprisingly Tough*, URBAN INST., (April 5, 2022), *available at* https://www.urban.org/urban-wire/newly-proposed-earnings-standard-higher-education-surprisingly-tough.

[124] Jason D. Delisle & Jason Cohn, *A Newly Proposed Earnings Standard for Higher Education Is Surprisingly Tough*, URBAN INST., (April 5, 2022), *available at* https://www.urban.org/urban-wire/newly-proposed-earnings-standard-higher-education-surprisingly-tough.

The Honorable Miguel A. Cardona
Secretary of Education
Page 35 of 87

earnings of a program's graduates, it will often reflect earnings in concentrated geographic regions. In contrast, the earnings threshold, at best, will represent median earnings at the State level. Thus, the earnings of 45 graduates who reside in and around Modesto, California, would be compared to a State-wide earnings number that incorporates individuals living in San Francisco, San Jose, Los Angeles, and San Diego.

Instead, we suggest the Department adopt an earnings threshold variance. In addition to addressing the geographic concerns raised by the earnings threshold proposal, an earnings threshold variance would adjust for some of the challenges we discuss above with regard to gender, race, and high poverty areas. Specifically, we recommend reducing the earnings threshold by 15 percent. When the Proposed Rule debt-to-earnings metric is compared against the return on investment ("ROI") (meaning, the expected lifetime earnings of the median student in each program to a counterfactual earnings profile that estimates lifetime earnings for that same student if she had never gone to college), the Proposed Rule results in a substantial number of "incorrect fails" (meaning those programs have positive ROI but nonetheless fail the debt-to-earnings test).[125] Reducing the threshold by 15 percent allows for variances caused by demographic differences, while significantly reducing the number of incorrectly failing programs. For example, reducing the earnings threshold to 85 percent of early-career high school diploma holders' median earnings reduces the share of programs incorrectly failing GE by nearly half, from 17 percent to nine percent.[126]

> **2.** **The Department should not implement an earnings premium measure before the Department resolves the many issues arising from the use of actual earnings in the calculation.**

The earnings premium measure calculated by the Department relies, in part, on the annual earnings data that it obtains. And the Department has failed to offer any meaningful solution to the myriad issues with its earnings data – issues openly acknowledged during the 2019 rulemaking – including the impact of wage discrimination, geography, or market events (e.g., a pandemic), or the inability to fully capture unreported income, unearned income, and self-employment income, as discussed above. Higher education researchers have raised serious concerns about the inclusion of an earnings premium measure given the lack of associated research and public vetting of the new metric.[127] So long as this annual earnings data is flawed or incomplete, the earnings premium measure not only fails to serve its purpose, it can be harmful. Students may be dissuaded from attending good programs and persuaded to attend poor ones, or a single program institution could erroneously be forced into closure.

---

[125] Preston Cooper, *Biden's Flawed Attempt to Stem Rising Tuition Costs*, FOUND. FOR RSCH. ON EQUAL OPPORTUNITY (Oct. 11, 2022), *available at* https://freopp.org/accountable-or-not-evaluating-the-biden-administrations-proposed-gainful-employment-framework-a49231683263.

[126] Preston Cooper, *Biden's Flawed Attempt to Stem Rising Tuition Costs*, FOUND. FOR RSCH. ON EQUAL OPPORTUNITY (Oct. 11, 2022), *available at* https://freopp.org/accountable-or-not-evaluating-the-biden-administrations-proposed-gainful-employment-framework-a49231683263.

[127] Katherine Knott, *A Stricter Test for College Programs*, INSIDE HIGHER ED (May 23, 2023), *available at* https://www.insidehighered.com/news/government/student-aid-policy/2023/05/23/stricter-test-college-programs.

The Honorable Miguel A. Cardona
Secretary of Education
Page 36 of 87

E.      **Process for Determining D/E Rates and Earnings Premium (Subpart Q: 668.405 - 668.406)**

1.      **The Department must include a transitional rate opportunity for GE programs.**

As the Department is aware, the Obama administration partially addressed this issue in the 2014 GE rule by calculating transitional rates for a multi-year period after the law took effect. Though far from sufficient, this approach at least permitted institutions some opportunity to improve their D/E rates by calculating a program's median loan debt based on the cohort of students who completed the program during the most recently completed award year (instead of the students who completed the program during the otherwise applicable cohort period). The Obama administration recognized the fairness of this approach, observing that it would "allow institutions an opportunity to pass the D/E rates measure by taking immediate steps to improve their otherwise failing GE programs by reducing the loan debt of currently enrolled students."[128] And  although "the 2011 Prior Rule did not include a transition period, it would have capped the number of ineligible programs in the first year that programs could become ineligible, and, additionally, in the first three years that the 2011 Prior Rule would be effective, would have allowed for an alternate earnings appeal based on BLS earnings data."[129] Further, as the Obama administration noted in 2014: "Even institutions that only begin to make improvements after the regulations take effect, or those that did not have informational rates for programs that were not in existence or are medical or dental programs, will get substantial, if not full, benefit of the transition period."[130] Under the Proposed Rule, there would be no opportunity for an institution to impact its D/E rate or earnings premium performance for the first five award years the rule is in effect. Hypothetically, an institution could begin offering its programs for free on July 1, 2024, and see no improvement in its D/E rate or earnings premium until 2030 (the first year the 2-year cohort would include data from 2024-2025).

During negotiated rulemaking, there was broad support for a transition period across sectors. For example, the primary negotiator for community colleges said "given a lot of the uncertainties around the new earnings threshold and how it's been calculated, I'd strongly recommend a transition period."[131] The primary negotiator for States introduced the notion of a transition period, explaining that it was "substantively warranted" because "all of this takes time."[132] Even the Department's own negotiator acknowledged that "[w]e hear that and we understand it while we think it is premature to propose language that would include some sort of a transition period to account for that, we are looking closely at this matter and are committed to looking at whether we can include something like that in the final rule, provided we don't reach consensus today." For the reasons discussed above, we strongly encourage the Department to do exactly that.[133]

---

[128] 79 Fed. Reg. 16428 (March 25, 2014).

[129] *See* 57 Fed. Reg. 16451 (March 25, 2014).

[130] 79 Fed. Reg. 64925 (Oct. 31, 2014).

[131] Ann Kress, Primary Negotiator for Community Colleges, Session 3, Day 3, Morning, March 16, 2022, Institutional and Programmatic Eligibility Negotiated Rulemaking at pg. 24, *available at* https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/transcriptmar16am.pdf.

[132] Debbie Cochrane, Primary Negotiator for States, Session 3, Day 2, Afternoon, March 15, 2022, Institutional and Programmatic Eligibility Negotiated Rulemaking at pg. 35, *available at* https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/transcrmar15pm.pdf.

[133] Greg Martin, Federal Negotiator, Session 3, Day 3, Morning, March 16, 2022, Institutional and Programmatic Eligibility Negotiated Rulemaking at pg. 20, *available at* https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/transcriptmar16am.pdf.

The Honorable Miguel A. Cardona
Secretary of Education
Page 37 of 87

2.    **The rule against retroactive rulemaking precludes the Department from making program eligibility determinations based on metrics calculated using data from years that precede the effective date of the Proposed Rule.**

The Department's Proposed Rule violates the prohibition against retroactive rulemaking. The Supreme Court has made clear that "[r]etroactivity is not favored in law," and that administrative agencies may not promulgate retroactive rules without express statutory authority from Congress.[134] Nowhere does the HEA authorize the retroactive effects proposed in the Department's GE framework.

Agency rules operate retroactively when they are substantively inconsistent with prior agency practice and establish new legal consequences for actions that took place before enactment.[135] Retroactive rules "take away or impair vested rights acquired under existing laws, or create a new obligation, impose a new duty, or attach a new disability, in respect to transactions or considerations already past."[136]

Proposed Subpart S would do just that. There, the Department proposes harsh sanctions on institutions based on earnings data from years before the Proposed Rule would take effect (presumably on July 1, 2024). For example, in award year 2024-2025, the Department proposes to calculate D/E rates from as far back as award year 2017-18 for the two-year cohort period and award year 2015-2016 for the four-year cohort period.[137] The Department further proposes to use corresponding earnings data to sanction programs in the harshest possible manner by terminating their eligibility to participate in Federal financial aid programs.[138] Thus, it is likely that the Proposed Rule will result in the termination of programs: (a) whose D/E rates did not violate any rule or statute in place prior to the implementation of the proposed framework; and (b) that will have had no opportunity to come into compliance. In other words, the Proposed Rule attaches a new and severe punishment for considerations that have long since passed, violating the rule against retroactive rulemaking.

Agency rules with retroactive effect must be substantively reasonable and reasonable *in being made retroactive*.[139] The Proposed Rule fails on both accounts. The Department attempts no justification, nor could it, that its goals in advancing the Proposed Rule require retroactive effect. In fact, the Department has previously recognized the effectiveness of a disclosure-only protocol to promote transparency and accountability, an alternative that would not require retroactive sanction.[140] The Department further

---

[134] *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *see also Landgraf v. USI Film Prod.*, 511 U.S. 244, 265 (1994) ("[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic."); *Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 257, 271 (D.D.C. 2018) ("Any retroactive policy must have sufficiently substantial interests to counterbalance any resulting inequities from the retroactive agency action.") (internal quotations omitted).

[135] *Arkema Inc. v. E.P.A.*, 618 F.3d 1, 7 (D.C. Cir. 2010); *Nat'l Min. Ass'n v. Dep't of Lab.*, 292 F.3d 849, 860 (D.C. Cir. 2002).

[136] *Vartelas v. Holder*, 566 U.S. 257, 266 (2012) (quotation omitted).

[137] *See* 88 Fed. Reg. 32329 (May 19, 2023).

[138] *See* proposed 34 C.F.R. § 668.91(a)(3)(vi).

[139] *Celtronix Telemetry, Inc. v. F.C.C.*, 272 F.3d 585, 589 (D.C. Cir. 2001); *U.S. AirWaves, Inc. v. F.C.C.*, 232 F.3d 227, 233 (D.C. Cir. 2000).

[140] *See* 84 Fed. Reg. 31404 (July 1, 2019) ("The Department agrees . . . that the most effective method to increase accountability and transparency, under current law, for all programs is through a disclosure-only protocol[.]").

The Honorable Miguel A. Cardona
Secretary of Education
Page 38 of 87

proposes to calculate D/E rates using data from years for which many institutions will likely not have relevant records. The Department generally does not require institutions to retain certain financial aid records for a given student more than three years after the student graduates.[141] Further, good data security practice dictates that institutions destroy nonessential records. Yet the Proposed Rule would calculate D/E rates using data that is six, seven, or eight years old.[142] Given the Department's own recognition of the effectiveness of disclosure alone[143]—and its own record retention guidelines[144]—it cannot justify the Proposed Rule's harsh sanctions, nor the reasonableness of making those sanctions retroactive.

The unreasonableness of Subpart S's retroactivity is made even more clear by the Department's own past embrace of a transitional period, allowing institutions to come into compliance—or not—*after* the rule takes effect. For example, the 2014 version provided for a transition period, which, the Department reasoned, would allow failing programs an opportunity to come into compliance before risking ineligibility.[145] This recognition by the Department only underscores the unreasonableness of mandating retroactive sanctions in the current proposed version.

Attaching severe sanctions to earnings outcomes from years in the past exemplifies what now-Justice Gorsuch has called "exploiting the power of retroactivity in ways worrisome to due process and equal protection."[146] Justice Gorsuch identifies several "ill effect[s]"[147] of retroactivity, including "upsetting settled expectations with a new rule of general applicability" and "penalizing persons for past conduct."[148] Both of those intrusions on due process and equal protection are present in the Proposed Rule. The Department gains nothing by sanctioning institutions over D/E rates based on data predating the Proposed Rule's enactment. This is especially true because the Department could easily avoid these concerns about foundational constitutional protections and basic fairness by permitting institutions to make the necessary changes to come into compliance *after* the Proposed Rule takes effect.

It is fundamentally unfair to sanction institutions based on program and pricing decisions that were made prior to the effective date of the law and that cannot be reversed or impacted in any way. Accordingly, D/E rates and earnings premiums calculated using data from years that precede the effective date of the Proposed Rule should be for informational purposes only. Sanctioning programs based on data that precede the effective date of any new regulations would constitute a retroactive rule, which the Department is prohibited from promulgating without express authority from Congress.

---

[141] *Chapter 7: Record Keeping, Privacy, & Electronic Processes*, 2021-2022 FED. STUDENT AID HANDBOOK, *available at* https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2021-2022/vol2/ch7-record-keeping-privacy-electronic-processes.

[142] *See* 88 Fed. Reg. 32329 (May 19, 2023).

[143] *See* 84 Fed. Reg. 31404 (July 1, 2019) ("The Department agrees with the commenters that stated that the most effective method to increase accountability and transparency, under current law, for all programs is through a disclosure-only protocol[.] ").

[144] *See* U.S. Dep't of Educ., Privacy Technical Assistance Center, Best Practices for Data Destruction, *available at* https://studentprivacy.ed.gov/sites/default/files/resource_document/file/Best%20Practices%20for%20Data%20Destruction%20%282019-3-26%29.pdf.

[145] *See* 79 Fed Reg. 64948 (Oct. 31, 2014).

[146] *De Niz Robles v. Lynch*, 803 F.3d 1165, 1175 (10th Cir. 2015).

[147] *De Niz Robles*, 803 F.3d, at 1175 (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 203 (1947)).

[148] *De Niz Robles*, 803 F.3d, at 1176.

The Honorable Miguel A. Cardona
Secretary of Education
Page 39 of 87

The Department's proposal to apply the new standards to metrics calculated using data from years that precede July 1, 2024 (the presumed effective date[149]), is not authorized by the HEA and is contrary to public policy. Agencies are not permitted to adopt regulations that will have retroactive effect if it will increase a party's liability for its past conduct.[150] This yields a proposed rule that contravenes strong public policy against *ex post facto* application of laws. As the Supreme Court has repeatedly explained, there is a presumption against retroactive legislation.[151] For this reason, a statute will not be given a retroactive effect unless the language of the statute expressly requires that result.[152] This doctrine applies with equal force in the context of administrative rules.[153] The APA also provides that administrative rules may only have "future effect."[154] And an administrative agency may only promulgate a rule with retroactive application if Congress has expressly authorized the agency to make rules with retroactive application.[155] Congress has not done so here.

> ### 3. The Department should provide institutions with a meaningful opportunity to review and correct its D/E rate data and calculations before the Department imposes any sanctions.

As the Department is aware, the 2014 Rule afforded institutions with an opportunity to conduct an alternate earnings appeal, a process by which they could obtain alternate earnings information through a survey of their graduates and submit that data for use in recalculating their D/E rates. In the commentary that accompanied the proposed 2014 rule, the Obama administration stated that, in addition to offering institutions "an adequate opportunity" to "correct any inaccuracies in the list of students to be submitted" to the Earnings Agency and "to challenge the loan debt of the students who completed the program in the applicable cohort period that is used to calculate the rates, along with the Department's actual computation of the D/E rates…we recognize that this process must provide an institution an adequate opportunity to present and have considered rebuttal evidence of the earnings data, and the alternate earnings appeal process provides that opportunity."[156] In the present proposal, the Department suggests that such an appeal process is unwarranted, largely based on the Department's view that the primary justification for an alternate earning appeal is unreported income and that concerns regarding unreported income are overstated.[157]

The Department's arguments are unconvincing and were rejected in *AACS* Litigation.[158] There, the court ruled that "[t]he [Department] acted arbitrarily and capriciously with respect to the underreporting issue identified by commenters. The [Department] openly acknowledged that underreporting is an issue, even

---

[149] Ayelet Sheffey, *Biden's Education Department just released its 'strongest-ever' plan to ensure student-loan borrowers don't graduate with unaffordable debt* , BUSINESS INSIDER, May 17, 2023, *available at* https://www.businessinsider.com/what-is-the-new-gainful-employment-rule-student-loan-debt-2023-5 ("Senior department officials told reporters on a press call that they were confident that the rules would be finalized by November 1 and implemented on July 1, 2024.)"

[150] *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006).

[151] *See, e.g., Fernandez,* 548 U.S., at 37*; Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

[152] *Fernandez*, 548 U.S., at 37; *Landgraf*, 511 U.S. at 265.

[153] *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988).

[154] 5 U.S.C. § 551.

[155] *Bowen*, 488 U.S. at 208-09.

[156] 79 Fed. Reg. 16458 (March 25, 2014).

[157] 88 Fed. Reg. 32335 (May 19, 2023).

[158] *See generally Am. Ass'n of Cosmetology Sch. v. Devos*, 258 F. Supp. 3d 50 (D.D.C. 2017).

The Honorable Miguel A. Cardona
Secretary of Education
Page 40 of 87

identifying cosmetology schools by name," but failed to sufficiently consider and resolve the underreporting issue of the earnings data.[159] In the version of the rule at issue in the *AACS* Litigation, the Department directed institutions to the alternate earnings appeals process in the event that the institution contended earnings data was inaccurate due to underreporting.[160] But, in the Proposed Rule, the Department provides no such process, nor does it substantively address the issue of unreported income. Instead, the Department merely offers the blanket statement that unreported income concerns have become "less persuasive" to the Department with time.[161] Remarkably, during the negotiated rulemaking for the Proposed Rule, the Department's own negotiator said "I do understand that there are instances where people do not report all of their earnings to the IRS. They should...*And we don't believe that it's necessary for our regulations to take into account the fact that some people don't report those earnings as they're supposed to.*"[162] In light of the preceding analysis, the Proposed Rule stands on even shakier footing than the invalidated rule at issue in the *AACS* Litigation.

The Department attempts to justify its elimination of the alternate earnings appeal by claiming that doing so will "reduce administrative burden" taken on by the Department under prior iterations of the GE rule.[163] However, the Department's justification lays bare the operational shortcomings of the Department, not flaws with the alternate earnings appeals process. The Department cannot lawfully shirk its responsibility to provide due process to institutions because it thinks it is too burdensome to do so. Reducing the burden on the Department is not a valid rationale for abdicating its specific duties under the Constitution to provide due process to institutions.

The Department also suggests that eliminating the alternate earnings appeal is appropriate because "it is unlikely that any earnings appeal process would generate a better estimate of graduates' median earnings[.]"[164] However, whether the alternate earnings appeal process would frequently change the estimate of median earnings at issue is irrelevant to whether the Department is providing institutions due process as required by the Constitution.

