# Exhibit 5

**Hollywood and Cortiva Institutes**

**2001 W. Sample Rd., Suite 318**

**Pompano Beach Fl. 33064**

**VIA REGULATIONS.GOV**

June 19, 2023

The Honorable Miguel Cardona
Secretary
U.S. Department of Education
400 Maryland Ave. S.W.
Washington, D.C. 20202

  **Re:  Docket ID ED-2023-OPE-0089**

Dear Secretary Cardona:

  Thank you for the opportunity to comment, today, on the package of proposed rule changes regarding Certification Procedures, Financial Value and Gainful Employment ("GE"). Financial Responsibility, Administrative Capability and Ability to Benefit ("ATB"), hereinafter referred to as the "Rule", which were the result of the Notice of Proposed Rulemaking ("2023 NPRM"), published by the Department of Education (the Department") on May 19, 2023.

  I am the Owner, CEO and President of 11 beauty and wellness (cosmetology and massage) schools in various geographic regions across the United States.  I own and operate Hollywood Institute of Beauty ("Hollywood Institute"), in three locations in Florida - Casselberry, Hollywood and West Palm Beach.  Hollywood Institute ("Hollywood Institute"), which I also own and operate, is located in Margate, Florida. There are seven Cortiva Institutes which I own and operate, of which three are in Florida - Pompano Beach, Maitland and St. Petersburg.  The other 4 Cortiva Institutes, which I own and serve as CEO and President, are located in Arlington (TX), Baltimore (MD), King of Prussia (PA), and Cromwell (CT).

  I have been the owner, CEO and President of the four Hollywood Institutes for 14 years, and the owner, CEO and President of Cortiva Institutes for four years.  I am an active member in FACTS (the Florida Association of Cosmetology and Technical Schools) and AACS (the American Association of Cosmetology Schools).

Page **1** of **16**

Student enrollment, at all 11 campuses in 2022 averaged to be 1800. Of these enrolled students, approximately 70% accessed Title IV federal funds to pay for their education.

I cannot emphasize enough the impact that the Rule will have on my schools, and more importantly, our students if it were to be enacted in its current form. Just based on the reduction of the "150% Rule" to 100% of state minimums will cause both our Massage Therapy and Full Specialist programs at all four Hollywood Institutes in Florida to lose Title IV funding.

The Cortiva Institutes in Florida generate a substantial portion of their revenue from massage therapy programs. These programs at all three locations in Florida will lose eligibility for Title IV participation.

Yet, ironically, the other four Cortiva Institutes in TX, MD, PA and CT, all of which focus on providing massage therapy programs, will NOT lose their Title IV eligibility because of the disparity between the state minimums.

It is puzzling to me that the Department can even entertain a Rule which will have such disparate consequences across various states. A student at my Cortiva Institute in Arlington, TX can access Title IV federal financial aid to attend the same program which will now be unavailable, if this Rule is adopted, to a Cortiva Institute student in Pompano Beach.

Please accept this submission as my public comment, on behalf of the 11 cosmetology schools which I own, operate and represent, here, its students, educators, allied businesses and consumers regarding the proposed amendments to Certification Procedures, Financial Value and Gainful Employment ("GE"), Financial Responsibility, Administrative Capability, and Ability to Benefit ("ATB"), as is advanced in the Rule.

**<u>Certification Procedures</u>**

**§668.14(b)(26) (150% Rule /proposed at 100%)**

The proposed edits to §668.14(b)(26) will **seriously affect** (if not debilitate) the viability of the four Hollywood Institute schools which I own in Florida as well as the three Cortiva Institutes which I own in Florida. All seven of those schools, in Florida, will lose eligibility for Title IV financial aid for their respective Massage Therapy and/or Full Specialist programs, when the Rule is amended from 150% of state minimums to 100%.

The state of Florida is one of the few states which requires the lowest amount of clock hours for cosmetology, skin, barbering and massage programs in the United States. The state minimum for Massage Therapy is 500 hours. The state minimum for Full Specialist (nails and skin) is 400 hours.

Both the Cortiva Institutes and Hollywood Institutes, seven in total, rely on the 150% Rule to qualify their Massage and Full Specialist programs for Title IV aid and Pell Grants. At 150% of Florida state minimum, the Massage Therapy program qualifies for Title IV aid and Pell Grants.  At 150% of the Florida state minimum, the Full Specialist programs qualify for Title IV aid and Pell Grants.  I do not **take advantage** of the 150% rule, but **"teach up to it"**; I offer a 600 hour program (20% above state minimums) for Massage and 600 hour program for Full Specialist (25% above state minimums). At 600 hours, the Massage and Full Specialist enrollees can access Title IV student loans and Pell Grants.

