**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| 360 DEGREE EDUCATION, LLC, d/b/a Cortiva Institute; and THE COALITION FOR CAREER SCHOOLS,<br><br>                Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF EDUCATION; and SECRETARY MIGUEL A. CARDONA, in his official capacity as Secretary of the Department of Education,<br><br>                Defendants. | Case No. _____<br><br>**Brief in Support of Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Stay** |

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ..............................................................................................................2

I.    Under the Current, Longstanding 150% Rule, Career Schools Have Flexibility in the Length of Programs They Offer Students on Federal Student Aid......................................2

II.    The Department Has Adopted a New Bare Minimum Rule Eliminating the Flexibility That the 150% Rule Offered, Without a Reasoned Justification .........................................4

III.    Cortiva and Its Students, as Well as Similarly Situated Career Schools and Students, Will Be Harmed If the Bare Minimum Rule Goes Into Effect on July 1, 2024 .........................5

ARGUMENT ....................................................................................................................8

I.    Plaintiffs Are Entitled to a Temporary Restraining Order and Preliminary Injunction.......8

    A.    Plaintiffs Are Likely to Succeed on the Merits of Their Statutory and Administrative Procedure Act Claims ...................................................................9

        1.    Plaintiffs Are Likely to Succeed on Their Claim That the Department Exceeded Its Statutory Authority (Count I)...................................9

        2.    Plaintiffs Are Likely to Succeed on Their Claim That the Bare Minimum Rule Is Arbitrary and Capricious (Count II)...............................................11

        3.    Plaintiffs Are Likely to Succeed on Their Claim That the Bare Minimum Rule Violates the APA Because It Is Not a Logical Outgrowth of the Proposed Rule (Count III).........................................................................19

    B.    Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury ............................22

    C.    The Balance of the Equities and Public Interest Favor an Injunction....................23

    D.    The Bond Requirement Should Be Waived..........................................................24

II.    The Court Should Alternatively Delay the Effective Date of the Bare Minimum Rule under 5 U.S.C. § 705.............................................................................................................24

CONCLUSION..................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
   78 F.4th 210 (5th Cir. 2023) ............................................................... 11, 25

*Allina Health Services v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ................................................................. 20

*American Iron and Steel Institute v. EPA*,
   568 F.2d 284 (3d Cir. 1977).................................................................... 20

*Broadspire Servs., Inc. v. Wells*,
   No. 1:22-CV-163-H, 2022 WL 18587853 (N.D. Tex. Nov. 3, 2022) ........................ 1

*Chamber of Comm. v. Dep't of Lab.*,
   885 F.3d 360 (5th Cir. 2019) ................................................................... 12

*Costa v. Bazron*,
   456 F. Supp. 3d 126 (D.D.C. 2020) .............................................................. 8

*Daimler Trucks N. Am. LLC v. EPA*,
   737 F.3d 95 (D.C. Cir. 2013) ................................................................... 20

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
   710 F.3d 579 (5th Cir. 2013) ................................................................ 2, 23

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   591 U.S. 1 (2020)............................................................................ 11–12

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016).......................................................................... 15, 19

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009).......................................................................... 14–15

*F.C.C. v. Prometheus Radio Project*,
   592 U.S. 414 (2021)............................................................................ 12

*Greer's Ranch Cafe v. Guzman*,
   540 F. Supp. 3d 638 (N.D. Tex. 2021) ........................................................ 24

*Kaepa, Inc. v. Achilles Corp.*,
   76 F.3d 624 (5th Cir. 1996) ................................................................... 24

*Lee v. Verizon Commc'ns Inc.*,
  No. 3:12-CV-4834-D, 2012 WL 6089041 (N.D. Tex. Dec. 7, 2012) ........................................ 8

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007) ................................................................................................ 19–20

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.*,
  760 F.2d 618 (5th Cir. 1985) ................................................................................................ 8

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ........................................................................................ 1, 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) .................................................................................................... 12

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) .................................................................................................... 15

*Netflix, Inc. v. Babin*,
  88 F.4th 1080 (5th Cir. 2023) ................................................................................................ 8

*Nken v. Holder*,
  556 U.S. 418 (2009) .............................................................................................. 8, 24

*Rest. L. Ctr. v. United States Dep't of Lab.*,
  66 F.4th 593 (5th Cir. 2023) .................................................................................... 23

*Shell Oil Co. v. EPA*,
  950 F.2d 741 (D.C. Cir. 1991) .................................................................................... 20

*Sw. Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) .................................................................................... 12

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) .............................................................................. 23, 25

*United States v. Texas*,
  97 F.4th 268 (5th Cir. 2024) ........................................................................................ 2

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
  985 F.3d 472 (5th Cir. 2021) .................................................................................... 12

*Wages & White Lion Invs., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) .................................................................................... 12

*Winter v. Nat. Resources Defense Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................................ 8

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................ 22

**Statutes**

5 U.S.C. § 552 .......................................................................................... 20

5 U.S.C. § 553 .......................................................................................... 20

5 U.S.C. § 705 .................................................................................. 1, 2, 24

5 U.S.C. § 706 ................................................................ 1, 9, 11–12, 19

20 U.S.C. § 1088 ........................................................................................ 3

20 U.S.C. § 1099c-1 ..................................................................... 10–11, 21

20 U.S.C. § 1232a ...................................................................................... 9

20 U.S.C. § 3403 ................................................................................... 1, 9

Pub. L. No. 89-329, 79 Stat. 1219 (1965) ................................................ 3

Pub. L. No. 90-575, 82 Stat. 1014 (1968) ................................................ 3

Cal. Bus. & Prof. Code §7362.5 ............................................................. 15

Neb. Rev. St. §§ 38-1710 ........................................................................ 15

8 NYCRR 52.15 ....................................................................................... 15

19 NYCRR 162.4 ..................................................................................... 15

Utah Code Ann. § 58-11a-302 ................................................................ 15

W. Va. Code, § 30-27-3 .......................................................................... 15

**Rules**

34 C.F.R. § 668.14(b)(26)(ii) (effective July 1, 2024) ................................ 14

34 C.F.R. § 668.14(b)(26)(ii)(A) .......................................................... 4, 10

U.S. Department of Education, *Student Assistance General Provisions and Federal Pell Grant Program*, 59 Fed. Reg. 9,526 (Feb. 28, 1994) .................................................................. 3

U.S. Department of Education, *Student Assistance General Provisions; Federal Family Education Loan Programs; Federal Pell Grant Program*, 59 Fed. Reg. 22,387 (Apr. 29, 1994) .................................................................................................................... 3

U.S. Department of Education, *Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB)*, 88 Fed. Reg. 32,300 (May 19, 2023) .................................................................. 4

U.S. Department of Education, *Financial Responsibility, Administrative Capability, Certification Procedures, Ability To Benefit (ATB)*, 88 Fed. Reg. 74,568 (Oct. 31, 2023) ................................................................................ 4–5, 11, 13, 16–18, 21

U.S. Department of Education, Federal Student Aid, "Implementation of Program Length Restrictions for Gainful Employment (GE) Programs," GEN-24-06 (April 15, 2024)........... 14

