**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| 360 DEGREE EDUCATION, LLC *et al.*,<br><br>   *Plaintiffs*,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,<br><br>   *Defendants*. | No. 4:24-cv-00508-P |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND STAY**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 3

    I.    Statutory Framework ........................................................................................ 3

    II.   Regulatory History......................................................................................... 5

ARGUMENT ................................................................................................................. 8

    I.    Plaintiffs Fail to Show Irreparable Harm ................................................ 8

    II.   Plaintiffs Are Unlikely to Succeed on the Merits ................................ 12

          A.    The Revised Provision Falls Within the Secretary's Authority............... 12

          B.    The Revised Provision Is Neither Arbitrary Nor Capricious.................. 15

          C.    Plaintiffs' Procedural Claim Lacks Merit and Plaintiffs Fail to Show Harm .................................................................................... 21

    III.  The Public Interest and Balance of Equities Weigh Against Emergency Relief, and Any Relief Should Be Limited to the Individual Plaintiff's Established Harm .......................................................................................... 24

CONCLUSION .............................................................................................................. 25

## **TABLE OF AUTHORITIES**

**Cases**

*All. for Hippocratic Med. v. FDA*, 78 F.4th 210 (5th Cir.),
    *cert. granted*, 144 S. Ct. 537 (2023) ............................................................... 13

*Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284 (3d Cir. 1977) ....................................... 23

*Anyadike v. Vernon Coll.*,
    No. 7:15-cv-157-O, 2015 WL 12964684 (N.D. Tex. Nov. 20, 2015) .............................. 9

*APSCU v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015) .............................................. 21

*Califano v. Yamasaki*, 442 U.S. 682 (1979). ................................................................ 25

*Career College Ass'n v. Riley*, No. 94-830, 1995 WL 17958540 (D.D.C. June 16, 1995) ..... 5, 14

*Career Colleges & Schs.  v. U.S. Dep't of Educ.*, 98 F.4th 220 (5th Cir. 2024) ......................... 10

*Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177 (5th Cir. 1989) .............................................. 22

*Couch v. Bank of New York Mellon*,
    No. 4:24-cv-85, 2024 WL 846267 (N.D. Tex. Feb. 28, 2024) ......................................... 9

*Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95 (D.C. Cir. 2013) ....................................... 22, 23

*DHS v. Regents*, 591 U.S. 1 (2020) ...................................................................... 13

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ................................................... 17, 18

*FCC v. Prometheus Radio Proj.*, 592 U.S. 414 (2021) ...................................................... 15

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ................................................... 9

*Gill v. Whitford*, 585 U.S. 48 (2018) ...................................................................... 25

*Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603 (N.D. Tex. 2006) ........................... 9

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ................................................................. 11

*La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217 (5th Cir. 2010) ...................................... 8

*Labrador v. Poe*, 144 S. Ct. 921 (2024) ................................................................... 25

iii

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
No. 3:17-cv-3200, 2019 WL 7882552 (N.D. Tex. Sept. 18, 2019) ................................. 9

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007) ................................... 21

*Louisiana v. Verity*, 853 F.2d 322 (5th Cir. 1988) ...................................................... 15

*Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) .................................................. 22, 23

*Munaf v. Geren*, 553 U.S. 674 (2008) ......................................................................... 8

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................. 8, 24

*Redeemed Christian Church of God v. USCIS*, 331 F. Supp. 3d 684 (S.D. Tex. 2018) ............... 9

*Second Amend. Found., Inc. v. ATF*,
No. 3:21-CV-0116-B, 2023 WL 7490149 (N.D. Tex. Nov. 13, 2023) .......................... 23

*Shell Oil Co. v. EPA*, 950 950 F.2d 741 (D.C. Cir. 1991) ........................................... 23

*Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898 (5th Cir. 2021) ........................... 15

*Trump v. Hawaii*, 585 U.S. 667 (2018) ..................................................................... 25

*Univ. of Tex. v. Camenisch,* 451 U.S. 390 (1981) ...................................................... 9

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475–76 (5th Cir. 2021) ........ 15

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................... 25

*Winter v. NRDC*, 555 U.S. 7 (2008) ........................................................................ 24

**Statutes**

Department of Education Organization Act, Pub. L. No. 96-88, 93 Stat. 668 (1979).................... 4

Higher Education Amendments of 1992, Pub. L. No. 102-325 ................................................ 4, 5

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ............................. 2, 9, 15, 22, 25

5 U.S.C. § 705 .................................................................................................. 1, 25

5 U.S.C. § 706 .................................................................................................... 15

Higher Education Act ("HEA") Title IV, 20 U.S.C. §§ 1070-1099dd ..................................... 1, 3

20 U.S.C. § 1070 ........................................................................................... 3

20 U.S.C. § 1087a ......................................................................................... 3

20 U.S.C. § 1087c ................................................................................... 4, 12

20 U.S.C. § 1087d ................................................................................... 4, 12

20 U.S.C. § 1088 ................................................................................. 4, 5, 6

20 U.S.C. § 1089 ......................................................................................... 24

20 U.S.C. § 1094 ................................................................................... 4, 12

20 U.S.C. § 1099c-1 ............................................................... 5, 13, 14, 24

20 U.S.C. § 1221e-3 ................................................................................... 12

20 U.S.C. § 3403 ................................................................... 4, 5, 13, 14

20 U.S.C. § 3474 ......................................................................................... 12

28 U.S.C. § 1391 ........................................................................................... 2

28 U.S.C. § 1404 ........................................................................................... 2

**Legislative Materials**

H.R. Rep. No. 79-1980 (1946) ................................................................ 25

H.R. Conf. Rep. No. 96-459 (1979) .......................................................... 4

S. Rep. No. 96-49 (1979) ............................................................................ 4

**Regulations**

58 Fed. Reg. 39618 (July 23, 1993) .......................................................... 6

59 Fed. Reg. 9526, 9527 (Feb. 28, 1994) ........................................... 6, 18

59 Fed. Reg. 22348, 22366 (Apr. 29, 1994) ................................... 6, 7, 18

85 Fed. Reg. 54742 (Sept. 2, 2020) .................................................... 7, 18

NPRM, 88 Fed. Reg. 32300 (May 19, 2023) ................................................. 7, 16, 21, 22

Final regulations, 88 Fed. Reg. 74568 (Oct. 31, 2023) ........................................*passim*

34 C.F.R. § 668.8 ................................................................................................ 6, 14

34 C.F.R. § 668.9 ........................................................................................................ 6