Finally, the Department suggests that the alternate earnings appeal is not necessary because "the number of occupations related to GE programs where tipping is common seems far smaller than has been presented in the past"; therefore, the issues with underreporting of income would presumably be smaller, too.[165] But this explanation is insufficient because, though the number of GE programs that lead to employment involving tipping may "seem far smaller" on the whole, that does not change the fact that the proposed GE framework could still unfairly lead to the deprivation of Title IV participation for some programs where tipping comprises a significant percentage of the completers' post-graduation income. For these reasons and those further detailed below, the Department should reinstate the alternate earnings appeal.

---

[159] *Am. Ass'n of Cosmetology Sch.*, 258 F. Supp. 3d 63.

[160] 79 Fed. Reg. 64951 (March 25, 2014).

[161] 88 Fed. Reg. 32335 (May 19, 2023).

[162] Greg Martin, Federal Negotiator, Session 2, Day 2, Afternoon, Feb. 15, 2022, Institutional and Programmatic Eligibility Negotiated Rulemaking at pg. 59, *available at* https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/feb15pm.pdf (emphasis added).

[163] 88 Fed. Reg. 32345 (May 19, 2023).

[164] 88 Fed. Reg. 32336 (May 19, 2023).

[165] 88 Fed. Reg. 32336 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 41 of 87

a.    **The lack of an earnings appeal process violates the due process rights of institutions.**

Schools have liberty and property interests under the HEA, both of which entitle schools to due process.[166] The Obama administration conceded this point in 2014, explaining: "[b]ecause a program's continued performance in the zone can ultimately lead to an ineligibility determination, we believe due process warrants allowing appeals for both failing and zone final D/E rates."[167]

Accordingly, the Due Process Clause of the Constitution requires the Department to provide institutions with adequate notice and meaningful opportunity to be heard before depriving those institutions of a legally protected interest.[168] Meaningful notice requires disclosure of the underlying evidence, without which it would be impossible for an affected party to present an effective challenge.[169] Similarly, a meaningful hearing requires that the Department's evidence be available to affected schools.[170] Yet, under the Proposed Rule, a program could be deemed ineligible before the institution even had an opportunity to review the earnings data underlying the supposedly failing D/E rate calculation that led to the ineligibility determination. Therefore, in contravention of the institution's due process rights, there would be no disclosure of the underlying evidence, nor would there be an opportunity for the institution to present an effective challenge prior to deprivation of the institution's property interest in its Title IV eligibility. Further, there would be no recourse at all prior to the ineligibility determination for institutions that would be obligated to provide student warnings on the basis of D/E rate calculations with flawed underlying data.

Although an institution could appeal a program-eligibility termination action taken against an ineligible GE program, in such an instance, the institution could only appeal "on the basis that the Department erred in its calculation of the program's D/E rates or earnings threshold measure."[171] In other words, institutions would not have an opportunity to challenge the underlying earnings data; institutions could only challenge potential computing errors in the resulting calculations. This limitation is ill-conceived considering that due process protections are meant to benefit all parties. If the Department desires the D/E calculations to provide "accurate information on the financial consequences of [a student's] education program choices[,]"[172] the Department should welcome the opportunity to improve the accuracy of the underlying data through the alternate earnings appeal process.

With regard to the opportunity for institutions to review and correct completer lists, the Department invites "helpful insight from institutions" in search of the "most current and accurate debt and earnings data possible."[173] Likewise, due process requires that the Department afford an earnings appeals process so that D/E rates are based on the most current and accurate earnings data possible.

---

[166] *See Cont'l Training Servs., Inc. v. Cavazos*, 893 F.2d 877, 893 (7th Cir. 1990); *Career Coll. Ass'n v. Dep't of Educ.*, No. 92-1345, 1992 WL 233837, at *5 (D.D.C. Aug. 31, 1992).

[167] 79 Fed. Reg. 16461 (March 25, 2014).

[168] *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

[169] *See Kapps v. Wing*, 404 F.3d 105, 124 (2d Cir. 2005).

[170] *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4 ("[T]he Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation.").

[171] 88 Fed. Reg. 32345 (May 19, 2023).

[172] 88 Fed. Reg. 32307 (May 19, 2023).

[173] 88 Fed. Reg. 32334 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 42 of 87

> **b.    The lack of an earnings appeal process will unjustly cause irreparable harm to institutions.**

The lack of an alternate earnings appeals process is particularly concerning because erroneously calculated D/E rates could lead to irreparable harm for an institution. Among other harms, failing D/E rates could expose an institution to reputational costs and prompt collateral regulatory actions by the Department (e.g., financial responsibility triggers). In the event a school is determined not financially responsible, the school may be required to provide a letter of credit or other form of surety and may be placed on provisional status. Provisional status subjects the institution to increased Departmental oversight, requiring, for example, Departmental approval prior to offering new programs or establishing additional locations. If the Department determines that an institution is not materially fulfilling all of its provisional certification requirements, the Department can revoke its Federal financial aid eligibility with fewer due process protections than those available to institutions that are fully certified.

In addition, on March 23, 2022, the Department announced a significant new policy that, in some cases, will require owners, investors, and controlling parties of private colleges and universities to guarantee the regulatory liabilities of schools.[174] Under the new policy, corporations or other legal entities that "have or could have a direct or indirect effect on the institution's administrative capability or financial responsibility" may be required to sign an institution's program participation agreement ("PPA"). The Department has indicated that it will require controlling parties to co-sign the PPA if the institution has had a financial responsibility composite score below 1.5 since its last certification (initial or recertification) or if the institution is on provisional certification status by the Department.[175]

Most significantly, the lack of an alternate earnings appeal could lead to the deprivation of Title IV eligibility. The Department has admitted that, due to statistical noise that will most likely be used by the Earnings Agency to disguise student identities, "we estimate that the probability that a program would be erroneously declared ineligible (that is, fail in 2 of 3 years using adjusted data when unadjusted data would result in failure for 0 years or 1 year) is less than 1 percent[.]"[176] The Department fails to consider that for the "1 percent" of programs impacted, representing over 320 GE programs,[177] loss of eligibility would erroneously cut off 100 percent of that program's access to Federal financial aid. In all cases, these harms would be suffered without regard to whether the underlying data are accurate or reliable. Given the high stakes for institutions, the alternative earnings appeal process is indispensable.

---

[174] *Updated Program Participation Agreement Signature Requirements for Entities Exercising Substantial Control Over Non-Public Institutions of Higher Education*, FED. STUDENT AID, (Mar. 23, 2022), *available at* https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-23/updated-program-participation-agreement-signature-requirements-entities-exercising-substantial-control-over-non-public-institutions-higher-education?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=.

[175] *Updated Program Participation Agreement Signature Requirements for Entities Exercising Substantial Control Over Non-Public Institutions of Higher Education*, FED. STUDENT AID, (Mar. 23, 2022), *available at* https://fsapartners.ed.gov/knowledge-center/library/electronic-announcements/2022-03-23/updated-program-participation-agreement-signature-requirements-entities-exercising-substantial-control-over-non-public-institutions-higher-education?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=.

[176] 88 Fed. Reg. 32335 (May 19, 2023).

[177] 88 Fed. Reg. 32398 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 43 of 87

4. **As part of a reinstated process for appealing draft D/E rates, the Department should perform alternate D/E rate calculations at the level of the 8-digit OPEID (i.e., individual locations).**

Alternate D/E rate calculations at the level of the 8-digit OPEID would permit the Department to assess, and institutions to demonstrate, that although a D/E rate calculated for a program across all locations and markets might be failing, the D/E rate for programs in specific locations and markets are passing. Critically, this would allow programs that are successful at specific locations to avoid becoming collateral damage. Further, calculations and related disclosures that are based on individual locations would be more meaningful to the students attending those locations, as they more accurately reflect the quality of instruction, operational costs, employer demand, and market characteristics of that student's specific campus. Because the Department already has the ability to gather and calculate data at the 8-digit OPEID level, there would be no system limitations that should inhibit the efficient calculation of location-specific, alternate D/E rates.

5. **The Department should not impose sanctions for metrics calculated using data from years that exceed required record retention periods.**

In almost all cases, institutions are not required to maintain student finance and financial aid records beyond five years following a student's graduation. According to the Federal Student Aid Handbook for 2021-2022, "[s]chools must retain all required records for a minimum of three years from the end of the award year."[178] Moreover, Federal and State agencies are consistently encouraging institutions to destroy records after record retention periods have expired in order to prevent data breaches.[179] The Department has provided guidance on data retention related to breaches. Specifically, it has stated that "[m]inimizing the amount of data you retain, by destroying them when no longer needed, is a key element of the Fair Information Practice Principles (FIPPs), and is widely considered to be a best practice for protecting individuals' privacy and for lessening the potential impact of a data breach or inadvertent disclosure."[180] In some cases, the Proposed Rule would require institutions to produce data for the sixth, seventh, eight, and ninth award years preceding the award year for which the D/E rates are being calculated. By doing so, the Department has provided confusing guidance on best practices for record retention, which is inconsistent with requirements for other programs that use similar data to what is required for GE.

F. **Student Disclosure Acknowledgements (Subpart Q: 668.407)**

Under proposed §§ 668.43(d) and 668.407, the Department intends to create and maintain a new disclosure website that would provide, among other things, the D/E rates and earnings premium for all GE and non-GE programs. For any year for which the Department notifies an institution that its non-GE

---

[178] *Chapter 7: Record Keeping, Privacy, & Electronic Processes*, 2021-2022 FED. STUDENT AID HANDBOOK, *available at* https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2021-2022/vol2/ch7-record-keeping-privacy-electronic-processes.

[179] *Best Practices for Data Destruction*, U.S. DEP'T OF EDUC., p. 4, *available at* https://studentprivacy.ed.gov/sites/default/files/resource_document/file/Best%20Practices%20for%20Data%20Destruction%20%282019-3-26%29.pdf.

[180] *Best Practices for Data Destruction*, U.S. DEP'T OF EDUC., p. 4, *available at* https://studentprivacy.ed.gov/sites/default/files/resource_document/file/Best%20Practices%20for%20Data%20Destruction%20%282019-3-26%29.pdf.

The Honorable Miguel A. Cardona
Secretary of Education
Page 44 of 87

program has failed the D/E rates test, the institution would have to ensure that students review the Department's website and acknowledge having seen the information about the program through the agency's website. Significantly, under § 668.407(c), an institution would not be permitted to disburse Title IV funds to a student until the student provided the required acknowledgment. Separate and expanded warning and acknowledgment requirements for GE programs are set forth in proposed § 668.605 (discussed below).

The specific contents of the Department's proposed disclosure website are detailed in § 668.43, which concerns consumer information that must be provided to students at Title IV-participating institutions. The Department also proposes adding to this section the following new disclosure requirements, which would apply to *all* Title IV programs (GE programs and non-GE programs):

- **Program web pages**. Institutions must provide a "prominent link to, and any other needed information to access," the Department's disclosure website "on any web page containing academic, cost, financial aid, or admissions information about the program or institution."

- **Distribution to prospective students**. Institutions must provide the information needed to access the disclosure website "to any prospective student, or a third party acting on behalf of the prospective student, before the prospective student signs an enrollment agreement, completes registration, or makes a financial commitment to the institution."

- **Distribution to current students**. Institutions must provide the information needed to access the disclosure website "to any enrolled title IV, HEA recipient prior to the start date of the first payment period associated with each subsequent award year in which the student continues enrollment at the institution."

> 1. **On its website, and in its various acknowledgements and warnings required by the Proposed Rule, the Department should recognize that there are many ways to measure postsecondary education value.**

With this disclosure requirement and, indeed, with this entire NPRM, the Department defines the value of postsecondary education too narrowly. Although economic mobility is an important factor for many students in considering whether to pursue higher education, there are also non-economic considerations and benefits.[181] For example, individuals with postsecondary credentials tend to engage in higher levels of civic participation in their communities, are more likely to be in good health, have higher levels of well-being, feel more engaged in work, are less likely to rely on social safety-net programs, and are incarcerated less often.[182] And, as exhibited by persons completing degrees long after their working years, education can sometimes be a goal in its own right, a personal achievement.

---

[181] Isabel V. Sawhill, *Higher Education and the Opportunity Gap*, Brookings Inst. (2013), *available at* https://www.brookings.edu/research/higher-education-and-the-opportunity-gap/; Philip Trostel, *It's Not Just the Money: The Benefits of College Education to Individuals and to Society*, Lumina Found., *available at* https://www.luminafoundation.org/files/resources/its-not-just-the-money.pdf.

[182] Sandy Baum & Kathleen Payea, *The Benefits of Higher Education for Individuals and Society*, College Bd. (2004), *available at* https://research.collegeboard.org/media/pdf/education-pays-2004-full-report.pdf.

The Honorable Miguel A. Cardona
Secretary of Education
Page 45 of 87

A study published by Philip Trostel, an economics professor at the University of Maine, demonstrates numerous other benefits to individuals and to society stemming from a college education, including increased likelihood of employment, improved health choices, increased volunteerism, reduced reliance on the public fisc, increased voting and participation in community service and civic organizations, increased neighborhood interactions and trust, and intergenerational benefits.[183] "The evidence is overwhelming that investment in college education pays in a big way both for individuals and for society."[184]

Indeed, the Department's preamble to the NPRM recognizes that benefits to education are broader than just increased income:

> Postsecondary education and training generate important benefits both to the students pursuing new knowledge and skills and to the Nation overall. Higher education increases wages and lowers unemployment risk, and leads to myriad non-financial benefits including better health, job satisfaction, and overall happiness. In addition, increasing the number of individuals with postsecondary education creates social benefits, including productivity spillovers from a better educated and more flexible workforce, increased civic participation, improvements in health and well-being for the next generation, and innumerable intangible benefits that elude quantification.[185]

This recognition, as well as studies showing that improved occupational outcome and the benefits of a postsecondary education should not only be measured by increased income, indicate that the Department's Proposed Rule to measure the value of postsecondary education based solely on a D/E ratio is arbitrary and capricious. Given the overwhelming evidence that postsecondary education's value extends beyond student earnings, we suggest that the Department should exercise caution when developing its website and classifying programs as "high-debt-burden" and "low-earnings."

> 2. **On its website and in its various acknowledgements and warnings, the Department should ensure precision in describing the nature and import of the metrics that it calculates**.

For example, the Department should be clear that its calculations only measure the average debt burden for individual students, not taxpayers. As the Department is aware, public institutions of higher education receive billions annually in State and local appropriations. In 2019-2020, public degree-granting institutions reported receiving $76.6 billion in State appropriations and $14.5 billion in local appropriations.[186] By calculating only debt owed by students in its D/E rates, the Department's formula provides a partial picture and potentially hides poor-performing programs that receive enormous non-Federal public investments. To ensure that its disclosures are useful and accurate, and avoid potentially

---

[183] Philip Trostel, *It's Not Just the Money: The Benefits of College Education to Individuals and to Society*, LUMINA FOUND., *available at* https://www.luminafoundation.org/files/resources/its-not-just-the-money.pdf.
[184] Philip Trostel, *It's Not Just the Money: The Benefits of College Education to Individuals and to Society*, LUMINA FOUND., *available at* https://www.luminafoundation.org/files/resources/its-not-just-the-money.pdf.
[185] 88 Fed. Reg. 32306 (May 19, 2023).
[186] U.S. Dep't of Educ., *Finance Survey (IPEDS-F:FY91) and Spring 2002 through Spring 2021, Finance Component*, NAT'L CTR. FOR EDUC. STAT. (Jan. 2022), *available at* https://nces.ed.gov/programs/digest/d21/tables/dt21_333.30.asp.

The Honorable Miguel A. Cardona
Secretary of Education
Page 46 of 87

misleading taxpayers, regulators, and public policy professionals, the Department should prominently disclose that its D/E rates formula excludes funding from State and local governments received by institutions.

### 3. The Department should develop and disclose alternative value measures to provide a more holistic picture of program value.

Many students pursue higher education to achieve an employment outcome that is better than their current one. Exclusively using a D/E measure may miss the economic prosperity many programs provide. Using an economic mobility indicator would take into account how students' incomes *change* after enrolling by using pre- and post-college earnings.[187] This methodology of assessing program value based on a pre- and post-earnings comparison was recently offered as a better alternative by Congressman Robert (Bobby) Scott (D-VA), Ranking Member of the House Committee on Education and the Workforce.[188] The Department also should include program-level student completion rates. Although graduating with excessive student loan debt is a concern for many borrowers, a more troubling outcome is for students who take on debt but never complete their program. Research shows time and time again that there are significant economic benefits associated with increased postsecondary attainment.[189] For example, those who attend college and do not complete recognize smaller benefits and are three times more likely to default than those who graduate.[190] The Department, we note, has recognized the critical importance of student persistence and its effect on students' lives.[191]

### G. Reporting Requirements (Subpart Q: 668.408)

### 1. The reporting requirements are unreasonable and unduly burdensome and will needlessly increase the cost of higher education.

Under § 668.408, each award year, all institutions would be required to report to the Department an extraordinary array of data for their Title IV-eligible programs (both GE programs and non-GE programs). These reporting obligations generally fall into the following three categories, though the agency does propose under § 668.408(a)(4) to retain the right to collect "any other information the Secretary requires the institution to report."

---

[187] Matthew Chingos & Kristin Blagg, *Toward an economic mobility ranking of U.S. colleges*, THE BROOKINGS INST. (Nov. 12, 2015), *available at* https://www.brookings.edu/wp-content/uploads/2016/07/Download-the-paper-1-1.pdf.

[188] *Breaking the System Part II: Examining the Implications of Biden's Student Loan Policies Before the H. Comm. on Educ. & the Workforce*, at minute 1:13:18, (May 24, 2023), *available at* https://www.youtube.com/watch?v=f7Up35z3v-I.

[189] Ben Miller, *The Relationship Between Student Debt and College Completion*, CTR. FOR AM. PROGRESS (June 26, 2015), *available at* https://www.americanprogress.org/article/the-relationship-between-student-debt-and-college-completion/.