If §668.14(b)(26) is allowed to stand, **all** Massage and Full Specialist programs in Florida will no longer be Title IV eligible – not just Hollywood Institutes and Cortiva Institutes. Students are not in a position to pay cash for 400 and 500 hour programs.  The proposed rule will **quash these two programs, in Florida, entirely**.  It will **compromise the financial viability** of all Florida schools who offer these programs and cause **shortages in the industries** in Florida who hire graduates of these programs.

I have personally attended legislative sessions in Tallahassee with Mez Varol, the President of FACTS. I agree with him that, on the forefront of each participating legislator's mind was, "will this reduction in hours **cause** potential students **to lose** Title IV financial aid?" Florida state legislators **relied on the 150% Rule** when electing to reduce state minimums. These reductions, in Florida state minimums, **would not have been undertaken** by the Florida state legislature if the Title IV money for these programs was going to be affected.

Amending §668.14(b)(26), as proposed, does not result in a uniform application across all 50 states, given that the states, themselves, set the minimums. It is inequitable, discriminatory, and unconscionable that a Cortiva Institute massage student in Baltimore (where the state minimum is 750 hours) qualifies for Title IV funds, but a similarly situated student in Florida does not.  The 50% "cushion", which is built into the unamended rule **provides latitude** for a school in a state with **restrictive minimums** to teach "up to" the requisite 600 hours to qualify for financial aid.  That was, as I understand it, **the purpose of the 50% cushion – to equal the "playing field"**.  Now, the Department is attempting to eliminate that.

I recommend that the Department eliminate its proposed edits to §668.14(b)(26). As proposed, the rule when applied is **arbitrary** and **capricious.**

I recommend that the "adjacent state" rule be retained intact, unamended.  The "alternate state" rule, as proposed in the NPRM, is even more restrictive and impossible to access than the now existing "adjacent state" rule.  And, that rule was almost impossible to apply.  There is no rationale provided by the Department for these new restrictions.  The intent of the existing rule was mobility – to ensure a graduating student completed enough clock hours to be "gainfully employed" in that adjacent state.  Now, and without rationale being provided, that latitude to relocate is eliminated.  New, unrelated thresholds must be met **AND** certified by an auditor. Are

these new impositions based on data and findings of abuse under the existing rule, or merely **arbitrary** and **capricious**?

The Adjacent State Rule, as written, should stand. At a minimum, it may help schools in Florida compensate for the 150% rule being reduced to 100% of minimum state hours. It meets the Department's stated purpose. The proposed rule goes beyond the scope of the Department's authority, **is not supported by Congressional authority** is arbitrary and capricious.

### §668.13 – Renewal of Certification.

In its revision of §668.13, the Department eliminates the provision that, if the Department does not "make a determination to grant or deny certification within 12 months of the expiration of [an institution's] current period of participation, the institution will automatically be granted renewal of certification, which may be provisional." 88 Fed. Reg. 32491 (May 19, 2023).

I urge the Department to **maintain the current regulation**. The Department **should** promptly process applications, provide timely feedback to institutions, properly oversee institutions, and provide timely remedies for deficiencies identified. The Department expects timely responses from institutions. Why should there be a double standard? Institutions should not be "kept waiting" for indefinite periods of time.

In addition, the Department proposes a plethora of "supplementary performance measures" that it will take into consideration when assessing whether or not to certify or condition the Title IV participation of an institution. The Department's justification for these new factors, is that "[c]odifying these supplemental performance measures would also provide additional clarity and transparency to institutions regarding the types of information the Department will likely consider when making certification decisions." 88 Fed. Reg. 32379 (May 19, 2023).

I disagree with the Department's proposal as to these supplementary performance measures, published at §668.13I. The inclusion of these supplementary performance measures **is inconsistent with the Department's statutory authority** under 20 U.S. Code §1099c(b). That Code permits the Department to require institutions to provide "sufficient information and documentation to determine that the requirements of eligibility, accreditation, financial responsibility, and administrative capability" are met. Measures inconsistent with or exceeding this authority (reporting debt-to-earnings, earnings premium, and educational and pre-enrollment expenditures) should be eliminated.

### §668.14 - Program Participation Agreement

The proposed rule at §668.14 requires that several significant procedural and content changes be made to an institution's program participation agreement (PPA).

I recommend that the Department **eliminate** the co-signature requirement proposed in § 668.14(a)(3)(ii).  The requirement is inconsistent with and **exceeds the Department's statutory authority** to require financial guarantees from owners, as stated in HEA Section 498.  The Secretary has the authority to require financial guarantees from **the institution and individuals who exercise substantial control**. That authority does not extend to an entity.

### § 668.14(b)(32)(ii) – Educational Prerequisites

As proposed, **an institution** (not the student) must determine that a program satisfies the applicable educational prerequisites for professional licensure or certification requirements **in the State where the student is enrolled** (not the state which the student elects).