240 CMR 2.01..................................................................................................................... 15

D.C. Mun. Regs. tit. 17 § 5608 ........................................................................................... 10

NH ADC Nur 602.12 ........................................................................................................... 10

8 NY ADC 52.12 .................................................................................................................. 10

16 Tex. Admin. Code § 117.40 ............................................................................................ 6

16 Tex. Admin. Code § 83.202 ........................................................................................... 15

Vt. Admin. Code 20-4-300:5-2 ........................................................................................... 15

**Other Sources**

Kaila M. Simpson, et al.,
"Examination of Cosmetology Licensing Issues," American Institutes for Research, August 30, 2016 (the "Simpson Study") ................................................................................. 18

Nicolas Acevedo et al.,
"Occupational Licensing and Student Outcomes," *Postsecondary Equity & Economics Project*, February 2022 (the "Acevedo Study")........................................................ 17

Spiros Protopsaltis & Sharon Parrot,
*Pell Grants – a Key Tool for Expanding College Access and Economic Opportunity – Need Strengthening, Not Cuts* (July 27, 2017)................................................................. 6

Stephanie Riegg Cellini and Kathryn J. Blanchard,
"Quick College Credentials: Student Outcomes and Accountability Policy for Short-Term Programs," *Brookings Institute*, July 22, 2021 (the "Cellini Study")....................... 18

## INTRODUCTION

The U.S. Department of Education's "Bare Minimum Rule"—which restricts federal student aid to only career programs providing the bare minimum hours a State requires for licensure in a given field—is substantively and procedurally invalid. And if it goes into effect on its **Effective Date of July 1, 2024**, it will have immediate and irreparable consequences for Plaintiff Cortiva, for members of Plaintiff The Coalition for Career Schools, and for countless others around the country. The Court should thus provide prompt preliminary relief, in the form of a temporary restraining order and/or preliminary injunction, to prevent those irreparable harms and preserve the *status quo ante* while this litigation plays out. Alternatively, the Court may simply delay the Effective Date. *See* 5 U.S.C. § 705.

Plaintiffs readily meet the prerequisites for preliminary relief:

***First***, Plaintiffs are likely to succeed on their claims that the Bare Minimum Rule is substantively and procedurally invalid. Plaintiffs need to show a likelihood of succeeding only on *one* claim, *see, e.g.*, *Broadspire Servs., Inc. v. Wells*, No. 1:22-CV-163-H, 2022 WL 18587853, at *4 (N.D. Tex. Nov. 3, 2022), but Plaintiffs' three main claims are all strong and likely to succeed:

(a)    the Bare Minimum Rule exceeds the Department's statutory authority, *see* 5 U.S.C. § 706(2)(C), because the Higher Education Act of 1965, as amended, ("HEA") does not allow the Department "to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system" absent express authority, 20 U.S.C. § 3403(b);

(b)    the Bare Minimum Rule is arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A), because the Department failed to address meaningful comments, failed to explain changes to a long-standing regime, and ultimately adopted an irrational rule; and

(c)    the Bare Minimum Rule is procedurally invalid, *see* 5 U.S.C. § 706(2)(D), because it was not a "logical outgrowth" of the Proposed Rule, *Mock v. Garland*, 75 F.4th 563, 584 (5th Cir. 2023), thereby depriving Plaintiffs and the public at large a meaningful opportunity to participate in the rulemaking.

1

***Second***, Plaintiffs will suffer irreparable harm absent preliminary relief, as will countless other career schools, their students, their communities, and the workforce. This ill-conceived rule will have dramatic and perverse consequences, including pressuring students to forgo favorable Pell Grants for less favorable loans. For schools, it will immediately affect course design and enrollment and threatens longer-term effects that undermine the viability of some programs altogether. None of those harms can be unwound if the Court later invalidates the rule.

***Third***, the balance of the equities and the public interest also favor preliminary relief. Where, as here, the Federal Government is the defendant, those two factors merge, *see United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024), and the Fifth Circuit has made clear that "the public is served when the law is followed," *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). Thus, if the Court agrees that Plaintiffs are likely to succeed on the merits and that the Bare Minimum Rule will cause irreparable harm absent preliminary relief, then the last two pieces fall easily into place.

Plaintiffs raise two additional house-keeping notes: (a) the Court should waive the requirement of a surety bond under Rule 65; and (b) as an alternative to an injunction, the Court has clear authority to stay the Effective Date of the Bare Minimum Rule. *See* 5 U.S.C. § 705.

The Court should enjoin Defendants from implementing the Bare Minimum Rule, or in the alternative, should delay the Effective Date pending the outcome of this litigation.

## BACKGROUND

I.   **Under the Current, Longstanding 150% Rule, Career Schools Have Flexibility in the Length of Programs They Offer Students on Federal Student Aid**

Since its introduction in 1965 and throughout its many renditions, the HEA has specifically provided a method for federal funding for students to attend either nonprofit institutions to pursue bachelor's degrees or proprietary programs that provide at least one year of education to prepare

students for employment.[1] Consistent with its congressional mandate to fund proprietary schools and their gainful employment programs, the Department proposed the 150% Rule on February 28, 1994, to allow flexibility for schools, States, and accreditors to decide the length of training to best prepare students while curbing perceived abuses. *See* 59 Fed. Reg. 9,526, 9,546–47. The 1994 proposal applied only to *clock hour* (not credit hour) programs[2] and stated that the Department found the relationship between the length of the program and entry level requirements for the recognized occupation was "reasonable if the number of clock hours provided in the program does not exceed by more than 50 percent the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student, as established by the State in which the program is offered, if the State has established such a requirement." *Id.* at 9,571.

The Department promulgated this regulation—which became known as the 150% Rule—without change from the proposed rule. *See* 59 Fed. Reg. 22,387, 22,427. In response to comments, the Department explained that the purpose behind the provision was to "curb existing abuses" by institutions and to "specifically target areas of past abuse." *Id.* at 22,387. The behavior that the Department was referencing has come to be known as "course stretching." *Id.* at 22,366. The Department questioned the "motives" of any institution, claiming it is necessary to "greatly exceed" the minimum number of clock hours required by a State. *Id.* at 22,387. The 150% Rule

---

[1] *See* Pub. L. No. 89-329, 79 Stat. 1219, 1248, § 435(a) (1965) (defining "eligible institutions" as nonprofit or public institutions that provide educational programs for bachelor's degrees and as "any school which provides not less than a one-year program of training to prepare students for gainful employment in a recognized occupation"); Pub. L. No. 90-575, 82 Stat. 1014, 1023 (1968) (establishing that "vocational school[s]" qualify as eligible institutions under the HEA); 20 U.S.C. § 1088(b)–(c) (1994) (providing that "proprietary institutions of higher education" and "postsecondary vocational institutions" can receive federal funding for career education).

[2] Clock hour programs refer to programs that count the actual hours students spend attending class or engaging in other instructional activities. Credit hours refer to the number of credits a student receives for enrolling in and successfully completing a given course.

clearly established 150% of minimum hours as a reasonable length that does not "greatly exceed" those standards. The 150% Rule is currently codified at 34 C.F.R. § 668.14(b)(26)(ii)(A).