34 C.F.R. § 668.14 ...............................................................................................*passim*


**Secondary Sources**

11A Charles Alan Wright *et al.*, Fed. Prac. & Proc. Civ. ("FPP") §§ 2947, 2948.1 (3d ed.) .. 9, 24

Acevedo, Nicolas, Kathryn J. Blanchard, & Stephanie Riegg Cellini,
     *Occupational Licensing and Student Outcomes*, PEER (2022)[1]...........................................19

Simpson, Kaila M. et al.,
     *Examination of Cosmetology Licensing Issues: Abridged Report: Data Tables for
     Outcomes of Interest*, American Institutes for Research (AIR) (2016)[2] ........................ 19

Cellini, Stephanie Riegg & Kathryn J Blanchard,
     *Quick college credentials: Student outcomes and accountability policy for short-term
     programs*, Brookings Institution (2021)[3] ................................................................19-20

---

[1] Included as Exhibit 1 in attached Appendix.
[2] Included as Exhibit 2 in attached Appendix.
[3] Included as Exhibit 3 in attached Appendix.

## INTRODUCTION

Last October, the Department of Education issued final regulations that include a revision to one subsection of a rule governing school participation in the Higher Education Act ("HEA"), Title IV federal student aid programs that the Department administers. The revised provision, which will take effect on July 1, 2024, generally requires that, as a condition of Title IV participation, which confers financial benefits on schools, a vocational program's length cannot exceed the relevant State's mandatory training requirements to become licensed or credentialed in the occupation that the program trains students to enter. Faced with billions of taxpayer dollars spent on federal student aid, with many students left with unaffordable debt, the Department sought to align Title IV aid more closely to States' determinations of appropriate program length.

Plaintiffs filed suit on May 31, 2024 and now seek emergency injunctive relief under the Federal Rules and 5 U.S.C. § 705. This Court should deny Plaintiffs' motion. Not only did Plaintiffs delay seven months before seeking relief, making their claimed emergency one that they have chosen to manufacture themselves, but their asserted irreparable harm depends entirely on the notion that, if the revised provision takes effect, plaintiff 360 Degree Education ("360 Degree")'s Arlington massage therapy program will have to cut its length from 600 to 500 hours.

But Texas law *already* limits massage therapy programs to 500 hours, and Texas has approved 360 Degree's Arlington program only for 500 hours—the same limit that the Department's provision will impose. Indeed, no massage therapy program in Texas can claim injury from the Department's rule revision because all such programs must already adhere to the maximum length mandated by Texas. Although 360 Degree's Arlington program currently appears to be in violation of State requirements, enjoining the Department's rule will not leave that program, or any Texas massage therapy program, free to offer a 600-hour course of training that

could be eligible for Title IV participation. For its part, plaintiff Coalition for Career Schools ("CCS") has not established its standing, much less any irreparable harm. Plaintiffs' failure to meet their burden on this prong justifies denial of their motion without further analysis.[1]

Yet Plaintiffs' arguments on the merits are also unlikely to prevail. Plaintiffs wrongly suggest the Department lacked statutory authority to set a condition on Title IV participation that falls well within the Secretary's purview and in no way—contrary to Plaintiffs' suggestion—interferes with States' prerogatives in the field of education. The revised provision *defers* to State determinations regarding occupational program requirements and is a condition on federal spending, not course content.

Plaintiffs also fail to show the revised provision is arbitrary or capricious under the Administrative Procedure Act ("APA"). Although such claims are properly evaluated based on a certified administrative record (which could have occurred by now, had Plaintiffs filed suit earlier), currently-available portions of the record show that the Department considered relevant factors and reasonably explained its revision. For their part, Plaintiffs fail to justify the notion that students should be forced to spend up to 50 percent more time, with correspondingly higher costs that either students or taxpayers must bear, on training that States do not require when instead they could enter the workforce earlier—which is generally students' goal in such programs. Congress intended Title IV aid to help students, but the only parties that benefit unequivocally from overlength programs are the schools that gain risk-free money from students' federally-funded tuition payments. The Department has long imposed limits on program length as a condition of schools' Title IV participation and has now reasonably determined that the limit should match

---

[1] Not only can Plaintiffs show no redressable injury-in-fact for any massage therapy program in Texas, but 360 Degree's principal place of business is not in this District, calling into question whether proper venue lies in this District under 28 U.S.C. §§ 1391(e) or 1404(a). Defendants do not concede that Plaintiffs have met the statutory standards for venue in this District.

States' occupational licensing requirements.

Plaintiffs also raise a procedural challenge, asserting they lacked fair notice that the Department might remove accrediting agencies from the final revised provision. But the proposed rule explained the purpose of the proposed revision, thus giving fair notice that the terms of the proposal (which expressly mentioned accrediting agencies) were up for debate. In any event, any procedural error on this ground was harmless, so this claim cannot justify emergency relief.

Finally, even if the Court grants emergency relief, such relief should be limited to the specific provision Plaintiffs challenge—34 C.F.R. § 668.14(b)(26), as revised by Final regulations, 88 Fed. Reg. 74568 (Oct. 31, 2023)—and should be no greater than necessary to obviate any harms of their own that Plaintiffs can establish. But as noted, CCS's standing is murky, its purported membership is unknown, and it cites no harms of its own. And 360 Degree's claimed injury is a non-starter under Texas law. Plaintiffs' request for broad relief, when they cannot even establish their own harms, should be denied.[2]

## **BACKGROUND**

### I.   **Statutory Framework**

While other HEA titles focus on schools and teachers, Title IV is devoted to students, detailing various grant, loan, and work study assistance programs. *See* 20 U.S.C. §§ 1070–1099d; *cf. id.* §§ 1070(a), 1087a(a) (recognizing purpose of Title IV's grant and loan programs is to help students pursue their courses of study at participating schools). In recent years, the Department has annually disbursed more than $100 billion in new Title IV federal aid to millions of postsecondary students and their families, including around $72 billion in loans. 88 Fed. Reg. at 70103, 70107.

Although students are the intended beneficiaries of Title IV aid, postsecondary schools

---

[2] This is not the only pending case challenging the provision at issue. *Cf. Am. Massage Therapy Ass'n v. U.S. Dep't of Educ.,* No. 1:24-cv-1670 (D.D.C. filed June 7, 2024).

benefit when student aid recipients choose to attend their programs and thereby funnel federal grant and loan money to those programs in the form of tuition and fees. The HEA's Title IV framework holds schools accountable through statutory conditions and requirements administered by the Secretary. The HEA limits Title IV participation to "eligible" schools and requires such schools to enter into program participation agreements with the Department. *See* 20 U.S.C. §§ 1087c, 1087d, 1094. Participation agreements condition a school's continuing Title IV eligibility on the school's compliance both with express statutory requirements and with further requirements that the Secretary "determines are necessary to protect the interests of the United States and to promote the purposes of" Title IV. *Id.* § 1087d(a)(6).