[190] Brittany Hackett, *ED Fact Sheet: Non-Completers Face Harsher Consequences for Student Debt*, NAT'L ASS'N OF STUDENT FIN. AID ADM'RS (Aug. 3, 2015), *available at* https://www.nasfaa.org/news-item/5260/ED_Fact_Sheet_Non-Completers_Face_Harsher_Consequences_for_Student_Debt.

[191] Miguel Cardona, *A New Vision for College Excellence*, THE CHRON. OF HIGHER EDUC. (Aug. 11, 2022), *available at* https://www.chronicle.com/article/a-new-vision-for-college-excellence?cid2=gen_login_refresh&amp;cid=gen_sign_in.

The Honorable Miguel A. Cardona
Secretary of Education
Page 47 of 87

- **General Program Reporting**. For each program, institutions would be required to produce (i) the name, CIP code, credential level, and length of the program; (ii) whether the program is programmatically accredited and, if so, the name of the accrediting agency; (iii) whether the program meets licensure requirements or prepares students to sit for a licensure examination in a particular occupation for each State in the institution's metropolitan statistical area; (iv) the total number of students enrolled in the program during the most recently completed award year, including both recipients <u>and</u> non-recipients of Title IV, funds; and (v) whether the program is a medical or dental program whose students are required to complete an internship or residency.[192]

- **General Student Reporting**. For each student, institutions would be required to produce: (i) information needed to identify the student and the institution; (ii) the date the student initially enrolled in the program; (iii) the student's attendance dates and attendance status (e.g., enrolled, withdrawn, or completed) in the program during the award year; and (iv) the student's enrollment status (e.g., full time, three quarter time, half time, less than half time) as of the first day of the student's enrollment in the program; (v) the student's total annual cost of attendance; (vi) the total tuition and fees assessed to the student for the award year; (vii) the student's residency tuition status by State or district; (viii) the student's total annual allowance for books, supplies, and equipment from their cost of attendance; (ix) the student's total annual allowance for housing and food from their cost of attendance; (x) the amount of institutional grants and scholarships disbursed to the student; (xi) the amount of other State, tribal, or private grants disbursed to the student; and (xii) the amount of any private education loans disbursed, including private education loans made by the institution.[193]

- **Completed and Withdrawn Student Reporting**. For each student who completed or withdrew from the program during the award year, institutions would be required to report: (i) the date the student completed or withdrew from the program; (ii) the total amount the student received from private education loans for enrollment in the program that the institution is, or should reasonably be, aware of; (iii) the total amount of institutional debt the student owes any party after completing or withdrawing from the program; (iv) the total amount of tuition and fees assessed the student for the student's entire enrollment in the program; (v) the total amount of the allowances for books, supplies, and equipment included in the student's cost of attendance for each award year in which the student was enrolled in the program, or a higher amount if assessed the student by the institution for such expenses; and (vi) the total amount of institutional grants and scholarships provided for the student's entire enrollment in the program.[194]

Under the Proposed Rule, institutions would be required to report the initial batch of data "no later than July 31 following the date these regulations take effect…." Assuming the proposed regulations take effect July 1, 2024, institutions would be required to report data for "the second through seventh award years" by July 31, 2024.[195] This would mean data would be due for award years 2017-2018 through 2022-2023. In future years, the data for each award year would be due by October 1 following the end of the award year. As with prior versions of the GE rule, the Proposed Rule contemplates that some institutions may no

---

[192] Proposed 34 C.F.R. § 668.408(a)(1).

[193] Proposed 34 C.F.R. § 668.408(a)(2).

[194] Proposed 34 C.F.R. § 668.408(a)(3).

[195] Proposed 34 C.F.R. § 668.408(b). Medical and dental programs that require an internship or residency would be required to report data for the second through eighth award years.

The Honorable Miguel A. Cardona
Secretary of Education
Page 48 of 87

longer have the required data on hand, in which case, they must "provide to the Secretary an explanation, acceptable to the Secretary, of why the institution failed to comply with any of the reporting requirements."[196]

These reporting requirements are extremely burdensome for postsecondary institutions. During the initial year, institutions would have a mere 30 days in which to provide the Department with five years of student-level data concerning, potentially, their entire student body. Given the resources available to most postsecondary institutions, meeting such a fast deadline may be impossible to meet. In addition, the extensive reporting requirements and the short timeframe within which the Department will have to analyze the items reported and create the proposed website and other student information raises concerns that the Department will not be able to process and make use of the data that it is requesting from institutions. Such a short timeline renders suspect the Department's justification for requesting this extensive set of data in the first instance. Such a failing would render this disclosure requirement arbitrary and capricious and not an exercise of reasoned decision-making because the Department cannot provide a rationale for requiring such information when it cannot be used for the purpose requested.[197] For instance, in the first year, the Department requires approximately five years of student-level data from numerous institutions by July 31. By July 31, most students have already chosen the institution they will attend that fall and many students will choose their institution for the following year by December or January. It is highly implausible that the Department can analyze this level of student data from thousands of institutions in a meaningful way.

Nor do institutions generally maintain years of student data on the topics requested or at the granular level required by the Proposed Rule. In fact, the Department and other Federal and State agencies have encouraged institutions of higher education to destroy data when it is no longer needed to protect data security. By the Department's own statements, the longer that data are retained, the more likely it is to be breached.[198] "Minimizing the amount of data you retain, by destroying them when no longer needed, is a key element of the Fair Information Practice Principles (FIPPs), and is widely considered to be a best practice for protecting individuals' privacy and for lessening the potential impact of a data breach or inadvertent disclosure."[199] Indeed, the NPRM itself appears to recognize that schools do not routinely keep such extensive data for periods as long as six or seven years by providing a requirement that schools who no longer possess the data must "provide to the Secretary an explanation, acceptable to the Secretary, of why the institution failed to comply with any of the reporting requirements."[200]

Nor does the Proposed Rule appear to contemplate the costs, burden, or potential for security breach created by requiring such extensive disclosures of student-level information. Rather than offering specifics about these burdens, the Proposed Rule states cursorily that the Department "understand[s] those concerns, but we nonetheless believe that the benefits to students and to taxpayers derived from the

---

[196] Proposed 34 C.F.R. § 668.408(b)(2).

[197] *State Farm*, 463 U.S., at 43.

[198] *See Best Practices for Data Destruction: Protecting Student Privacy*, available at https://studentprivacy.ed.gov/resources/best-practices-data-destruction (last visited June 2, 2023).

[199] *See Best Practices for Data Destruction: Protecting Student Privacy*, available at https://studentprivacy.ed.gov/resources/best-practices-data-destruction (last visited June 2, 2023) (citing FIPPs standard, issued by National Institute of Standards and Technology).

[200] Proposed 34 C.F.R. § 668.408(b)(2).

The Honorable Miguel A. Cardona
Secretary of Education
Page 49 of 87

reporting requirements . . . outweigh the costs associated with additional institutional burden."[201] The Proposed Rule specifically acknowledges that this reporting will be one of the "primary costs of the proposed regulations related to the financial value transparency and GE accountability requirements," but the Department provided no evidence and little beyond its bare belief that such reporting requirements are necessary.[202] Such cursory statements do not represent adequate consideration of the costs and burdens of the regulation.[203]

Nor does the Proposed Rule adequately answer the Department's statements regarding the burdensome nature of similar reporting requirements for former versions of the rule on gainful employment. Specifically, in 2019, the Department "agree[d] that the GE regulations have been overly burdensome to schools and to the Department" and "permanently removed" this burden from institutions of higher education, stating that the Department's regulations "should be sensitive to cost and burden."[204] The Department also stated that, "[i]n developing any future transparency framework, the Department will focus on using administrative data sets and Department-developed data tools to minimize the burden on institutions and to allow students to compare all of the institutions and programs they are considering by accessing a single website."[205] This Proposed Rule does not, however, follow this statement by the Department, but instead mandates that institutions produce substantial and voluminous data.

Indeed, rather than contending with the 2019 Recission's statements about unnecessary burden, the Department's Proposed Rule reverts to the 2014 Rule, as though that were the current rule being modified. But the 2014 Rule is not the current rule and the "added burden of this reporting relative to existing requirements"[206] should not be compared to the 2014 Rule, but to the 2019 Rule which "permanently removed"[207] these reporting requirements.

Nor does the Department offer any explanation for the change from the 2019 Recission beyond its conclusory statement that it believes the benefits of such disclosure requirements outweigh the costs. The Department reiterates its justifications for issuing the Proposed Rule but does not reckon with the Department's clear statements in its 2019 Recission of a similar rule. When a new administration changes course in regulations, it cannot change without adequately engaging with the facts and findings from the prior course of action.[208] We submit that the Department has not, in this instance, adequately considered the costs and burdens of the reporting requirements of the Proposed Rule, nor has it adequately

---

[201] 88 Fed. Reg. 32341 (May 19, 2023).

[202] 88 Fed. Reg. 32341 (May 19, 2023).

[203] *See Michigan v. E.P.A.*, 576 U.S. 743, 750-51 (requiring agencies to consider costs to regulated parties in rulemaking).

[204] 84 Fed. Reg. 31419 (July 1, 2019).

[205] 84 Fed. Reg. 31419 (July 1, 2019).

[206] Proposed 34 C.F.R. § 668.408 (May 19, 2023).

[207] 84 Fed. Reg. 31419 (July 1, 2019).

[208] *Encino*, 579 U.S., at 222 (finding violation of APA where regulatory change "was issued without the reasoned explanation that was required in light of the Department's change in position" where agency "offered barely any explanation"); *Organized Village of Kake v. U.S.D.A.*, 795 F.3d 956, 969 (2015) ("direct, and entirely unexplained, contradiction" of finding in prior rule violated APA without a "reasoned explanation for disregarding the facts and circumstances that underlay its previous decision."); *Fox Television Stations, Inc.*, 556 U.S., at 515-16 (2009) ("In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.").

The Honorable Miguel A. Cardona
Secretary of Education
Page 50 of 87

responded to the statements related to administrative burden on institutions made in the Department's 2019 Recission.

Further, the Proposed Rule specifically removes this burden from non-GE institutions stating, "for non-GE programs the Department believes alleviating some institutional reporting burden justifies a temporary sacrifice in the quality of the D/E data reported during a transition period."[209] The Department provides no such "transition period" for GE institutions, which are often smaller and with fewer resources than non-GE institutions. Rather, the Department specifically requires GE institutions to provide such reporting with an accelerated turnaround time, as discussed above, and that will specifically affect the GE programs' eligibility for Title IV.[210] For some reason, the Department sees fit to provide non-GE institutions the benefit of the doubt, even though those institutions are not facing the severe consequences to be faced by GE institutions. Thus the Proposed Rule is biased against GE institutions and essentially subjecting them to a rule that threatens their existence based on disclosures the Department has called "overly burdensome" and on a 30-day timeframe in the first year. And, if GE institutions cannot satisfy the Department's requirements, they will be required to begin warning students that the institution may lose eligibility for Title IV *in the first year that the Proposed Rule is effective*. In short, this disclosure rule and the Proposed Rule in general "unfairly target[s] career and technical education programs"[211] and reinforces the "disparate impact" on GE schools, as recognized by the Department in 2019.[212]

In the NPRM, the Department repeatedly emphasizes its view that "[w]ith college tuition consistently rising faster than inflation, and given the growing necessity of a postsecondary credential to compete in today's economy, it is critical for students, families, and taxpayers alike to have accurate and transparent information about the possible financial consequences of their postsecondary program career options when choosing whether and where to enroll."[213] It is deeply ironic that the agency's solution to its concerns regarding financial value is to propose an accountability framework that will dramatically increase the administrative burden placed on institutions,[214] thereby driving up costs which, ultimately, will be passed on to students. There is no question that the reporting, disclosure, and other data and communication requirements contemplated in this rule will require the allocation of significant human and economic resources at great cost to institutions. Any assertion to the contrary is unrealistic. And when institutions pass this cost on to students, it will decrease the return on their investment. Moreover, if it negatively impacts the program's D/E rates and earnings premium, it could even force the institution to discontinue the program, thereby diminishing access.

    **H.**      **GE Program Eligibility (Subpart S: 668.601 – 668.603)**

          **1.**      **The Department lacks the statutory authority to determine a program's Title IV eligibility on the basis of the program's D/E rates.**

---

[209] 88 Fed. Reg. 32340 (May 19, 2023).
[210] 88 Fed. Reg. 32340 (May 19, 2023).
[211] 84 Fed. Reg. 31397 (July 1, 2019).
[212] 84 Fed. Reg. 31392 (July 1, 2019).
[213] 88 Fed. Reg. 32306 (May 19, 2023).
[214] 88 Fed. Reg. 32441 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 51 of 87

To support its authority for the Proposed Rule's sweeping gainful employment eligibility framework, the Department relies on 20 U.S.C. §§ 1001 and 1002.[215] § 1001(b)(1) uses the phrase a "program of training to prepare students for gainful employment in a recognized occupation" in one definition of "institution of higher education." § 1002(b)(1)(A)(i) and § 1002(c)(1)(A) use this phrase in defining "proprietary institution" and "postsecondary vocational institution," respectively.

The Department acknowledges that "[t]he HEA does not more specifically define … 'gainful employment'" and that "through multiple reauthorizations of the HEA," Congress has never "further clarified the concept of gainful employment."[216] Nevertheless, the Department justifies tying the Proposed Rule's D/E rates to Title IV eligibility based on the Department's self-described "legal duty to interpret, implement, and apply those terms in order to observe the statutory eligibility limits in the HEA."[217] The Department has created this purported "duty" out of thin air given that the phrase "gainful employment" was untouched by the Department for over four decades before the first promulgation of the GE framework in 2010. For this reason and others discussed below, the Department has impermissibly expanded the scope of its role with regard to gainful employment in contravention of its Congressional delegation of authority.

It is a well-settled "administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."[218] Moreover, "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear."[219] And an "agency [ ] must point to clear congressional authorization for the power it claims."[220]

To define "gainful employment" and, in turn, tie D/E rates to Title IV eligibility when Congress has declined to do during several reauthorizations, pushes the meaning of the two-word statutory term far beyond reason. Indeed, the Department only possesses the limited authority given to it by Congress and may not change the words of a statute to expand its authority. Yet here, the Department purportedly unearths authority for a complex regulatory framework in a small, seemingly straightforward statute. The Supreme Court has observed that Congress does not set forth the "fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not…hide elephants in mouse holes."[221]

Notably, the Department itself has historically agreed with this position, explaining that the GE framework represents a "complicated patchwork of regulations that the Department has created" in order to "set its own policy agenda in the absence of any direction from Congress."[222] The Department added that it "believes that it is dangerous and inappropriate for it to use two words in the HEA to create an approach to institutional accountability, that could potentially be used to manipulate the higher education

---

[215] 88 Fed. Reg. 32322 (May 19, 2023)

[216] 88 Fed. Reg. 32307 & 32322 (May 19, 2023).

[217] 88 Fed. Reg. 32322 (May 19, 2023).

[218] *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 328 (2014).

[219] *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994).

[220] *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2608 (2022) (quotations omitted).

[221] *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001); see also *W. Virginia*, 142 S. Ct. at 2609 ("Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices," and further explaining that Congress does not "delegate such [ ] sweeping and consequential authority in so cryptic a fashion…Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line.") (internal quotations omitted).

[222] 84 Fed. Reg. 31400 (July 1, 2019).

The Honorable Miguel A. Cardona
Secretary of Education
Page 52 of 87

marketplace."[223] We agree. The HEA does not authorize, or even contemplate, the sweeping regulatory GE framework proposed by the Department in the Proposed Rule.

The Department should abandon its attempt to transform an innocuous statutory phrase into a complex regulatory regime. Should the Department wish to pursue a GE type framework, it must instead seek explicit congressional permission to regulate the relationship between Title IV eligibility and student debt.

### a.    The meaning of "gainful employment" is well established.

Courts rely on the "plain meaning rule" as their guiding principle of statutory interpretation. The plain meaning rule provides that when the language of a statute is unambiguous and clear on its face, the meaning of the statute must be determined from the language of the statute itself. As the Supreme Court has held, "[t]he legislature must be presumed to use words in their known and ordinary signification."[224] The Department must presume the same of the eighty-ninth Congress, responsible for drafting the 1965 HEA and its references to "gainful employment."

At the time the HEA was enacted, "gainful employment" simply referred to a job that pays. For example, Webster's Third New International Dictionary defined the concept as "productive of gain," or "providing an income," for example, "a [gainful] occupation."[225] The Shorter Oxford English Dictionary defined "gainful" as "employment paid, useful."[226] Accordingly, the Department has erred in defining "gainful" as a specific percentage of monetary return over the amount owed. In failing to give the phrase "gainful employment" its plain-meaning effect, the Department illegally acts beyond its statutory authority.

Similar fact patterns, tried before Federal courts, have yielded this same conclusion. In *MCI Telecommunications Corp. v. AT&T Co.* ("*MCI*"), Congress had given the Federal Communications Commission ("FCC") authority to "modify" certain filing requirements. The FCC argued that "modify" should be defined to include a large, major, or important change.[227] The Supreme Court rejected the FCC's attempt to expand its decision-making authority, stating that "virtually every dictionary" defined "modify" as a minor or incremental change.[228] Accordingly, the Court found that Congress empowered the FCC to make minor, not major, changes.[229]

Like the FCC in *MCI*, the Department is improperly attempting to expand its regulatory authority by redefining "gainful" to mean significant or major monetary payments. Common usage of "gainful" does not support the Department. Nor does a single dictionary support the contention that only jobs paying large amounts (or large amounts relative to debt) are "gainful."

Beyond the plain meaning rule, other statutory interpretation approaches make clear that the Department has exceeded its authority in attempting to define "gainful employment" and subjecting Title IV eligibility to the Department's novel definition. For example, courts uniformly follow the rule that

---

[223] 84 Fed. Reg. 31422 (July 1, 2019).
[224] *Levy v. M'Cartee*, 31 U.S. 102, 110 (1832).
[225] *See, e.g.,* Webster's Third New International Dictionary 928 (1965) (defining "gainful").
[226] *See* Shorter Oxford English Dictionary 1066 (6th ed. 2007) (defining "gainful" as "employment paid, useful").
[227] *MCI Telecommunications Corp.,* 512 U.S., at 225–27.
[228] *MCI Telecommunications Corp.,* 512 U.S., at 225.
[229] *MCI Telecommunications Corp.,* 512 U.S., at 228.