I support the elimination of these proposed edits and reversion back to the original language.  This proposal **unfairly limits student choices**.

### § 668.14(b)(32)(iii) – State Authorization Reciprocity Agreements

I recommend that the Department eliminate its proposed edits, here, which compromises State authority. It is the States who have purview over the operations of higher education institutions.  The contents of such reciprocity agreements, including applicable consumer protection laws, should be left to those States.

### Financial Value and Gainful Employment ("GE")

As an owner and operator of eleven cosmetology and wellness schools, which will be significantly and perhaps devastatingly impacted by this subsection of the Rule, I believe that I was not afforded sufficient time to comment.  The Rule is cumbersome, the calculations are intricate, the research and data cited by the Department is lengthy, and impact of the proposed rule on institutions, their students and their affiliates **is projected to be unprecedented**.

Be reminded that our schools will lose Title IV eligibility for **11** programs at the seven schools which I own and operate in Florida because of the now proposed "100% Rule". But, if by some miracle,  those programs survive a Rule challenge, and survive under the proposed GE Rule, the residual effects on my institution's **financial solvency** will be substantial.  The administrative burden placed on my administration for eleven schools will be **monumental**.  Most of my schools offer one, if not two programs.  For proprietary institutions, like mine, with only one or two programs, the proposed GE Rule **could result in the closure of one or more of my schools**. If one program fails the GE metric, and it is one of one or two programs being offered, the school cannot survive.  The American Association of Cosmetology Schools ("AACS"), in an impromptu survey of its member schools in the beauty and wellness industry, determined that **41% of cosmetology programs** will fail measure, lose Title IV eligibility and **likely shut down**.

I am told that "cosmetology schools" are mentioned, by sector, over 40 times in the proposed Rule.   Are we being targeted because of past bad acts of huge proprietary institutions who mislead thousands of students?   Understand that many students who attend Hollywood Institutes and Cortiva Institutes graduated from "non-traditional" high schools –

some were educated in the prison system while others attended an alternative high school.  These students are looking to learn a creative trade with a moderate amount of theory courses educating the creative and artistic techniques of that trade.  A barber student is not going to convert his/her education to pursue becoming an aviation technician.  That student chose the cosmetology/wellness school because it complements the level of education in which that student can succeed.  The Department appears to overlook the core values provided by cosmetology/wellness schools to the "challenged" student sector.

It is unfathomable, yet predictable, that **no representative** from either a cosmetology school or a small proprietary school (under 450 students) was included on the Institutional and Programmatic Eligibility Committee which negotiated Financial Value and GE.  In fact, my name was submitted by the American Association of Cosmetology Schools ("AACS") as a potential negotiator for that committee.  The Department **elected** to not include me.  Then, a fellow Florida school owner, Michael Halmon, was nominated by Brad Adams (negotiator for proprietary postsecondary schools) from the floor to represent small proprietary school with under 450 students.  That nomination was defeated by a vote of 8 – 6, with the federal negotiator (representing the Department) voting "thumbs down".  With issues like the 150% rule, 90/10 and GE "on the table", why did the Department twice refuse to seat a cosmetology/small proprietary school owner on the committee?

I agree with FACTS that the Department failed to comply with the statutory rulemaking requirements as to the **composition of the rulemaking committee**. That committee must reflect "the diversity in the industry, representing both **large and small** participants, as well as individuals serving local areas and national markets." 20 U.S.C. §1098a(b)(1); National Educ. Ass'n v. Devos, 379 F. Supp. 3d 1001, 1008 (N.D. Cal. 2019).

At least one negotiator was needed (and should have been included) for the small school sector (under 450 students) to have adequate representation. The lack of inclusion of at least one spokesperson representing small institutions of higher education on a committee of 15 charged with negotiating revisions to the critically important 150% Rule, GE Rule and 90/10 Rule (which passed by consensus) fell short of any composition reflecting the diversity of the proprietary sector. I contend that all components of the proposed rule discussed by the wrongfully composed Programmatic Eligibility Committee be removed and renegotiated.

Similarly, the Programmatic Eligibility Committee, which negotiated GE and the 150% Rule, **lacked the expertise** required by statute. The negotiated rulemaking statute requires the Committee to select "individuals with demonstrated expertise or experience in the relevant subjects under negotiation," and the Department's published protocol. (Negotiated Rulemaking Committee; Negotiator Nominations and Schedule of Committee Meetings, 86 Fed. Reg. at page 69607 (December 21, 2021).  That did not happen, here.

The overwhelming **majority of committee** members (eight in fact) represented interest groups **other than institutions of higher education** that are not subject to GE.  Those members, by definition, **lacked any "demonstrated expertise or experience in the relevant topics**."  For

that reason, I argue that all components of the proposed rule discussed by the Programmatic Eligibility Committee be removed and renegotiated.