## II.    The Department Has Adopted a New Bare Minimum Rule Eliminating the Flexibility That the 150% Rule Offered, Without a Reasoned Justification

Without any evidence that the 150% Rule was no longer working, on May 19, 2023, the Department published a Notice of Proposed Rulemaking ("Proposed Rule") that—among five other major topics in a 212-page document—included proposed changes to 34 C.F.R. § 668.14(b)(26)(ii)(A). The Department stated that it planned to amend the 150% Rule

> to limit the number of hours in a gainful employment program to ***the greater of*** the required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement, ***or*** as established by any Federal agency or the institution's accrediting agency.

88 Fed. Reg. 32,300, 32,320 (emphasis added). The Department added that "[l]onger programs . . . are more likely to result in higher debt and a longer period of enrollment without requisite career benefits." *Id.* at 32,381. And it asserted that "current regulations . . . have led to situations where institutions have offered more hours than were necessary for a student to become licensed in the State where the institution was located." *Id.* at 32,382.

Despite the massive scope of the Proposed Rule, the Department refused to extend the period for comment beyond 30 days. Instead, on October 31, 2023, the Department published a Final Rule that inverted State minimums into maximums. *See* 88 Fed. Reg. 74,568 (the "Bare Minimum Rule"). The Bare Minimum Rule requires career schools to

> [d]emonstrate a reasonable relationship between the length of the program and the entry level requirements for the recognized occupation for which the program prepares the student by limiting the number of hours in the program to the greater of . . . [t]he required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation for which the program prepares the student, as established by the State in which the institution is located, if the State has established such a requirement or as established by any Federal agency.

4

*Id.* at 74,697.

To justify the change to the 150% Rule, the Department stated that, even though it had long given "latitude for institutions to provide quality programs and furnishes a sufficient safeguard against the abuses of course stretching," any hours beyond the bare minimum require students and taxpayers to pay a substantial amount "for training that is not necessary to obtain employment." *Id.* at 74,638. In response to commenters' concerns about limiting educational opportunities and failing fully to prepare students for the workforce, the Department cited three studies discussed *infra*. It claimed these studies show that programs that are unnecessarily long may interfere with a student's ability to persist and complete, may cost more in tuition but not lead to higher wages, and delay the student's entry into the workforce. None of those studies related to the 150% Rule or analyzed whether it was wise to overhaul federal student aid for career education by turning State minimum licensure requirements into maximum course lengths. *Id.* at 74,639. In response to comments that additional hours beyond state minimums are "critical for success," the Department curtly suggested that was not their problem; commenters should approach their States about revising the program length requirements or offer the coursework outside of the Title IV, HEA programs, which receive federal student aid. *Id.* at 74,641.

The Department recognized the Bare Minimum Rule's impact and stated its intent fundamentally to change career programs by preventing the use of federal student aid for any part of a program that was longer than a State's requirement. *Id.* at 74,637. Yet, it simultaneously denied it was "dictating the length of a particular program[] or its curriculum." *Id.*

### III. Cortiva and Its Students, as Well as Similarly Situated Career Schools and Students, Will Be Harmed If the Bare Minimum Rule Goes Into Effect on July 1, 2024

Cortiva trains students in a variety of careers and assists them to become licensed practitioners in the health, beauty, and wellness industries. The various Cortiva entities operate a

total of seven schools across five states, including a school located in Arlington, Texas, that will be severely impacted by the Bare Minimum Rule. Among other programs, Cortiva's Arlington campus operates a Professional Massage Therapy Program ("PMT Program") that is eligible for federal funds under Title IV of the HEA.

Cortiva's student body is mostly female (72%) and very diverse (64% of its students are Black or African American, and 19% are Hispanic). Ex. A (Heller Decl.) ¶ 11. Cortiva's students currently can accept Pell Grants (which need not be repaid and are reserved for the financial neediest students) because Cortiva's program is at least 600 clock hours. *See* 20 U.S.C. § 1088(b). Indeed, 84.6% of Cortiva's Arlington campus active students currently receive Pell Grants. But with the Bare Minimum Rule's changes, those students will no longer be able to receive those Grants because Texas's minimum requirements for licensed massage therapists is 500 hours. Ex. A (Heller Decl.) ¶ 10; *see also* 16 Tex. Admin. Code § 117.40. The inevitable result of the Bare Minimum Rule will be either (a) those students are forced to find different (and less beneficial) types of loans[3] or (b) Cortiva will have to ultimately shut its doors. Closure would result in hundreds of fewer jobs created every year in Texas and approximately 15 lost jobs at Cortiva.

Other career schools, including members of Plaintiff The Coalition for Career Schools,[4] will also be adversely affected. Bellus Academy, a coalition member that operates schools in

---

[3] *See, e.g.*, Spiros Protopsaltis & Sharon Parrot, *Pell Grants – a Key Tool for Expanding College Access and Economic Opportunity – Need Strengthening, Not Cuts* (July 27, 2017), https://www.cbpp.org/research/pell-grants-a-key-tool-for-expanding-college-access-and-economic-opportunity-need (explaining that Pell Grants are among the best tools to help low-income populations have access to education and have better economic opportunities).

[4] Plaintiff The Coalition for Career Schools is a coalition of career schools that offer gainful employment programs and companies that conduct business with career schools. Because of the Department's sudden implementation of the Bare Minimum Rule, members of Plaintiff Coalition for Career Schools are now required to either dilute their programs so students are not as prepared to operate in their respective careers or ask students to finance their degrees through means less advantageous to the students than under the 150% Rule regime.

California and Kansas, will be forced to eliminate some programs altogether, lose Pell Grant eligibility for others, and forego the opportunity for international certification for students who are military spouses and serve abroad.  Ex. B (Lynch Decl.) ¶¶ 8–11, 16–18.

Even the California Board of Vocational Nursing and Psychiatric Technicians wrote a March 14, 2024, letter to the Department, urging the Department to delay the implementation of the Bare Minimum Rule by at least 18 months. *See* Ex. C. As California explained:

> California law currently requires LVN [(licensed vocational nurse)] education programs under BVNPT to consist of no less than 1530 hours to cover required content. (Cal. Code Reg. ti. 16 § 2532, subd. (a).) BVNPT currently oversees 168 LVN education programs, 133 of which currently require between 1550-1840 hours. The nearly 80 percent of programs that currently require more than 1530 hours would no longer be eligible for Title IV funding when 34 CFR 668.14(b)(26)(ii) is implemented.

*Id.* at 1. It went on to state that

> Unless the implementation of 34 CFR 668.14(b)(26)(ii) is delayed, California will likely experience negative impacts, such as:
>
> - The nursing shortage in the nation's most populous state would be exacerbated if the existing schools decide to not admit any new student cohorts until their program change applications are approved, potentially reducing the number of nursing students in the pipeline between July 1 and December 31 of this year by up to 4000.
>
> - Vocational nursing students may turn to riskier or less favorable means to finance their education if existing schools decide to continue enrolling students into programs that are no longer eligible for Title IV funding. The average tuition at the private programs ranges from $20,000 to $38,000 and more than half of the students depend on Title IV.