Over a decade after enacting the HEA, Congress established the Department of Education as a cabinet-level agency while clarifying that this change did not impact the federal government's authority over education, relative to the authorities of states and local governments. Department of Education Organization Act, Pub. L. No. 96-88, § 103, 93 Stat. 668 (1979) (codified at 20 U.S.C. § 3403); *see* H.R. Conf. Rep. No. 96-459, at *36 (1979); S. Rep. No. 96-49, at *24 (1979). The same law states that no "provision of a program administered by the Secretary . . . shall be construed to authorize the Secretary . . . to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system, . . . except to the extent authorized by law." 20 U.S.C. § 3403(b).

In the Higher Education Amendments of 1992, Congress modified the HEA's statutory descriptions of vocational programs eligible to participate in Title IV. Pub. L. No. 102-325, § 481 (codified as amended at 20 U.S.C. § 1088(b)). As modified, eligible vocational programs now had to provide at least "600 clock hours of instruction, 16 semester hours, or 24 quarter hours," among other requirements, to participate in Pell Grant and loan programs. 20 U.S.C. § 1088(b)(1).

4

Programs of "at least 300 clock hours," but "less than 600 clock hours of instruction," may be eligible to participate in Title IV's loan program if they meet regulatory requirements promulgated by the Secretary, *id. §* 1088(b)(2)(A), which Congress specified must "determine the quality of programs of less than 600 clock hours in length," requiring "at a minimum" that such programs "have a verified rate of completion of at least 70 percent and a verified rate of placement of at least 70 percent." Pub. L. No. 102-325, § 481. In the same law, Congress enacted 20 U.S.C. § 1099c-1, which expressly states that the provisions of § 3403(b) "shall not apply to Secretarial determinations made regarding the appropriate length of instruction for programs measured in clock hours." Pub. L. No. 102-325, § 498A.

## II.    Regulatory History

At the time of the 1992 law's enactment, vocational programs were traditionally described in terms of "clock hours." *See Career College Ass'n v. Riley*, No. 94-830, 1995 WL 17958540, at *2 (D.D.C. June 16, 1995) ("Vocational classes, by contrast [to those offered in collegiate and university settings], have typically been measured in 'clock' or 'contact' hours."). However, after Congress' 1992 revisions, many vocational programs "sought to increase the amount of federal financial aid to which their students are entitled"—thus increasing the amount of Title IV funds the programs themselves would receive—"by strategically converting from the clock to the credit hour unit of measurement." *Id.*; *see id.* at *3 ("[I]t seems reasonably clear that many vocational schools artificially inflated the amount of instruction they appeared to be offering their students in order to increase their financial aid eligibility."). In response to such abuse, the Secretary made clear that, for certain non-degree vocational programs less than two years in length that chose to identify their offerings in credit hours for other purposes, the Department would apply a uniform formula for converting credit hours to clock hours for purposes of assessing Title IV eligibility.

*See* 58 Fed. Reg. 39618 (July 23, 1993) (34 C.F.R. §§ 668.8(k), (*l*), 668.9, as amended). The 1993 rule explained that these provisions did not intrude on a school's academic affairs; instead, they applied "only to calculations made for title IV, HEA program purposes, *i.e.*, whether a program qualifies as an eligible program under § 668.8, and the amount of title IV, HEA program assistance that a student enrolled in an eligible program may receive." *Id.* at 39622.

The Department promulgated additional regulations in 1994 to comply with the 1992 Act's directives. 59 Fed. Reg. 9526, 9527 (Feb. 28, 1994). The 1992 Act's revisions meant that certain short-term programs of less than 600 clock hours would cease to be Title IV-eligible while other vocational programs providing at least 300 clock hours may become eligible to participate in Title IV's loan programs for the first time. *Id.* at 9527, 9531. In response to those statutory changes, the Department exercised its express authority under the statute to prescribe quality control regulations by requiring, as a condition of Title IV participation, that programs may not exceed by more than 50 percent the minimum number of clock hours required for occupational training by the State in which the program was located. *Id.* at 9532. The Department explained this measure "will help curb abuse" of Title IV "by preventing institutions from providing unnecessary training to students in order to receive additional Title IV, HEA program funds"—a practice known as "course stretching." *Id.* at 9532-33; 59 Fed. Reg. 22348, 22366 (Apr. 29, 1994) ("course stretching" is an abuse whereby vocational schools extend the length of their programs "purely for the purpose of exceeding the statutory 600 clock hour minimum" for Pell Grant eligibility, as set forth in 20 U.S.C. § 1088(b)(1)(A)); *see also id.* at 9547-48 (recognizing that "excessive length of programs requires a student to incur additional unnecessary debt"). When adopting the final provision—set forth at 34 C.F.R. § 668.14(b)(26) (version effective until June 30, 2020)—the Department recognized that some commenters favored lowering the limit to 100 percent of State requirements

but believed at the time that the 150 percent limit would "furnish[] a sufficient safeguard against the abuses of course stretching." 59 Fed. Reg. at 22366.

In 2020, the Department revised § 668.14(b)(26) by allowing programs to rely on longer minimum requirements of adjacent States. *See* 85 Fed. Reg. 54742, 54776-77 (Sept. 2, 2020); 34 C.F.R. § 668.14(b)(26) (version effective until July 1, 2024). This revision was intended to balance the competing concerns with "setting proper safeguards to ensure program length is not inflated and ensuring students are able to meet States' occupational licensure requirements," "especially in regional economies that cross State boundaries." *See id.*

In May 2023, the Department issued an Notice of Proposed Rulemaking ("NPRM") proposing, among other things, a further revision to § 668.14(b)(26) that would (1) reduce the number of clock hours that the Secretary would generally consider reasonable from 150% to 100% of the home State's licensing requirements while (2) replacing the "adjacency" criterion for reliance on another State's licensing rule with the requirement that a majority of the program's students reside or be employed in that State, or, if part of same metropolitan statistical area, that a majority of students intend to work in that State upon graduation. 88 Fed. Reg. 32300, 32381-82 (May 19, 2023). The Department explained its concerns that students who received Title IV aid to attend programs longer than necessary for State licensure were "using up more of their lifetime eligibility for Pell Grants or other Federal financial aid," and were more likely to face higher debt and longer loan repayment periods, without requisite career benefits. *See id.* at 32381.