The Honorable Miguel A. Cardona
Secretary of Education
Page 53 of 87

"words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[230] The Supreme Court expounds: "[s]tatutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear[.]"[231] Reading the entire HEA clarifies what Congress intended for "gainful employment" to mean. For example, 20 U.S.C. § 1036(e) addresses "fellowship terms and conditions" and prohibits graduate fellowships if "the individual is engaged in gainful employment, other than part-time employment related to teaching, research, or a similar activity."[232] This sentence indicates that "gainful employment" merely means paid employment (in a recognized occupation), not employment that suffices to service a student's debt. A plain reading of this sentence indicates that "gainful employment" is meant to be read in parallel with the phrase "part-time employment," showing clearly that "gainful employment" simply means a paying job. As the Supreme Court instructs, this meaning elucidates the phrase "gainful employment" throughout the entire statutory scheme.

> **b.** **The Proposed Rule's GE scheme runs afoul of the major questions doctrine in that Congress did not grant such far-reaching authority through the modest statutory phrase "gainful employment."**

Not only is there no textual hook for the Department's GE scheme, but one would not expect Congress to grant such far-reaching authority on such a slender statutory basis (the undefined two-word phrase "gainful employment"). As the Supreme Court recently made clear in *West Virginia v. Environmental Protection Agency* (*"West Virginia"*),[233] the fundamental inquiry into agency authority is "whether Congress in fact meant to confer the power the agency has asserted."[234] Under the major questions doctrine, it is presumed that "Congress intends to make major policy decisions itself, not leave those decisions to agencies."[235] When the agency claims far-reaching powers for itself, the "'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."[236] Even where, unlike here, a regulation has a colorable textual basis, both courts and agencies must be aware that "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices."[237] Nor "does Congress typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme."[238]

The Department's GE proposal has strong parallels to the EPA rulemaking that the Supreme Court struck down in *West Virginia*. There, because Congress had declined to enact climate change legislation, the EPA seized upon a statutory provision that required adoption of the "best system of emission reduction" for certain existing pollution sources.[239] This "ancillary" statute "had been rarely used in the preceding

---

[230] *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

[231] *United Savings Ass'n v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 371 (1988).

[232] 20 U.S.C. § 1036(e).

[233] *West Virginia v. Environmental Protection Agency*, 142 S. Ct. 2587, 2609 (2022).

[234] *West Virginia*, 142 S. Ct., at 2608.

[235] *West Virginia*, 142 S. Ct., at 2609 (internal quotation marks omitted).

[236] *West Virginia*, 142 S. Ct., at 2608 (quoting *Brown & Williamson*, 529 U.S., at 159-60).

[237] *West Virginia*, 142 S. Ct., at 2609 (internal quotation marks and brackets omitted).

[238] *West Virginia*, 142 S. Ct., at 2609 (internal quotation marks and brackets omitted).

[239] 42 U.S.C. § 7411(a)(1), (d).

The Honorable Miguel A. Cardona
Secretary of Education
Page 54 of 87

decades," and had been interpreted to require technology-based solutions.[240] The EPA nonetheless promulgated a new rule interpreting "system of emission reduction" to include an emissions cap plan that would force utilities to shift electrical generation from coal plants to plants using cleaner fuels. The Supreme Court struck down the rule, finding no "clear congressional authorization" to the EPA to decree emissions caps incentivizing utilities to shift away from coal-based generation plants, and certainly none "in the previously little-used backwater" of the statutory section invoked.[241]

Even if the Department's interpretation of "gainful employment" were a definitional possibility (which it is not), the Department's interpretation is flawed because there is no "'clear congressional authorization' to regulate in that manner."[242] As in *West Virginia*, references to "gainful employment" in the HEA represent minor provisions that were uninterpreted by the Department for the first 45 years of their existence. The Department's Proposed Rule refashions these minor provisions as the wellspring of power to address a matter of great political significance involving a significant portion of the American economy and on which the country's major political parties are deeply divided.[243] According to the Department's Regulatory Impact Analysis for the Proposed Rule, the GE framework would affect roughly 32,058 programs serving approximately 2.9 million students who receive $16 billion annually in Federal financial aid. By all accounts (including in the Department's own estimation),[244] this framework is an "economically significant" proposal.

Additionally, the Department predicts that the GE framework may cause enrollment shifts between programs, which would trigger the transfer of "resources between students, institutions, State and local governments, and the Federal government,"[245] effectively impacting every facet of the higher education ecosystem. Moreover, the framework would impose reporting obligations burdening institutions to the tune of 5.1 million hours during the first reporting year.[246] And most significantly, the GE framework proposes the power to strip an institution of its Title IV eligibility on the basis of arbitrarily determined D/E rates and unsupported earnings thresholds, resulting in irreparable harm to the institution, its students, and the public fisc. These broad consequences implied by the GE proposal are not the kind of matter that Congress would delegate to the Department in obscure fashion. Therefore, the proposed GE framework is impermissible under the major questions doctrine.

> c.    The statute requires that institutions "prepare students for gainful employment," not "ensure" students secure gainful employment.

The HEA requires programs offered by proprietary schools to "*prepare* students for gainful employment," not help students secure and retain "gainful employment" in a recognized occupation. This distinction, which the Proposed Rule ignores, is important for two reasons.

---

[240] *West Virginia*, 142 S.Ct., at 2602, 2610-11.
[241] *West Virginia*, 142 S.Ct., at 2613-14.
[242] *West Virginia*, 142 S.Ct., at 2613-14.
[243] *West Virginia*, 142 S.Ct., at 2616, 2620-21 (Gorsuch, J., concurring) (identifying factors for identifying major questions where congressional delegation must be clear).
[244] 88 Fed. Reg. 32392 (May 19, 2023).
[245] 88 Fed. Reg. 32443 (May 19, 2023).
[246] 88 Fed. Reg. 32441 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 55 of 87

First, an agency only possesses the limited authority given to it by Congress. An agency is not free to change the words of a congressionally enacted statute in order to expand its authority. Accordingly, when Congress unambiguously states that a school must "prepare" students for "gainful employment," the Department is not free to adopt regulations forcing proprietary schools to ensure that their students secure and retain relatively high-paying employment and timely pay off their debts.

Second, by modifying the terms of the HEA to require that schools ensure their students secure and retain "gainful employment," the Department is penalizing schools for the personal choices that their students make and over which the schools have no control, thereby incentivizing schools to reject students who are likely to choose employment in fields that may be personally or professionally rewarding, but less lucrative. Upon graduation, students may decide to work in a nonprofit field, to move overseas, to become a homemaker, or simply to not enter the labor market. Other students may make poor financial decisions that impact their ability to repay their loans. Still others may be subject to unforeseen and unfortunate life events, such as a disease or disability that prevents them from working, or an economic crisis that prevents them from getting a job in their chosen fields. Even assuming the Department has discretion to stretch the concept of "gainful employment," whether a school "prepares students for gainful employment" cannot be made contingent on these post-graduation externalities, which are well beyond the control of any institution. Yet that is precisely what the Proposed Rule improperly does.

> **d.     "Gainful Employment" refers to the nature of the program—not the program's outcomes.**

The statutory scheme demonstrates that the phrase "gainful employment" is only meant to refer to the nature of a program, not the debt and earnings outcomes of the program. Under 20 U.S.C. § 1002, a proprietary school qualifies as an "institution of higher education" and, in turn, is eligible to participate in Title IV programs if, among other requirements, it has been in existence for at least two years and it "provides an eligible program of training to prepare students for gainful employment in a recognized occupation." Because the program would have likely only been in existence for two years at the time it initially becomes Title IV-eligible, the program would not yet have any D/E rates and, thus, no D/E outcomes. Yet, the program is still eligible for Title IV funding because of the nature of the program—it is designed to train and "prepare students for gainful employment in a recognized occupation"—regardless of its D/E outcomes. Therefore, the Department exceeds its statutory authority by tying Title IV eligibility to D/E rates.

> **e.     The fact that Congress has already addressed the relationship between student debt and Title IV eligibility shows that Congress did not intend for the Department to transform the term "gainful employment" into a complicated debt-measuring matrix.**

Congress has already addressed the very area in which the Department wishes to act: the relationship between student debt and Title IV eligibility. In 20 U.S.C. § 1085(a), Congress explicitly ties an institution's ability to participate in Title IV to the institution's cohort default rate. Under the statute, a school whose cohort default rate is equal to or greater than the defined threshold percentage for each of the three most recent fiscal years is no longer eligible to receive Title IV funds.[247] In light of this statute, it is absurd to

---

[247] 20 U.S.C. § 1085(a).

The Honorable Miguel A. Cardona
Secretary of Education
Page 56 of 87

believe that Congress would implicitly grant the Department the license to adopt its own debt matrices that depart from the debt measures Congress itself has already enacted.

This congressional choice is made even more obvious and compelling by the fact that when discussing the institutional cohort default rate, nowhere does Congress authorize the Department to promulgate additional Title IV eligibility requirements, let alone more stringent requirements. This is true despite the fact that Congress, in the same statute, demonstrated its ability to explicitly authorize the Secretary to promulgate regulations regarding eligibility requirements in other limited instances.[248]

As the Supreme Court has recognized, Congress does not set forth the "fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not ... hide elephants in mouseholes."[249] When Congress wants the Department to establish regulations affecting institution eligibility, it says so explicitly. The fact that Congress has not done so—and instead has done the job itself—is determinative.

> **2.    An institution should not be penalized if a program is being responsibly retired and produces failing D/E rates in its final years.**

A program that an institution voluntarily determines to wind down could suffer a decline in its D/E rates or earnings premium, particularly if the decision to wind down the program was based in part on market changes. Under the Department's Proposed Rule, an institution would be prohibited from reintroducing that program for three years, even if the new version is shorter, less expensive, and redesigned to be more attractive to employers. The Department should not penalize a program if it is being responsibly retired and produces failing D/E rates in its final years.

> **3.    Students who have enrolled in or remain enrolled in a program with full knowledge of the program's D/E rates and earnings premium should be permitted to receive Title IV aid until they complete the program.**

The Federal financial aid programs are founded, in part, on the belief that students should have the ability to choose their programs and institutions. Moreover, it is highly likely that if they lose access to aid, many students will be forced to withdraw from the program. Some may determine not to complete their education, others may be unable to find another institution willing to accept them, and others still may be required to retake classes or restart clinicals. These outcomes are all extremely negative for the student and significantly devalue the taxpayer's investment in the student's education. If the Department's aim is to protect students and to promote the successful completion of their education, its GE scheme should avoid forcing withdrawals.

> **4.    If a program is subject to a loss of eligibility due to failing D/E rates or earnings premiums, the program should only lose access to the Direct Loan program.**

Pell Grants provide basic access to postsecondary education without repayment obligations whereas loans facilitate choice with negative consequences if default occurs. Unfortunately, as currently structured, the Proposed Rule would result in an all-or-nothing loss of eligibility, to include Pell Grants. Instead, the Proposed Rule should be revised such that if students attending the institution are duly

---

[248] *See* 20 U.S.C. § 1085(p)(4) (authorizing the Secretary to promulgate regulations regarding the eligibility requirements of educational lenders).

[249] *Whitman*, 531 U.S., at 468.

The Honorable Miguel A. Cardona
Secretary of Education
Page 57 of 87

informed that the program's D/E rates or earnings premium are failing and choose to continue in the program, the student should still have the opportunity to access Pell Grant funds. Though true that, as a practical matter, there would be some institutions that simply could not survive without the Direct Loan funding stream (effectively causing the same result as that caused by total loss of eligibility), for other programs with students who are relying more heavily on Pell Grants and less on loans, "it could be a big difference and you could really see a positive impact for [] being able to tailor the remedy to the problems at issue."[250] As academics have noted, this "tailoring" is paramount given that "not all of higher education is about economic outcomes and so there may be colleges that we wish to support with Pell Grants that might not be good economic investments for a loan."[251] For this reason, we strongly urge the Department to limit the loss of eligibility exclusively to the Direct Loan program.

    **I.**      **Certification Requirements for GE programs (Subpart S: 668.604)**

We support the certification requirements for GE programs, as we believe them to be reasonable and a significant improvement over prior rules. We urge the Department to implement § 668.604 as proposed.

    **J.**      **Student Warnings and Acknowledgments (Subpart S: 668.605)**

        **1.**      **The Department should not compel institutions to issue misleading or inaccurate warnings to current and prospective students.**

Proposed § 668.605 compels institutions to make misleading or inaccurate statements to students and prospective students. Under the Proposed Rule, institutions would be required to issue "notifications to current and prospective students . . . if [their] program could lose title IV, HEA eligibility based on its next published D/E rates or earnings premium."[252] Because institutions would lose eligibility after just two consecutive years with failing D/E rates, these notification requirements would take effect after a single failure.[253] Compelling institutions to deliver these warnings is troubling for several reasons.

First, this requirement exposes institutions to serious reputational harm based on the Department's arbitrary criteria. The proposed warnings would alert students to the fact that their program "has not passed standards established by the U.S. Department of Education based on the amounts students borrow for enrollment in the program and their reported earnings" and direct students to a disclosure website maintained by the Department.[254] Despite the Department's nimble phrasing, the statements would convey the straightforward message that the program in question does not measure up.

Moreover, the proposed notices would include an explanation of "whether, in the event that the program loses eligibility, the students could transfer credits earned in the program to another institution."[255] These

---

[250] *Accountability in Higher Education: Using Evidence to Inform Regulatory Policy – Part I*, THE BROOKINGS INST. (Sept. 9, 2020), min. 38:00, *available at* https://www.youtube.com/watch?v=sS5etKaJxiM.

[251] *Accountability in Higher Education: Using Evidence to Inform Regulatory Policy – Part I*, THE BROOKINGS INST. (Sept. 9, 2020), min. 27:37, *available at* https://www.youtube.com/watch?v=sS5etKaJxiM.

[252] 88 Fed. Reg. 32347 (May 19, 2023).

[253] *See* 88 Fed. Reg. 32343 (May 19, 2023).

[254] 88 Fed. Reg. 32347 (May 19, 2023).

[255] 88 Fed. Reg. 32347 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 58 of 87

notices would go both to current students, and *prospective* students.[256] Thus, the reputational harm for programs that fail to meet the Department's prescribed D/E rates would be aimed directly at prospective students, the constituency those institutions rely upon.

Second, this determination would be based soley on the Department's arbitrary criteria. All students make educational choices based on more than the amount they borrow in relation to their future earnings. Students find value in programs based on countless criteria not accounted for in the Department's determinations. This is clearly true for fields like nursing or social work, but also extends to cosmetology, auto repair, and numerous other fields. Yet, institutions that offer programs that attract students *in spite of* their comparatively low potential for future earnings will nonetheless (a) risk termination, and (b) be compelled to inform students that the Department has determined that their course of study is not valuable. The Department proposes to compel institutions to parrot this determination without regard for whether the underlying data are reliable or whether it is an accurate reflection of a program's value *to the students it serves*. In fact, the data reflect the Department's myopic and arbitrary choice to condition access to Federal financial aid on one particular definition of value—money.

As the Department knows, equivalent measures in the 2014 Rule were held to be immediately appealable as final agency action.[257] The Department should thus rescind the warning and acknowledgment measures in the Proposed Rule.

> **2.      At the very least, the Department should modify the text of its proposed warnings to accurately reflect the rule.**

Institutions do not make determinations about which programs are or are not eligible for Federal financial aid—the Department does. Any student warnings should accurately convey that the Department has chosen to revoke eligibility based on its own arbitrary criteria without regard for any action the institution has taken to improve its D/E rates or for the students whose programs are affected. Instead, the Department proposes to strictly control the content of the warnings.[258] The Department proposes to have institutions themselves deliver these warnings, but gives them no opportunity to articulate any context or point of view different from what the Department mandates: "The warning would be the only substantive content contained in these written communications."[259] The Department cannot justify its choice to compel institutions themselves to deliver the proposed warnings while simultaneously forbidding them from contributing their own point of view.

> **3.      The proposed warnings violate the First Amendment's prohibition on compelled speech.**

The proposed warnings violate the First Amendment rights of institutions to be free from compelled speech. The government's ability under the law to require consumer warnings extends only to warnings

---

[256] 88 Fed. Reg. 32347 (May 19, 2023).

[257] *Am. Ass'n of Cosmetology Sch.*, 258 F. Supp. 3d, at 65-66.

[258] This is true despite the Department's recognition that "institutions are well positioned to tailor communications about acknowledgment requirements in a manner that best meets the needs of their students[.]" 88 Fed. Reg. 32338 (May 19, 2023). The Department does not explain why the same does not hold true for the warning requirements.

[259] 88 Fed. Reg. 32347 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 59 of 87

containing "purely factual and uncontroversial information[.]"[260] The Department is clear that the proposed warnings are meant as consumer warnings: "Providing timely and effective warnings to students . . . is especially critical in allowing students to make informed choices about whether to enroll or continue in a program for which expected financial assistance may become unavailable."[261] Yet, the proposed warnings contain non-factual information that is far from uncontroversial. As described above, the proposed warnings make de facto value judgments in addition to any factual information they convey. Those value judgments are controversial, informing students that their programs are not valuable in the eyes of the Department. As the Department knows, the D.C. District Court in *Ass'n of Priv. Colleges & Universities v. Duncan* stated, without ruling, that similar warnings likely violated the First Amendment by compelling non-factual speech.[262]

Further, unlike the kinds of consumer warnings generally upheld by courts, the proposed warnings do not promote "the robust and free flow of accurate information[,]" which "is the principal First Amendment justification for protecting commercial speech[.]"[263] Instead, the Department limits the content of the warnings to include only the information they mandate without allowing an institution to provide further context. Thus, the proposed warnings violate the First Amendment rights of institutions and should be removed from the final rule.

### 4. The proposed warnings will cause irreparable harm to programs, making it impossible to recruit future students and leading to program teach-out.