It is customary for GE to be **the entire focus** of a NPRM. The record confirms that seven days and a total of 51 hours were dedicated to negotiating GE in 2014. In 2017, 72 hours of negotiations over the course of nine days were devoted to GE, before the rule was rescinded.

This time around, **only a few hours** over the course of **two days** were devoted to discussing the Department's "issue paper" and proposed language. The Department's negotiator recognized these time constraints.

Here's my "take" - the abbreviated time for negotiation **is the reason** that **all six institutional representatives** voted against the Department's proposal. Yet, the Department is advancing the new GE **despite unified opposition** from those **negotiators representing institutions** and the **most abbreviated time for negotiations** in the history of GE.

I believe that abbreviate time for scheduling GE discussions within the Committee failed to meet the statutory requirement that the sessions "provide for a **comprehensive discussion and exchange of information**." 11 20 U.S.C. § 1098a(a)(1)-(2). The federal negotiator, Greg Martin, acknowledged "less time" devoted to GE and "time constraints". See transcript: Greg Martin, Federal Negotiator, Session 2, Day 2, Morning, Feb. 15, 2022, Institutional and Programmatic Eligibility Negotiated Rulemaking. Arguably, a few hours over the course of a few days **was not sufficient** to yield a comprehensive discussion or exchange of information. For this reason, I contend that **the lack of consensus** which served as the **predicate** for the Department's GE compilation of the proposed rule is **arguably invalid** and the proposed final rules should therefore be rejected.

I note that the Department allowed itself **425 days** to write and publish its proposed rule after negotiated rulemaking concluded. Yet, public commentors, including school owners like me, were allowed only thirty days to digest and comment on the 1077 proposed rule and supporting data. This is not in keeping with the intent of the Administrative Procedures Act ("APA"); the public comment period should be reopened to allow for supplemental comments.

The Department is now proposing to calculate and disclose Debt to Earnings ("D/E") rates and a new "earnings premium" for every program at every Title IV institution. While Title IV eligibility determinations would apply only to GE programs (non-degree Title IV programs offered by public and private non-profit institutions and all Title IV programs offered by proprietary institutions), the calculation will be done **for every program.**

The Department **lacks authority over ineligible programs**. The regulation, as published, violates the prohibition against Federal control of education. The published regulation seeks to impose conditions and restrictions on non-Title IV programs offered by eligible institutions. This is **prohibited** by the ED's general authorizing statute, is irreconcilable with the HEA and should be striken.

And, now a new "earnings premium" ("EP") test has been introduced, as if GE was not enough. EP will be calculated in addition to the D/E metric to determine whether a GE program should remain Title IV eligible. Simply stated, if the median earnings of a program's graduates fail to consistently exceed the median earnings of high school graduates, that program fails the EP test. I find the EP test problematic, unnecessary and overbearing. Cosmetology and wellness schools offer **short-term,** lower cost programs that produce **graduates who are known to underreport wages**.

The **EP test is flawed** and **should be eliminated**. It fails to consider "flex" work, part-time employment, self-employment, seasonal employment (relevant in Florida) and under-reporting of income.

The Department intends to rely on other federal agencies (probably the IRS) to collect financial earnings data, on which the EP test will be calculated. If the income isn't reported and **no** adjustments are made for that, **the resulting data will be flawed**. If part-time income (flex work) is reported yet considered as full-time employment, the resulting data will be **flawed.**

I recommend that, rather than impose sanctions based on flawed data, the Department rely exclusively on **consumer disclosures**. Reliable data to use to project and assess program outcomes **has not yet been identified**. Until then, disclosures provide a viable alternative.

Congress did not expressly authorize the Department to promulgate a **retroactive** regulation. I oppose the Department's intent to make program eligibility determinations based on "aged" data from years that precede the effective date of the rule. It is unconscionable and fundamentally unfair (and likely unlawful) to sanction institutions based on program and pricing decisions that were made many years prior to the effective date of the law. Those decisions cannot be revisited, adjusted, reversed, or impacted in any way. That equates to retroactivity, which was not expressly authorized. D/E rates and EP calculations using data from the years preceding the rule's effective date should be for **informational purposes only.**

No "transitional metric" for GE programs was adopted by the Department in this recent amending of the Rule. And, it should have been.

If not a transition metric, then the Department should consider **"capping"** the maximum number of programs to be deemed ineligible at an institution and then allowing for **an alternate earnings appeal**. As the Rule is written, an institution **can do nothing** to impact its D/E rate or EP metric **for the first five award years**. Rather than improving transparency, which is the objective here, it is arguably punitive that an institution that improves its D/E or EP in 2024 **will see no improvement in those metrics until 2030.**

I object to the Department holding institutions accountable for earnings data generated during calendar years 2020 and 2021, when the COVID-19 pandemic was at its height of impact. Schools were closed. Licensing agencies were closed. Retail opportunities for employment were non-existent. The Department is being insensitive to the devastation to institutions in general, and the cosmetology sector specifically if it makes, publishes, and sanctions institutions based on determinations that rely on earnings data from 2020 and 2021. And yet, this is what is proposed,

Page **8** of **16**

here.