*Id.* at 2. The Bare Minimum Regulation will not aid the national nursing shortage.

Finally, companies like Pivot Point International, Inc. and Borboleta Beauty that collaborate with career schools will suffer as such companies will have fewer people to employ. Ex. D (Cyrenne Decl.) ¶¶ 6–11; Ex. E (Alexander Decl.) ¶¶ 3–11. For businesses like PPI and Borboleta, the education that career colleges provide is essential to their workforce.

## ARGUMENT

### I.    Plaintiffs Are Entitled to a Temporary Restraining Order and Preliminary Injunction

The Court should issue a preliminary injunction to prevent the Department from enforcing an unlawful and procedurally invalid rule to the detriment of Plaintiffs and other similarly situated career schools. A preliminary injunction will allow the Court to preserve the *status quo ante* for a limited time while rendering a meaningful decision on important statutory and APA challenges to the Bare Minimum Rule. *See Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 627 (5th Cir. 1985) ("The purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.").  A TRO "is analyzed using the same factors applicable to preliminary injunctive relief." *Costa v. Bazron*, 456 F. Supp. 3d 126, 133 (D.D.C. 2020) (cleaned up); *Lee v. Verizon Commc'ns Inc.*, No. 3:12-CV-4834-D, 2012 WL 6089041, at *1 n.2 (N.D. Tex. Dec. 7, 2012) ("[A] TRO is simply a highly accelerated and temporary form of preliminary injunctive relief, and requires plaintiffs to establish the same four elements . . ." (citation and internal quotation marks omitted)).

To obtain a TRO or preliminary injunction, Plaintiffs must demonstrate: (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm without an injunction; (3) the balance of equities favors issuing an injunction; and (4) it is in the public interest to issue the injunction. *Winter v. Nat. Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023). When the government is the defendant, the last two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining that "[t]he third and fourth factors . . . merge when the Government is the opposing party").

A.    **Plaintiffs Are Likely to Succeed on the Merits of Their Statutory and Administrative Procedure Act Claims**

Plaintiffs are likely to succeed on their claims that the Bare Minimum Rule exceeds the Department's statutory authority, is arbitrary and capricious, and is not a logical outgrowth of the proposed rule.  Plaintiffs need a likelihood of success on only one of these three claims.

1.    **Plaintiffs Are Likely to Succeed on Their Claim that the Department Exceeded Its Statutory Authority (Count I)**

Plaintiffs are likely to succeed on their claim that the Rule should be set aside and vacated under 5 U.S.C. § 706(2)(C) because the Department overreached by unlawfully exercising direction, supervision, or control over curriculum, programs of instruction, and administration.

The HEA expressly provides that the Department lacks authority

to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, over any accrediting agency or association, or over the selection or content of library resources, textbooks, or other instructional materials by any educational institution or school system, ***except to the extent authorized by law***.

20 U.S.C. § 3403(b) (emphasis added).  Congress's stated intention was "to protect the rights of State and local governments and public and private educational institutions in the areas of educational policies" and to "not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the States." 20 U.S.C. § 3403(a); *see also* 20 U.S.C. § 1232a (prohibiting interpreting any federal law to allow federal "direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system").

As commenters noted, the Bare Minimum Rule contradicts this limitation by setting a maximum program length, which effectively directs, supervises, and controls the curriculum,

9

program of instruction, or administration of educational institutions.[5] A school's program will not qualify to receive any federal student aid under Title IV unless the program is the bare minimum length for state licensure with respect to an occupation. Students who enroll in any gainful employment program longer than the bare minimum length on or after July 1, 2024, will lose access to *any* federal student aid.

Although federal law includes an exception to § 3403(b) for "[s]ecretarial determinations made regarding the appropriate length of instruction for programs measured in clock hours," 20 U.S.C. § 1099c-1(e), the Bare Minimum Rule is not such a determination. It applies to *all* gainful employment programs, whether they are measured in clock hours, credit hours, or any other measurement.[6] Specifically, the Bare Minimum Rule limits federal student aid to "[t]he required minimum number of clock hours, credit hours, or the equivalent required for training in the recognized occupation . . . as established by the State in which the institution is located . . . ." 34 C.F.R. § 668.14(b)(26)(ii)(A) (effective July 1, 2024). Some gainful employment programs like Cortiva's PMT Program use credit hours, not clock hours.[7] The Bare Minimum Rule, however, applies to these credit hour programs in violation of the statutory prohibition in § 3403(b).

---

[5] *See* CECU Public Comment submission to Docket ID ED-2023-OPE-0089 at 79; Bellus Academy Public Comment submission to Docket ID ED-2023-OPE-0089 at 6. The full docket for the Final Rule, including the comments submitted during the rulemaking process, is available at https://www.regulations.gov/docket/ED-2023-OPE-0089.

[6] The rule would also result in significant confusion as some states do not use "credit hours" or "clock hours" in their requirements. For example, the Final Rule would apply to New York's registered professional nurse or licensed practical nurse requirements for "30 semester hours." 8 NY ADC 52.12(b)(1)(i). Similarly, under the Final Rule, practical nursing programs in the District of Columbia would be subject to a minimum of "six hundred (600) clinical hours." D.C. Mun. Regs. tit. 17 § 5608. New Hampshire would be subject to the state's minimum of "600 hours of nursing classroom instruction." NH ADC Nur 602.12(c).

[7] Other credit hour programs include Elgin Community College (Illinois)'s "Massage Therapy Vocational Specialist" certificate program which requires a minimum of 38.5 credit hours, https://catalog.elgin.edu/degree-programs-certificates/career-technical/career-technical-degrees-certificates/massage-therapy/#certificatestext; and Maricopa Community Colleges (Arizona)'s

The Department also never relied on § 1099c-1(e)'s clock-hour authority to justify the Bare Minimum Rule. It is well-established that "[a]n agency must defend its actions based on the reasons it gave when it acted." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 24 (2020); *see also All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 257 (5th Cir.) (Ho, J., concurring in part) ("[E]stablished precedent requires us to review [an agency's] action based on the path it took—not the path it might have taken."). Here, the Department never cited § 1099c-1(e) in the Notice of Proposed Rulemaking and did not request any comments on whether it could impose a bare-minimum restriction on clock hour programs under § 1099c-1(e). And while the Department cited § 1099c-1(e) in the Final Rule, it did so only in the context of responding to a comment about a different issue—not in providing the statutory justification on which it relied for the Bare Minimum Rule. *See* 88 Fed. Reg. at 74,577. There is thus no basis to conclude that the Bare Minimum Rule is justified by § 1099c-1(e), which the Department did not rely on and which does not justify the rule as written in any event. Even if that stray reference counted as justifying the rule, that would simply reinforce that the Department failed to provide Plaintiffs and other interested parties adequate notice to allow for meaningful comment and is thus precluded from enforcing a Final Rule that does not represent a "logical outgrowth" of the Proposed Rule. *Mock*, 75 F.4th at 584.