The Department issued final regulations on October 31, 2023, which included a final revision to § 668.14(b)(26) ("Revised Provision") among other regulations. 88 Fed. Reg. 74568, 74696-97. The Revised Provision adopts the proposed 100 percent limit based on the home State or a State where most students live or work, but the Department clarified that students enrolled

before the effective date would not be affected. *Id.* at 74636. The Department also clarified that the Revised Provision does not apply to degree programs or entirely-distance or correspondence programs but instead was limited to non-degree programs in States with minimum hour requirements. *Id.* at 74636-37. For such programs, "the hours required by a State typically represent all, or the vast majority of, the curriculum offered in a program." *Id.* at 74637.

Department guidance indicates that it will not require schools to report new program lengths until all students who enrolled before July 1, 2024 have graduated, transferred, or withdrawn. *See* Declaration of David Musser ex.B at 2, attached hereto. Further guidance indicates that, particularly for an initial six-month period after the Revised Provision goes into effect, the Department will seriously consider any circumstances beyond a school's control that delay its ability to reduce program lengths when deciding whether to take enforcement action. *See id.* ex.A.

## ARGUMENT

Emergency injunctive relief "is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A movant must show a substantial threat of irreparable harm; "a substantial likelihood of prevailing on the merits"; that "the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted"; and that "the injunction will not disserve the public interest." *La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 219 (5th Cir. 2010). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, Plaintiffs fail at every step.

## I.    Plaintiffs Fail to Show Irreparable Harm

Plaintiffs' "substantial period of delay"—waiting seven months after the Revised Provision's issuance on October 31, 2023 before filing suit on May 31, 2024—"militates against the issuance of a preliminary injunction"—much less a TRO—"by demonstrating that there is no

8

apparent urgency to the request for injunctive relief." *Gonannies, Inc. v. Goupair.Com, Inc*., 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (denying PI requested six months after plaintiffs learned of infringement); *cf.* 11A Charles Alan Wright *et al*., Fed. Prac. & Proc. Civ. ("FPP") § 2948.1 (3d ed.) ("A long delay by plaintiff . . . may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *Anyadike v. Vernon Coll.*, No. 7:15-cv-157-O, 2015 WL 12964684, at \*3 (N.D. Tex. Nov. 20, 2015) (internal quotation omitted). "[A]nywhere from a three-month delay to a six-month delay [is] enough to militate against issuing injunctive relief." *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-cv-3200, 2019 WL 7882552, at \*2 (N.D. Tex. Sept. 18, 2019) (collecting cases).

Moreover, Plaintiffs' delay turns the purpose of emergency relief on its head since such relief is meant "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). A "trial on the merits"— which in the APA context means cross-motions for summary judgment based on a certified administrative record—could already have occurred by now, had Plaintiffs filed suit in a timely manner. *Cf. Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Redeemed Christian Church of God v. USCIS*, 331 F. Supp. 3d 684, 694 (S.D. Tex. 2018) (summary judgment is "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review").

Nor do Plaintiffs show irreparable harm that is "imminent and not speculative." *Couch v. Bank of New York Mellon*, No. 4:24-cv-85, 2024 WL 846267, at \*8 (N.D. Tex. Feb. 28, 2024). For one thing, Plaintiffs mischaracterize the harm facing 360 Degree's Cortiva massage therapy program in Arlington. No Texas massage therapy program will incur any harm whatsoever from

the Revised Provision because Texas law already imposes a 500-hour maximum on such programs—which is also the State's minimum requirement for licensing. TEX. OCC. CODE ANN. §§ 455.156(b)(1), .205(b), attached hereto as Exhibit A. Moreover, Texas has only approved Cortiva to operate a 500-hour program. *See* Declaration of Shari Mecca ¶ 7 & attach.A (attached hereto). Contrary to the three declarations that Plaintiffs submit addressing the Arlington program, *see* Pl. Mem. exs.A, F, G,  the Revised Provision will have no impact on that program's Title IV eligibility, and it appears that the Texas Veterans Commission State Approving Agency's denial of approval for Cortiva to operate a 600-hour massage therapy program in Arlington was based on the current State law limitation, not on future Title IV regulations. Mecca Decl. ¶ 10.

Although 360 Degree evidently operates another massage therapy program in Florida, Plaintiffs submitted no declaration addressing any imminent irreparable harm that program would incur due to the Revised Provision. Nor did purported organizational plaintiff CCS submit any declaration. Indeed, CCS fails to establish its standing, much less any irreparable harm. *Career Colleges & Schs.  v. U.S. Dep't of Educ.,* 98 F.4th 220, 233–34 (5th Cir. 2024) ("A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue[.]"). Defendants have found no public website substantiating this organization's existence, let alone what its "purpose" might be. *See id.* (identifying prongs of associational standing).

The declaration of a single purported CCS member, Bellus Academy[3], citing *past* compliance costs of programs in California and Kansas, also fails to identify *future* imminent irreparable harm to Plaintiffs that could be prevented with injunctive relief. Lynch Decl. ¶ 20. While citing students' interests, Plaintiffs ignore that any students enrolled in a Title IV-eligible program before July 1, 2024 may continue in a longer version of the program and receive the same

---

[3] Tellingly, CCS is not mentioned in the memberships identified on Bellus Academy's website. *See* https://bellusacademy.edu/membership-and-accreditation/ ; Mecca Decl. ¶ 11 & attach.B

aid until they graduate. Plaintiffs also lack standing to assert current students' interests, much less speculate about the alleged interests of unknown future potential students. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (a party generally "cannot rest his claim to relief on the legal rights or interests of third parties").[4] Students stand to benefit from shorter, less costly programs that allow them to enter the workforce sooner, particularly when training for an occupation with typically low earnings, and they may use their lifetime Pell Grant allotment elsewhere if they choose.

One Cortiva declarant claims that, to cut its length from 600 to 500 hours, the Arlington program would eliminate certain courses. Black Decl. ¶¶ 8-9. But as indicated, Texas already imposes a 500-hour limit on the Arlington program. Even if the program has been non-compliant until now, State law mandates that its hours be cut regardless of any relief this Court might order. Moreover, States, not the Department, dictate the content of required courses. *See, e.g.*, TEX. OCC. CODE ANN. § 455.156(b)(1) (identifying specific hour requirements for anatomy, physiology, kinesiology, pathology, hydrotherapy, and more); FLA. ADMIN. CODE ANN. § 64B7-32.003(1)(c) (similar). Plaintiffs also fail to explain why such a harm would be irreparable since courses could simply be reinstated (if, of course, Texas did not already limit the Arlington program's hours).