Under the Department's proposal, a program would lose eligibility if it: (i) fails the D/E rates test in two out of any three consecutive award years for which the program's D/E rates are calculated, or (ii) fails the earnings premium test in two out of any three consecutive award years for which the program's earnings premium is calculated. It also is required to make significant student warnings if it fails only a single year. As such, the current proposal affords institutions virtually no opportunity to adjust for market shifts or other unforeseen events – like a global pandemic – that negatively impact earnings for one or more years. A program that consistently prepares students for gainful employment might fail in a year like 2020 when unemployment increased dramatically.[264] Under the Department's proposal, the program would be required to make the required warnings due to this single-year anomaly, which we believe would likely force it to close precisely when it is most needed (i.e., during an economic downturn when individuals are looking to retrain). We urge the Department to develop a more reasonable standard. For example, a program might only lose eligibility if it fails three out of four consecutive award years, which would suggest a pattern of poor performance. This would afford institutions a more reasonable opportunity to adjust for market shifts or other unforeseen events. In addition, we propose the rule specify that the Secretary has the discretion to waive sanctions for any program training students to be essential workers or to enter

---

[260] *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985).

[261] 88 Fed. Reg. 32348 (May 19, 2023).

[262] *Ass'n of Priv. Colleges & Universities,* 870 F. Supp. 2d, at 154 n.5. Nor do the changes to the content of the new warnings save them from a First Amendment challenge, since the proposed warnings carry the same message, as explained above, albeit using minimally different wording.

[263] *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001).

[264] *COVID-19 ends longest employment recovery and expansion in CES history, causing unprecedented job losses in 2020,* Bureau of Labor Statistics, June 2021, *available at* https://www.bls.gov/opub/mlr/2021/article/covid-19-ends-longest-employment-expansion-in-ces-history.htm.

The Honorable Miguel A. Cardona
Secretary of Education
Page 60 of 87

professions experiencing critical national job shortages or as a result of a national, State, or local emergency declared by the appropriate government authority.

> **5.    Any acknowledgement requirements should apply equally to GE and non-GE programs.**

There is no basis for excluding the acknowledgment of failing earnings premium measures from the required student acknowledgments for non-GE programs. Under the Proposed Rule, for both GE and non-GE programs, for any year for which the Department notifies an institution that its program has failed the D/E rates test, the institution would have to ensure that students review the Department's website and acknowledge having seen the information about the program through the agency's website.[265] The institution would not be permitted to disburse Title IV funds to a student in its program until the student provided the required acknowledgment.[266] For GE programs, this requirement would apply when the program fails either the D/E rates test or the earnings premium test. However, unlike GE programs, non-GE programs only have student acknowledgment requirements when they fail the D/E rates test, not when they fail the earnings premium test.[267]

This disparity is baffling. By its own projections, it is readily apparent that a significant number of non-GE programs will fail the proposed financial value transparency standards,[268] impacting even more students than those impacted by failing GE programs.[269] The NPRM indicates that, during the first year following implementation, there will be over 875,000 students enrolled in 1,633 failing non-GE programs.[270] By contrast, the Department projects nearly 700,000 students will be enrolled in 1,775 failing GE programs, roughly 175,000 fewer students than those impacted by failing non-GE programs.[271] The Department claims that the student acknowledgments are essential to "ensur[ing] students are aware of these outcomes when financial considerations may be particularly important[.]"[272] However, the Department seems to selectively value full awareness of failing outcomes for GE programs, while shrouding from view failing earnings premium measures at non-GE programs.

The Department has left the decision to exclude the acknowledgment requirement for failing earnings premium measures for non-GE programs largely unexplained. In support of this nearly-bare proposal, the Department says that, "[w]hile many non-GE students surely care about earnings, non-GE programs are more likely to have nonpecuniary goals. Requiring students to acknowledge low-earning information as a condition of receiving aid might risk conveying that economic gain is more important than nonpecuniary considerations. In contrast, students' ability to pursue nonpecuniary goals is jeopardized and taxpayers bear additional costs if students enroll in high-debt burden programs. Requiring acknowledgement of the D/E rates ensures students are alerted to risk on that dimension."[273] According to the Department, "[t]he D/E and earnings premium metrics capture related, but distinct and important dimensions of how

---

[265] Proposed 34 C.F.R. § 668.605(a).
[266] Proposed 34 C.F.R. §§ 668.605(g) and 668.407(c).
[267] Proposed 34 C.F.R. § 668.407(c).
[268] 88 Fed. Reg. 32418-19 (May 19, 2023).
[269] 88 Fed. Reg. 32420-21 (May 19, 2023).
[270] 88 Fed. Reg. 32418-19 (May 19, 2023).
[271] 88 Fed. Reg. 32420-21 (May 19, 2023).
[272] 88 Fed. Reg. 32310 (May 19, 2023).
[273] 88 Fed. Reg. 32338 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 61 of 87

programs affect students' financial well-being."[274] If, as the Department says, the D/E and earnings premium metrics provide "distinct and important" perspectives, the Department should alert students in non-GE programs to the risk on both dimensions.

## III.    FINANCIAL RESPONSIBILITY

Our concerns regarding the proposed financial responsibility framework are set out below. First, we offer general comments regarding the scope of the Department's authority to promulgate financial responsibility regulations. We then proceed through the proposed regulatory text section-by-section to provide specific analysis.

### A.    General Comments

#### 1.    The proposed financial responsibility rules exceed the Department's authority under § 487 of the HEA.

The Department cites § 498 of the HEA as its primary authority to promulgate regulatory actions related to financial responsibility.[275] Although there is no question that the Department's authority partly derives from § 498, it also flows from and is subject to § 487. For this reason, the Department's prior financial responsibility rulemakings cite both §§ 487 and 498 when discussing the agency's authority to determine financial responsibility regulations.[276] Indeed, § 487 is particularly important to consider as it outlines important **limitations** on the Department's authority.

And in fact, §§ 487 and 498 must be read together. Under accepted canons of statutory interpretation, statutes must be interpreted "as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."[277] Courts do "not defer to 'an agency interpretation that is inconsistent with the design and structure of the statute as a whole.'"[278]

It is only when §§ 487 and 498 of the HEA are read together that Congress' intent and the limit of the Department's authority is fully understood. In particular, § 487(c) provides:

"(1) Notwithstanding any other provisions of this subchapter, the Secretary shall prescribe such regulations as may be necessary to provide for--…

(B) **in matters not governed by specific program provisions**, the establishment of **reasonable standards** of financial responsibility and appropriate institutional capability for the administration by an eligible institution of a program of student financial aid under this subchapter, including any matter the Secretary deems necessary to the sound

---

[274] 88 Fed. Reg. 32327 (May 19, 2023).
[275] 88 Fed. Reg. 32353 (May 19, 2023).
[276] 81 Fed. Reg. 39359 (June 16, 2016); 83 Fed. Reg. 37270 (July 31, 2018).
[277] *Keeley v. Whitaker*, 910 F.3d 878, 884 (6th Cir. 2018).
[278] *Lujan v. United States Dep't of Educ.*, 2023 WL 2638280, at *11 (W.D. Tex. Mar. 24, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 62 of 87

> administration of the financial aid programs, such as the pertinent actions of any owner,
> shareholder, or person exercising control over an eligible institution;"[279]

A plain reading of the prefatory language to § 487(c)(1)(B) prohibits the Department from establishing financial responsibility standards in matters that are already governed by specific program provisions.[280] As evidenced throughout the Title IV statutes and regulations, references to the "program" or "program provisions" refer to provisions of the Title IV program.[281] As such, if a matter is already addressed and governed by a Title IV program provision, Congress has made clear that the Department may not issue a corresponding Financial Responsibility standard governing the same topic.

Congress' desire to avoid duplicative laws and regulations is reasonable. If Congress or the Department addresses a particular concept in detail under Title IV, there is no reason for that concept to be addressed again as part of the financial responsibly framework. Multiple iterations of the same concept would be administratively burdensome for institutions and also could create inconsistent standards. Congress further expressed its intent for the Department to avoid duplicate regulations in other parts of the HEA, including within §§ 491 and 498B.

The following proposed rules are specifically addressed in existing Title IV program provisions, and therefore their inclusion in the proposed financial responsibility framework exceeds the Department's authority under § 487(c)(1) of the HEA, for the reasons detailed above:

| Matter | Program Provision Citation |
|---|---|
|  |  |
| Equity, Primary Reserve, and Net Income Ratios | 34 C.F.R. § 668.172 |
| Cash Reserves | 34 C.F.R. § 668.173 |
| Institutional Refunds and Return of Title IV Funds | 20 U.S.C. § 1094(22); 20 U.S.C. § 1091b |
| Borrower Defense Claims | 20 U.S.C. § 1087 |
| Change in Ownership | 34 C.F.R. § 600.31 |
| Gainful Employment | 34 C.F.R. § 668.14(b)(26) |
| Teach-Out Plans | 20 U.S.C. § 1094(f) |
| State Actions/Citations | 20 U.S.C. § 1094(a)(21) |
| 90/10 Rule | 20 U.S.C. § 1094(a)(24) |
| Cohort Default Rate | 20 U.S.C. § 1085 |
| Defaults | 20 U.S.C. § 1099c-1 |

---

[279] Emphasis added.

[280] *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

[281] While the most logical reading of "specific program provision" refers to provisions of the Title IV program, even a more conservative reading of the term, as referring to provisions of an institution's PPA, would prevent the Department from including the following concepts in the financial responsibility framework: Institutional Refunds and Return of Title IV Funds (20 U.S.C. § 1094(22); 20 U.S.C. § 1091(b)); 90/10 Rule (20 U.S.C. § 1094(a)(24)), Teach-Out Plans (20 U.S.C. § 1094(f)), State Actions/Citations (20 U.S.C. § 1094(a)(21)), Accrediting Agency Actions (20 U.S.C. § 1094(a)(21)), and Gainful Employment (34 C.F.R. § 668.14(b)(26)).

The Honorable Miguel A. Cardona
Secretary of Education
Page 63 of 87

| Fluctuations in Title IV Volume | 20 U.S.C. § 1099c-1 |
| High Annual Drop Out Rates | 20 U.S.C. § 1099c-1 |
| Discontinuation of Programs | 34 C.F.R. § 685.214 |
| Closure of Locations | 20 U.S.C. § 1087 |
| Program Eligibility | 34 C.F.R. § 668.232 |

The Department should exclude the above provisions from the final rule lest it exceed the statutory limitation on its authority detailed in HEA § 487(c).

      **2.**      **Many elements of the proposed financial responsibility rules are unreasonable and unsupported by any factual record, as detailed in the section-by-section comments and suggestions.**

When Congress has spoken unambiguously, an agency is bound by that interpretation.[282] With regard to measures of financial responsibility, Congress explicitly stated in § 487(c)(1) of the HEA that the Department must be **reasonable** and assess specific abilities of the institution. Thus, Congress expressly limited the Department's ability to promulgate financial responsibility rules. Any proposed standards or processes for determining financial responsibility that fail to satisfy these parameters are beyond the Department's authority.

Significantly, this reasonableness standard is more stringent than the arbitrary and capricious standard typically applied to Federal regulations. A reasonableness standard is akin to administrative law's "substantial evidence" standard, which requires a reviewing court to ask whether a "reasonable mind might accept" a particular record as "adequate support for a conclusion."[283] A substantial evidence standard also requires a reviewing court to take a "harder look" at an agency's actions than the arbitrary and capricious standard.[284]

In many cases, the proposed revisions to the financial responsibility standards are unreasonable and unsupported by any factual record, as highlighted in the following section-by-section comments and suggestions.

    **B.**    **Factors of Financial Responsibility (Proposed § 668.15)**

      **1.**      **The Department must ensure that all statutorily required provisions found in § 668.15 are preserved.**

The Department proposes to remove § 668.15 and reserve this section, stating that "removing the factors from § 668.15 would remove unnecessary text and streamline part 668."[285] Although we are generally supportive of this streamlining effort, the current § 668.15 contains important concepts, including provisions required by statute, that would be removed from regulations.

---

[282] *Encino*, 579 U.S., at 220.
[283] *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999).
[284] *Alabama Power Co. v. Occupational Safety & Health Admin.*, 89 F.3d 740, 744 (11th Cir. 1996).
[285] 88 Fed. Reg. 32353 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 64 of 87

For instance, HEA § 498(c)(3) states that the Secretary "shall determine an institution to be financially responsible, notwithstanding the institution's failure to meet [certain financial responsibility criteria]" if an institution meets one of four criteria: (1) the posting of third-party financial guarantees, (2) having liabilities backed by the full faith and credit of the State, (3) establishing to the satisfaction of the Secretary, with the support of a financial statement audited by an independent certified public accountant in accordance with generally accepted auditing standards, that the institution has sufficient resources to ensure against the precipitous closure of the institution, **or** (4) meeting standards of financial responsibility designated by the Secretary. This statutory requirement is found at current § 668.15(d). The proposed regulations would not reflect this requirement if § 668.15 is removed.

C.      **Compliance Audits and Audited Financial Statements (Proposed § 668.23(d)(5))**

1.      **The proposed requirement that institutions disclose expenditures relating to recruiting, advertising, and other pre-enrollment activities is unwarranted and unreasonable.**

Under proposed § 668.23(d)(5), the Department will require each institution to disclose in a footnote to its audited financial statement the amount it spent in the preceding fiscal year on recruiting activities, advertising, and other pre-enrollment expenditures. As justification, the Department speculates that institutions "feeling pressure due to a declining financial situation may spend excessive amounts of its resources on recruitment, advertising, or other pre-enrollment expenditures to generate revenue in the short-term, at the possible detriment to the institution in the long-term."[286]

First, an institution's marketing and recruiting expenditures represent no clear or quantifiable risk to institutions, making it impossible for the Department to defend the reasonableness of such a reporting requirement (or the use of such data in making eligibility determinations, as discussed in later sections). Indeed, the Department offers no meaningful factual support for its underlying premise that the amount of money spent on recruiting, advertising, or other pre-enrollment activities signals an institution's financial weakness. There are numerous reasons why an institution may spend resources on recruitment, advertising, or other expenditures, many of which have nothing to do with its financial stability. As just one example, institutions with top-tier football programs spend **millions** per year to recruit approximately 25 students. It is fair to say that these institutions are not spending money on recruitment efforts because the school is "feeling pressure due to a declining financial situation." Additionally, other institutions allocate resources to campus events designed to attract prospective students or to promote brand awareness. In fact, virtually every Title IV-participating institution allocates funds to marketing and recruiting each year, often considerable funds, and the vast majority of these institutions are financially responsible (a fact easily confirmed by the Department's public data).

Second, as a practical matter, it would be extremely difficult to consistently implement and enforce this requirement across higher education. "Recruiting," "advertising," and "pre-enrollment activities" are vague terms. It is unclear how institutions would even determine what portion of the expenditures related to these activities should be disclosed. For instance, institutions that showcase athletic programs as part of their student recruitment and marketing strategy might be required to include all money spent on athletics in the proposed disclosure. The Department also offers no indication regarding what level of

---

[286] 88 Fed. Reg. 32354-5 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 65 of 87

expenditure might be deemed "excessive," or how it might determine or defend the reasonableness of such a threshold.

As an alternative to the proposed disclosure, the National Center of Education Statistics should convene a Technical Review Panel to discuss how institutions might report this data through the Integrated Postsecondary Education Data System.

     **D.**     **General Standards of Financial Responsibility (Proposed § 668.171(b))**

          **1.**     **The proposed financial responsibility standards create an unreasonable and unnecessarily complex framework.**

Congress' directive to the Secretary as set forth in the HEA is straightforward – create a set of **reasonable** standards to ensure that institutions can meet their financial obligations to students and taxpayers. The Department, unfortunately, has taken these simple instructions and created a set of regulations that are unreasonable and unworkable for institutions.

First, the proposed framework creates an unreasonable administrative burden for institutions. The Department is proposing over **40** discrete events or actions that could lead an institution to a determination that it is not financially responsible. A significant number of proposed triggering events and actions are written in legalese, requiring institutions to hire legal counsel simply to understand the requirements. On top of this, the proposed regulations create at least **20** different requirements for reporting one of the over 40 events or activities that may have occurred.

If the goal of the Department is to receive additional information from institutions about their financial health, it should create a limited and simple set of metrics that institutions can understand without the burden and expense of hiring counsel. It is not reasonable for institutions to have to comply with such an unwieldly set of standards, in addition to the hundreds of other obligations imposed by the Department. The most likely outcome of such a complex framework is that institutions will either ignore their obligations, which defeats the purpose of these regulations, or incorrectly administer these requirements, creating significant additional administrative work for the Department.

Of the proposed reported events and actions, many will not provide useful financial information to the Department, but all will significantly increase the workload of already burdened institutional and agency staff. Should institutions comply with the trigger and reporting requirements as proposed, the resulting deluge of paperwork would likely be impossible for the Department to manage. The sheer volume of reports would likely prevent the Department from carefully reviewing the documents provided, if they are reviewed at all.

Second, the Department's proposals are unworkable. The proposed framework is an amalgamation of the policies of the past three Presidential administrations. Trying to integrate the policy preferences of the Biden administration into an already impractical structure creates confusion and inconsistency.

For example, as explained in more detail below, the very concept of a trigger that automatically renders an institution not financially responsible, in addition to being unfair and contrary to public policy, is inconsistent with statutory authority (HEA § 498(c)) and regulations currently in existence (§ 668.171(f)).

The Honorable Miguel A. Cardona
Secretary of Education
Page 66 of 87

It is also unclear how the concepts of a "preliminary" or "final" financial responsibility determination, as articulated at § 668.171(f)(3), or general standards of financial responsibility, articulated at proposed § 668.171(b), fit into the Department's framework. The general standards, in particular, seem to occupy a separate category of financial responsibility conditions, with little explanation regarding how they will be applied or the potential consequences for institutions.

Moreover, it is important to note that the Department has not provided a separate economic analysis for the proposed changes to properly assess the budget impact and estimates of costs, benefits, and transfers.[287] If the Department performed such an analysis, it would likely conclude that the costs of such a framework far outweigh any benefits.

In the final rule, the Department should abandon this complex triggering framework in favor of a simple set of criteria that all institutions can follow, with regulatory language that is accessible and understandable to all, and a meaningful opportunity for institutions and the agency to dialogue before any determination regarding financial responsibility is made.

2. **The proposed financial responsibility standards that do not include a materiality threshold are unreasonable.**

As noted above, Congress explicitly directed the Department to develop **reasonable** financial responsibility standards and to use these standards to make an informed determination regarding an institution's financial health. The framework the Department proposes, however, would permit the Department to demand financial protection with no consideration of the materiality of the event that prompted the financial responsibility determination. Consequently, there is a significant likelihood of "false-positive" determinations (i.e., a healthy institution experiencing a non-material event that leads to a determination that it is not financially responsible).