The Department proposes to calculate each program's D/E rates based on earnings information it intends to obtain from institutions, the agency's systems, and a TBD Federal agency. The Department's preference is the Internal Revenue Service. See 88 Fed. Reg. 32328 (May 19, 2023).

I argue that SSA data is flawed as it relates to the cosmetology and wellness industry and should not be used as a basis for calculating D/E or EP. As I mentioned earlier, it does not account for individuals who elect to work **part time**; nor does it account for "**cash**" income or income received as **tips**. The Department relied on SSA data when promulgating the 2014 GE rule. The Court agreed with that "flawed data" argument in American Association of Cosmetology Sch. v. Devos. (258 F. Supp. 3d at 73). There, the Court recognized the underreporting of income and cash income in the cosmetology and wellness industry, to hold that "although SSA data is highly accurate in some respects and is thus a useful starting point for determining average earnings, it has significant shortcomings—at least for certain occupations."

I believe that using the D/E calculation, as proposed, fails to meet the Department's objectives to (1) disclose accurate student outcomes and (2) measuring the overall quality of programs. In 2019, the Department recognized the disconnect between D/E calculations and the measurement of program quality, stating that the "D/E rates measure is an **inaccurate** and **unreliable proxy** for program quality[.]" 84 Fed. Reg. 31392 (July 1, 2019). (emphasis added).

Arguable, the D/E measurement, as proposed, does not assess the financial value of a program over a graduate's lifetime. The Department acknowledges this, by saying it "agrees that D/E rates, based on earnings in the third and fourth year following completion of a program, do not accurately predict how much a graduate will earn over a lifetime." 21 84 Fed. Reg. 31410 (July 1, 2019). Is the objective, here, to assess the financial value of a program over a graduate's lifetime, or to determine that graduates "ability to pay" his/her loan debt two or three years out?

The "zone" concept is proposed to be eliminated, despite being included in the past two renditions of GE. The "zone" allowed additional time for a program to come into compliance if its annual earnings rate was between 8 percent and 12 percent or its discretionary income rate was between 20 percent and 30 percent. The setting of these thresholds appears to be **arbitrary** and not based on established data or methodologies. And there is no rationale provided for the elimination of the zone. I suggest that the zone should be reinstated.

Students at my eleven schools routinely borrow funds to cover living expenses, in excess of that which is necessary to cover tuition, when accessing a federal grant, state grant or V.A. Chapter 30 to cover all or most of his/her tuition. It makes sense for the Department to **exclude** federal grants, state grants and V.A. Chapter 30 from the total loan debt calculation. As proposed, these funds borrowed for living expenses are not deducted from the debt total included in the

D/E rate. **Institutions should not be held accountable for excess debt, beyond that to cover tuition and related expenses, which a student elects to incur.**

The eleven schools which I own and operate graduate more women than men, minorities, individuals with lower socio-economic status, immigrants, returning citizens, and members of the LGBTQ+ community – all of whom are **subjected to wage discrimination** in the United States. Calculating D/E or EP without recognizing and adjusting for wage discrimination will result in disparate earnings results. Again, flawed data.

My eleven schools are in rural areas, in metropolises, on the "south side" of major cities and in agricultural hubs. An institution should not be subject to sanctions based on the **socioeconomic status and demographics** of its students. Doing so could result in the **loss of Title IV** and the **closure** of those institutions who are making well-intended efforts to expand access and opportunity to students who are not served by mainstream institutions.

Likewise, my eleven schools are in diverse geographic locations. The earnings of students graduating from my schools will vary based on the **diversity of the geographic locations** within that state. As to my seven schools in Florida, the earnings potential in the middle of Florida, where farming and agriculture are prevalent, will vary significantly from the "gold coast", with its high-net-worth population. The Department needs to develop a methodology or protocol to address these geographic disparities in reported earnings. The regulation, as proposed, fails to do so.

The issue of under-reported income cannot be overly emphasized. For graduates from my schools - hair stylists, barbers, skin care technicians, nail technicians, massage therapists – cash for services and cash tips **are the norm** and **not the exception**. The Department must adopt a methodology to **solve the problem of unreported income**. In its opinion in AACS v. the U.S. Department of Education (the AACS Litigation), the court agreeing with AACS that the Department **did not adequately address** how underreported income would be treated when calculating the D/E ratios under the 2014 GE rule for programs like cosmetology. T**he election of some, if not all, graduates to underreport income should not be to the institution's detriment.** Institutions have absolutely no control over how graduates interact with the IRS.