### 2. Plaintiffs Are Likely to Succeed on Their Claim That the Bare Minimum Rule Is Arbitrary and Capricious (Count II)

Plaintiffs are likely to succeed on their claim that the Bare Minimum Rule should be set aside under 5 U.S.C. § 706(2)(A) because the rule is arbitrary and capricious in at least three ways: (1) it fails to justify turning State *minimums* into *maximum* requirements; (2) it turns a safe harbor

---

"Certificate in Completion in Massage Therapy" which requires the completion of 36-40 credit hours, https://www.maricopa.edu/degrees-certificates/health-sciences/massage-therapy-5144-ccl.

into a strict-liability trap; and (3) it provides no reasoned justification for regulatory changes to the longstanding 150% Rule, which has been in place for 30 years.

The APA provides that courts shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). Agency action thus must "be reasonable and reasonably explained." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). That standard is "searching and careful," *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (citation omitted), and has "serious bite," *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation omitted); *see also DHS v. Regents*, 591 U.S. at 33 (agency acted arbitrary and capriciously when it did not properly "assess whether there were reliance interests, determine whether they were significant, [or] weigh any such interests against competing policy concerns"). Thus, "[i]llogic and internal inconsistency," *Chamber of Comm. v. Dep't of Lab.*, 885 F.3d 360, 382 (5th Cir. 2019), or "shortcomings in the agency's explanations" doom the agency action, *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014, 1018 (5th Cir. 2019).

*First*, the Bare Minimum Rule is arbitrary and capricious because the Department failed to justify the reasonableness of pegging the *maximum* hours for a program to the state-law *minimum*. The Bare Minimum Rule dictates that, for educational programs measured in clock hours, credit hours, or the equivalent, the State's minimum hour requirement is now the maximum length for federal student aid without explanation. States appropriately exercise authority to set program length requirements for gainful employment programs by setting minimum requirements. States enacted their minimum licensure requirements while the 150% Rule was in effect, and their

12

legislatures certainly had no occasion to believe the Federal Government would treat those *minimum* licensure requirements as *maximums*. States set minimums out of concern that programs for certain occupations are not long enough—not that they are too long. States certainly have the *authority* to set a maximum program length, but they have not used it. Nor have they given any indication that the Federal Government should construe their minimums as maximums.[8]

Commenters raised concerns about looking to state minimums, but the Department gave them short shrift. The Department advised schools to contact their State legislatures or "offer the coursework outside of the Title IV, HEA programs." 88 Fed. Reg. at 74,641. Another commenter raised concerns that State regulators move too slowly to respond to the rule change, but the Department said it "cannot speculate on how quickly or slowly" licensure requirements are updated, plus the rule would not take effect for 7 months after publication. *Id.* These responses— essentially, "go away and leave us alone"—are the definition of arbitrary and capricious. The Department is willfully choosing not to address legitimate concerns. The legislatures in States like Montana, Nevada, North Dakota, and Texas hold session only every other year, meaning some States will not be able to change their minimum hour requirements for gainful employment programs until at least 2025.

Indeed, the Department's willingness to create arbitrary carve-outs—for distance education programs, correspondence courses, and certain nursing programs that require a degree—shows that the Department is not genuinely concerned about student debt or the "excessive length" of programs. Indeed, distance education programs can, by the Department's own logic, continue to provide programs that are too long, too expensive, and lead to too much student debt. And the

---

[8] *See* CECU Public Comment submission to Docket ID ED-2023-OPE-0089 at 79.

Department appears to be perfectly fine with that. Yet, it has not treated gainful employment programs equally or explained why it won't.

***Second***, the Department acted arbitrarily and capriciously by converting a program intended to be a safe-harbor into a strict-liability trap. The Department stated that the Bare Minimum Rule provides a safe harbor for an educational institution to "[d]emonstrate a reasonable relationship between the length of the program and the entry level requirements for the recognized occupation for which the program prepares the student by limiting the number of hours in the program to" a certain prescribed length. 34 C.F.R. § 668.14(b)(26)(ii) (effective July 1, 2024). The Bare Minimum Rule, however, imposes an *absolute maximum* for program length. Specifically, the Department has since made clear that "[a]pplicable GE programs that exceed these length restrictions *by any amount* are ineligible *in their entirety* to participate in the Title IV programs."[9] The Department does not explain how it is reasonable to exclude a gainful employment program that exceeds a State's minimum even by one hour from access to federal student aid. That is quintessentially arbitrary.

***Third***, the Department nowhere provided a reasoned justification for regulatory changes to the longstanding 150% Rule, which has been in place for 30 years. An agency is required to "provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position," and "of course the agency must show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). That hurdle is higher when a longstanding policy "engendered serious reliance interests that must be taken into

---

[9] Federal Student Aid, "Implementation of Program Length Restrictions for Gainful Employment (GE) Programs," GEN-24-06 (April 15, 2024), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2024-04-15/implementation-program-length-restrictions-gainful-employment-ge-programs (emphasis added).

account." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *Fox*, 556 U.S. at 515). "[A]n 'unexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice,'" *id.* (quoting *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

The Bare Minimum Rule results in additional not less debt for students. The "Department issued final regulations related to certification procedures for institutions participating in the Title IV, HEA programs to provide important protections for students to ensure that their programs do not result in unnecessary debt and can meet their educational goals." GEN-24-03, n.9 *supra*. Ironically, the April 15 Guidance acknowledges that "in some cases a GE program will no longer qualify for Federal Pell Grant eligibility and will need to satisfy placement and completion rate requirements in order to qualify for participation in the William D. Ford Direct Loan program." *Id*. Contrary to the Department's goals to prevent unnecessary debt, the Department concedes that the Bare Minimum Rule will require students who are otherwise qualified for Pell Grants to take out loans and go into debt because programs, like Cortiva's PMT Program, will be required to be 100 hours less than the threshold for Pell Grant eligibility.

The 150% Rule took into account disparities among States' minimum requirements. For example, 300 hours of training are required to become licensed as a massage therapist in Utah, whereas 1,000 hours are required in Nebraska and New York.[10] Similarly, 1,800 hours of training are required to become licensed as a cosmetologist in West Virginia,[11] whereas 1,000 hours are required in Vermont, Texas, Rhode Island, New York, Massachusetts, and California.[12]    If

---

[10] *See* Utah Code Ann. § 58-11a-302(4)(a)(iv); Neb. Rev. St. §§ 38-1710, 1703; 8 NYCRR 52.15(b).
[11] *See* W. Va. Code, § 30-27-3(l).
[12] *See* Vt. Admin. Code 20-4-300:5-2(b); 16 Tex. Admin. Code § 83.202(a); 19 NYCRR 162.4(a); 240 CMR 2.01(1); Cal. Bus. & Prof. Code §7362.5(a).

institutions in States offered programs up to 150% more than the State minimum, then a student may more easily satisfy the requirements of a different State. The 150% Rule allowed students in various states to more easily transfer their skills and continue their occupations in other States and thus to level the "playing field," as Cortiva Institute noted in its public comment.[13]

Over the 30 years since enactment, the 150% Rule has given rise to substantial reliance interests—for institutions, for States, for students, and for employers who hire students from these programs. And in light of that reliance upon a decades-old rule, the Department's short justification for the change is simply inadequate. The Department's stated reason for the change proceeds essentially as follows: the Department is protecting students from being charged for unnecessary training, *see* 88 Fed. Reg. at 74,636; training over the statutory minimum is necessarily deemed "unnecessary" by the Defendants, *see id.* at. 74,640; therefore, no participation should be permitted for programs over a State's statutory minimum, *see id*. By the Department's logic, States, through the promulgation of clock hour minimum requirements, intend to establish that the bare minimum is all the training that students could or should receive, not only to be eligible for licensure, but to be successful in their career.