In sum, Plaintiffs fail to show a substantial threat of irreparable harm, and their motion should be denied on that basis alone.

---

[4] Plaintiffs similarly lack standing to assert the interests of the third parties whose statements they attach, which thus have no bearing on their assertion of harm. Those statements also merely speculate regarding possible indirect impacts of the Revised Provision, suggesting, for example, that programs "will remove lashing education," Alexander Decl. [Pl. ex.E] ¶ 9; or no longer use materials produced by certain third party vendors, Cyrene Decl. [Pl. ex.D] ¶¶5, 9-10—neither of which the Department has mandated—or that a California board may have trouble completing its review of changes before July 1, 2024, Pl. ex.C, ignoring the Department's guidance allowing for enforcement discretion in such circumstances. *See* Musser Decl. ex.A.

11

II.     **Plaintiffs Are Unlikely to Succeed on the Merits**

A.     **The Revised Provision Falls Within the Secretary's Authority**

The Revised Provision easily falls within the Secretary's statutory authority. Congress authorized the Secretary to administer Title IV's federal grant and loan programs, in part by issuing and amending rules that "govern[] the manner of operations of, and govern[] the applicable programs administered by, the Department." 20 U.S.C. § 1221e-3; *see also id.* § 3474 (authorizing Secretary to prescribe rules that he deems "necessary or appropriate to administer and manage" the Department's functions). More specifically, the HEA directs the Secretary to "prescribe such regulations as may be necessary" to establish "reasonable standards of financial responsibility and appropriate institutional capability" for schools, "including any matter the Secretary deems necessary to the sound administration of [Title IV] financial aid programs." *Id.* §1094(c)(1)(B).

The HEA further requires schools that are eligible to participate in Title IV to enter into program participation agreements with the Department. *See* 20 U.S.C. §§ 1087c, 1087d, 1094. Those agreements condition a school's continuing Title IV eligibility on the school's compliance with requirements that the Secretary "determines are necessary to protect the interests of the United States and to promote the purposes of" Title IV. *Id.* § 1087d(a)(6); *cf. id.* § 1094(a)(21).

The Department listed the conditions to which schools entering into Title IV program participation agreements must agree in 34 C.F.R. § 668.14(b). The Revised Provision is one such condition. *See* 34 C.F.R. § 668.14(b)(26). The Provision reflects the Department's conclusion that non-degree vocational programs "exceeding the length the State has set for licensure or certification in a given occupation should not be supported by Federal student financial aid." 88 Fed. Reg. at 74637. The Provision does not prevent schools from "offer[ing] longer programs"; it simply makes State-aligned program length a condition of schools' Title IV participation, which

12

funnels billions of federal taxpayer dollars to schools. *Id.* As such, the Provision falls squarely within the Secretary's administrative authority to ensure Title IV's purpose to help students is served. Moreover, it does so by deferring to State determinations regarding appropriate program length. Ultimately, the Provision recognizes that States, with oversight responsibility for occupational licensing, are best positioned to determine appropriate training levels for such occupations, and it would serve neither students' nor States' nor taxpayers' interests to invest federal funds just so that students could delay their graduation and go deeper into debt by taking coursework beyond what States require. "When a student seeks training for a specific occupation, their goal is to meet the requirements [set by the State] for that occupation." *Id.* at 74638.

Plaintiffs argue that the Department's alignment of Title IV-funded program length for non-degree vocational programs to match State requirements amounts to an exercise of "direction, supervision, or control over the curriculum, program of instruction, administration, or personnel" of such programs, in violation of 20 U.S.C. § 3403(b). Pl. Mem. at 9. That notion is plainly incorrect. As described above, § 3403 was part of the 1979 legislation establishing the Department and clarified that making the Department a cabinet-level agency would not change the relative spheres of authority between the Federal Government and States. *See id.* § 3403(a). But Congress later clarified that § 3403(b) has no impact on "Secretarial determinations made regarding the appropriate length of instruction for programs measured in clock hours." 20 U.S.C. § 1099c-1(e).[5]

---

[5] Plaintiffs argue that the Department "never relied on § 1099c-1(e)'s clock-hour authority to justify" the Revised Provision. Pl. Mem. at 11. However, the Department cited this provision, among others, in the Preamble when responding to comments regarding the Revised Provision. 88 Fed. Reg. at 74638 (citing HEA section 498A(e)). Moreover, agencies cannot waive authority granted by Congress simply by failing to cite a statutory provision in a proposed rule. The cases Plaintiffs cite are inapposite because they do not address issues of statutory interpretation but instead "whether agency action was adequately explained," *DHS v. Regents*, 591 U.S. 1, 20 (2020), and whether agency action was arbitrary or capricious, *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 256-57 (5th Cir.) (Ho, C.J., concurring in part & dissenting in part) (explaining his view that agency decision "violates the agency's own rules"), *cert. granted*, 144 S. Ct. 537 (2023).

Moreover, even aside from § 1099c-1(e), States have never had authority to determine under what circumstances schools may participate in federal Title IV programs. Rather, Congress vested authority in the Department to administer Title IV and impose conditions—including the length limitation set forth in the Revised Provision—on programs' participation as described above. As the Department explained, the Revised Provision does not "dictat[e] the length of a particular program, or its curriculum." 88 Fed. Reg. at 74637. To the contrary, schools are free to maintain programs of any length, and States may revise their licensing requirements, including the amount of training required, at any time. The Department does have authority to determine that federal taxpayer funds should not be expended solely to support schools' expansion of program lengths beyond what States require. But even if a school chooses to reduce the length of its program to remain Title IV-eligible, the Department does not dictate how it should do so. While a school may choose to eliminate a specific course, it could also allow students to choose between certain courses, reduce the hours associated with certain courses, or implement some other method.