Under a reasonable proposed framework, prior to any determination that an institution is not financially responsible, and only after a meaningful dialogue with the institution, the Department would have to conclude that the reported action or event, whether mandatory or discretionary, is likely to have a material adverse effect on the institution's ability to meet its financial obligations. A reasonable framework would also have clear, articulable criteria that the Department would use when determining if such a materially adverse event or action has occurred. Anything less:

- is inconsistent with the Department's goal of creating processes and standards to alert the Department when an institution cannot meet, or is in danger of not meeting, its financial responsibility standards, as institutions would be reporting immaterial actions or events that have no effect on the financial health of institutions;

- requires institutions to extend **significant** administrative resources compiling and disclosing actions or events that have no effect on the financial health of the institution (such costs to be passed along to students); and

---

[287] 88 Fed. Reg. 32453 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 67 of 87

- requires the Department to extend **significant** administrative resources to address disclosed actions or events that have no effect on the financial health of the institution (such costs to be passed along to taxpayers).

In the final rule, the Department should include a materiality standard with articulable criteria as a threshold when determining what events or actions may lead to a conclusion that an institution is not financially responsible.

> **3.** **Any determination of financial responsibility that does not involve input from an institution is unreasonable.**

In all circumstances, institutions should have an option to provide input and evidence to the Department **prior** to any determination of financial responsibility. Appeal rights should also be provided for institutions to provide an avenue for relief in the event of incorrect or unwarranted action. The proposed framework, in contrast, would lead to erroneous financial responsibility determinations because it does not guarantee meaningful input from institutions prior to determinations being made. Accurate decisions cannot be made without relevant information on hand. It also is inconsistent with notions of due process and sound public policy, as institutions would suffer financial penalty without having any opportunity to provide information concerning the nature and materiality of the event to the institution.

> **4.** **Financial responsibility events or actions that are speculative or unquantifiable are unreasonable.**

It is unreasonable that unknown or unquantifiable events or actions serve as the basis of a determination that an institution is not financially responsible. Rather, the Department should only include events or actions in the Proposed Rule for which the agency can completely and accurately identify the impact on an institution's financial health. The Department agreed with this position in 2019, observing in the 2019 Final Borrower Defense Rule that financial triggers that are speculative, abstract, and unquantifiable are not reliable indicators of an institution's financial condition or its ability to operate and should not be included in the financial responsibility framework.[288] It further acknowledged that requiring financial protection for speculative events creates high costs and burdens for institutions, and many such events may be resolved with no or minimal financial impacts on the institution.[289]

Throughout the Proposed Rule, the Department repeatedly acknowledges that the proposed triggers are not grounded in evidence or data, but are designed only to "increase the ability of the Department to monitor institutions for issues that **may** negatively impact their financial responsibility..."[290] Indeed, of the 16 mandatory triggers listed Table 4.4, Mandatory Triggering Events, the Department cannot identify the complete impact to institutions for 8 of those triggers, and of the 12 discretionary triggers listed in Table 4.5, Discretionary Triggering Events, the Department cannot identify the complete impact to institutions for 8 of those triggers.[291] In the absence of empirical data justifying the fact that a proposed trigger will increase the likelihood of financial risk to the institution, it is unreasonable to include such a trigger in the final rule.

---

[288] 84 Fed. Reg. 49861-2 (Sept. 23, 2019).
[289] 83 Fed. Reg. 37286 (July 31, 2018).
[290] 88 Fed. Reg. 32312-3 (May 19, 2023).
[291] 88 Fed. Reg. 32443-5 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 68 of 87

The Department has not sufficiently justified its reversal in course. Thus, in addition to its current proposal being unreasonable on its face, the agency's decision to advance its current proposal without justifying its reversal is arbitrary and capricious.

### E.    Financial Responsibility Triggers (Proposed § 668.171(c-d))

#### 1.    The proposed "automatic" failures of financial responsibility are inconsistent with HEA § 498(c)(3) and the current regulatory language found at § 668.171(f).

Under proposed § 668.171(c), almost all mandatory triggers constitute automatic failures of financial responsibility and require financial protection. This is inconsistent with both HEA § 498(c)(3) and 34 C.F.R. § 668.171(f). As noted above, HEA § 498(c)(3) states that the Secretary "shall determine an institution to be financially responsible, notwithstanding the institution's failure to meet [other financial responsibility criteria]" if an institution meets one of four standards. A plain language reading of this statute provides that the Secretary must find an institution financially responsible if it meets one of the four criteria. The Secretary does not have discretion to mandate that an institution satisfy one criteria over another.

Automatically finding an institution not financially responsible based on a mandatory trigger is thus inconsistent with HEA § 498(c)(3), which permits an institution the opportunity to be found financially responsible notwithstanding its failure to meet other criteria outlined by the Department. Furthermore, it is important to note that the current financial responsibility regulations create opportunities for institutions to dialogue with the Department prior to any financial responsibility determination. In particular, § 668.171(f)(3)(i)(C) allows institutions the opportunity to "explain or provide information about the conditions or circumstances that precipitated a triggering event… [that demonstrates] a material adverse effect on the institution." Likewise, under § 668.171(f)(3)(ii), the Department must "consider the information provided by the institution in determining whether to issue a final determination that the institution is not financially responsible." The proposed mandatory triggering framework, under which institutions are automatically judged to not be financially responsible, is inconsistent with § 668.171(f), as it denies institutions an opportunity to interact with the Department prior to a determination.

In the final rule, the Department should ensure that financial responsibility determinations are only made **after** due consideration by the Department of any statutorily prescribed requirements. Further, should the Department move forward with this unlawful framework, the Department should make clear in the regulations that all financial responsibility determinations are subject to § 668.171(f)(3).

#### 2.    The proposed method of assessing financial protection is inconsistent with HEA § 498(e).

Under proposed § 668.171(c) and (d), if the Department requires financial protection as a result of more than one mandatory or discretionary trigger, the Department will require separate financial protection for each individual trigger. Institutions would be required to provide financial protection of not less than 10 percent of the total Title IV, HEA funding in the prior fiscal year per triggering event.

The Honorable Miguel A. Cardona
Secretary of Education
Page 69 of 87

This proposed method for assessing financial protection is inconsistent with the authority granted to the Department by Congress. Pursuant to § 498(e) of the HEA, the Department is authorized to collect from institutions a financial guarantee "sufficient to satisfy the institution's potential liability to the Federal Government, student assistance recipients, and other program participants." The proposed framework, however, might require institutions to stack financial protection guarantees that cumulatively total well in excess of any amount needed to satisfy any potential liability to the Department.

We also observe that, in many instances, a single event at an institution could cause more than one "triggering event" to occur. For example, if a publicly-traded institution does not timely file a required annual report, it might also receive a notification of non-compliance from the SEC. Or if an institution does not meet the 90/10 rule requirement, it might also violate a financial obligation. In such cases, though multiple triggering events have occurred, there may be no reason that an increased amount of financial protection is required. In the final rule, the Department should ensure provisions relating to the assessment of financial protections are consistent with HEA § 498(e).

### 3.      The proposed standard for removing financial protection is unreasonable.

Under both proposed § 668.171(c) and (d), in making a determination of whether financial protection can be released, the Department "considers whether the administrative or financial risk caused by the event has ceased or been resolved, including full payment of all damages, fines, penalties, liabilities, or other financial relief." This standard is unreasonable and unfair for institutions, as many of the events or actions leading to a particular trigger cannot be resolved or remedied once they have occurred, take considerable time to do so, or are beyond the control of the institution, making the standard impossible to meet. In other words, institutions may have stacked financial protection guarantees with no way to remove them.

In the final rule, the Department should create clear and articulable standards for when financial guarantees will be imposed and removed, as well as an avenue for institutions to appeal a Department decision.

### 4.      The proposed financial responsibility trigger related to lawsuits and other actions is unreasonable.

Under proposed § 668.171(c)(2)(i)(C), the Department will automatically consider an institution to be financially irresponsible and require financial protection if that institution is sued to impose an injunction, establish fines or penalties, or to obtain financial relief such as damages, in an action brought on or after July 1, 2024, by a Federal or State authority, or through a qui tam lawsuit in which the Federal government has intervened and the suit has been pending for at least 120 days. In justifying this Proposed Rule, the Department explains that "[i]nstitutions subject to these types of actions are likely to have their financial stability **negatively affected**."[292]

The filing of a lawsuit, regardless of government involvement, is not sufficient to determine an institution financially irresponsible and require financial protection. The mere filing of a suit does not establish wrongdoing on the part of an institution or confirm that the claims have any merit, much less result in a

---

[292] 88 Fed. Reg. 32358 (May 19, 2023) (emphasis added).

The Honorable Miguel A. Cardona
Secretary of Education
Page 70 of 87

financial liability that materially and negatively impacts the institution's financial position.[293] This type of event is speculative, abstract, and unqualifiable – the exact type of event the Department explicitly disclaimed in the 2019 Final Borrower Defense rules.[294]

> **5.      The proposed financial responsibility trigger related to institutions initiating a change in ownership is unreasonable.**

Under proposed § 668.171(c)(2)(i)(D), any institution undergoing a change in ownership that incurs any debt or liability, regardless of amount or materiality, will be considered not financially responsible by the Department, because the Department is "concerned that [such] institutions may be in a vulnerable position."[295]

First, merely incurring debt or liability while undergoing a change in ownership is not sufficient to determine an institution financially irresponsible and require financial protection. It is just as likely that an institution undergoing a change in ownership would emerge from the process in a stronger and more financially secure position. Notably, the Department provides no evidence to substantiate its position that transactions where the institution takes on debt or liability are likely to be unsuccessful, much less that they may impact the institution's ability to satisfy financial responsibility standards. This, again, is the same type of speculative, abstract, and unqualifiable event that the Department explicitly disclaimed in the 2019 Final Borrower Defense rules.[296]

Second, because the Department receives a same day balance sheet in connection with every transaction, it actually has the ability to **precisely** assess the institution's financial responsibility following the closing of the transaction. In other words, in this particular circumstance, the agency can quantify the exact impact of any liability or debt and determine whether it is material as part of an existing agency process. Thus, there is no reason to add an imprecise and speculative standard that could lead to erroneous financial responsibility determinations.

Finally, because the Department already has a robust process in place for requiring the reporting of and evaluating changes in ownership, and significant discretion for imposing financial protection as part of that process, there is no need to insert change in ownership considerations into the "trigger" framework.

> **6.      The proposed financial responsibility trigger related to teach-out plans is unreasonable.**

Under proposed § 668.171(c)(iv), an institution that is required to submit a teach-out plan or agreement will be considered not financially responsible by the Department and required to provide financial protection. There are a number of potential reasons that an institution may be required to submit a teach-out plan. Some, such as the initiation of an emergency action against an institution, may be reasonable bases for which to anticipate that financial protection may be required. Others, such as closing an

---

[293] *Tucker v. Am. Int'l Grp., Inc.*, 2012 WL 685461, at *4 (D. Conn. Mar. 2, 2012) ("[I]t is hornbook law that unproven, non-adjudicated allegations are not evidence."); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014) ("[A]llegations from another lawsuit are not evidence.").
[294] 88 Fed. Reg. 32312 (May 19, 2023).
[295] 88 Fed. Reg. 32358 (May 19, 2023).
[296] 88 Fed. Reg. 32312 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 71 of 87

additional location or an institution voluntarily ceasing operations, are not reasonable bases for financial protection.

A trigger requiring financial protection upon the submission of a teach-out plan will have unwanted effects. First, it would incentivize schools to keep locations open, despite the fact that the location may no longer be serving its purpose and its continued presence may constitute a drain on institutional resources. Forced to choose between a location that is running slightly in the red and a letter of credit calculated against the entire institution's Title IV revenues, institutions may have no choice but to keep the doors open. It also may chill certain forms of education innovation. Institutions may elect to forgo innovative efforts if they will be unable to close a location without incurring a significant financial penalty. This trigger also could lead to absurd results. Under its terms, an institution with a multi-billion dollar endowment that makes the financially responsible decision to close an additional location would be determined not financially responsible and required to post financial protection, even though there is no financial risk to the institution.

It also is unclear what benefit would be gained from placing additional financial strain on an institution that has announced that it is voluntarily ceasing operations. The Department already has a closed-school procedure for institutions that announce closure and designated staff members who oversee close-out processes. The Department may request and review a range of documentation, including the teach-out plan provided to the accreditor. And closing institutions are required to complete a close-out financial audit, which affords the Department a process through which it can settle all accounts with the institution and pursue any outstanding amounts owed.

### 7.    The proposed trigger related to State actions is unreasonable.

Under proposed § 668.171(c)(2)(v), an institution cited by a State licensing or authorizing agency for failing to meet State or agency requirements is not financially responsible when the agency provides **notice** that it will withdraw or terminate the institution's licensure or authorization if the institution does not take the steps necessary to come into compliance with that requirement.

Not permitting an institution the opportunity to take the necessary steps required by a State licensing or authorizing agency before a determination of financial responsibility is unreasonable and unfair to institutions. Such a premature action is also a waste of resources, as it is possible that institutions could easily resolve issues with State licensing or authorizing agencies, or that agencies may have made a mistake that could be clarified by the institution.

The trigger also could lead to absurd results. Should an institution be cited for a minor failure to meet certain State requirements (for example, a cosmetology program's failure to clean floor mats at a prescribed interval), State agencies could (and typically do) include pro forma language in the resulting report explaining that continued failure to meet requirements could lead to loss of licensure or accreditation. It would be unreasonable for such a report, which has nothing to do with the financial health of an institution, to constitute a mandatory failure of financial responsibility.

In the final rule, the Department should, at minimum, allow institutions the chance to address the concerns of a State agency prior to a determination that the institution is not financially responsible. Otherwise, the potential financial consequences to institutions is speculative at best.

The Honorable Miguel A. Cardona
Secretary of Education
Page 72 of 87

8.      **The proposed trigger related to the U.S. Securities and Exchange Commission ("SEC") reports is unreasonable.**

Under proposed § 668.171(c)(2)(vi)(D), an institution that does not file a required annual or quarterly report with the SEC is not financially responsible and required to provide financial protection. It is true that a late filing **could** indicate a more significant issue. But it also is true that reports are routinely filed late by very healthy companies and for reasons completely unrelated to the organization's financial stability. The Department also provides no meaningful rationale for its assertion that the failure to timely file a quarterly report or a simple notification of noncompliance with exchange requirements signals a need for financial protection. A proposed trigger relating to SEC reports is speculative, abstract, and unqualifiable and the Department should eliminate it in the final rule.

9.      **The proposed trigger related to creditor events is unreasonable.**

Under proposed § 668.171(c)(2)(xi), certain creditor events can be the basis of mandatory triggers regardless of whether the creditor may have waived the violation at issue. If a violation is waived by a creditor, it is irrelevant to the financial health of an institution and, therefore, should not be the basis of a mandatory trigger.

In the final rule, the Department should make clear that a violation waived by a creditor does not constitute a mandatory triggering event. This change would also be consistent with the standard articulated at § 668.171(f)(3)(A).

10.      **For its discretionary triggers, the applicable standard should be "material" adverse effect rather than "significant" adverse effect.**

The Department should use "material" rather than "significant" adverse effect for two reasons. First, a "material" adverse effect standard is consistent with the existing regulatory framework. Both § 668.171(b)(3)(iv), which establishes the mandatory and discretionary trigger framework, and § 668.171(f)(3)(i)(C), which provides the notice procedures, use the "material" adverse effect standard. Using a different standard would create confusion and inconsistent application of the regulation. Second, the "material" adverse effect standard is the language currently in place at § 668.171(d), and the Department has not provided any explanation for the change. Without justification, such a change would not be reasonable.

11.      **The Department should include criteria for how it will interpret an adverse effect on the financial condition of the institution in regulation.**

The Department has not provided any indication for how it will determine whether an event has a "significant adverse effect on the financial condition of the institution" other than an indication in the preamble that a "case-by-case review and analysis of the factors and events applicable" would need to be conducted.[297] The Department should articulate fully the criteria it will be using to make these determinations to promote transparency, ensure consistent application of the criteria, and provide notice to institutions of the relevant factors that it will consider. This criteria should also obligate the Department

---

[297] 88 Fed. Reg. 32362 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 73 of 87

to review any information that is presented. Such checks and balances are particularly important as institutions can be severely penalized pending the result of the Department's determination.

**12.      Any list of discretionary triggers should be finite.**

The events and actions listed under proposed § 668.171(d) are not exclusive, meaning the Department could presumably add additional triggers at its discretion. Any list of discretionary triggers should be finite so that institutions have notice and can comply with the triggering events. It is unfair, and violative of the APA, for the Department to add additional triggers without a full notice and comment process.

**13.      The Department should remove or clarify vague or arbitrary discretionary triggers.**

In addition to articulating a clear materiality standard and framework, the Department should remove or clarify the vague or arbitrary discretionary triggers. The link between discretionary triggers, if any, and the financial health of an institution should be grounded in evidence and data. At minimum, the Department should consider the following clarifications to the proposed discretionary triggers:

a.   Under proposed § 668.171(d)(1) concerning Accrediting Agency and Government Actions, the Department should remove "show-cause" as a reason for a discretionary trigger. A "show-cause" historically has not been a negative action, but rather an opportunity for an institution to improve.

b.   Under proposed § 668.171(d)(2) concerning defaults and delinquencies, the Department should make clear that a discretionary trigger has not occurred if a creditor waives a violation.

c.   Under proposed § 668.171(d)(3) concerning fluctuations in Title IV volume, the Department should clarify in regulation what it means by "significant fluctuation."

d.   Under proposed § 668.171(d)(4) concerning high dropout rates, the Department should clarify in regulation what is meant by a "high dropout rate."

e.   Under proposed § 668.171(d)(6) concerning borrower defense claims, the trigger should only be met after the institution in question has an opportunity to present evidence and defend itself in the borrower defense process and all appeal mechanisms have been exhausted.

f.   Under proposed § 668.171(d)(9) concerning State citations, the Department should clarify in regulation that the citations must have an effect on the financial health of the institution.

g.   Under proposed § 668.171(d)(11) concerning exchange disclosures, the Department should clarify in regulation that the possible violation must have a material negative effect on the financial health of the institution.