Yet, the Department proposes once again to calculate D/E rates using **actual earnings** without offering **any solution for the underreported income problem**.

Because of this underreported income, my eleven schools are at **serious risk** of **failing** not only the **D/E calculation,** but also the **EP calculation**, which will also be based upon the "flawed", underreported income. T**he Department should resolve this shortfall, before it causes the demise of the cosmetology school sector.**

It is beyond comprehension to me that the Department proposes to eliminate the **alternate appeals process**. In the AACS Litigation, the Department advanced the alternate earnings appeal process **as a defense**, taking the position that because an appeal process was available to address underreporting, that **using the actual earnings** (albeit underreported) was justified. In the AACS Litigation, the Court found the Department's "narrowing of appellate

recourse" to be **arbitrary and capricious**. What could possibly be the rational for totally **eliminating the appellate recourse** this time around? Isn't that even more arbitrary and more capricious if eliminated?  As proposed, there is no methodology or process to account for under-reported or self-employment income.  And, then there is no appellate process through which to challenge an income determination made by the Department.  I **urge the Department to re-address these issues.**

It makes sense that all of a former graduate's income, be it **earned or unearned**, should be considered for the calculation of D/E and EP, regardless as to how it is reported to the IRS. To do otherwise will result in, yet again, flawed data and flawed D/E and EP measurements.

The Department has proposed no methodology to address graduates with **no reported income**.  As the regulation stands now, it is **assumed** that when no income is reported, that graduate is **unable to find employment** and the **program is penalized**.  Graduates become incarcerated.  Or disabled.  Or pregnant.  What about the "booth rental" graduate who accepts "cash-only" and does not report anything?  Whatever federal agency the Department chooses to calculate these numbers should **exclude any graduate in the cohort who reports no income.** Then, in turn, the Department should **exclude the same number of students** with the highest loan debt **from the calculation of the median loan debt**.

I believe that the Department should mirror the 2011 and 2014 GE rules by using the **higher of the mean or median earnings** to calculate D/E.  Back then, the Department advanced its argument that using the higher of the mean or median was the best approach and most fairly represented the earnings for the cohort. Here, the Department proposes only to use the median. Why the deviation?

I take exception to the EP measure, in its entirety.  The Earnings Threshold, as proposed, is a **flawed metric** and does not provide a viable basis to compare the earnings of institution graduate to those of a high school graduate.  Under the proposed rule, the **Annual Earnings** is based on the **actual earnings** of all of program's graduates, **whether or not they are seeking employment**. This disregards program graduates, for example, who elect not to work, are disabled or incarcerated or elect to stay home and be caregivers.  The proposed **Earnings Threshold** only includes high school graduates who "**were actively looking for work** during the last 4 weeks" and "were available to accept a job." Everyone who "counts" under the Annual Earnings calculation is "dis-counted" under the Earnings Threshold calculation.  **The comparison is inequitable.**

As proposed, the Annual Earnings (program graduates) is based on the actual earnings of all the program's graduates, as measured about **three years** after completion of their program. No cosmetology or massage graduates are employed in their career **prior to** completing their program – they have not yet attained the requisite certification or license. As a result, those program graduates will have been employed in the cosmetology sector **for three years or less** when their earnings are measured. Yet, the Earnings Threshold (high school graduates) includes earnings data for individuals **between the ages of 25 and 34**. Assuming those individuals graduated high school at age 18, it is possible and probable that these individuals may have been

employed in their current career for **as many as 16 years. Comparing a three year earnings history to a 16 year earnings history is inequitable**.

In the EP calculation, the **Annual Earnings (**institutional grads), being the sum total of all actual earnings of a program's graduates, will be representative of earnings in concentrated **geographic regions.** The collective earnings of my Hollywood Institute graduates in Casselberry, Florida (in the middle of the state) will be disparate to that of a my Hollywood Institute program's graduates in West Palm Beach, Florida (a wealthy city west of Palm Beach). Yet, the **Earnings Threshold** (high school graduates) will represent **median earnings throughout the state**. That, again, is an inequitable comparison.

The issues with EP are overwhelming and significant. I urge the Department to resolve these issues **before** the implementation of the regulation. The EP measure, as proposed, is reliant on the Annual Earnings (program graduates) data the Department obtains. **And that is flawed**, as I have repeatedly pointed out, here. No remediation of that flawed data has been proposed by the Department. If the Annual Earnings data is flawed or incomplete, the earnings premium measure will be flawed, fails to serve its purpose and wrongfully puts institutions at jeopardy of lower enrollments or closure.