There are two major issues with this conclusion: *First*, the 150% Rule was created in 1994. Many state licensure requirements have been either created or modified in the last 30 years. As stated above, the legislatures would have been aware of the 150% Rule and created their minimums with the 150% Rule in mind. *Second*, certain public commenters[14] argued that, by setting minimum

---

[13] In Cortiva's Public Comment submission to Docket ID ED-2023-OPE-0089, Cortiva focused on the impact of the Final Rule on the Florida-based school. The comment suggested that, based on Cortiva's understanding of the Proposed Rule, the Texas-based school would not be. However, after subsequent research and additional consideration in light of the Final Rule, Plaintiff is now aware that, in fact, the Bare Minimum Rule will have significant effects on the Texas-based school.
[14] *See* CECU Public Comment submission to Docket ID ED-2023-OPE-0089 at 79; Thompson Coburn Public Comment submission to Docket ID ED-2023-OPE-0089.

requirements, States indicated their primary concern is that career programs were not long enough and that, if a State thought a program was too long, it could set a maximum length in its reasonable discretion.[15] The Department did not directly or meaningfully respond.

Instead of addressing comments from Cortiva and others, the Department repeatedly claimed that programs are "unnecessarily long" and that they "may interfere" with students' ability "to persist and complete" their programs. 88 Fed. Reg. at 74,639. But the Department provided no support for these *ipse dixit* assertions. Similarly, the Department stated that programs longer than the State minimum licensing requirements "may have engaged in course stretching." *Id.* at 74,640. But again, the Department provides no support for that obvious bit of speculation.

The Department cited three studies, but none relates to the 150% Rule or demonstrates that programs exceeding State minimum requirements harm students.

1. The Department cited Nicolas Acevedo et al., "Occupational Licensing and Student Outcomes," *Postsecondary Equity & Economics Project*, February 2022 (the "Acevedo Study") for the allegation that there is a "lack of any correlation" between setting higher hours requirements in massage therapy or cosmetology and increased wages. *See* 88 Fed. Reg. 74,639. But that study took an "average wage" for all individuals in the given occupation; did not control for several factors, including location of employment and whether the persons worked part-time or full-time; and did not distinguish between different ages and experience levels. The Acevedo Study also made clear that it could not make any conclusion on causal relationships "and more research is

---

[15] "Indeed, certain States have exercised their authority to set program length requirements for career programs by setting **minimum** requirements. This shows both that States have this authority, and their primary concerns is that career programs are not long enough. Should a State have concerns that a particular program or too long, it could set a maximum length in its reasonable discretion." CECU Public Comment submission to Docket ID ED-2023-OPE-0089 at 79 (emphasis in original); *see also* Thompson Coburn Public Comment submission to Docket ID ED-2023-OPE-0089.

needed to explore the causal relationship between licensing hours and student outcomes." It did not examine whether programs in certain States that had higher numbers of hours than the minimum did better than programs that were set at the minimum. Instead, the Acevedo Study critiqued States with longer hours requirements without examining whether students trained in those States fared better than students in programs with only the minimum hours in other States. At best, the Acevedo study is a call for further study.

2. The Department cited Kaila M. Simpson, et al., "Examination of Cosmetology Licensing Issues," American Institutes for Research, August 30, 2016 (the "Simpson Study") to demonstrate a lack of correlation between curriculum hours and wages or training hours and safety/complaints. *See* 88 Fed. Reg. at 74,639. But the Simpson Study acknowledges that its wage data was unreliable: "[T]here are two primary limitations to these data: (1) the data reported incorporate reported hourly wage information, which excludes data on tips—a significant source of income for those in the service industry; and (2) wage estimates are for wage and salary workers only, which excludes self-employed persons." Those are gaping holes. The Simpson Study also acknowledges that its data was unreliable due to "extensive limitations in the available unemployment data for the cosmetology profession" and that its conclusion was of limited value because it had to collect and rely on anecdotal evidence rather than data which "limited" its conclusions' "usefulness." That is no basis to upend 30 years of regulatory certainty.

3. The Department cited Stephanie Riegg Cellini and Kathryn J. Blanchard, "Quick College Credentials: Student Outcomes and Accountability Policy for Short-Term Programs," *Brookings Institute*, July 22, 2021 (the "Cellini Study")[16] for the proposition that  programs with "lower training requirements . . . tend to result in lower earnings . . . which means spending an additional

---

[16] The Cellini Study was completed by two of the same authors of the Acevedo Study.

few hundred or thousand dollars to attend an unnecessarily long program may be the difference between a positive and negative return on investment." 88 Fed. Reg. 74,639. While the Cellini Study concludes that lower training requirements means lower earnings, the Department's extrapolation that additional hours could result in a negative return on investment ("ROI") appears nowhere in the study and is pure speculation by the Department. Further, the Cellini Study did not control for full- versus part-time work. The Bare Minimum Rule is also flatly contrary to the conclusion of the Cellini Study: that federal student aid should not be used for lower hour programs, not that it should be available *only* for the bare minimum.

None of these studies comes close to justifying the nullification of a 30-year-old rule on which career schools have reasonably relied. When a long-standing rule is subject to a challenge, the agency must provide a "more reasoned explanation" for "why it deemed it necessary to overrule its previous position." *Encino Motorcars*, 579 U.S. at 222. The Bare Minimum Rule threatens, at a minimum, to disrupt career programs by forcing them to change their curricula in a matter of months absent State action. It also has the potential to wipe out entire schools because of this change, leaving potential students without a way to increase their income and communities without workers willing to operate in fields served by those schools.

Plaintiffs are thus likely to succeed on the merits of their claim that the Department acted arbitrarily and capriciously.

### 3.   Plaintiffs Are Likely to Succeed on Their Claim That the Bare Minimum Rule Violates the APA Because It Is Not a Logical Outgrowth of the Proposed Rule (Count III)

Plaintiffs are likely to succeed on their claim under 5 U.S.C. § 706(2)(D) because the Bare Minimum Rule does not reflect a "logical outgrowth" of the Proposed Rule and thus failed to provide the public with the "fair notice" the APA requires. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). Specifically, the Department did not signal that it might restrict

19

the availability of federal student aid based entirely on State requirements, since the Proposed Rule also provided a role for an institution's accreditor, and the Department never discussed a States-only alternative. That failure prevented Plaintiffs and other stakeholders from commenting on the negative implications of that choice in a meaningful way.