Almost thirty years ago, another court rejected an argument similar to Plaintiffs' and instead held that § 3403(b) had no bearing on the Department's establishment in 34 C.F.R. § 668.8(*l*) of a uniform clock-to-credit-hour conversion standard for determining vocational programs' Title IV eligibility. *Career College Ass'n*, 1995 WL 17958540, at *7. As that court recognized, the Department's exercise of authority to "establish eligibility requirements for federal student aid programs," consistent with the HEA, is in no way tantamount to exercising "'direction or control' over the school curricula." *Id.* Otherwise, "the Secretary would essentially be foreclosed from establishing any eligibility standards whatever for federal financial aid," but "[i]t is quite clear that § 3403(b) was never intended to produce such a result." *Id.* It would be odd indeed to conclude that Congress made the Department a cabinet-level agency—thus increasing

14

its authority within the Federal Government—only to prevent it, in the same Act, from exercising authorities previously set forth in the HEA, such as the authority to set forth conditions in Title IV program participation agreements. Plaintiffs are unlikely to succeed on this claim.

### B.    The Revised Provision Is Neither Arbitrary Nor Capricious

An emergency motion is particularly ill-suited to evaluation of whether a final agency action is arbitrary or capricious under the APA, 5 U.S.C. § 706(2)(A). APA review properly takes place at summary judgment based on "the whole [administrative] record" before the agency, "or those parts of it cited by a party." *Id.* § 706. "The APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). A court "may not consider evidence outside the administrative record," *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021), nor should the court "weigh the evidence in the record pro and con." *Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988). Although a court's review is "searching and careful," it ultimately does not "substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475–76 (5th Cir. 2021).

Although Plaintiffs' belated filing prevented the Department from compiling and certifying the administrative record in time for the Court's review prior to July 1, all available material suggests that the Department's decision to revise the maximum non-degree vocational program length for Title IV participation to match State licensing requirements was eminently reasonable. The NPRM makes clear that the Department's recent rulemakings all have occurred against a backdrop of ballooning Title IV expenditures by the Department and a student debt crisis of epic proportions. In the 2022 award year, the Department disbursed approximately $5 billion in Pell

15

Grant funding and $11 billion in loans to students attending Title IV-eligible vocational programs. 88 Fed. Reg. at 32398. All this money was in turn passed on to the programs in the form of tuition and fees. Yet, when programs are longer than States require for licensing or certification, students must spend time and money unnecessarily. *See* 88 Fed. Reg. at 74682. Given that the vocational programs subject to the Revised Provision "are certificate programs that result in low-to-moderate incomes, the cost of added credits," beyond what is needed for State licensure, "may well undercut a program's positive financial return on investment" and "also represents more time a student must spend enrolled as opposed to making money in the workforce." *Id.*

Plaintiffs argue the Revised Provision is arbitrary and capricious for three reasons, but they rely on flawed logic with no evidentiary support whatsoever. First, Plaintiffs assert that the Revised Provision is arbitrary because it turns "minimums" into "maximums"—by setting the maximum vocational program length that Title IV will fund as equal to State minimum training requirements for the relevant occupations. Pl. Mem. at 12. While the terms "minimum" and "maximum" in isolation may be opposites, Plaintiffs' theory in context makes no sense. States set minimum training requirements because they deem a certain amount of training necessary to take up certain occupations. The Revised Provision recognizes that Title IV funding aimed at helping students complete the training needed to prepare for those occupations should align with States' assessments of the amount of training required. The Department reasonably responded to commenters that their recourse, if they disagreed with a State's requirements, was properly with the State because the Revised Provision defers to States' determinations. Plaintiffs speculate that States consider Title IV when setting occupational licensing requirements but offer no support for that notion, and their argument on this point inverts logic. After all, a non-profit legal organization would not act irrationally by limiting its attorneys' CLE reimbursements to the number of credits

required to maintain a State Bar license. The Department's decision here is similarly reasonable.

Plaintiffs suggest the Department "create[d] arbitrary carve-outs" for certain categories of programs, Pl. Mem. at 13, but again they mischaracterize the record. The Department did narrow and clarify the application of its proposed revision in several ways in response to comments and reasonably explained its decision in each instance. The Department clarified that the provision does not apply to degree programs because such programs, in contrast to non-degree programs, often include general education components in addition to the specific courses a State requires for licensure, so degree programs are necessarily longer. 88 Fed. Reg. at 74636-37. The Department excluded programs offered fully through distance education or correspondence courses because most students enrolled in such programs would likely not be in the State where those programs are located, so the State's licensing requirements would not be relevant. *Id.* at 74637-38. None of these reasonable determinations makes the Revised Provision arbitrary.

Second, Plaintiffs argue that the Revised Provision is arbitrary because it imposes "strict-liability" rather than a "safe harbor." Pl. Mem. at 14. Again, Plaintiffs rely on catchy phrasing, but they cite absolutely nothing, in the single paragraph they devote to this point, to explain what they mean. Their empty argument just repeats that the Revised Provision is unreasonable because it conditions Title IV funding on limiting program length in accord with State requirements, but that argument lacks merit for the reasons already explained.

In what they label as the "third" basis to deem the Revised Provision arbitrary and capricious, Plaintiffs assert that the Department failed to explain its revision of § 668.14(b)(26) consistent with the applicable burden when a prior rule "engendered serious reliance interests that must be taken into account." Pl. Mem. at 14 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). Here, the Department has ensured that any students already enrolled in an

overlength program before the Revised Provision's effective date, in reliance on the prior rule, will continue to receive the same Title IV aid until they complete their training. 88 Fed. Reg. at 74636.

Moreover, the very case Plaintiffs cite makes clear that even where serious reliance interests are implicated, an agency may change its policy as long as it shows "awareness that it is changing position" and "that there are good reasons for the new policy." *Encino Motorcars*, 579 U.S. at 221-22. The Department has met that burden here. As detailed above, the Department adopted the original § 668.14(26) in response to statutory changes that could otherwise encourage the abusive practice of "course stretching"—whereby schools extend the length of their programs beyond State requirements simply in order to meet the clock hour thresholds for Title IV Pell Grant and/or loan eligibility. 59 Fed. Reg. at 9532-33; 59 Fed. Reg. at 22366. That concern has never gone away, but the Department has tried different forms of flexibility to limit adverse impacts on students who wished to work in a different State from where they were trained. Thus, the original 1994 Rule incorporated a standard buffer, approving Title IV eligibility for programs up to 50 percent longer than their State's requirement. 59 Fed. Reg. at 22366. The 2020 Rule added the possibility of relying on adjacent States. 85 Fed. Reg. at 54776. And the 2023 Rule removes the 50 percent buffer while adjusting the circumstances where a program can extend its length to match other States' requirements. 88 Fed. Reg. at 74696-97. Among other alternatives, the 2023 Rule considered retaining the 50 percent buffer but concluded that allowing Title IV-participating programs to exceed what States require "risks students taking on greater amounts of loan debt that will not result in appreciably higher earnings." *Id.* at 74686.