Removing or clarifying these standards will assist institutions to comply with these regulations and help to prevent the reporting of unresponsive information to the Department.

**F.      Recalculating the Composite Score (Proposed § 668.171(e)).**

The Honorable Miguel A. Cardona
Secretary of Education
Page 74 of 87

In both proposed § 668.171(e)(3)(ii) and (e)(4), the equity ratio should be adjusted by decreasing both the modified total amount in addition to modified equity. If the Department is decreasing an institution's equity, its total assets should be decreased as well.

### G.      Reporting Requirements (Proposed § 668.171(f)).

#### 1.      The Department should create a simpler reporting framework for institutions.

Consistent with our comments above, the Department should abandon the needlessly complex financial responsibility framework in the final rule in favor of a simple set of criteria. As part of this revision, the Department should similarly abandon the complex set of reporting requirements in favor of a simple standard. Such a standard should provide institutions with a reasonable amount of time to report, for example, 30 calendar days instead of 10, and should be based on when leadership of the institution has **knowledge** that a particular event or action has taken place as opposed to its mere occurrence.

Moreover, under § 668.171(b)(3)(6), a triggering event must have a "material adverse effect on the financial condition of an institution" for the Department to find that institution is not finally responsible. Consistent with this language, the Department should amend the reporting requirements to clarify that institutions are not required to report an event or action unless it is reasonably likely that it would have a material adverse effect on the overall financial health of the institution.

#### 2.      The Department should remove proposed § 668.171(f)(1)(iii).

Under proposed § 668.171(f)(1)(iii), the Department would require institutions to report receipt of a civil investigative demand, subpoena, request for documents or information, or other formal or informal inquiry from any government entity. This proposed regulation is overbroad and should be removed. Institutions receive regular requests and inquiries from government entities for varying reasons, many unrelated to an institution's financial health or stability. Requiring institutions to report *all* such requests and documentation would be an extreme administrative burden for institutions and would inundate the Department with volumes of paperwork (assuming institutions comply with this regulation) and little benefit. For example, as written, institutions would be required to report all subpoenas issued between the parties or court orders during the pendency a civil litigation matter. Institutions also would be required to report requests or inquiries from law enforcement to assist with criminal matters.

In response to the Department's directed question, for the reasons articulated above, proposed § 668.171(f)(1)(iii) should also not be included as a mandatory or discretionary trigger.

### H.      Audit Opinion and Disclosures (Proposed § 668.171(h))

Under proposed § 668.171(h), the Department may consider an institution to not be financially responsible, even when that institution has otherwise satisfied all other standards of financial responsibility. As explained above, however, § 498(c)(3) of the HEA states that the Secretary **must** determine that an institution is financially responsible if that institution meets one of the four listed criteria. To ensure consistency with the Department's statutory authority, the Department should make clear that standards at proposed § 668.171(h) are subject § 498(c)(3).

The Honorable Miguel A. Cardona
Secretary of Education
Page 75 of 87

I.    **Alternative Standards and Requirements (Proposed § 668.175)**

In proposed § 668.175(c) and (f), the Department suggests that institutions seeking to establish their financial responsibility by posting financial protection in favor of the Department, or to participate under the provisional certification alternative, must also "remedy the issue(s) that gave rise to the failure to the Department's satisfaction" if such failure occurred under § 668.171(b)(2) or (3). The former references the requirement that institutions maintain sufficient cash reserves to make required returns of unearned Title IV funds. The latter, however, encompasses the entire universe of mandatory and discretionary triggering events.

The Department should abandon this problematic requirement that institutions must also "remedy the issue(s) that gave rise to the failure to the Department's satisfaction" in the final rule. Many of these events cannot be "remedied" once they have occurred, or are beyond the control of the institution, making the standard impossible to meet. Or, even where it may be possible to remedy an issue, it could take considerable time to do so, creating confusion as to whether the institution would be deemed eligible for continued Title IV participation in the interim. Finally, the very purpose of the financial protection under § 668.175(c) is to establish the financial responsibility of the institution **despite** the triggering event. If the institution has remedied or otherwise resolved the triggering event, there would no longer be a basis for requiring the financial protection.

J.    **Change in Ownership (Proposed § 668.176)**

1.    **The Department should abandon changes that would have an unnecessary chilling effect on change in ownership transactions.**

Under the proposed change in ownership rule, Department proposes for the first time to evaluate the recent financial history of the institution (i.e., the seller) as part of the transaction, and to require the new owner to post a letter of credit as part of the materially complete application if the institution has had significant operating losses or a negative tangible net worth in either of its two most recent fiscal years, or has otherwise failed financial responsibility requirements.[298] The Department would also require the new owner to post a letter of credit if "the amount of debt assumed to complete the change in ownership requires payments (either periodic or balloon) that are inconsistent with available cash to service those payments."[299]

The Department should reconsider these proposals, as they are likely to have a chilling effect on potential transactions. As the Department is well aware, higher education is in period of contraction, with many institutions struggling financially or on the verge of closure. Indeed, the Department's financial responsibility framework is predicated on the fact an institution's financial distress will have significant and negative impacts on students and taxpayers.

Financially strong institutions can provide a lifeline to distressed institutions. The Department should be encouraging and facilitating such transactions to assist financially struggling institutions and their students, subject to reasonable oversight.

---

[298] Proposed 34 C.F.R. § 668.176(b)(3)(i).
[299] Proposed 34 C.F.R. § 668.176(c).

The Honorable Miguel A. Cardona
Secretary of Education
Page 76 of 87

Non-profit transactions provide an illustrative example of the potential chilling effect of the proposed regulations. Commonly in nonprofit transactions, an institution in a stronger financial position may be willing to accept the liabilities of a distressed institution along with its assets. Typically, no money changes hands in these deals and it is a win-win for both institutions. If an institution is required to post a letter of credit, however, the calculus changes. That institution may be less likely to assume both a distressed institution's liabilities and post a letter of credit. If a distressed institution cannot find a willing partner, that institution will likely be forced to close, to the detriment of students, the institutional community, and taxpayers. As the above proposed language threatens to stifle transactions, it should be amended in the final rule.

> **2.    The Department should foster certainty and predictability for institutions engaging in change in ownership transactions.**

Under proposed §668.176, the Department retains a significant amount of discretion in the change in ownership process. This reservation of discretion, and the uncertainty it creates, would be problematic for all parties in a potential transaction.

Predictability and efficiency are essential to successful transactions, including in the higher education space. Clear and consistent regulatory processes and meaningful coordination with regulatory agencies both before and after a postsecondary transaction are critical. Where these elements are present, parties can understand relevant requirements and timelines, documentation relating to the transaction can be properly drafted, risk and costs can be appropriately allocated among the parties to the transaction, regulatory applications can be properly completed and timely filed, and regulators can obtain everything they require to review and approve the transaction.

Where parties are unable meaningfully assess their risk, it greatly increases the possibility that transactions will not run smoothly, or will simply be abandoned. The discretion retained by the Department in the change in ownership process means a buyer must be willing to engage in a transaction without a clear understanding for conditions the Department may impose or an indication of whether consummation of a transaction would even pass muster from the Department. This is an extraordinary burden to place upon a prospective buyer and will likely have a chilling effect on potential transactions.

For these reasons, the Department should articulate fully the standards it will be using to make the change in ownership determinations in regulation, without a significant reservation of discretion, to provide notice to institutions of the relevant factors that the Department will be considering and to ensure consistent and transparent application of those standards for all transactions.

IV.    **CERTIFICATION PROCEDURES**

A.    **Certification Procedures (Proposed § 668.13)**

1.    **Removing the timeframe at proposed § 668.13(b)(3) is counterproductive and harmful to institutions.**

The Department proposes to eliminate § 668.13(b)(3), which provides that in the event the Department does not "make a determination to grant or deny certification within 12 months of the expiration of [an

The Honorable Miguel A. Cardona
Secretary of Education
Page 77 of 87

institution's] current period of participation, the institution will automatically be granted renewal of certification, which may be provisional."

The timeframe established at § 668.13(b)(3) should not be removed. We agree with the Department's position, as explained just three years ago in the 2020 final rule for Distance Education and Innovation, that providing a 12-month deadline would encourage prompt processing of applications, timely feedback to institutions, proper oversight of institutions, and speedier remedies for deficiencies identified.[300] A timeframe also provides certainty to institutions that they will receive a response by a date certain.

As the Department is well aware, in recent years institutions have been required to wait for months, or even years, for required approvals or answers to inquiries. This is by no means a reflection on the hardworking Department staff, but rather the effect of the significant increase in the Department's workload. Response times will likely be delayed further as a result of the Department's current and upcoming regulatory agenda and the resumption of Federal student loan payments, particularly if the Department's hiring budget is not increased. Without a timeframe, institutions could be kept in limbo for years waiting for a decision from the Department. As such, it is in the interests of the higher education community to keep § 668.13(b)(3) in effect.

Finally, given that the existing 12-month deadline not only was implemented by this agency a mere three years ago, but also was the product of a negotiated rulemaking that achieved consensus, the Department must provide a fact-supported rationale for its reversal. In the absence of such a rationale, its proposed elimination of § 668.13(b)(3) is not only ill-advised, but also arbitrary and capricious.

2. **Proposed § 668.13(c)(1)(i)(D),(F), and (G) and § 668.13(c)(1)(ii)(A) and (B) exceed the Department's authority under §§ 487(d)(2) and 498(h) of the HEA.**

The Department's statutory authority to provisionally certify an institution derives from HEA §§ 487(d)(2) and 498(h). These provisions, generally, permit the Secretary authority to provisionally certify an institution: (1) if it fails 90/10 (§ 487(d)(2)); (2) if it is seeking initial certification (§ 498(h)(1)(A)); (3) if its administrative capability and financial responsibility is being determined for the first time; (4) if it undergoes a complete or partial change in ownership; or (5) if it is seeking to renew its certification and is, in the judgment of the Secretary, in an administrative or financial condition that may jeopardize its ability to perform its financial responsibilities under a PPA (§ 498(h)(1)(B)).

The HEA does not provide the Department plenary authority to provisionally certify institutions. Indeed, under authority granted by the HEA, the Department may only provisionally certify institutions in accordance with the limited provisions above. Thus, because proposed § 668.13(c)(1)(i)(D), (F) and (G) and proposed § 668.13(c)(1)(ii)(A) and (B) exceed the Department's authority under the HEA, as the Department would have the authority to provisionally certify a broader set of institutions than permitted under §§ 487(d)(2) and 498(h), the agency must eliminate this proposed language from the final rule.

3. **Factors proposed under § 668.13(e) exceed the Department's authority under § 498(b) of the HEA.**

---

[300] 85 Fed. Reg. 54742 (Sept. 2, 2020).

The Honorable Miguel A. Cardona
Secretary of Education
Page 78 of 87

Under proposed § 668.13(e), the Department articulates a number of supplementary performance measures to be used in determining whether to certify, or condition the participation of, an institution.

The Department's authority for this regulation derives from HEA § 498(b), which permits the Department to require institutions to provide "sufficient information and documentation to determine that the requirements of eligibility, accreditation, financial responsibility, and administrative capability" are met. Measures that are not reasonably related to an institution's eligibility, accreditation, financial responsibility, or administrative capability, in particular, the debt-to-earnings, earnings premium, and educational and pre-enrollment expenditures measures, are inconsistent with this authority and must be eliminated. Indeed, in the preamble, the Department only describes such measures as providing "useful information regarding the value of an institution's educational offerings and the outcome of student experiences."[301]

Further, any articulated measures, at minimum, should detail the thresholds that the Department considers problematic and the standards that may lead the Department to a determination that an institution's certification should be denied or conditioned. Finally, any list of supplementary measures should be finite so that institutions have notice of the factors the Department will be considering.

      **B.**      **Program Participation Agreement (Proposed § 668.14).**

           **1.**      **The co-signature requirement at proposed § 668.14(a)(3)(ii) is inconsistent with the Department's statutory authority under § 498(e) of the HEA.**

Under proposed § 668.14(a)(3)(ii), the PPA of a proprietary or private nonprofit institution would need to be signed by an authorized representative of an entity with direct or indirect ownership of the institution if that entity has the power to exercise control over the institution. A co-signer of a PPA would assume the liabilities of the institution.[302]

The Department's authority to require financial guarantees from owners derives from HEA § 498(e), which provides that the Secretary has the authority to require financial guarantees from the institution and **individuals** who exercise substantial control. Although § 498(e)(2) explains that the Secretary can determine that an entity exercises substantial control over the institution, the statutory language does not, in any place, state that the Department may require a financial guarantee from a legal entity.

Congress' decision to discuss both individuals and entities in § 498(e), and to refrain from imposing financial guarantees on entities, must be read as intentional, consistent with established principles of statutory construction. As proposed, § 668.14(a)(3)(ii) is inconsistent with the statutory requirements found at HEA § 498(e) and should be removed from the final rule.

Finally, should the Department move forward with any co-signature requirement, the final regulation must, **at minimum**, be amended to meet the requirements of HEA § 498(e)(4). Under this statute, financial guarantee obligations cannot be imposed on an institution that has met the four criteria outlined in subparagraphs A-D.

---

[301] 88 Fed. Reg. 32379 (May 19, 2023).
[302] 88 Fed. Reg. 32379 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 79 of 87

2.      **Proposed § 668.14(b)(26) is inconsistent with the Department's statutory authority.**

Proposed § 668.14(b)(26) would cap the Title IV eligibility for certain programs that lead to gainful employment in a recognized occupation. Through this change, the Department is attempting, without authority, to limit the lengths of programs taught by institutions of higher education.

As the Department is well aware, there is no single agency or organization in the United States that is charged with oversight of institutions of higher education. This responsibility is shared between the Department, States, and accreditors, commonly referred to as the "triad" (the "Triad"). The Triad ensures a balanced relationship of regulatory responsibilities. The Department is responsible for the administration of the Federal financial aid programs. States issue licenses to institutions to operate, set standards, and regulate consumer protection. And accreditors ensure that institutions of higher education meet acceptable levels of quality in teaching and learning.

Oversight of program length is the responsibility of States and accreditors. Indeed, the Department is statutorily prohibited from exerting any direction, supervision, or control over a curriculum or program of instruction of any educational institution.[303] The Department also is prohibited from establishing any criteria that specifies, defines, or prescribes the standards that accrediting agencies shall use to assess any institution's success with respect to student achievement.[304]

States and accreditors are in the best positions to determine appropriate program lengths and curricula to meet the specific needs of students. This is likely why Congress gave oversight responsibilities to States and accreditors, rather than the Department, and explicitly forbade the Department from being involved in such determinations.

Indeed, certain States have exercised their authority to set program length requirements for career programs by setting **minimum** requirements. This shows both that States have this authority, and their primary concerns is that career programs are not long enough. Should a State have concerns that a particular program or too long, it could set a maximum length in its reasonable discretion.

Proposed § 668.14(b)(26) is an attempt to avoid statutory prohibitions and find a way to interfere with an institution's program length and curriculum. Because proposed § 668.14(b)(26) unlawfully exerts control over an institution's curriculum and programs, it should be removed from the regulation. In fact, the Department has no authority, or rational basis, to ascribe an eligibility cap on a State minimum for programs that otherwise meet all other State, accreditor, and Departmental requirements.

Should the Department choose to move forward with this proposal, however, it should, at minimum, offer a transition opportunity for institutions and students. Without such a transition period, students in the middle of their programs when the regulation goes into effect would be harmed, as those students would unexpectedly lose access to Federal financial aid for the remainder of their program.

---

[303] 20 U.S.C. § 1232a.
[304] 20 U.S.C. § 1099b.

> ### 3. Proposed § 668.14(b)(32) and § 668.43(a)(5) should be removed and addressed during the Department's upcoming State Authorization rulemaking.

As discussed in more detail below, proposed § 668.14(b)(32) and § 668.43(a)(5) create a number of problems. To better consider and fully discuss these proposals, the Department should instead take up professional licensure and certification issues during the State Authorization negotiated rulemaking this Fall. Along with being better aligned, postponing professional licensure and certification topics to the Fall will allow the Department to invite State authorization experts who could speak about the potential consequences and practical impact of the proposed changes, and better understand the potential consequences of the proposed changes. This would be consistent with previous negotiated rulemakings, and also would afford the Department the opportunity to consider and correct the deficiencies outlined below.

> #### a. Proposed § 668.14(b)(32)(ii) inappropriately limits student choice and unnecessarily burdens institutions.

Under proposed § 668.14(b)(32)(ii), an institution must determine that a program satisfies the applicable educational prerequisites for professional licensure or certification requirements in the State where the student is enrolled.

This proposal contradicts the framework outlined at § 668.43, which was established pursuant to a negotiated rulemaking that reached consensus. Presently, institutions must disclose to students whether their educational programs meet the requirements for licensure only in the States for which the institution has made a determination on that point. If the institution has not made any determination, it discloses that no determination has been made. We agree with the Department's position, articulated in 2019, that a disclosure framework is most appropriate for this situation.[305] We also believe that the current disclosure framework appropriately provides notice to students of professional licensure requirements within States and allows them to make informed choices about their education. In contrast, the administrative burden and potential liability associated with the Proposed Rule will drive institutions to stop making licensure programs available in States where they have small enrollments, thus limiting student choice. We emphasize that students could have strong and legitimate reasons for choosing a program that may not satisfy a State's licensure requirements. For example, the student may be temporarily located in a particular State, may wish to take the program but not submit to licensure, or may wish to transfer to another program within the institution following completion. In fact, we stress that for decades, hundreds of thousands of students have left their home States to pursue postsecondary education in other jurisdictions, including in a wide range of licensed professions, notwithstanding the fact that their education may not satisfy licensure requirements in the State in which they were raised, or in which they ultimately intend to practice.

> #### b. Proposed § 668.14(b)(32)(iii) inappropriately usurps State authority.

Under proposed § 668.14(b)(32)(iii), an institution must comply with all State consumer protection laws related to closure, recruitment, and misrepresentations, including both generally applicable State laws and those specific to educational institutions. Although we are generally supportive of the Department's consumer protection goals, proposed § 668.14(b)(32)(iii) is problematic for a number of reasons.

---

[305] 84 Fed. Reg. 58886 (Nov. 1, 2019).