The Department, in the proposed Rule, does not allow institutions an opportunity to review and correct its D/E rate data and calculations, once received by the Department from the federal agency, **prior to implementing sanctions**. I suggest that this is unfair and violative of due process. The opportunity to review and correct D/E calculations was included in GE in 2014; the Department issued draft D/E rates and the institution had the opportunity to challenge the accuracy of the loan data used to calculate the rates. This "**right to review and correct**", which has been **eliminated** in the proposed regulation, is tantamount to ensuring more accurate D/E rates. I'm undecided which omission by the Department most compromises fairness and due process - the omission of the alternate earnings appeal or the omission of the opportunity to review and correct D/E data.

As mentioned above, the Department has omitted the alternate earnings appeal process in this round of GE amendments. The 2014 GE rule permitted institutions to conduct an alternate earnings appeal, during which the institution could obtain alternate earnings information through a survey of its graduates and submit that data for use in recalculating its D/E rates. This alternate appeal process is **critical** to me, as an owner of eleven schools and who is on notice that my graduates **routinely either underreport or fail to report** their earned income. Presently, the Department argues that an appeal process is unwarranted, primarily because concerns regarding unreported income are **overstated**. These very arguments were rejected by the D.C. District Court in the AACS Litigation. It is incomprehensible to me that the Department is electing to ignore the outcome in the AACS Litigation and, in the alternative, to subject well-intended schools to inaccurate D/E calculations, which could lead to sanctions, loss of Title IV eligibility and school closures.

**Student Disclosure Acknowledgements**

There are many ways to measure the value of a postsecondary education other than by comparing debt to earnings.  The extrinsic value of a postsecondary education is overlooked by the Department, in lieu of its obsession with debt and earnings.  With increased income opportunities comes improved social status, increased personal security, less likelihood of relying on safety-net programs, and lesser risk of homelessness and incarceration. I suggest that these extrinsic values balance the D/E "cautionary" language on the Department's website.

### Reporting Requirements (Subpart Q: 668.408)

The accountability and reporting requirements proposed under Subpart Q: 668.408 are unnecessary, overly burdensome, will require me to add administrative personnel and will result in tuition increases to cover those costs. And, to what end? Additional costs will be passed on to students, decreasing the financial value equation.  And that is contrary to the Department's and the Regulation's intent.

### GE Program Eligibility (Subpart S: 668.601 – 668.603)

It is inappropriate to penalize an institution if a program is being responsibly retired and produces failing D/E rates in its final years.   Further, students who have enrolled in or remained enrolled in a program **with full knowledge** of a program's failing D/E rates and EP **should be permitted to receive Title IV aid until they complete the program.**  At the core of the Federal financial aid programs is the unfettered ability for a student to select his/her program and institution. If a student loses aid, he/she may have no choice but to withdraw from the program. Some students may "drop out"; others may have difficulty finding another institution to which to transfer. All the potential outcomes are to the student's detriment and negate the taxpayers' investment in that student thus far.

And, if a student elects to continue in a program subject to a loss of eligibility due to failing D/E rates or EP, that student should continue to have access to Pell Grants and only lose access to the Title IV funds.

### Student Warnings and Acknowledgments - (Subpart S: 668.605)

The warnings required in the proposed regulation will cause irreparable harm to programs, making it impossible to recruit future students and leading to program teach-out. As proposed, warnings are required if the institution **fails one year's metrics**.  Institutions would not have the option of making market or program corrections if the failure is due to unforeseen events – like a nuclear disaster or climate disruption. Under the proposed regulation, the program is required to warn, which will cause irreparable harm, only because of an unforeseen event in a single year.

I recommend that the Department develop a more reasonable standard for warnings and loss of Title IV eligibility.  Perhaps warnings are required after the second year of failure or the program loses eligibility if it fails three out of four consecutive award years, both scenarios providing for a pattern of poor performance. This would allow institutions a more reasonable opportunity to compensate for market shifts or other unforeseen events.

**Financial Responsibility**

I take exception to the requirement that institutions disclose dollar amounts spent in the preceding fiscal year on recruiting activities, advertising, and other pre-enrollment expenditures. With eleven schools, I spend a significant amount of money on these legitimate and revenue generating business activities. It is a good and acceptable business practice to ensure a continuous stream of revenue and has no correlation to the financial stability of my schools. The disclosures are overly burdensome, unwarranted, and unreasonable.

The Department should **simplify** the proposed financial responsibility framework; as proposed it is unreasonable, overly-burdensome and unnecessarily exhaustive. The Department is proposing **over 40 discrete events or actions** that **could** result in a determination of financially irresponsible. The proposed regulations identify 20 or so events that must be reported **if they may have occurred**. The burden on institutions here, especially small schools under 450 students, is extravagant and unnecessary. Compliance will be cumbersome and inconsistent. The Department should abandon this exaggerated schematic in favor of a simple set of criteria that all institutions can follow.