The APA requires agencies to give notice of proposed rulemakings to the public to allow for comments on the same. *See* 5 U.S.C. § 552(a)(1)(D) & (E) (requiring agencies to publish in the Federal Register substantive rules of general applicability adopted as authorized by law, and all amendments, revisions, or repeals). That publication must occur not less than 30 days before the rule is effective, and the agency must also provide notice about (1) what it proposes to do and (2) the bases for its proposed action. *See* 5 U.S.C. § 553(b).

Final rules that are not, at least, a "logical outgrowth" of the proposed rule fail to provide the public with "fair notice" of the rule that the APA requires.[17] Similarly, agencies cannot issue a final rule broader in scope than the proposed rule without notice, *see American Iron and Steel Institute v. EPA*, 568 F.2d 284, 291 (3d Cir. 1977) (holding a proposed rule did "not apprise an interested person" that the possible change to the rule would affect them), nor can an agency alter a rule's language without first telling the public, *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1106 (D.C. Cir. 2014) (holding final rule invalid after agency "announced a final rule adopting the exact opposite interpretation of [a] statute").

---

[17] *Long Island Care*, 551 U.S. at 174. Final rules cannot be the first opportunity for comments by the public, *see Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013) (holding that the EPA could not issue a final rule that contained significant changes not in the proposed rule), nor can the agency express its intent for the first time when issuing a final rule, *see Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991) ("[A]n unexpressed intention cannot convert a final rule into a 'logical outgrowth' that the public should have anticipated.").

In the Proposed Rule, the Department proposed that one of the standards for the required minimum hours would be the hours established by the institution's accreditor. Were that the standard, in some instances, the number of clock hours required for programs would exceed State minimum requirements, and many programs that are now in jeopardy may have been spared. Without explanation or notice, the Department removed the provision stating that it "would undercut the purpose of focusing on State requirements, as an accreditor could decide to simply set hour requirements higher than what a State deems necessary." *See* 88 Fed. Reg. at 74,637. Never mind that the Department never disclosed this "purpose" in the Proposed Rule. Public comments did not recommend removing this accreditor provision. Had the public been made aware that the Department would potentially remove the accreditor-related provision, public comment submissions would have addressed the serious problems with removing accreditors from the decision-making process. Notifying the public of this possibility also would have provided the opportunity for the public to provide information, data, and/or argument as to why the provision should not be removed from the Bare Minimum Rule.

That failure is fatal because accreditors are an important part of the regulatory triad, which includes States and the Department. The Department failed to signal it was considering removing one leg of the triad, accreditors, entirely from the process without adequate opportunity to comment on how that harms students, institutions, employers, and the general public. Thus, the Bare Minimum Rule is not a logical outgrowth of the Proposed Rule.

Separately, the Department never notified stakeholders in its proposed rule and request for comment that it might impose a restriction on clock hour programs based on § 1099c-1(e), as noted above. Thus, institutions like Cortiva or Bellus Academy did not have the opportunity to comment

on the Department's proposed imposing a restriction on clock hour programs. Thus, the Bare Minimum Rule violates the logical outgrowth doctrine.

### B.     Absent an Injunction, Plaintiffs Will Suffer Irreparable Injury

Plaintiffs are entitled to an injunction because they will suffer actual injury if the Court chooses not to issue a preliminary injunction. Students who enroll in Cortiva's PMT program on or after July 1, 2024, will lose access to Pell Grants, which do not need to be repaid, and instead will have to incur Direct Loans, which accrue interest at 5.5%. Ex. A (Heller Decl.) ¶¶ 26–27. Cortiva also will be required to cut hours from instrumental courses such as anatomy and physiology, professional ethics and business, and massage techniques education from clinical assessment and therapies and allied modalities. Ex. F (Black Decl.) ¶ 9. Finally, Cortiva has *already* lost access to G.I. Bill benefits and other veterans' education benefits as a result of the Bare Minimum Rule. Ex. G (Lezcano Decl.) ¶¶ 8–15. The Bare Minimum Rule has thus already harmed Cortiva and will "threaten[] the very existence of [Cortiva's] business." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Cortiva will likely need either to discontinue its PMT Program, which is its largest program, or to shut its doors in Arlington altogether if the Bare Minimum Rule goes into effect. This threatens both students' ability to obtain gainful employment and the interests of businesses in Texas that would otherwise hire Cortiva's students.

Still other schools such as Bellus Academy will be required to eliminate some of its programs completely, lose the opportunity for international certification for its students, including military spouses who work abroad serving the U.S., and will be left with "incredibly difficult choices to make for [its] students, staff, and operations if the Final Rule becomes effective on July 1, 2024." Ex. B (Lynch Decl.) ¶¶ 9–11, 21. Bellus Academy's staff already has spent approximately 445 hours in attempting to receive approvals for its programs to comply with the Final Rule and in preparing its catalogs, course materials, and curricula to comply with the Bare

Minimum Rule.  *See id.* ¶ 20. The nonrecoverable costs alone of "complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023); *see also Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022). The focus is on the irreparability of the injury, not the magnitude. *See Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016) (The key inquiry is "not so much the magnitude but the irreparability."). Even purely economic costs are irreparable when "they cannot be recovered in the ordinary course of litigation." *Id.* at 343 & n.41.

### C.    The Balance of the Equities and Public Interest Favor an Injunction

The balance of the equities and public interest merge here against the United States to favor issuing a preliminary injunction, since "the public is served when the law is followed." *Daniels Health Scis.*, 710 F.3d at 585.

Moreover, Plaintiffs have tried since October 31, 2023, to resolve issues concerning the Bare Minimum Rule with the Department and were promised long-awaited guidance that only confirmed the Department cannot evenhandedly enforce the Bare Minimum Rule on July 1, 2024, when it becomes effective.  The Department issued the April 9, 2024 Updates on New Regulatory Provisions Related to Certification Procedures and Ability-to-Benefit, which states:

> [I]nstitutions have expressed concern about their ability to seek and obtain approval from accrediting agencies and States to change the lengths of their GE programs in time to come into compliance with the regulations. Institutions have also expressed concern about their ability to determine the specific requirements for licensure in the States in which they operate and, in some cases, limit the States in which they operate in order to comply with requirements for programs to meet licensure and certification requirements in all States where an institution enrolls students. The Department has also heard concerns from State agencies about their ability to approve a substantial number of program changes in time for their institutions to be in compliance. Additionally, we are aware of challenges that institutions have experienced regarding access to and use of certain Department systems.
>
> The Department understands that there may be circumstances outside of an institution's control that prevent compliance with these new requirements

23

> by July 1, 2024. However, the Department believes that most of those
> concerns and challenges will have been resolved or sufficiently mitigated
> by January 1, 2025. The Department has enforcement discretion with
> respect to an institution's compliance with certain Title IV, HEA
> requirements. Given the concerns received from institutions and States,
> particularly for the period between July 1, 2024 and January 1, 2025, we
> will consider exercising this discretion before taking action regarding the
> provisions in 34 CFR 668.14(b)(26) and 34 CFR 668.14(b)(32).