Plaintiffs cite two bases for deeming the Department's explanation deficient, but the Department reasonably responded to comments raising these issues. First, Plaintiffs suggest that students attending programs under 600 hours would be limited to Title IV aid in the form of loans

rather than Pell Grants. However, the Department responded to this notion by pointing out that neither taxpayers nor students should be "paying for training programs that exceed the program length required for State licensure"; longer programs have higher tuition overall, requiring students either to borrow more or use up their lifetime Title IV Pell Grant allotments unnecessarily, and forcing students to delay entry into the workforce. 88 Fed. Reg. at 74639-40. Plaintiffs assume that it is fine to force taxpayers to pay for unnecessary training through Pell Grants just to enrich schools with vocational programs. The Department instead weighed the relevant factors and concluded that, in light of the absence of research supporting a connection between longer programs and higher wages, and the net impacts on both students and taxpayers of allowing overlong programs to participate in Title IV, the Revised Provision was appropriate. *See* 88 Fed. Reg. at 74639, 74641; *see id.* at 74640 ("The Department defers to State authorities regarding the appropriate number of instructional hours required to qualify to practice in a given profession. If a State has set a minimum requirement that is lower than" the Title IV participation thresholds set by Congress, "it would be inappropriate" to use Title IV aid for such programs.).

In particular, the Department noted that studies were unable to identify a correlation between higher training hour requirements and higher wages in massage therapy or cosmetology. *Id.*[6] The Department further emphasized that no commenter had explained why the Revised Provision should deviate from "States' judgments regarding the appropriate amount of training required," when exceeding that threshold to train for occupations that typically yield low earnings risked either leaving students with unaffordable debt or imposing unnecessary costs on taxpayers. *Id.* (citing finding in Cellini *et al*., *Quick college credentials: Student outcomes and accountability*

---

[6] The Department cited Acevedo *et al.*, *Occupational Licensing and Student Outcomes* (2022); Simpson, *et al., Examination of Cosmetology Licensing Issues* (2016)). These and other studies cited herein are included in an Appendix attached hereto.

*policy for short-term programs* (2021), that cosmetology and massage therapy short-term program graduates typically had relatively little debt but earned less than average high school graduate); *see id.* at 74640 (recognizing States "carefully consider their hour requirements, which are often set through a body convened for this purpose").

Plaintiffs nonsensically argue (again) that States "minimum" requirements reveal States' concern that career training programs "were not long enough," so States likely considered the current Title IV rule when setting their licensing standards. Pl. Mem. at 16-17 & nn.14-15. Plaintiffs again cite nothing to support this theory, *see* 88 Fed. Reg. at 74642, and ignore that States' concern in licensing is to ensure workers in certain occupations have sufficient training— without regard to how they pay for it. State requirements thus reflect what States deem appropriate and (as with CLE requirements for lawyers) do not reflect any expectation that students would exceed that threshold. Moreover, States can change their licensing requirements, and they had eight months to do so before the Revised Provision took effect. *See id.* at 74640-41. Although Plaintiffs criticize the studies that the Department cited, they do so primarily on the ground that the studies used "unreliable" or inconclusive data. *See* Pl. Mem. at 17-19.[7] Yet Plaintiffs cite no research at all submitted during the rulemaking process contradicting the Department's conclusion that training beyond State licensure requirements would not financially benefit students. Although the studies cited by the Department followed standard research practices by frankly acknowledging

---

[7] Plaintiffs also question the notion that adding hundreds or thousands of dollars to students' costs "may be the difference between a positive and negative return on investment" as "pure speculation." Pl. Mem. at 19 (quoting 88 Fed. Reg. at 74639). The Department instead made a logical inference based on the very point Plaintiffs acknowledge—the Cellini study's conclusion that the short-term vocational programs it examined yielded low earnings. Cellini, at 16-18. Plaintiffs also suggest the Revised Provision is "flatly contrary" to the Cellini study, but there is no contradiction between that study's conclusion that students in short-term cosmetology and massage therapy programs report low earnings and the Department's conclusion that schools should not force students into more training than States require just to get more Title IV money.

the limitations of their data, they were the best available information before the Department at the time of its decision. *APSCU v. Duncan*, 110 F. Supp. 3d 176, 195 (D.D.C. 2015).

Plaintiffs' second point is that the original rule "took into account disparities among States' minimum requirements." Pl. Mem. at 15. But as explained by the Department and described above, the Revised Provision does also, by allowing programs to go by another State's requirements if a majority of their students live or work in that State. *See* 88 Fed. Reg. at 74639 (the exceptions in § 668.14(b)(26)(ii)(B) provide flexibility that mitigates concerns "about students being unable to seek employment across state lines"). The Department explained that, under the current rule, some schools had adopted an "adjacent" State's hours even when that state "was many miles away and students were unlikely to seek to become employed there." 88 Fed. Reg. at 32382. It further responded to comments on this issue by citing research showing "most students seek or obtain employment close to where they live or attend school" and by pointing out that "States may also adjust their requirements for those with out-of-state training where they deem appropriate, and many do so through participation in licensure compacts and reciprocity agreements." 88 Fed. Reg. at 74639. The Department repeatedly emphasized its deference to State determinations of appropriate program length. *See id.* at 74639-41. Plaintiffs fail to show that the Department's decision was arbitrary or capricious.

### C. Plaintiffs' Procedural Claim Lacks Merit and Plaintiffs Fail to Show Harm

Plaintiffs argue the Revised Provision is procedurally defective under the APA on the ground that it is not a "logical outgrowth" of the NPRM's proposal. A final rule must "be a logical outgrowth of the rule proposed," and the logical-outgrowth issue is "one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up). Plaintiffs imply that any "alter[ation]" to a rule's language requires a new opportunity for comment, Pl. Mem. at 20,

21

but that is not the law. Agencies can and often do revise a proposed rule in response to comments, and courts recognize the "absurdity" that would result if an agency "can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary." *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95, 100 (D.C. Cir. 2013) (internal quotation omitted). Thus, a proposed rule must "fairly apprise[] interested persons of the subjects and issues the agency is considering" such that a final rule "alike in kind" could be reasonably anticipated. *Mock v. Garland*, 75 F.4th 563, 584 (5th Cir. 2023). That is "all the APA demands," and the Department "need not specifically identify every precise proposal which [it] may ultimately adopt as a final rule." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989) (cleaned up).