1530 Wilson Blvd, Suite 1050
Arlington, VA 22209 | www.career.org

The Honorable Miguel A. Cardona
Secretary of Education
Page 81 of 87

First, the proposed language would infringe on State authority and the role of States in the higher education regulatory scheme. Under the Triad, States have the purview to authorize the operations of higher education institutions. States may enter into State authorization reciprocity agreements, as contemplated by 34 C.F.R. § 600.2, to permit interstate postsecondary education with other State members. Decisions about the contents of such agreements, including applicable consumer protection laws, should be left to the States to cover in their agreements. Participation in a reciprocity agreement is not mandatory. States can leave or propose amendments should issues or conflicts arise.

In addition to usurping the right of States to freely contract, the proposed edits would be unworkable for institutions. The proposed regulation would create over 50 separate consumer protection standards for institutions to consider. This is an enormous burden to administer and would lead to tiered sets of consumer protections for students. The patchwork of obligations would largely be impossible for institutions to administer faithfully, as institutions would be required to monitor the legislative and regulatory activity of 50 States. This would largely defeat the purpose and intent of reciprocity agreements and undo the work of the past decade to implement a framework that protects students while guarding against a chaotic patchwork of State laws.

We also stress that the extraordinary speed with which the legislatures of nearly every State and territory adopted new legislation for the purpose of joining the State authorization reciprocity agreement administered by the National Council for State Authorization Reciprocity Agreements ("NC-SARA") demonstrates the overwhelming approval of the existing reciprocity framework by the directly elected representatives of those States. The State legislatures, controlled by both Democrats and Republicans, signaled their strong belief in a system of reciprocity that would eliminate the very bureaucracy and administrative burden that the Department, with no mandate from Congress, now proposes to reinstate.

Further, we highlight that, although the Department would be reintroducing a problem previously deemed so serious that every State but one acted with unprecedented speed to address it, the agency does not seem to be solving any particular problem in return. Were there no tools available to manage issues relating to closure, recruitment, and misrepresentations, we would understand the argument for taking such an extraordinary step. But this is not the case. Every State has general consumer protection laws that may be invoked to address such concerns involving students, and every State has the ability to create new laws outside their State authorization framework if they feel additional tools are required. For its part, the Department has an extraordinary array of statutes, regulations, and guidance at its disposal for assisting students with matters involving closure, recruitment, and misrepresentations. Moreover, this administration has dedicated the better part of its regulatory agenda to expanding and strengthening such provisions. Accordingly, there is no reasonable justification for requiring students, employers, and institutions to pay the extreme cost that would be associated with this proposal.

Should the Department move forward with this proposal, which we believe would be a grave misstep, it must clarify the meaning of terms "closure, recruitment, and misrepresentations." It is unclear what State laws would be covered by those terms. If interpretation is left to each State, it is likely that States will define the terms differently, with some States arguing this language covers a significant number of laws while others taking the position that the list for compliance should be more targeted. Without further guidance and refinement, it would be even more difficult for institutions to comply with this Proposed Rule.

The Honorable Miguel A. Cardona
Secretary of Education
Page 82 of 87

### 4.   Proposed § 668.14(e) exceeds the Department's authority under § 498 of the HEA.

Under proposed § 668.14(e), the Department provides a litany of additional conditions it may apply to provisionally certified institutions that the Department determines "to be necessary or appropriate to the institution."

Although HEA § 498(h) provides the Department with limited authority to provisionally certify certain types of institutions, there is no corresponding authority for the Department to assert additional conditions on those institutions. If Congress had intended to give the Department the authority to impose restrictive conditions on provisionally certified institutions, it would have made that clear in § 498(h) or another provision of the HEA. Absent authorization to apply conditions on provisionally certified schools, proposed § 668.14(e) exceeds the Department's authority and should be eliminated.

If the Department moves forward, however, the proposed conditions should be significantly revised. Certain conditions listed may inhibit an institution's ability to provide high-quality educational programming (for example: limitations on the additions of new programs or locations) or to secure funds sought by the Department to show financial responsibility (for example: limitations on the rate of growth or new enrollment by students). Such conditions would be counterproductive for institutions and the Department. As the Department is well aware, an important goal of the Title IV financial aid programs is to ensure that students are offered the best educational programs at the best possible price. The proposed conditions would impede this objective by inhibiting an institution's ability to revise or introduce programs consistent with new trends and employer demands.

For career schools in particular, the ability to make adjustments and to adapt to new technologies is essential to prepare students for current job markets. If an institution is prevented from making a necessary change to its programs due to Department imposed conditions, students taking outdated programs may, unnecessarily, be at a competitive disadvantage when applying for jobs. This could lead to lower starting salaries or poorer career outcomes for students, both of which would also be harmful to students, employers, and the taxpayers supporting Title IV programs.

In addition, the Department should: (1) clearly define how it will determine what is "necessary or appropriate" for an institution, including the addition of criteria and a materiality standard; and (2) provide the opportunity to dialogue with the Department about the imposition of such conditions, including appropriate appeal rights in the event of an adverse decision. Such checks on the Department's authority are particularly important if the Department's list of conditions remains non-exhaustive.

### 5.   Proposed § 668.14(b)(34) should be revised to avoid unintended consequences.

Proposed § 668.14(b)(34) provides that, under its PPA, an institution "will not maintain policies and procedures to encourage, or condition institutional aid or other student benefits in a manner that induces, a student to limit the amount of Federal student aid, including Federal loan funds, that the student receives, except that the institution may provide a scholarship on the condition that a student forego borrowing if the amount of the scholarship provided is equal to or greater than the amount of Federal loan funds that the student agrees not to borrow." The plain language reading of this provision suggests that institutions would be barred from advising students on reasonable financial responsibility practices, which include limiting the amount of Federal student aid according to the student's financial needs. The

The Honorable Miguel A. Cardona
Secretary of Education
Page 83 of 87

United States Financial Literacy and Education Commission warns that '[i]f critical information provided about the cost of attendance and aid available is not clear, students and families are not able to make optimized choices about colleges and compare their value propositions. A choice made based on incomplete information could result in over-borrowing…"[306] We think it unlikely that the Department intends the proposal to prevent institutions from educating students about the merits of responsible borrowing. As such, the Department should reword this proposal to avoid this unintended consequence.

## V.      ADMINISTRATIVE CAPABILITY

Our concerns regarding the proposed expansion of the standards for an institution to establish and maintain administrative capability under 20 U.S.C. § 1099c and 34 C.F.R. § 668.16 are set out below. In general, we believe many of the proposed revisions to the administrative capability standards are vague, duplicative, and difficult to measure. Accordingly, the following suggestions are offered to assist the Department's efforts in creating a workable, useful, and just final rule.

### A.      Adequate Financial Aid Counseling (Proposed § 668.16(h))

The Proposed Rule creates enhanced disclosure and certification obligations, including additional student disclosures relating to cost of attendance and net price, available financial assistance, and award deadlines, among others.[307] We commend the Department for devising meaningful and detailed guidelines for disclosures to students related to Federal student aid. We strongly support useful financial guidance for all members of the postsecondary education community.

### B.      Significant Negative Action or Finding (Proposed § 668.16(n))

The Department proposes that an institution would not be administratively capable if it has been subject to a "significant negative action or a finding as by a State or Federal agency, a court or an accrediting agency where the basis of the action is repeated or unresolved, such as non-compliance with a prior enforcement order or supervisory directive" or has "lost eligibility to participate in another Federal educational assistance program due to an administrative action against the institution."[308] As the Department itself acknowledges, the point of the administrative capability regulations is to "ensure that institutions can appropriately administer Title IV, HEA programs."[309] However, as drafted, the Proposed Rule could result in a finding that an institution lacks administrative capability even if the underlying non-compliance is entirely unrelated to the institution's management of the Title IV programs. To ensure consistency with the Department's statutory authority, the proposed language should be amended to specify that it applies to significant negative actions or findings where the conduct that was the basis for the action or finding **directly relates to an institution's handling of Title IV funds**. We also recommend that the language should be revised to clarify that the "finding" must be a "**significant negative** finding."

---

[306] *Best Practices for Financial Literacy and Education at Institutions of Higher Education*, U.S. Fin. Lit. & Educ. Comm'n, pg. 13 (2019), available at https://home.treasury.gov/system/files/136/Best-Practices-for-Financial-Literacy-and-Education-at-Institutions-of-Higher-Education2019.pdf.
[307] Proposed 34 C.F.R. § 668.16(h).
[308] Proposed 34 C.F.R. § 668.16(n).
[309] 88 Fed. Reg. 32302 (May 19, 2023).

The Honorable Miguel A. Cardona
Secretary of Education
Page 84 of 87

### C.    Adequate Career Services (Proposed § 668.16(q))

The Proposed Rule states that institutions must have "adequate career services" in order to be administratively capable. In assessing whether an institution has "adequate career services," the Department would consider: (i) the share of students enrolled in GE programs; (ii) the number of career services staff; (iii) the career services promised to students; and (iv) the presence of institutional partnerships with recruiters and employers who regularly hire graduates.[310]

> **1.    Accreditors – and especially accreditors of career schools – already require that institutions provide career services, calculate and disclose placement and employment rates, and satisfy related thresholds.**

We strongly believe all institutions should provide meaningful and effective career services to students. We also believe institutions should be held accountable for providing such services, particularly to the extent they have been advertised. However, we believe the Department's Proposed Rule is redundant and inconsistent with the responsibilities assigned the various members of the Triad. In this case, the Department is proposing new regulations that require compliance with standards already closely monitored and measured by the accrediting agencies.[311] Further, not only are accreditors already reviewing the adequacy and effectiveness of career services at each institution that they accredit, they do so with specificity tailored to different types of institutions – something that the Department's Proposed Rule does not accomplish (as detailed more thoroughly below).

> **2.    The Department's statutory obligation is to determine whether institutions have the capability to administer the Title IV programs, and we do not believe there is a sufficient nexus between the administration of the Title IV programs and the adequacy of their career services to assert that the latter is an element of the former.**

As noted above, we strongly support appropriate career services for every student at every institution. However, the Department's inclusion of this Proposed Rule under the requirements related to Administrative Capability is misplaced. Whether an institution has adequate career services is not sufficiently related to an institution's administration of the Title IV programs, and it is a broad stretch of the statute requiring that institutions demonstrate administrative capability.

> **3.    The proposed standards articulated by the Department for determining the adequacy of such services are vague and do not represent a clear metric against which institutions could measure their likely compliance.**

---

[310] Proposed 34 C.F.R. § 668.16(q).

[311] For example, the *Accrediting Commission of Career Schools and Colleges Standards of Accreditation* at Standard VI.C.1. provides that "The school makes graduate employment assistance available to students and the extent and nature of employment assistance services provided aligns with any claims made by the school with regard to those services." *available at* https://www.accsc.org/UploadedDocuments/standards%20and%20alerts/ACCSC-Standards-of-Accreditation-and-Bylaws-070122.pdf.

The Honorable Miguel A. Cardona
Secretary of Education
Page 85 of 87

The Proposed Rule lays out some items the Department may measure to determine adequacy of career services, but they are vague and lack specificity that would allow institutions to determine their own compliance. If an institution sat down with this rule to consider whether it complied, it would have no way to measure the effectiveness of its career services. The timing, specific support, and student contact necessary to help a student in one field may be vastly different from a student in another.

### D.   Provide Clinical or Externship Opportunities (Proposed § 668.16(r))

Under the Proposed Rule, an institution may be found lacking administrative capability if it does not provide every student with a geographically accessible clinical or externship opportunity related to and required for completion of the credential or license in a recognized occupation within 45 days of successful completion of other required coursework.[312] The Department should eliminate this proposed addition, because clinical and externship arrangements are highly specific and differ widely from program to program and region to region. Although we recognize that clinical and externship experiences are a very important piece of some programs, an institution's administrative capability should not hinge on whether or not a student considers the externship opportunities available to them to be "geographically accessible." What is "geographically accessible" to one student may vary greatly based on a variety of factors. We believe institutions should work with students to find viable opportunities for this important work, but this is not a reasonable or easily measurable standard for evaluating the administrative capability of institutions. Additionally, accreditors already monitor whether clinical or externship experiences are available as students progress to that part of their program.[313]

### E.   Delayed Disbursements (Proposed § 668.16(s))

Under the Proposed Rule, the Department establishes how it will consider an institution's administrative capability with respect to the timely disbursement of Federal financial aid funds.[314] In general, we support the notion that funds should be disbursed in a manner consistent with students' needs. However, the Department should consider the following changes:

> **1.   The Department should eliminate the condition related to student complaints or specify with more detail how student complaints could trigger noncompliance.[315]**

Currently, the Proposed Rule states that a school may be found lacking administrative capability if "the Secretary is aware of multiple verified and relevant student complaints."[316] This standard is too vague and difficult to determine. The Department should consider eliminating this condition or amending it based on the suggestions below.

---

[312] Proposed 34 C.F.R. § 668.16(r).

[313] For example, the *Accrediting Bureau of Health Education Schools Accreditation Manual*, at Standard V.B.4.b states that "Clinical experiences are available for all enrolled students as they progress to that portion of the program." *available at* https://abhes.org/wp-content/uploads/2022/12/19th-Edition-Accreditation-Manual-Effective-12023-1.pdf.

[314] Proposed 34 C.F.R. § 668.16(s).

[315] Proposed 34 C.F.R. § 668.16(s)(1).

[316] *See* Proposed 34 C.F.R. § 668.16(s)(1).

The Honorable Miguel A. Cardona
Secretary of Education
Page 86 of 87

If the Department insists on maintaining this trigger, only complaints that meet all of the following conditions should be considered: (1) complaints that have been made in writing to a Federal or State agency, (2) complaints that remain outstanding for a period of 120 days following the institution's opportunity to resolve the complaint, and (3) complaints that are material and directly relate to an institution's handling of Title IV funds. When the Department identifies complaints meeting those three conditions, again, they should only trigger a lack of administrative capability if the number of those complaints should exceed 5 percent of the institutions' current enrollment.

### 2. The Department should eliminate the condition related to high rates of withdrawals attributable to delays in disbursements.[317]

With this condition, the Department has created a standard that is very difficult to prove. The Department would need evidence that individual student withdrawals were specifically attributable to delays in disbursements. Additionally, the Proposed Rule states that a "high" rate of withdrawal attributable to delayed disbursements would trigger a finding; this is too vague. We recommend eliminating this section, as it is impossible to implement.

### F. Title IV Funds from Failing Gainful Employment Programs (Proposed § 668.16(t))

Under the Proposed Rule, an institution would not be administratively capable if it derived more than half of its total Title IV funds in the most recent fiscal year from GE programs that are failing, or if it enrolled more than half of its students who received Title IV aid in programs that are failing under the proposed GE metrics.[318]

We strongly urge the Department to eliminate this proposal to tie administrative capability to the number of passing GE programs (or enrollments in GE programs). Although we appreciate that a high number of failing GE programs *could* signal a vulnerability for an institution, there is no clear basis to conclude that high D/E rates or a low earnings premium signal an inability to successfully administer the Title IV programs. As the Department makes clear in its own Proposed Rule, the D/E rates and earnings premium measure are designed to assess financial value, not administrative capability.

Additionally, there is no factual support or rationale for this speculative threshold. The Department has not provided evidence that an institution deriving 50 percent of its Title IV funds from failing GE programs or that enrolled 50 percent of its students in failing GE programs lacks administrative capability. Without that support or evidence, the Department has proposed an arbitrary standard without a basis in fact.[319] This proposal should be eliminated.

---

[317] Proposed 34 C.F.R. § 668.16(s)(2).

[318] Proposed 34 C.F.R. § 668.16(t).

[319] The Department must provide "adequate reasons for its decisions." *Encino*, 136 S. Ct., at 2125; *see Earth Island Inst.*, 494 F.3d, at 766 ("An agency action is not supportable if it did not consider all the relevant factors and if there is no rational connection between the facts found and the determination made.").

1530 Wilson Blvd, Suite 1050
Arlington, VA 22209 | www.career.org

The Honorable Miguel A. Cardona
Secretary of Education
Page 87 of 87

## VI.    ABILITY TO BENEFIT

### A.    The Department should increase the enrollment cap for the approved State process.

Under the proposed approved State process, a State would agree that the total number of students who enroll through the State process during the initial period will total no more than the greater of 25 students or 1.0 percent of enrollment at each institution participating in the State process.[320] As proposed, the enrollment cap will prevent very small schools from participating in the State process during the initial period, which may foreclose their ability to participate long term. To illustrate, it is difficult to imagine that a school with 500 students would want to provide an ability to benefit program for 5 students (i.e. 1.0 percent of the enrollment at the institution). This endeavor would be an impracticability in light of economies of scale for most similarly situated institutions. As such, we urge the Department to revise the enrollment cap to 5 percent of enrollment at each institution participating in the State process or 100 students, whichever is greater.

### B.    The Department should not define a time period for determining an appropriate success rate.

Under the Proposed Rule, if 50 percent or more participating institutions across all States do not meet the success rate in a given year, then the Secretary may lower the success rate to no less than 75 percent for two years.[321] We urge the Department to strike the phrase "for two years" from the final rule. This would provide the Secretary with the discretion to determine what an appropriate success rate is in certain circumstances that may extend beyond two years.

### C.    The Department should define the proposed eligible career pathway program compliance requirements in greater detail.

With regard to the proposed academic and career counseling services provision[322] and the proposed provision on workforce preparation activities and training,[323] we strongly urge the Department to provide more specificity defining compliance obligations. In fact, the Department conceded in the preamble that it has "provided minimal guidance on [eligible career pathway program] documentation requirements."[324] However, the Department goes on to state that "we believe it is necessary to establish baseline requirements in regulation to curtail bad actors' efforts to provide subpar programming. These baseline requirements would also support good actors by providing further regulatory clarity to support their efforts, weeding out subpar eligible career pathway programs, and steering students towards eligible career pathway programs with better outcomes."[325] Nowhere in the proposed regulations or in existing regulations does the Department specify those "baseline requirements," and it is unclear where, how, or when the Department will create them. The Department should do so in the final rule.

---

[320] 88 Fed. Reg. 32497.
[321] Proposed 34 C.F.R. § 668.156(j)(1)(iii).
[322] Proposed 34 C.F.R. § 668.157(a)(4).
[323] Proposed 34 C.F.R. § 668.157(a)(5).
[324] 88 Fed. Reg. 32391.
[325] 88 Fed. Reg. 32391.