Being financially responsible is ingrained into every owner's business decisions. I understand the need to notify the Department when I cannot meet its financial responsibilities. I understands that I must notify the Department if one of my schools is in "material" danger of not meeting its financial responsibilities. The proposed regulation requires that **speculative** or **discretionary** triggering events be reported. Reporting should be limited to **material triggering events.** The Department should limit reporting to only those events which have a **material adverse effect** on that institution's ability to meet its financial responsibilities. The exhaustive and unnecessary list of "triggering events", as proposed, serves no purpose other than to frustrate institutions and require them to spend more money on administration. I would like to better understand the Department's statutory authority for this speculative reporting.

Again, I will raise a due process concern in relation to this aggressive need to report speculative triggering events which, in the Department's opinion, **may** indicate lack of financial responsibility and **may result in negative determination**. Institutions should be afforded an **opportunity to review any conclusions** reached by the Department, and **to provide a response to and evidence supporting** that response, to be evaluated and considered by the Department **before reaching any determination that an institution is not financially responsible.**

In the 2019 Final Borrower Defense Rule, the Department takes a position that any event triggers that are **speculative, abstract**, and **unquantifiable**, are not reliable indicators of an institution's financial condition or its ability to operate and should not be included in the financial responsibility framework. 84 Fed. Reg. 49861-2 (Sept. 23, 2019). The conundrum, here, is why that position has been abandoned?

I believe that the Department should consistently apply the standard adopted in 2019, as stated above. To be consistent with that 2019 position, I suggest that, at a minimum:

1. Proposed § 668.171(c)(2)(i)(B) concerning Lawsuits and Other Actions be eliminated;
2. Proposed § 668.171(c)(2)(i)(D) concerning Change in Ownership be eliminated;
3. Proposed § 668.171(c)(2)(iii) concerning Gainful Employment be eliminated;
4. Proposed § 668.171(c)(2)(iv) concerning Teach Out Plans be eliminated;
5. Proposed § 668.171(c)(2)(v) concerning State Actions be eliminated; and
6. Proposed § 668.171(c)(2)(vi) concerning Publicly Listed Entities be eliminated.

The term "material adverse effect" needs to be articulated and defined in the regulation, including the methodologies which the Department will apply to determine if a "discretionary" triggering event has had a "material adverse effect" on an institution. Without a clear definition of a "material adverse effect" against which defined methodologies can be applied to determine if a "discretionary" triggering event is material, it will be difficult to fairly and consistently administer the following discretionary triggers and they should be removed:

1. Proposed § 668.171(d)(1) concerning Accrediting Agency and Government Actions;
2. Proposed § 668.171(d)(3) concerning Fluctuations in Title IV Volume;
3. Proposed § 668.171(d)(6) concerning Pending Borrower Defense Claims;
4. Proposed § 668.171(d)(7) concerning Discontinuation of Programs;
5. Proposed § 668.171(d)(8) concerning Closure of Locations; and
6. Proposed § 668.171(d)(11) concerning Exchange Disclosures.

### Alternative Standards and Requirements (668.175)

I disagree with the requirement as stated in 668.175(c) and (f), that an institution must also **remedy** "the issue(s) that gave rise to the failure **to the Department's satisfaction".** This requirement is untenable. Compliance, in many instances, will be impossible. Many triggering events cannot be "remedied" once they have occurred, or are beyond the control of the institution, such that meeting the standard is impossible. Even if a remedy is within the institution's control, it could take considerable time to implement that remedy. In the meantime, what is the status of the institution? Is it eligible for continued Title IV participation in the interim?

### Change in Ownership (668.176)

My accreditors already micro-manage any change in ownership and/or control. Without accreditation, my schools cannot participate in the Title IV program. The changes proposed, here, will affect institutions and transactions differently. As to me and my eleven schools, I believe that the Department is unnecessarily burdening schools with these additional requirements which serve little or no purpose and is further and unnecessarily imposing itself into a private business transaction.

### Administrative Capabilities

I am truly not understanding the Department's proposal to tie administrative capability to the number of passing GE programs (or enrollments in GE programs). Although a high number of failing GE programs could signal a financial vulnerability, there is no clear basis to conclude that high D/E rates or low EP would **indicate an inability to successfully administer** the Title IV program. As the NPRM makes clear, the D/E rates and earnings premium measure are designed to assess financial value, **not administrative capability**.

**<u>Ability to Benefit</u>**

The proposed regulation mirrors that negotiated in the NPRM, which outlines the requirements for demonstrating that programs are "eligible career pathway programs." I take no exception to the modified rule, as proposed.

I sincerely thank you for the opportunity to comment on these proposed Rule changes and hope you will take my comments into consideration. I am available to assist the Department in any way it deems valuable and to respond to any follow-up questions regarding the above comments.

Sincerely,

/s/
Neal R. Heller, Esq.

Neal R. Heller
Owner, CEO and President
Hollywood Institute and Cortiva Institute