GEN-24-03, n.9 *supra*. The Department knows schools cannot comply with the Bare Minimum

Rule due to circumstances out of their control. Without further explanation, the Department picks

an arbitrary date of January 1, 2025, and says it will "consider exercising" its enforcement

discretion until then. Schools like Cortiva and coalition members remain at the whim and mercy

of bureaucratic discretion. That is not adequate relief, but it shows that even the Department

recognizes that interim relief is necessary.

Further, the balance of the equities favors the *status quo*; preliminary relief will prevent

irreparable harm, without harming the Government, while the Court considers the lawfulness of

the Department's attempt to change the *status quo*. *See Nken*, 556 U.S. at 429.

### D.     The Bond Requirement Should Be Waived

The security requirement in Rule 65(c) is not appropriate in all cases, and the Court may

waive it. *See, e.g.*, *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). This Court has

found that, where there is no evidence that a defendant will suffer financial loss, there is no need

to post security. *See Greer's Ranch Cafe v. Guzman*, 540 F. Supp. 3d 638, 652 (N.D. Tex. 2021).

## II.    The Court Should Alternatively Delay the Effective Date of the Bare Minimum Rule under 5 U.S.C. § 705

The Court should issue preliminary injunctive relief to prevent the Department from

enforcing the Bare Minimum Rule. But if the Court does not, then it should, at a minimum, stay

the Bare Minimum Rule's Effective Date until this Court and the Fifth Circuit have the opportunity

to determine whether the rule is unlawful. 5 U.S.C. § 705 authorizes courts reviewing final rules

to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." The Fifth Circuit has endorsed a district court's staying a rule's effective date under § 705 as an alternate remedy to issuing a preliminary injunction. *See All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir.) (holding that a stay under § 705 is "an appropriate form of relief" because it is a "temporary form of vacatur" allowed under the APA);[18] *see also Texas v. EPA*, 829 F.3d at 435 (staying a final rule in its entirety pending the outcome of the petition for review). To give adequate time for this review, Plaintiffs request the Court to stay the effective date while the lawsuit is pending.

## **CONCLUSION**

The Court should grant Plaintiffs' Motion and preliminarily enjoin and enter a temporary restraining order preventing the Department from enforcing the Bare Minimum Rule. In the alternative, the Court should stay the effective date of the rule while the lawsuit is pending.

---

[18] *Cert. granted sub nom. Food & Drug Admin. v. All. for Hippocratic Med.*, 144 S. Ct. 537, 217 L. Ed. 2d 285 (2023), *and cert. granted sub nom. Danco Lab'ys, L.L.C. v. All. for Hippocratic Med.*, 144 S. Ct. 537, 217 L. Ed. 2d 285 (2023), *and cert. denied sub nom. All. for Hippocratic Med. v. Food & Drug Admin.*, 144 S. Ct. 537, 217 L. Ed. 2d 285 (2023).

Dated: May 31, 2024          Respectfully submitted,

/s/ Melissa Hensley
Melissa Hensley (Texas Bar No. 00792578)
Cory R. Ford (Texas Bar No. 24121098)
MCGUIREWOODS LLP
2601 Olive Street, Suite 2100
Dallas, TX 75201
Telephone: (469) 372-3926
Facsimile: (214) 273-7475
cford@mcguirewoods.com
mhensley@mcguirewoods.com

Farnaz Farkish Thompson (D.C. Bar No. 1659285)*
John S. Moran (D.C. Bar No. 1014598)*
Jonathan Helwink (D.C. Bar No. 1754411)*
Stephen Tagert (Virginia Bar No. 99641)*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Telephone: (202) 828-2817
Facsimile: (202) 828-3327
fthompson@mcguirewoods.com
jmoran@mcguirewoods.com
jhelwink@mcguirewoods.com
stagert@mcguirewoods.com

* pro hac vice forthcoming

## CERTIFICATE OF CONFERENCE

On May 30, 2024, Plaintiffs' counsel conferred by email with Kathryn L. Wyer, Senior Trial Counsel at the U.S. Department of Justice, Civil Division, Federal Programs Branch; informed her of Plaintiffs' intention to file this lawsuit and motion; and asked to confer on the position of the United States. Ms. Wyer is counsel for defendants in *American Association of Cosmetology Schools, et al. v. United States Department of Education, et al.*, No. 4:23-1267 (N.D. Tex.) and *Ogle School Management, LLC, et al. v. U.S. Department of Education, et al.,* No. 4:24-259-O. Ms. Wyer has not responded, but Plaintiffs expect that the United States will oppose the motion, have conveyed that expectation to Ms. Wyer, and have asked her to notify counsel if that expectation was not correct. Undersigned counsel will provide a courtesy copy of this motion to Ms. Wyer via email upon filing.

*/s/ Melissa Hensley*
Melissa Hensley (Texas Bar No. 00792578)
Cory R. Ford (Texas Bar No. 24121098)
McGuireWoods LLP
2601 Olive Street, Suite 2100
Dallas, TX 75201
Telephone: (469) 372-3926
Facsimile: (214) 273-7475
cford@mcguirewoods.com
mhensley@mcguirewoods.com

Farnaz Farkish Thompson (D.C. Bar No. 1659285)*
John S. Moran (D.C. Bar No. 1014598)*
Jonathan Helwink (D.C. Bar No. 1754411)*
Stephen Tagert (Virginia Bar No. 99641)*
McGuireWoods LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Telephone: (202) 828-2817
Facsimile: (202) 828-3327
fthompson@mcguirewoods.com
jmoran@mcguirewoods.com
jhelwink@mcguirewoods.com

stagert@mcguirewoods.com

*pro hac vice forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2024 I caused the foregoing to be filed with the Clerk of

the U.S. District Court for the Northern District of Texas using the Court's CM/ECF system, which

will electronically serve copies of the same on counsel for all parties. A courtesy copy will also be

sent by e-mail to Kathryn L. Wyer, Senior Trial Counsel at the U.S. Department of Justice, Civil

Division, Federal Programs Branch.

/s/ Melissa Hensley
Melissa Hensley (Texas Bar No. 00792578)
Cory R. Ford (Texas Bar No. 24121098)
MCGUIREWOODS LLP
2601 Olive Street, Suite 2100
Dallas, TX 75201
Telephone: (469) 372-3926
Facsimile: (214) 273-7475
cford@mcguirewoods.com
mhensley@mcguirewoods.com

Farnaz Farkish Thompson (D.C. Bar No. 1659285)*
John S. Moran (D.C. Bar No. 1014598)*
Jonathan Helwink (D.C. Bar No. 1754411)*
Stephen Tagert (Virginia Bar No. 99641)*
MCGUIREWOODS LLP
888 16th Street NW, Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Telephone: (202) 828-2817
Facsimile: (202) 828-3327
fthompson@mcguirewoods.com
jmoran@mcguirewoods.com
jhelwink@mcguirewoods.com
stagert@mcguirewoods.com

* pro hac vice forthcoming