Plaintiffs argue that the NPRM, by including the option that a school could set program length according to its accrediting agency, did not give fair notice that the Department might remove that option from the final rule. However, the NPRM made clear the Department's concerns and goals with its revision—to prevent abuses that can arise from allowing overlength programs to participate in Title IV, but to allow programs to go by other States' requirements when there is a legitimate reason to do so. *See* 88 Fed. Reg. at 32381-82. The Preamble to the final regulations rejected a commenter's proposal that the Department rely exclusively on schools' and accreditors' judgments and further noted the proposal raised concerns that relying on accreditors would undermine the Department's goal—as expressed in the NPRM—to avoid unnecessary expenditures on programs that are longer than States require. 88 Fed. Reg. at 74637.[8]

The NPRM gave fair notice that the role of accrediting agencies was under consideration by identifying them in the proposed rule. Indeed, the fact that commenters addressed that role

---

[8] Plaintiffs falsely claim the NPRM "never disclosed" a "purpose" of "focusing on State requirements." Pl. Mem. at 21. The NPRM could not be clearer that its proposed revisions of § 668.14(b)(26) "address concerns the Department has about institutions offering programs tied to licensure that are longer than required by their State." 88 Fed. Reg. at 32381.

shows it was understood to be at issue, and the final Revised Provision, though omitting mention of accrediting agencies, is alike in kind with the proposed version. This is not a situation where "the NPRM and the Final Rule bear little resemblance to one another" because the agency replaced the original central framework with an entirely different test, as in *Mock*. *See* 75 F.4th at 583. Nor is it one where the final rule identified an entirely new topic, standard, or regulated substance without warning, as in the three cases Plaintiffs cite—*Am. Iron & Steel Inst. v. EPA*, 568 F.2d 284, 291 (3d Cir. 1977) (final rule included regulations affecting specialty steel industry when proposed rule did not suggest steelmaking would be subject of regulation at all); *Daimler Trucks*, 737 F.3d at 100–02 (final rule added new "substantial work" criterion); *Shell Oil Co. v. EPA*, 950 950 F.2d 741, 749–50 (D.C. Cir. 1991) (final rule on hazardous waste addressed "mixtures" and "derived" substances even though neither was mentioned in proposed rule).

Moreover, the Fifth Circuit recognizes that "procedural error alone is not sufficient to support a finding of likelihood of success on the merits." *Second Amend. Found., Inc. v. ATF*, No. 3:21-CV-0116-B, 2023 WL 7490149, at *6 (N.D. Tex. Nov. 13, 2023) (citing *Mock*, 75 F.4th at 586). Plaintiffs bear the burden to show prejudice "specific to [them]" by identifying "new information they would have submitted to the agency if given the opportunity." *Id.* (plaintiffs must explain "why their notice interests were harmed" to establish likelihood of success). Plaintiffs here fail to establish any error was not harmless. Instead, they just assert that "accreditors are an important part of the regulatory triad." Pl. Mem. at 21. That notion in no way addresses how Plaintiffs themselves—who are not accreditors—were prejudiced. Given the Department's explanation of its decision to defer to States' program length determinations and its rejection of the notion that accreditors should be able to undermine States' determinations, Plaintiffs fail to explain what further comment they might have made that was otherwise foreclosed.

Plaintiffs' second basis for a logical outgrowth claim similarly fails. Plaintiffs argue the NPRM failed to cite § 1099c-1(e) as a basis for the Department's statutory authority to amend § 668.14(b)(26). Pl. Mem. at 21. Plaintiffs cite no authority for the notion that agencies must cite every source of statutory authority in proposed rules, nor do they cite a single case that has set aside a final rule on this basis. Plaintiffs cannot identify prejudice on this ground when they have simultaneously raised a legal challenge in this case on this very issue, and when their challenge to the Department's statutory authority is meritless, as explained above.

In sum, Plaintiffs fail to establish a likelihood of success on any of their claims.

## III.    The Public Interest and Balance of Equities Weigh Against Emergency Relief, and Any Relief Should Be Limited to the Individual Plaintiff's Established Harm

The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Moreover, when assessing whether to grant a preliminary injunction before the merits have been adjudicated, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citation omitted). Any preliminary relief should be carefully tailored to address only the harms that plaintiffs have established. 11A Wright *et al*., FPP § 2947 (3d ed.)).

Here, these combined factors strongly counsel against issuing the requested emergency injunction or stay. The Department has a strong interest in implementing rules on schedule according to the master calendar, 20 U.S.C. § 1089(a), so that student financial assistance can be properly administered. Last-minute changes cause disruption to all participants and require numerous adjustments. The Department issue the Revised Provision following a lengthy rulemaking based on its determination that the revision would allow it to safeguard Title IV funds and prevent abuse. Moreover, many schools have already prepared to comply with the revision by applying to states and accreditors to reduce program hours, and program lengths and Title IV aid

for students enrolling on or some time after July 1, 2024 have been decided. Musser Decl. ¶¶ 4, 6. The Revised Provision should take effect as scheduled, even if this case continues on the merits.

Any injunction or stay issued by this Court should also be limited to the Revised Provision, which is only one among numerous provisions set forth in the October 31, 2023 Final regulations. The Court should also limit relief to any plaintiff's established injury, based on the constitutional and equitable principles mandating that "[a] plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury," *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018) (emphasis added), and that equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Any broader relief is inconsistent with Article III's judicial power, which "exists *only* to redress or otherwise protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (emphasis added). It is also inconsistent with traditional equitable principles premised on "providing equitable relief only to parties." *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring); *cf. Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

The APA's § 705 likewise explicitly incorporates the constitutional and equitable limitations on non-party relief. *See* 5 U.S.C. § 705 (permitting a court to stay agency action only "to the extent necessary to prevent irreparable injury"); *cf.* H.R. Rep. No. 79-1980, at 43 (1946) (recognizing § 705 relief "would normally, if not always, be limited to the parties complainant"). Any relief granted by the Court should be limited to Plaintiffs, yet CCS has established neither its standing nor irreparable harm, and 360 Degree has established no injury in light of Texas law. Thus, the Court should issue no injunction or stay at all.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

DATED:  June 12, 2024                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         MARCIA BERMAN
                                         Assistant Director, Federal Programs Branch

                                         /s/ Kathryn L. Wyer
                                         KATHRYN L. WYER (Utah Bar No. 9846)
                                         U.S. Department of Justice, Civil Division
                                         1100 L Street, N.W., Room 12014
                                         Tel. (202) 616-8475
                                         kathryn.wyer@usdoj.gov
                                         *Counsel for Defendants*